STATE OF NEW YORK: COUNTY OF CHAUTAUQUA

      SUPREME COURT

---

MISTY FREEMAN

                  Plaintiff,

        v.    Index # – 1.17–CV–0683–WKS


CITY OF JAMESTOWN OF POLICE OFFICER ELLIS

CITY OF JAMESTOWN OF SERGEANT BENDER

CITY OF JAMESTOWN OF LT. JACKSON

CITY OF JAMESTOWN OF JOHN DOE(S)


                  Defendants.

---

Examination Before Trial of

**SERGEANT ROBERT BENDER**

Held on **March 11th, 2019** at the Office of
the Corporation Counsel, 300 East Third Street
Jamestown, New York  14701, commencing at 10:35 a.m.
before Kathleen A. Roberts, Shorthand Reporter and
Notary Public in and for the State of New York.


**ADVANTAGE COURT REPORTING**
**(716) 962.4007**

```
 1   A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4       LAW OFFICE OF MATTHEW ALBERT

 5       By:  MR. MATTHEW ALBERT, ESQUIRE

 6            PO Box

 7            254 Richmond Avenue

 8            Buffalo, New York  14222

 9

10   FOR THE DEFENDANTS:

11       CORPORATION COUNSEL

12       By:  MS. MARILYN FIORE-LEHMAN, ESQUIRE

13            300 East Third Street

14            Jamestown, New York  14701

15

16

17

18

19

20

21

22

23
```

**ADVANTAGE COURT REPORTING**
**(716) 962.4007**

1                  **INDEX TO WITNESSES**

2

3   SERGEANT ROBERT BENDER

4   Examination by Mr. Albert:          05
  Examination by Ms. Fiore-Lehman:     --
5

6                  **INDEX TO EXHIBITS**

7   **DEPOSITION EXHIBITS**

8   11.  Sgt. Bender's Report

9   12.  Nicholas Desnerck's Supplemental Deposition

10   13.  Matthew Freeman's Statement

11   14.  Complaint

12   15.  Warrant

13   16.  Lt. Jackson's Supporting Deposition

14   17.  Decision/Order

15   18.  2nd Charge for Misty Freeman

16   19.  Notice of Claim

17

18           **DOCUMENT PRODUCTION REQUESTS**

19   BY MR. ALBERT:

20   1.  56/06 Formal request for the internal affairs
  file relating to officer complaint.
21

22

23

              **ADVANTAGE COURT REPORTING**
                **(716) 962.4007**

```
 1                    S-T-I-P-U-L-A-T-I-O-N-S

 2

 3    It is hereby stipulated and agreed by and between

 4    the parties hereto, through their respective

 5    counsel, that the sealing, certification and filing

 6    shall be waived;

 7

 8    It is further stipulated and agreed that all

 9    objections except as to the form of the question

10    shall be reserved until the time of trial;

11

12    It is further stipulated and agreed that the

13    signing of the transcript of testimony shall

14    be waived;

15

16    It is further stipulated and agreed that the

17    examining party will furnish the examined party

18    with a copy of the transcript of testimony free

19    of charge, and the examining party will only be

20    responsible for that testimony.

21

22                         *   *   *

23
```

**ADVANTAGE COURT REPORTING**
**(716) 962.4007**

SERGEANT ROBERT BENDER

1              SERGEANT ROBERT BENDER,

2      Having been duly sworn by the Notary, stating

3  his address to the Jamestown Police Department, 201

4  East Second Street, Jamestown, New York 14701, was

5  examined and testified as follows:

6  EXAMINATION BY

7  MR. ALBERT:

8      Q.   Good morning, sir.

9      A.   Morning.

10     Q.   We'll start with some basic background

11 questions.  How long have you been employed with the

12 Jamestown Police Department?

13     A.   April 2004.

14     Q.   And if you could describe your different

15 ranks and duties throughout your career, please?

16     A.   I was hired as a patrolman in 2004.  And

17 in 2013 I was promoted to sergeant.

18     Q.   And then -- It's self-explanatory, but as

19 a sergeant what are some of your duties?

20     A.   Supervise patrolmen, answer questions,

21 review reports, that kind of thing.

22     Q.   Okay.  And so do you guys have a

23 lieutenant?

**ADVANTAGE COURT REPORTING**
**(716) 962.4007**

## SERGEANT ROBERT BENDER

1        A.    We do.

2        Q.    You rank -- you rank above the lieutenant;

3    correct?

4        A.    No.

5        Q.    Lieutenants rank above sergeants?

6        A.    Right.

7        Q.    Okay.  So tell me if I'm correct,

8    lieutenants supervise sergeants?

9        A.    Yes.

10        Q.    And sergeants supervise patrolmen?

11        A.    Yes.

12        Q.    Do you answer calls yourself?

13        A.    At times, yeah.  We are assigned to the

14    road occasionally.  As sergeant we're technically --

15    if everyone shows up to work every day we would only

16    be on the road one day a week, inside three of the

17    four days.

18        Q.    And when you're inside what do you do

19    specifically, when you're inside, I guess, in terms

20    of supervision?

21        A.    Answer phones, monitor dispatch, review

22    reports from patrolmen when they come in and write

23    reports.  They ask me questions, so I help the

SERGEANT ROBERT BENDER

1    patrolmen out.

2        Q.    Understood.   Does the City of Jamestown

3    Police Department have an internal affairs unit?

4        A.    Yes.

5        Q.    Did you have one of those units back in

6    September of 2015?

7        A.    Yes.

8        Q.    Who mans that unit?

9        A.    The person in charge, it would be Captain

10   Samuelson.

11       Q.    Can you spell that?

12       A.    Captain Samuelson, S-A-M-U-E-L-S-O-N.

13       Q.    Oh, okay.   Are any other officers assigned

14   to that unit?

15       A.    No.

16       Q.    Okay.   And just -- you said no; correct?

17       A.    No, sorry.   I'll speak up.

18       Q.    Okay.   Fair enough.   So a one-man unit; is

19   that accurate?

20       A.    Yes, he's in charge of it.

21       Q.    Okay.   How many of the officers are

22   employed by the City of Jamestown Police Department?

23       A.    Currently we are down quite a few.   Let me

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1    just --

2        Q.    You can ballpark it if you want.

3        A.    I'm going to say about fifty-eight.

4        Q.    Fifty-eight.

5        A.    That's the chief and everyone.

6        Q.    Understood.  And what was the number in

7    September of 2015, ballpark it if you would?

8        A.    Close to sixty, I would say.

9        Q.    Okay.  And specific to internal affairs

10   complaints, is there any sort of policy as to how

11   these are filed and processed?

12       A.    Absolutely.

13       Q.    What is that policy?

14       A.    As far as someone coming and filing a

15   complaint, a supervisor would be notified, or myself

16   or any other supervisor working that shift.  They're

17   notified, they come in, they speak to the

18   complainant and they take the report.

19       Q.    Is there a specific form that is filled

20   out?

21       A.    It's just documenting on a normal report,

22   like what we would call a first sheet.

23       Q.    Sworn statement?

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1        A.    That's part of it, but we actually take a

2   report as well.

3        Q.    So there's a report taken and also then a

4   sworn statement?

5        A.    Yes.

6        Q.    Okay.  Then what does the supervisor do

7   with both that report and the sworn statement?

8        A.    Depends on the scenario.  Let's say a

9   normal officer complaint, we would take it, have

10   them sign the deposition, take all of the paperwork,

11   we complete it and put it into an envelope and hand

12   it to the captain, or put it in his mail box.

13        Q.    The captain?

14        A.    Right, because it's patrol we would give

15   it to Captain Isaacson, who would then review it,

16   and then he would assign it as an internal

17   investigation.

18              MR. ALBERT:  I'll make a formal

19   request.  I don't believe I have the report that is

20   being referenced.

21              MS. FIORE-LEHMAN:  You should have

22   it, I think I sent it to you.

23              MR. ALBERT:  I may be mistaken.

ADVANTAGE COURT REPORTING
(716) 962.4007

## SERGEANT ROBERT BENDER

1    There is a lot of paperwork in this case.

2    (Deposition Exhibit Number 11 – SERGEANT BENDER'S

3                          REPORT

4              marked for Identification.)

5    BY MR. ALBERT

6         Q.    I think we are at a place where you stated

7    that upon filing these documents you would provide

8    it to the captain; is that accurate?

9         A.    Yes.

10        Q.    Okay.  Then the captain, what would the

11   captain do with it at that point, if you know?

12        A.    I don't know technically.  I mean I'm not

13   a captain.

14        Q.    Sure.  Is giving it to the captain how the

15   formal complaint is initiated?

16        A.    Technically once it's given to me.

17        Q.    That's how it's initiated?

18        A.    Yeah.

19        Q.    So is there a case number or something

20   associated with the internal affairs complaint?

21        A.    Absolutely, one is created.

22        Q.    Would that be the same as the incident

23   number, or would that be separate?

SERGEANT ROBERT BENDER

1       A.   Yes, that is it.

2       Q.   That would be?

3       A.   Yes.

4       Q.   You pass it off to the captain, and then

5   who actually reviews the officer's conduct to make a

6   finding?

7       A.   Whoever he assigns to it.  I think

8   technically he is as he's reviewing it, but he

9   assigns it to someone to follow up on.

10      Q.   Are there different findings, a system or

11  something that incorporates all of the different

12  findings that the reviewer could find?

13      A.   I'm not understanding that question.

14      Q.   Yeah, okay.  So --

15      A.   Sorry.

16      Q.   That's okay.  An officer is accused of

17  misconduct of some sort?

18      A.   Okay.

19      Q.   It gets reviewed by a captain who assigns,

20  it.  Who does he assign it to; a sergeant,

21  lieutenant, to review?

22      A.   Lieutenant usually.

23      Q.   The lieutenant then reviews the

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1   individual's conduct?

2        A.   Um-hum.

3        Q.   Just say yes for the record.

4        A.   Yes.

5        Q.   Okay.  Then what are the possible outcomes

6   in terms of what the lieutenant could find?

7        A.   Oh, sure.  I guess one would be founded

8   and the other unfounded.

9        Q.   Are there any other potential --

10       A.   I don't know what -- I don't do internal

11  investigations so I don't know what they would

12  categorize them as.  I have only had one filed

13  against me in all of my fifteen years and it was

14  unfounded.

15       Q.   So fair to say you're not entirely

16  familiar with the --

17       A.   Exactly.

18       Q.   -- the review process?

19       A.   Exactly.

20       Q.   And that's not your detail, internal

21  affairs?

22       A.   No.

23       Q.   Okay.  Just very briefly, I don't know why

## SERGEANT ROBERT BENDER

1  we always ask these questions.  Your educational

2  background.  What's your highest level of education?

3      A.   I have an Associate's degree from

4  Jamestown Community College.

5      Q.   In criminal justice?

6      A.   In Applied Sciences.

7      Q.   Got you.  Now I'm going to direct your

8  attention to September 27th of 2015.  But prior to

9  that date did you have interaction at all with my

10  client Misty Freeman?

11      A.   No.

12      Q.   Did you know of her existence prior to

13  that date?

14      A.   No.

15      Q.   If you could, in your own words, describe

16  your interactions with her on that date in terms of

17  how it was that you spoke, how it was that you

18  interacted with her, and the nature of the

19  interaction.

20      A.   Okay.  I was assigned to the command desk

21  working inside as a supervisor.  She came into the

22  Jamestown Police Department to file a complaint and

23  I spoke to her about it.

### ADVANTAGE COURT REPORTING
#### (716) 962.4007

### SERGEANT ROBERT BENDER

1    Q.    What was the nature of her complaint, if

2  you recall?

3    A.    It was an officer complaint about Officer

4  Ellis.

5    Q.    Do you recall what it was that she said

6  specifically about Officer Ellis, what he did or

7  didn't do?

8    A.    Yes.

9    Q.    What?

10    A.    She had complained that he had kicked in

11  her door and with a peace officer that he was with

12  on the call, Mr. Desnerck, that was with him, kicked

13  the door in, and then they called her names and

14  called her a liar, and that she felt threatened by

15  that.

16    Q.    Nicholas Desnerck was a peace officer?

17    A.    No.  That was Officer Ellis, he was the

18  peace officer.

19    Q.    I see.  And what is a peace officer

20  called?

21    A.    Just like it sounds, we're there to just

22  keep the peace.  It would be someone picking up

23  property or a custody exchange.  They call us to

SERGEANT ROBERT BENDER

1    make sure that the parties don't fight.

2        Q.    Understood.  What is Officer Ellis's first

3    name?

4        A.    Aaron.

5        Q.    How long have you known Officer Ellis?

6        A.    I think he was hired in -- I don't know,

7    2013, 2014, something like that.

8        Q.    Are you friends with him?

9        A.    Just from work, yeah.

10       Q.    Sure.

11       A.    Coworkers.

12       Q.    Got you.  Do you know whether there had

13   been any prior complaints lodged against Officer

14   Ellis of any sort?

15       A.    No.

16       Q.    Is that something that you looked into

17   that night at all?

18       A.    Not that night.  He was new.  I think he

19   only had like six months on the job so I would

20   probably have known if he had.

21       Q.    I hear you.  So, was anyone with Misty

22   when she came in?

23       A.    Pretty sure that she came in by herself.

SERGEANT ROBERT BENDER

1      Q.   All right.

2      A.   I know for a fact she was the only one in

3  the room talking to me, but I don't know if she had

4  anyone waiting for her in the lobby.

5      Q.   Okay.  So she came into the command

6  center?

7      A.   Into the lobby.

8      Q.   Did you take her into a separate room?

9      A.   Interview room, yes.

10     Q.   Then you stated what she said.  You asked

11  her what happened; is that fair to say?

12     A.   Yes.

13     Q.   Okay.  How long did the whole process

14  take, the whole interview?

15     A.   Review the report?

16     Q.   Absolutely.

17     A.   Looks like she got there about 8:15.  And

18  what time did her son come in, that will give me an

19  idea.  She came in at about 8:05 p.m.

20     Q.   Okay.

21     A.   On the report it says 20:05 hours and her

22  son came in, and she had already left by that time,

23  21:45 hours, or 9:45 p.m.

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1      Q.    Okay.

2      A.    Close to the ballpark of an hour, hour and

3  a half I would say.

4      Q.    Sure.  One second.  Sorry.  Did you do

5  anything at that point, did you look up Misty

6  Freeman to see if she had any warrants, an arrest

7  record?

8      A.    Not that I recall.

9      Q.    And what did you say to her as she was

10 telling you what had taken place?

11     A.    As she was telling me what happened,

12 originally happened?

13     Q.    Yeah.  When you are in the interview room

14 with her.  She stated what she said; correct?  Let's

15 back up then.  To the best of your recollection what

16 did she say when she came into the interview room,

17 to you?

18     A.    She gave me the story of what happened.

19 Officer Ellis showed up with Nicholas Desnerck,

20 Officer Ellis broke the lock, kicked the door in,

21 and they were calling her names and calling her a

22 liar.

23     Q.    Did you then have her memorialize that in

## SERGEANT ROBERT BENDER

1    a statement; is that accurate?

2         A.   Yes.

3              MS. FIORE-LEHMAN:  We can use this

4    one.

5         Q.   So in your deposition, Exhibit 11, is that

6    a fair and accurate reflection of the statement that

7    you took from her on September 27th, 2015?

8         A.   Yes.

9         Q.   In there does she state that they kicked

10   that door in?  Does it say that anywhere in her

11   statement?

12        A.   Can I review it?

13        Q.   Sure.

14        A.   I reviewed it the other day but let me

15   make sure.

16        Q.   Does it say that they kicked the door in

17   in there?

18        A.   It doesn't phrase it as they kicked in the

19   door.

20        Q.   Obviously when people are recounting

21   events or what people said, mistakes sometimes

22   happen?

23              MS. FIORE-LEHMAN:  I'm going to

SERGEANT ROBERT BENDER

1    object.  You're asking for an opinion.

2            MR. ALBERT:  Well, it could lead to

3    admissible evidence, and we're in a depo, so --

4            MS. FIORE-LEHMAN:  If you can answer

5    it you can answer it.

6        A.   I can't -- you want me to give you my

7    opinion?

8        Q.   Well, did you make a mistake possibly

9    saying that my client said that Officer Ellis kicked

10   the door in?

11       A.   No.  What she originally told me may be

12   different than what she wrote.  This is her writing,

13   not mine.

14       Q.   So you're say she told you that he kicked

15   the door in, but she didn't put it in her statement?

16       A.   Yeah.  Happens all the time.

17       Q.   Let me ask you this:  You've been an

18   officer for how long?

19       A.   An officer or here in Jamestown?

20       Q.   An officer?

21       A.   Seventeen years.

22       Q.   So you've answered many calls in that

23   time?

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1     A.   Yes.

2     Q.   And obviously people have different

3  versions of events quite frequently?

4     A.   Yes, absolutely.

5     Q.   Sometimes people remember things

6  differently?

7     A.   Yes.  I would assume so.

8     Q.   Different perspectives?

9     A.   Sure.

10    Q.   Different vantage points?

11    A.   Sure.

12    Q.   People perceive things differently?

13    A.   Sure.

14    Q.   Just because two people say something

15  differently doesn't mean someone is lying; is that

16  correct?

17    A.   I can't look into someone's mind.  They

18  could be lying.

19    Q.   Sure, or it could be an honest mistake;

20  correct?

21    A.   Sure.  Anything is possible.

22    Q.   Okay.  This is what she said to you.  What

23  did you say to her when she was in that room making

SERGEANT ROBERT BENDER

1    a statement to you?

2        A.    About the statement?  I'm not certain what

3    you mean.

4        Q.    In general.  Describe to the best of your

5    recollection everything that you said to her while

6    she was in the interview room with you.

7        A.    I had advised her that I didn't think that

8    she was being completely truthful with me.

9        Q.    You had not -- had you spoken to any other

10   individuals about this incident?

11       A.    No, no.

12       Q.    Okay.  So without speaking with anyone

13   else what led you to believe that she was not being

14   completely truthful?

15       A.    Based on the type of call it was and how

16   we handle them as an agency, and the officer she was

17   accusing of just randomly barging into her door and

18   breaking a lock to get in, it did not -- it doesn't

19   steam feasible that he would do that on that call.

20       Q.    So fair to say that you had some

21   preconceived notions about the truthfulness of what

22   she was telling you?

23       A.    Correct.

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1          MS. FIORE-LEHMAN:    I'm going to

2    object to that, preconceived notions.

3          A.    Not preconceived.

4          Q.    What I'm saying, Officer Ellis had been

5    working just a few months at the time; is that

6    accurate?

7          A.    I don't know the exact time but he was on

8    the job a very short period of time.  I don't know

9    if he was off probation.

10         Q.    You believe that the Jamestown Police

11   Department does not handle calls that way?

12         A.    No, I know we don't.

13         Q.    So fair enough.  So based on your

14   knowledge of how Jamestown policemen act in the

15   community, you didn't think she was telling the

16   truth; correct?

17         A.    Correct.

18         Q.    And you told her that; is that accurate?

19         A.    Yes, that's accurate.

20         Q.    And then what happened?

21         A.    She reiterated that she was telling me the

22   truth and wanted to go on with a formal complaint.

23         Q.    Okay.  Then what happened?

23

SERGEANT ROBERT BENDER

1    A.    I took her complaint.

2    Q.    Then what did you do?

3    A.    Got a sworn statement from her.

4    Q.    Then what did you do?

5    A.    Had her sign it, and I notified my

6    lieutenant.

7    Q.    Who was your lieutenant?

8    A.    Tim Jackson.

9    Q.    Okay.  What did you say to Lieutenant Tim

10    Jackson?

11    A.    Advised him of who was in speaking with me

12    and what she was alleging had happened, and the

13    location.

14    Q.    Then what happened?

15    A.    He went to the scene of where this

16    allegedly took place.

17    Q.    What did he do next, to the best of your

18    knowledge?

19    A.    What he did to the best of my knowledge

20    was secured photographs of the scene, of the door

21    and the lock.

22    Q.    Did he speak to anyone, as far as you're

23    aware?

ADVANTAGE COURT REPORTING
(716) 962.4007

### SERGEANT ROBERT BENDER

1      A.    He did.

2      Q.    Who did he speak to?

3      A.    Matthew Freeman.

4      Q.    Okay.  Anyone else?

5      A.    Not that I know of.

6      Q.    The subject of this complaint was Officer

7  Ellis; correct?

8      A.    Yes.

9      Q.    Okay.  And did you speak to Officer Ellis

10 that night?

11     A.    I did after everything was done.

12     Q.    Did Lieutenant Jackson speak to Officer

13 Ellis?

14     A.    I'm sure he did.

15     Q.    What did you mean after everything was

16 done?

17     A.    After taking her statement.

18     Q.    Just for the record, that was yes?

19     A.    Yes.

20     Q.    And what did you say to Officer Ellis?

21     A.    I don't remember what I said to him, but

22 I'm sure I asked him the details of what happened,

23 what had happened.

SERGEANT ROBERT BENDER

1      Q.    What did he say to you?

2      A.    The exact opposite of what she was saying

3  happened.

4      Q.    And when you say the exact opposite, what

5  do you mean by that?

6      A.    That he went there as a peace officer and

7  that she became very upset, very quickly, and that

8  he never went into her home.

9      Q.    Okay.  Did you get a statement from

10  Officer Ellis?

11      A.    No, I did not.

12      Q.    Why did you not do that?

13      A.    To be honest with you, Lieutenant Jackson

14  and I didn't think about it, or just didn't think we

15  needed it because we had another third party that

16  was involved there, we had their statement.

17      Q.    Meaning Nicholas Desnerck?

18      A.    Yes.

19      Q.    Are you aware of Nicholas Desnerck's

20  criminal history?

21      A.    No.

22      Q.    Did you look into his criminal history on

23  that date?

SERGEANT ROBERT BENDER

1      A.    No.  Just like I didn't look into

2  Ms. Freeman's.

3      Q.    So you had no knowledge of Nicholas

4  Desnerck's credibility or lack thereof?

5      A.    Correct.

6      Q.    Obviously he called a peace officer to

7  accompany him to my client's house; correct?

8      A.    Correct.

9      Q.    Okay.  So is it fair to say that based

10  upon that that there was obviously some ill will

11  between my client and Nicholas Desnerck?

12      A.    I can't comment on that.  I don't know if

13  there was or wasn't.

14      Q.    Fair enough.  He said one thing, my client

15  said another?

16      A.    Correct.  Um-hum.

17      Q.    Yes?

18      A.    Yes.

19      Q.    And Officer Ellis didn't swear to anything

20  in relation to these events; correct?

21      A.    I believe he's not been disposed yet, so

22  no.

23      Q.    Right.  Also he did not provide a

ADVANTAGE COURT REPORTING
(716) 962.4007

## SERGEANT ROBERT BENDER

1    statement that evening or any other evening

2    subsequent to these events; correct?

3        A.    Correct.

4        (Deposition Exhibit Number 12 - N. DESNERCK'S

5                        STATEMENT

6                    marked for Identification.)

7    BY MR. ALBERT:

8        Q.    Okay.  I'm going to show you Exhibit 12

9    for deposition purposes.  If you want to take a look

10   at that document, see if you recognize it?

11       A.    Sure.  I do.

12       Q.    What is that?

13       A.    This is a deposition taken from Nicholas

14   Desnerck.

15       Q.    When was that taken?

16       A.    Same day, September 27th, 2015.

17       Q.    Who took that statement?

18       A.    I did.

19       Q.    Is it dated -- why doesn't it have a date

20   at the bottom next to his signature?

21       A.    It doesn't give a spot for a date.

22       Q.    Usually when people are giving sworn

23   statements, don't they typically --

SERGEANT ROBERT BENDER

1      A.    There is no spot for a date on these

2    forms.

3      Q.    Interesting.  Now --

4      A.    The date is right there.

5      Q.    That's the date that he's testifying as to

6    what took place; right?

7      A.    Yes.

8      Q.    But are you saying you took that from him

9    that night?

10      A.    Yes, and the date and time is right here

11    at the top.

12      Q.    I see.  How did you -- so you took a

13    statement from him at 10:25; is that accurate?

14      A.    Yes.

15      Q.    And how did you get ahold of him that

16    night?

17      A.    He was supposed to come in and give a

18    deposition for Officer Ellis about a different case,

19    that I have no knowledge, but I intercepted him

20    before he did that.

21      Q.    Do you know what he was going to speak to

22    Officer Ellis about?

23      A.    I don't know.

### SERGEANT ROBERT BENDER

1      Q.   So he knew Officer Ellis prior to him

2   going with Officer Ellis, prior to going to my

3   client's house?

4      A.   Know him or dealt with him on another

5   case?  I don't know, I guess.

6      Q.   So you don't know if they had some sort of

7   relationship prior to going to my client's house?

8      A.   No.

9      Q.   But you say they were talking about

10   something completely unrelated to my client; is that

11   right?

12      A.   I don't know.  It was case.  Before he was

13   able to give a deposition to Officer Ellis I got a

14   deposition about this.

15      Q.   So is it fair to say that it would appear

16   that that other deposition is something completely

17   unrelated to my client?

18      A.   I don't know if it is, honestly I don't.

19      Q.   Okay.  Fair enough.  He can speak to that,

20   obviously.

21      A.   Yep.

22      Q.   He does state that he had opened the outer

23   door to knock on the inner door, in his statement;

SERGEANT ROBERT BENDER

1    correct?

2        A.    Yes.

3        Q.    So he had, by his own admission, breeched

4    one door at least; correct?

5        A.    Yes.

6        Q.    Okay.  Where is -- are you aware of the

7    layout of my client's residence?

8        A.    Not until this morning when I looked at

9    the pictures, some photographs.

10       Q.    So you didn't know by opening the outer

11   door if that did make himself inside the residence?

12       A.    Based on the way she described it to me,

13   it sounded like a mud room.  That's how she

14   described it to me, but I was not there and I had

15   not seen any pictures or photographs of it until

16   today.

17       Q.    And a mud room is a room inside of a

18   house; correct?

19       A.    It can be.  When we go to a house, if

20   we've never been there before -- and looking at the

21   outside, a lot of times the houses in Jamestown, we

22   don't know if they're a whole house or apartments.

23   It could be a common hallway or a mud room for these

SERGEANT ROBERT BENDER

1    two apartments.  So looking at the house from the

2    outside you don't know all the time.

3        Q.    So when he's making this statement you had

4    never been in my client's house; correct?

5        A.    Correct.

6        Q.    And you didn't see the house, photographs

7    of my client's house, until this morning?

8        A.    Correct.

9        Q.    So when he opened the outer door you don't

10   know whether there was a separate unit and he went

11   in the common area of the house, or it's a single

12   unit dwelling and he did, in fact, go into the house

13   or not gotten to the interior door?

14       A.    Correct.

15       Q.    So he went into the outer door to knock on

16   the interior door?

17       A.    Correct.

18       Q.    Okay.  So from that standpoint the

19   testimony of my client is that they had gone into

20   the house, and his testimony, they are not

21   inconsistent; is that accurate?

22       A.    I'm not following that question, sorry.

23       Q.    My client stated that he came into the

SERGEANT ROBERT BENDER

1    house; correct?

2        A.   Yes.

3        Q.   He stated we knocked on the -- I'm sorry.

4    Opened the outer door to knock on the inner door;

5    correct?

6        A.   Correct, yes.

7        Q.   So we just established that from that

8    statement in and of itself, we cannot tell whether

9    he entered the residence or not; correct?

10       A.   He says he opened the outer door to knock

11   on the inner door that leads into the house.

12       Q.   Doesn't it say that?

13       A.   I opened the outer door to knock on the

14   inner door.

15       Q.   So I mean we don't know where the outer

16   door is in relation to the inner door; right?

17       A.   Yeah.

18       Q.   So we don't know if that meant that he

19   opened the outer door and walked in the house to

20   knock on an inner door, or whether the two doors

21   were adjacent?

22       A.   I'm not following how the inner door would

23   be inside of the house.  I guess I'm not tracking

SERGEANT ROBERT BENDER

1     that line of questioning.

2         Q.   You say there is a mud room?

3         A.   Yes.

4         Q.   So there is a mud room, and you walk --

5     then you would walk through the mud room to knock on

6     the inner door; is that correct?

7         A.   Yes.

8         Q.   We don't know whether that was the case

9     here or not; correct?

10        A.   Yeah.

11        Q.   He's saying he opened a door, went in and

12    knocked on the inner door?

13        A.   Knocked on the outer door to knock on an

14    inner door.

15        Q.   And when he's knocking on the inner door

16    he could have been inside of my client's door?

17        A.   No.  He's saying he knocked on the inner

18    door that leads into the house.

19        Q.   Well, if it's a mud room, the inner door

20    could be inside of my client's house?

21        A.   I'm still not understanding the question

22    the way you're looking at it.

23        Q.   From this statement, especially without

## SERGEANT ROBERT BENDER

1    knowing the layout of my client's house, we don't

2    know from this statement where Nicholas Desnerck was

3    when he --

4        A.    Correct.

5        Q.    He could have been somewhat inside the

6    house knocking on an inner door; correct?

7             MS. FIORE-LEHMAN:  Well, maybe he

8    should see the statement.

9             MR. ALBERT:  Of course.

10       A.    I opened the outer door, knocked on the

11   inner door.  Misty Freeman came out before I even --

12   before I entered the residence.

13       Q.    Okay.  Right.  I understand, so we don't

14   know where the inner door was that he was knocking

15   on; correct?

16       A.    Are you asking me if I know where that's

17   at?

18       Q.    Right.

19       A.    I don't.

20       Q.    Okay.  And fair to say if it's a

21   single-unit dwelling and there is a mud room, that

22   that area would not be a common area?

23       A.    Sure, if it's only a one --

### SERGEANT ROBERT BENDER

1    Q.   Right.  And we didn't know at that time

2    whether it was a one unit or two unit?

3    A.   I do now, but at that time I didn't.

4    Q.   Okay.  So --

5    A.   I had never been there.

6    Q.   Fair to say, assuming that it is a

7    single-unit dwelling and he's in the mud room, that

8    he would be in the residence; is that accurate?

9         MS. FIORE-LEHMAN:  If you know.

10   A.   What's that?

11        MS. FIORE-LEHMAN:  If you know.

12   A.   Sure.

13   Q.   All right.  So you got a statement from

14   Nicholas Desnerck before he made another statement

15   about something else to Officer Ellis; correct?

16   A.   Yes, sir.

17   Q.   All right.  And you also got a statement

18   from Matthew Freeman; is that accurate?

19   A.   Yes.

20   Q.   How did that come about?

21   A.   He literally just walked in the police

22   station and said he was here to file a statement.

23   (Deposition Exhibit Number 13 — MATTHEW FREEMAN'S

**ADVANTAGE COURT REPORTING**
**(716) 962.4007**

SERGEANT ROBERT BENDER

1                     STATEMENT

2              marked for Identification.)

3    BY MR. ALBERT:

4         Q.   I'm going to show you deposition Exhibit

5    13.

6         A.   Okay.

7         Q.   Is that the statement that you took from

8    Matthew Freeman?

9         A.   Yes, sir.

10        Q.   And you took that one after you took the

11   statement from Nicholas Desnerck?

12        A.   It appears that way.

13        Q.   I can hand it back if you need it.  I just

14   wanted to ask you a couple questions.

15        A.   Can I see the one from Nicholas Desnerck?

16   I just noticed the time.  Actually, it was before

17   Nicholas Desnerck's statement.

18        Q.   Okay.  I'm sorry.  I see that now.  Okay.

19   Fair to say that he indicates that he was in the

20   living room when this incident took place; correct?

21        A.   Yes.

22        Q.   And obviously without knowing the layout

23   of the house you would have no idea whether from the

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1  living room you could see these doors where this

2  action was taking place; correct?

3      A.  Correct.

4      Q.  He indicates that -- he never indicates

5  that he saw what took place, in the statement;

6  correct?

7      A.  It does mention he saw -- I can't remember

8  where it is.  If you give me a second to read this

9  through.

10     Q.  Sure.

11     A.  He does mention being able to see out a

12  window, I believe.  My mistake.  He doesn't put that

13  in the deposition, that is what he tells me and I

14  write it in my report, that he was able to see out

15  the window.  That was my mistake.

16     Q.  Fair to say when recounting an incident

17  that mistakes can happen?

18     A.  Just did.

19     Q.  Doesn't mean that you were intentionally

20  being misleading?

21     A.  Correct, I wasn't.

22     Q.  And he stated that what he heard was get

23  out.  And that was being yelled by his mother;

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1  correct?

2      A.   Yes.

3      Q.   Get out would generally imply that someone

4  is in?

5      A.   Generally speaking, yes.

6      Q.   But he never indicates in the sworn

7  statement that he saw what took place between his

8  mother and Officer Ellis and Nicholas Desnerck;

9  right?

10     A.   Correct.

11     Q.   So there is nothing in this statement

12 which is inconsistent with my client's statement; is

13 that fair to say?

14     A.   It says here that they were in the yard

15 while the mother was yelling at them.

16     Q.   Started at the doorway?

17     A.   Started at the doorway.  To me that would

18 not be in the house, like she said.

19     Q.   Okay.  But well, if we're talking about in

20 the doorway, you could be outside the doorway or

21 inside a doorway; correct?

22     A.   Well, that's correct.  So from -- I guess

23 from here, obviously it started outside the doorway

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1    and that would imply that they never came in.

2         Q.   I mean the statement speaks for itself, so

3    we don't necessarily have to debate it.  But what

4    I'm saying, it doesn't specifically say they never

5    came in the house; is that fair to say?

6         A.   It does not say that.

7         Q.   And the statement itself, we can sit here

8    and gab and debate all day, but there is nothing

9    clear in here saying that they were in the house or

10   out of the house as opposed to what he heard and

11   saw?

12        A.   It does not say that.

13        Q.   When you were taking Misty's statement you

14   stated that as she was speaking you felt she was

15   being dishonest based on your knowledge of Jamestown

16   Police Department and how they operate inside the

17   community?

18        A.   Yes.

19        Q.   Did you say anything to her in regards to

20   what would happen if she wasn't telling you the

21   truth?

22        A.   Yes.  Absolutely.  I just told her that if

23   it's found that she signed a sworn statement that

SERGEANT ROBERT BENDER

1   was found to be untrue, that she could can held

2   liable in court and charges would be filed against

3   her.

4        Q.   So you did tell her that?

5        A.   Yes, I did.  Would say most -- I can't sit

6   here and recount every time I've taken a statement,

7   but I would say most.

8        Q.   So you've said that to people on numerous

9   occasions?

10       A.   Yes.

11       Q.   How many times -- how many instances have

12  you charged someone with this crime of signing a

13  sworn statement?

14       A.   Me personally?

15       Q.   Yes.

16       A.   Never other than this.

17       Q.   So out of all of the other statements

18  you've taken and all the people that you've warned,

19  hey, if you're not telling the truth I'm going to

20  charge you, you've never made another arrest for

21  that crime; is that accurate?  If you know, on all

22  of the other statements that you've taken were all

23  of the people telling the truth?

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1      A.   As far as I know.  After the statement was
2  given it turned out to be true.  I don't follow up
3  on those.  It goes to court, court decides whether
4  or not people are telling the truth.
5      Q.   Sure.
6      A.   In this case I had two statements that
7  contradicted it, and I felt I had enough to file the
8  charges.
9      Q.   You took those statements after she filed
10  her statement?
11      A.   Correct.
12      Q.   What made you decide to investigate the
13  veracity, truthfulness of this statement compared to
14  all of the other ones that you've taken in your
15  career?
16      A.   One hundred percent truthful, if they
17  hadn't come in it would have been forward on and
18  they would have been doing -- whoever investigated,
19  that officer complaint would have had to do it on
20  their own.  So if she had not come in it wouldn't
21  have happened.
22      Q.   Okay.  So she just happened to be there?
23      A.   Yes.

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1      Q.    Okay.  But do you see anything in

2   Matthew's statement that directly contradicts his

3   mother's statement, and if so, what?

4      A.    I would have to sit down and compare the

5   two.  And I can if you like.

6      Q.    Sure.  Go ahead.

7      A.    I don't know if I need to use that one.

8      Q.    For review purposes?

9      A.    Not at all.  So, what I'm seeing is a

10  contradiction.  Her statement says they entered her

11  home and his said she went to the door to

12  investigate, and they were yelling at the door, not

13  in the home.

14     Q.    You find that to be contradictory?

15     A.    I do.

16     Q.    So from the statement yelling at the door

17  you could tell that these individuals never entered

18  the residence?

19     A.    It -- hers says they came in the home, and

20  his says they were at the door.

21     Q.    But upon standing at the door, so you're

22  either past the door or at the threshold?

23     A.    Yes.

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1       Q.    So we don't know whether, from that
2   statement, could we tell whether they were before
3   the threshold or at the threshold?  Can you discern
4   that?

5       A.    I can't tell you what he was thinking or
6   what he observed, obviously.  All we can do is go
7   off this, what he wrote.

8       Q.    Sure.  Exactly.  But I mean from someone
9   saying hey, they were at the door, can you tell
10  whether that means they crossed the threshold?

11      A.    You want me to tell you what I think that
12  means?  Is that what you're asking?

13      Q.    Sure.

14      A.    If I were right at the doorway what I
15  think that means?

16      Q.    Did you inquire to him as to what he means
17  by these individuals being at the door?

18      A.    On the statement, no.  I just let him
19  write the statement.  There is a little more detail
20  as far as what was asked of him in the report
21  itself.

22      Q.    Okay.  So you got those two statements,
23  then what did you do with the statements that you

SERGEANT ROBERT BENDER

1    collected at that point?

2        A.    What did I do with them?

3        Q.    What did you subsequently do after

4    obtaining those statements?

5        A.    A got her's, Matthew's and Nicholas

6    Desnerck's statement, reviewed them with Lieutenant

7    Jackson, and we decided that there was enough

8    contradiction to articulate a charge of making a

9    false written statement.

10       Q.    So what did you do upon drawing that

11   conclusion?

12       A.    We filed that charge.

13       Q.    Okay.

14   (Deposition Exhibit Number 14 - COMPLAINT

15              marked for Identification.)

16   BY MR. ALBERT:

17       Q.    Is this the complaint that you swore out

18   against my client?

19       A.    Yes.

20       Q.    Okay.  You've sworn out a lot of

21   complaints during your career; is that accurate?

22       A.    Yes.

23       Q.    When you do so are you taught to be as

SERGEANT ROBERT BENDER

1    specific as possible as to what it is that they did?

2        A.    Yeah, I would say.

3        Q.    So in other words, if someone is accused

4    of stealing you don't say he stole; but you say he

5    stole this, such and such property from such and

6    such residence at such and such time; is that

7    accurate?

8        A.    Yes.

9        Q.    Looking at that complaint you swore out,

10   the fact that my client made a false statement;

11   right?

12       A.    Right.

13       Q.    But you didn't specify what statements she

14   made that were false; correct?

15       A.    On here, no.  That's correct.

16       Q.    Why did you opt not to specify what

17   statements she made that were false?

18       A.    In this, and based on the way that the

19   limited space is that you have to type, I just typed

20   what it was, and then I then attached a supporting

21   deposition to it, the court documents that showed

22   it.

23       Q.    Right.

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1      A.   And that's the way I wrote it up.  Never

2  doing one of these before --

3      Q.   Understood.

4      A.   -- I thought that was sufficient.

5      Q.   Understood.  And then that night you

6  didn't go and arrest her; correct?

7      A.   No.

8      Q.   Why not?

9      A.   We sent all of the information to the

10  judge to let him review it and file for a warrant if

11  he felt this was enough.

12     Q.   Is that common practice?

13     A.   Yes.

14     Q.   Okay.  For Jamestown PD; correct?

15     A.   Yes.

16     Q.   What determines whether you're going to

17  apply for a warrant or if you're going to lock

18  someone up yourself?

19     A.   The biggest would be a person's safety.

20  If it's, you know, someone comes in and says they

21  were being assaulted, and the person knows where

22  they live and they're a threat to them, obviously we

23  would go make an arrest.

ADVANTAGE COURT REPORTING
(716) 962.4007

### SERGEANT ROBERT BENDER

1      Q.   But in an instance such as this one, other

2   than that, if a person's safety is -- wasn't really

3   an issue here?

4      A.   Not an issue here.  So we would send it up

5   to have it reviewed by the judge, and then he would

6   file for a warrant if he thought that there was

7   enough.

8      Q.   Do you know which judge signed off on this

9   to file for a warrant?

10     A.   I would have to look at the warrant.

11     Q.   I'm sorry.

12     A.   That's all right.

13     Q.   Do we know after reviewing the warrant

14  which judge signed off on it?

15     A.   Looks to be Judge LaMancuso's signature.

16     Q.   Okay.  And -- can I just take a look at

17  that?

18     A.   Sure.  You want this?

19     Q.   Yes.  Do you know when this warrant was

20  executed?

21     A.   When they went and picked her up?

22     Q.   Yes.

23     A.   There is a booking somewhere in the

SERGEANT ROBERT BENDER

1  paperwork that will have the date of when she was

2  picked up.

3      Q.   Okay.  Thank you.  Were you part of --

4  strike that, please.  Did you have any involvement

5  in arresting my client?

6      A.    That day, yes.  The officers that went to

7  pick her up asked for my assistance.

8      Q.   Do you know why they did that?

9      A.   Based on the area that they were going to.

10  They tried her house and she was not there, and

11  apparently she was at an outdoor event so they

12  wanted more officers there.

13      Q.   How did they determine she was at an

14  outdoor event?

15      A.   I believe they went to her house first and

16  they were told that.

17      Q.   Do you know who told them that?

18      A.   I don't.

19      Q.   Is there any documentation to show that

20  they had gone to her house first, if they did --

21      A.    If they went for a warrant check it would

22  be in a call log somewhere.  But if there's no

23  paperwork, it's done on a warrant check.

SERGEANT ROBERT BENDER

1    Q.    Do you know who the officers were that

2    originally went to her house?

3    A.    That was a long time ago.  I go to a lot

4    of calls.  I'm pretty sure that I know the

5    transporting officer, but that's about it.

6    Q.    Who was that?

7    A.    Just because she would have been probably

8    the only female working.

9    Q.    Who is that?

10    A.    It would have been Officer Russell.

11    Q.    So describe the circumstances in which my

12    client was arrested.

13    A.    Like they went to her house, did a warrant

14    check and she was not there.  And then they were

15    given information on where she was.  They called me

16    to assist because they wanted more police officers.

17    Then went to that location, located her and brought

18    her to jail.

19    Q.    Where was that location?

20    A.    Jefferson Middle School.

21    Q.    How many officers were present for this

22    arrest?

23    A.    Like I said, I don't remember all of the

SERGEANT ROBERT BENDER

1    officers that were there.  I could guess but that

2    would be about it.

3        Q.   Yeah, I mean again, you could -- maybe

4    estimate would be a better word.

5        A.   Sure, I can estimate for you.  My guess

6    would be probably somewhere in the ballpark of three

7    to four.

8        Q.   Okay.  Do you know why it was decided to

9    pursue that arrest at that time as opposed to

10   waiting until she got home, for instance?

11       A.   Sure.  Generally what we do -- and it's

12   common that the officers were thinking in this

13   case -- but in general what we would do for a

14   warrant check, we would go to someone's house and we

15   get information where we can go, somewhere in the

16   city.  Then we'll go there before they get home

17   because we can't guarantee that we're going to be

18   available when they get home, based on the call

19   volume.

20       Q.   Who set bail upon her?

21       A.   It would have been on the warrant.  Judge

22   issues it.

23       Q.   Okay.  Do you know how was this presented

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1    to the judge?  Was it given to him personally or

2    mailed to him?

3        A.    Goes through the channels of City Records

4    Department.  We submit this report, would have been

5    completed on the -- Wednesday the 27th into the

6    28th, it looks like, actually --

7        Q.    Right.  Right.

8        A.    So it would be turned into the Records

9    Department in the morning, actually would have

10    been -- because the 27th was a Sunday it would have

11    gone in on Monday to Records.  And then Records

12    would send it up to the court, after it's been

13    signed off by the lieutenant and the bureau.

14        Q.    So no officer actually presented this

15    before the judge when he was -- he's reviewing this

16    warrant; if you know?

17        A.    No.

18        Q.    In terms of the bail, is that something

19    that you guys request of the judge to set?

20        A.    No.

21        Q.    He does that unilaterally then, if you

22    know?

23        A.    Yeah.  The only time supervisors would set

### SERGEANT ROBERT BENDER

1    a bail is if someone was coming in on a new charge

2    where there has not been a warrant.

3        Q.   Sure.  Now, this was also an internal

4    affairs complaint too; correct?

5        A.   No.  This is -- there is two different

6    reports.

7        Q.   Meaning what?

8        A.   There was two different -- well, call

9    these first sheets, incident reports.  There were

10   two separate ones done.  One is an officer complaint

11   and one is a false statement.

12       Q.   Okay.  Where is -- so there was an officer

13   complaint that she filled out too; correct?

14       A.   Right.  And the officer complaint here

15   that I'm looking at.

16       Q.   And then there is a second incident report

17   that was completed, so two different incident

18   numbers?

19       A.   Well, I see --

20       Q.   I'm going to get this one marked.  Oh,

21   this was already marked.  Look at this officer,

22   complaint, that's separate.  What was the other

23   report that you filed?

### SERGEANT ROBERT BENDER

1      A.    Right there.  You have got it right there.

2      Q.    Well, this is the officer complaint;

3  correct?

4      A.    No.  At the top it says -- there is a

5  charge making a false statement.

6      Q.    So they look almost identical; right, but

7  they're --

8      A.    Both written by me.

9      Q.    Right.

10     A.    Handwriting is pretty similar.

11     Q.    And it is it fair to say that you wrote

12  about this -- okay.

13             MS. FIORE-LEHMAN:  This one is not

14  marked yet.

15     A.    Correct.

16  (Deposition Exhibit Number 16 - LT. JACKSON'S

17             SUPPLEMENTAL REPORT.)

18  BY MR. ALBERT:

19     Q.    So going back to the officer complaint.

20  Is this considered a formal report that she filed

21  against an officer -- or a formal complaint, I mean?

22     A.    Yes.

23     Q.    Even though this is not something she

SERGEANT ROBERT BENDER

1    wrote out?

2        A.    No.  She gives the statement and we do the

3    report.  We don't have them do the report.

4        Q.    Even in the officer complaint you --

5    basically you attached the other supporting

6    deposition from the other people that you

7    interviewed; correct?

8        A.    Um-hum.

9        Q.    Yes?

10        A.    Yes.

11        Q.    And talked about the fact that you were

12    requesting a warrant; correct?

13        A.    Yes.

14        Q.    Who did you give that officer complaint

15    to?

16        A.    Would have gone through the channels of

17    the paperwork.  Would go into a basket, captain got

18    a copy of it, and then it goes through the channels

19    of going into a file somewhere.

20        Q.    Do you know where -- the outcome of this

21    complaint?

22        A.    That's above my pay grade.  Goes to the

23    captain, and I'm assuming that he found what he did,

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1    based on my supporting deposition that I got,

2    sufficient, and it ended there.

3         Q.   Okay.  You don't know whether --

4         A.   I don't.

5         Q.   Would there be some sort of file relating

6    to this officer complaint?

7         A.   Yeah.  It all goes in the file in the

8    records department, in the police department.

9         Q.   And is there a file specific to the

10   officer complaint portion of it?

11        A.   Every incident has its own pile.

12        Q.   I get that, but in this case the incident

13   number, or the CR number is the same as Misty's

14   arrest; correct?

15        A.   No.

16        Q.   It's different?

17        A.   That's why I had to do two different

18   reports.

19        Q.   I got it now.  I'm sorry.  One number

20   different.  I'm sorry.  I hope I'm not being slow in

21   just trying to pick up the system.

22        A.   If you have not done this before you

23   wouldn't know.

SERGEANT ROBERT BENDER

1      Q.    Sure.  So in there there is a file with

2    everything related to this officer complaint bearing

3    an index number or an incident number?

4      A.    Yeah.  Incident number.

5      Q.    Okay.

6              MR. ALBERT:  I'm going to make a

7    formal request for the internal affairs file

8    relating to the officer complaint.

9      Q.    So you filled this out, this is her

10    original complaint as depicted in Exhibit 11.  And

11    you gave it off to whom exactly?

12      A.    It would have gone into the basket and in

13    to the records, and then the captain would have been

14    notified about it.

15      Q.    So did you that, you put it in the basket

16    and you don't know what happened to it?

17      A.    Yes.

18      Q.    Then you started working on this

19    supplementary report relating to my client's arrest;

20    is that accurate?

21      A.    That?

22      Q.    Yes.

23      A.    That's a supporting deposition.

### SERGEANT ROBERT BENDER

1    Q.    Right.

2    A.    The second police report, it's over there.

3    Q.    Oh, I had it all along.    Okay.    So this is

4    the report that you did relating to my client's

5    arrest; correct?

6    A.    Yes.

7    Q.    In conjunction with the complaint?

8    A.    Yes.

9    Q.    Okay.    And I'm going to hand this to you

10   in a second, but basically talks about Matthew

11   Freeman coming down to the station to offer a

12   statement; correct?

13   A.    Yes.

14   Q.    Originally he states that -- the officer

15   and Nicholas forced their way into the house;

16   correct?

17   A.    Yes.

18   Q.    And then it says that you told him he was

19   not telling the truth; right?

20   A.    That's correct.    It says -- do you want me

21   to read it to you?

22   Q.    You can read it for the record, if you

23   want.

SERGEANT ROBERT BENDER

1    A.    Writer advised Matthew he was not telling

2    the truth, and he then stated, Matthew then stated

3    Nicholas Desnerck entered the house.

4    Q.    So he changed the story after you told him

5    he's not telling the truth; correct?

6    A.    That I believed he was not telling the

7    truth, correct.

8    Q.    Did you talk to him about him being

9    arrested if he writes a false statement?

10    A.    I don't recall off the top of my head.

11    I'm pretty sure I did because I usually do.  He put

12    in the statement that everything is true and

13    accurate.

14    Q.    Okay.

15    A.    If it's false I realize I could be

16    arrested.  So I probably did mention that you make

17    sure you're being truthful.

18    Q.    So he could have been concerned that if

19    you didn't hear what you wanted him to say that he

20    could be arrested?

21    A.    Only about what happened.

22    Q.    But after he originally started telling

23    you what happened, you told him he's not telling the

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1    truth?

2        A.    Correct.

3        Q.    Obviously without any personal knowledge,

4    you were not there?

5        A.    Just based on what he had told the

6    lieutenant, who the lieutenant gave a supplementary

7    report before.

8        Q.    So you're saying that he spoke to the

9    lieutenant before he spoke to you?

10        A.    Yes.  On the scene.

11        Q.    So you're saying that evidentially he told

12    the police lieutenant that the door had already been

13    damaged?

14        A.    I believe it's in the lieutenant's

15    supplemental.  All damage happened a month or two

16    ago.

17        Q.    Is this what you're referring to as the

18    lieutenant's supplemental?

19        A.    No.  That's part of mine.

20        Q.    Okay.  You put what was in the

21    lieutenant's supplemental in your report?

22        A.    But it's attached, the one that the

23    lieutenant signed.

SERGEANT ROBERT BENDER

1          Q.   This one?

2          A.   Yes, sir.

3          Q.   You're saying this was attached to this

4     document?

5          A.   Um-hum.

6          Q.   Yes?

7          A.   Yes.

8          Q.   So I've got to find that one.  This one.

9     And --

10                    MR. ALBERT:  Off the record.

11                    (Off-the-record discussion.)

12    BY MR. ALBERT:

13         Q.   So you're saying that page four of this

14    document is what was -- of Exhibit 16, that's

15    Lieutenant Jackson's supplemental report; correct?

16         A.   Yes, sir.  Signed by Lieutenant Jackson.

17         Q.   Okay.  He indicated to Lieutenant Jackson

18    that he was not aware of any more damage that was

19    done; is that accurate?  You can obviously take a

20    look at the lieutenant's supplemental.

21         A.   Yep.  No damage to the door.

22         Q.   His superintendent talks about damage or

23    lack thereof as reported by Matthew Freeman;

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1    correct?

2        A.   Yes.

3        Q.   It states he was not aware of any new

4    damage; is that accurate?

5        A.   It does say that.

6        Q.   And he doesn't speak to whether or not

7    they came in the house or not; correct?

8        A.   Not specifically.  Right here it asks him

9    if there was a problem the other night, which

10   generally someone coming in the house -- my mom's

11   friends came over with the police to try to get his

12   dog back.

13       Q.   But that doesn't speak to whether or not

14   they came in the house or not; is that correct?

15       A.   Yes.  No, that doesn't.

16       Q.   Okay.  After he told you that they did

17   come in, you told him he's not telling the truth;

18   correct?

19       A.   Correct.

20       Q.   Okay.  And then that's when he said

21   something else about what took place; correct?

22       A.   Yes.  Correct.

23       Q.   He was a younger kid at the time?

**ADVANTAGE COURT REPORTING**
**(716) 962.4007**

### SERGEANT ROBERT BENDER

1      A.    Eighteen.

2      Q.    Okay.  Was he eighteen then or eighteen

3  now?

4      A.    I think he was eighteen then.

5      Q.    Okay.

6      A.    I only know that because I read the report

7  and I put it in my report that he was eighteen.

8      Q.    Okay.  So what -- let's go back to the

9  arrest of my client.  You stated that she was at a

10  middle school?

11      A.    Yes, sir.

12      Q.    What was going on?  Was there a football

13  game being played?

14      A.    Yes, football game.

15      Q.    Describe how it was that she was arrested.

16      A.    We went in to the field area.  It's a

17  pretty enclosed area, like where the high school has

18  their games.  We went into the enclosed area, walked

19  up to the press box where we were directed where she

20  was at, advised her that we had a warrant for her

21  arrest, and she was escorted out of the bleachers

22  and into a waiting police car.

23      Q.    Did she ask what she was being arrested

SERGEANT ROBERT BENDER

1   for?

2       A.   I don't recall, but most people do.

3       Q.   Sure.  Do you recall what you said to her?

4       A.   That she had a warrant for filing a false

5   statement.

6       Q.   What else?

7       A.   I didn't transport her so there was no

8   more communication.

9       Q.   Do you know how many people were present

10  when she was arrested at the ballpark?

11      A.   I don't remember the crowd at all.

12      Q.   Okay.  So there was a football game going

13  on but you don't know how many people were in

14  attendance?

15      A.   No.

16      Q.   I kind of answered my own question, but

17  the answer is?

18      A.   I have no idea.

19      Q.   Okay.  Sorry.

20      A.   That's okay.

21      Q.   Do you know whether anyone else was

22  present at the residence when this incident was

23  taking place?

ADVANTAGE COURT REPORTING
(716) 962.4007

## SERGEANT ROBERT BENDER

1     A.   Are we going back to the original

2  incident?  Sorry.

3     Q.   Yes, September 27th, that incident.

4     A.   No.  She mentioned that -- I believe in

5  her statement she says who was there, and never

6  formally gave me names.

7     Q.   Okay.

8     A.   She says kids, I think, multiple kids.

9     Q.   And they would obviously be witnesses of

10  some sort as to what took place; correct?

11     A.   Potentially, yes.

12     Q.   Were they spoken to?

13     A.   Well, one of them was, Matthew.

14     Q.   Aside from Matthew?

15     A.   No.  Other than that, no.

16     Q.   What about neighbors, were any neighbors

17  spoken to to see if they witnessed anything that was

18  going on on September 27th, 2015?

19     A.   I believe Lieutenant Jackson would have

20  put that in there if he did.

21     Q.   And Officer Ellis was the subject of a

22  complaint at that point; correct?

23     A.   Correct.

SERGEANT ROBERT BENDER

1      Q.    Okay.  So do you know the disposition of

2   that original charge that you had filed against my

3   client?

4      A.    Are you talking about -- sorry.  Maybe I

5   misheard you.  Your client or Officer Ellis?

6      Q.    The criminal charges that you filed

7   against her.

8      A.    I was thinking you were talking about

9   Ellis, I'm sorry.

10     Q.    No, that's okay.

11     A.    I don't know the technical wording, but

12  dismissed on something.

13     Q.    It was dismissed; right?

14     A.    Yes.

15     Q.    Is that accurate?

16     A.    Yes.

17     Q.    Okay.  Do you know the grounds for the

18  dismissal or no?  If you don't that's fine.

19     A.    I don't know the legal terms but basically

20  it said that -- told me the judge didn't like the

21  way something was worded in the charge that I wrote

22  up.

23     Q.    Do you know when that charge was

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1  dismissed?

2      A.   I don't.

3      Q.   Do you need a break at any point?  Does

4  anyone need a break?

5      A.   I can keep going.

6      Q.   Me too.  Okay.  April 27th, 2016, do you

7  know whether that was the time in which the charges

8  were dismissed against my client?

9      A.   I don't know without looking at the

10  paperwork.

11     Q.   Yeah, sure.

12  (Deposition Exhibit Number 17 --  DECISION/ORDER

13              marked for Identification.)

14  BY MR. ALBERT:

15     Q.   So you don't necessarily have to read the

16  whole thing, but you can if you want to.  But just

17  turn to the back page of the document and --

18     A.   Very last page?

19     Q.   Yeah.  And you can read more if you want

20  to.  But does that indicate the date?

21     A.   Appears to be the 27th day of April 2016.

22     Q.   Okay.  Did you file -- okay.  So you were

23  told it was written wrong essentially; correct?

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1      A.    He didn't like the wording in the charge,
2  apparently.
3      Q.    Did you file new charges against my client
4  in April of 2016?
5      A.    I don't believe it was in April.  I don't
6  remember when it was but I did file a secondary
7  charge and sent it up to court to see if that's what
8  he was looking for.
9            MR. ALBERT:  Can we mark this?
10         (Deposition Exhibit Number 18 - 2ND CHARGE
11               marked for Identification.)
12  BY MR. ALBERT:
13     Q.    I'm going to show you deposition Exhibit
14  18, and if you want to read through that that's
15  fine.  Just let us know if that's the amended second
16  complaint that you filed against my client that you
17  charged her with for filing a false instrument?
18     A.    Okay.
19     Q.    When was that filed?
20     A.    That was signed on July 28th, 2016.
21     Q.    Why did you not file the charges in April,
22  May, June or earlier in July of that year?
23     A.    When it was first given to me in an

ADVANTAGE COURT REPORTING
(716) 962.4007

**SERGEANT ROBERT BENDER**

1    envelope -- it was found to be behind the seat of a

2    police car, apparently the document or -- this was

3    in the envelope from --

4        Q.    You're talking about the decision; right?

5        A.    Yeah.  The decision, and -- was it

6    Bridget?  Bridget sent me a manila envelope with

7    this.

8        Q.    And when you say this, what are you

9    talking about?

10       A.    The decision.

11       Q.    Judge's decision?

12       A.    Yes.

13       Q.    Okay.

14       A.    Asking me to re-write the charge with

15    better wording.  And that was found in a police car

16    behind the driver's seat, I believe, is what the

17    officer told me.  And it was found a month later.

18       Q.    A month later from what?

19       A.    When it was actually given.

20       Q.    So that would be?

21       A.    Ballpark-ish late May.  Yes.

22       Q.    Okay.  Do you know how it got there?

23       A.    It was given to an officer apparently, she

## SERGEANT ROBERT BENDER

1  said she gave it to an officer who she saw in

2  Mayville court, and he apparently left it in the

3  police car and forgot to give it to me.

4      Q.   Okay.

5      A.   Then when I spoke to my lieutenant about

6  it, asked him some questions about what he thought I

7  should do, file new charges or if we should let it

8  go, and he said file new charges.  So that's when I

9  filed new charges.

10     Q.   Even though that's in May of 2016?

11     A.   Yep.

12     Q.   So why were charges not filed then after

13  you had spoken to the lieutenant in May of 2016?

14     A.   I actually -- I didn't speak to him in

15  May, I spoke to him later.  I had vacation time in

16  June, and when I came back -- it wasn't very long,

17  maybe a week, I had forgotten about it.  And he

18  reminded me about it and asked me what was going on

19  and I said is it too late.  And he said well, file

20  the charges and see what the judge decides.

21     Q.   So you didn't check to see by law whether

22  it was too late; is that what you're saying?  You

23  didn't check?

### ADVANTAGE COURT REPORTING
### (716) 962.4007

SERGEANT ROBERT BENDER

1        A.   I sent it up to the judge to see if it's

2   sufficient, and if it's okay to still do.

3        Q.   Okay.  So you used the judge's -- not

4   idea -- let me rephrase that.  You basically

5   requested that the judge advise you as to your

6   police duties?

7                    MS. FIORE-LEHMAN:  I'm going to

8   object.

9        A.   Not police duties.

10       Q.   All right.  I mean -- do you mind if I see

11  that a second?

12       A.   Which one?

13       Q.   The complaint.

14       A.   Absolutely.

15       Q.   Did you become aware at some point --

16                  MR. ALBERT:  Well, I'll mark this.

17  (Deposition Exhibit Number 19 - NOTICE OF CLAIM

18               marked for Identification.)

19  BY MR. ALBERT

20       Q.   Did you become aware at some point that my

21  client filed a Notice of Claim against the Jamestown

22  Police Department?

23       A.   Yeah.

**ADVANTAGE COURT REPORTING**
**(716) 962.4007**

SERGEANT ROBERT BENDER

1     Q.    When was that?

2     A.    I have no idea when it was.

3     Q.    Okay.  You don't know when it was that you

4     were served with her Notice of Claim?

5     A.    No, I don't.  It was left in my mailbox.

6     I never got a copy of anything.

7     Q.    Do you know when you received that Notice

8     of Claim in relation to when you filed the second

9     complaint against her?

10    A.    I don't.

11    Q.    Would it surprise you to know that the

12    Notice of Claim was served upon you just a day

13    before the second complaint was filed against her?

14    A.    Okay.

15    Q.    Is that something that would surprise you

16    or not?

17    A.    I literally don't know when I was served

18    the paperwork.  It was in my mailbox.

19    Q.    Did the fact that you guys were served

20    with a Notice of Claim in late July of 2018 remind

21    you about the charges against her in May?

22    A.    No.

23    Q.    It was coincidence then?

## SERGEANT ROBERT BENDER

1    A.    Well, in speaking to my lieutenant and he

2    said hey, what did you do with the paperwork, are

3    you going to file charges, and I said should I still

4    file charges, and he said yes, you should still file

5    charges.

6    Q.    When was that that he said that?

7    A.    That's the date I wrote it, I believe it

8    says on the bottom where I signed.  Oh, it's right

9    here.

10    Q.    Okay.  So July 28th, 2016?

11    A.    Right.

12    Q.    So which lieutenant spoke to you in

13    regards to that matter?

14    A.    Lieutenant Wozneak was working that day,

15    and he's the one that reminded me of it and asked me

16    what was going on with it.

17    Q.    Okay.  What was -- then in terms of -- you

18    knew the original complaint had been faulty

19    according to the judge; correct?

20    A.    Original complaint?

21    Q.    The one that was discussed?

22    A.    Yes.

23    Q.    What did you do in relation to this

SERGEANT ROBERT BENDER

1    complaint that was different than the first

2    complaint?

3         A.    Just worded it like the DA asked me to

4    change.

5         Q.    Right here, perfect.  Thank you.  Okay.

6         A.    So it looks like I actually put in a date

7    and time, and the address of the police department,

8    of when she came in, and then actually put in there

9    that did knowingly make a false statement by

10   providing a signed supporting deposition affirmed

11   under penalty of perjury at the Jamestown Police

12   Department.  So that wording wasn't in there.

13        Q.    Okay.  So you filed that.  You applied for

14   a warrant again; is that accurate?

15        A.    Yes.

16        Q.    Same judge, Judge LaMancuso?

17        A.    I'm not sure if it was signed off by the

18   same judge or not.

19        Q.    Okay.  Then do you know how she was

20   arrested in this particular instance?

21        A.    Was I there that day?  Is that what you're

22   asking?

23        Q.    Are you aware?

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1      A.   I'm aware now.  I wasn't then.

2      Q.   And what is it that you're aware of now?

3      A.   She turned herself in.

4      Q.   Do you know if she was posted anywhere on

5  any web sites showing that she had an active arrest

6  warrant?

7      A.   I don't.

8      Q.   When someone has an arrest warrant is

9  there some sort of -- is there some sort of public

10  or internet site?

11      A.   County-run web side that posts the

12  warrants.

13      Q.   Is that anytime that someone has an arrest

14  warrant, does that trigger that their name to be

15  posted by the department-run web site?

16      A.   I don't know how it works.  It's county.

17  I've never even logged onto it.

18      Q.   Understood, thank you.  Are you aware of

19  the outcome of this particular complaint that you

20  filed against her?

21      A.   It was again dismissed because of the time

22  lapse, time that it was filed again.

23      Q.   You're not sure when you filed it, you

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1   didn't know whether it was timely or not; is that

2   accurate?

3      A.   Correct.

4      Q.   I know you said you were going to let the

5   judge decide, but did you do anything yourself to

6   determine whether or not that complaint was timely?

7      A.   No.

8      Q.   You didn't do any legal research?

9      A.   No.  I didn't go up and talk to them or

10   confer with the ADA.  I signed it, wrote it up and

11   submitted to the judge to see if it was sufficient.

12      Q.   Two different judges in Jamestown;

13   correct?

14      A.   Yes.

15      Q.   And that particular judge that signed the

16   warrant may not have been aware of the history of

17   this case at all; correct?

18      A.   Probably.  That could have happened.

19      Q.   In other words, nowhere in that complaint

20   did it state that you had already filed a complaint

21   and it had already been dismissed, and the

22   procedural history of this case, that's not anywhere

23   in the complaint?

SERGEANT ROBERT BENDER

1    A.   Correct.

2    Q.   When you presented the warrant to the

3  judge he may not have been aware of the prior

4  history of the case; correct?

5    A.   Could be.  I don't know.

6    Q.   Okay.  Now, have you -- aside from the

7  conversations with your lawyer, which are

8  confidential, have you spoken to your fellow

9  officers about this matter as a whole?

10    A.   No.

11    Q.   Never talked to Officer Ellis about what

12  was going on here?

13    A.   Just asked if he had been deposed, or if

14  he was going to be deposed.

15    Q.   What about Lieutenant Jackson?

16    A.   Same.

17    Q.   So all you asked them is hey, have you

18  guys been deposed yet or are you going to be?

19    A.   Right.

20    Q.   Have you spoken to anyone, if you would --

21  and I know it's a broad question, but relay the

22  conversations that you have had with your fellow

23  officers about this matter.

ADVANTAGE COURT REPORTING
(716) 962.4007

SERGEANT ROBERT BENDER

1      A.   There is no way of recollecting in four

2  years' worth of conversations, that's just not

3  possible.

4      Q.   Fair.  Do you recall having conversations

5  about this matter with members of the Jamestown

6  Police Department?

7      A.   No.

8      Q.   I'm thinking if I'm missing anything.  If

9  not, I'm probably going to wrap up.  No more

10  questions, thank you.

11          MS. FIORE-LEHMAN:  I have no

12  questions.

13      (Where upon the examination was concluded.)

14              ***********

15

16

17

18

19

20

21

22

23

ADVANTAGE COURT REPORTING
(716) 962.4007

1  STATE OF NEW YORK

2  COUNTY OF CHAUTAUQUA

3

4      I, Kathleen A. Roberts, Notary Public in and

5  for the State of New York, do hereby certify:

6      That the witness named in the deposition, prior

7  to being examined, was first duly sworn;

8      That said deposition was taken by me at the

9  time and place herein set forth and was taken down

10  in shorthand and thereafter transcribed into

11  a typewritten version;

12      That said deposition is a true record of the

13  testimony given by the witness and of all objections

14  made at the time of the examination;

15      I further certify that I am neither counsel

16  for, nor related to any party to said action, nor in

17  any way interested in the outcome thereof;

18      IN WITNESS WHEREOF, have subscribed my name

19  on this 14th day of March, 2019.

20  _____

21

22              Notary Public in and for the

23              State of New York

**ADVANTAGE COURT REPORTING**
**(716) 962.4007**

**0**

05 [1]   3/4
06 [1]   3/20

**1**

1.17-CV-0683-WKS [1]   1/6
10:25 [1]   28/13
10:35 [1]   1/19
11 [4]   3/8 10/2 18/5 56/10
11th [1]   1/17
12 [3]   3/9 27/4 27/8
13 [3]   3/10 35/23 36/5
14 [2]   3/11 44/14
14222 [1]   2/8
14701 [3]   1/19 2/14 5/4
14th [1]   78/19
15 [1]   3/12
16 [3]   3/13 53/16 60/14
17 [2]   3/14 66/12
18 [3]   3/15 67/10 67/14
19 [2]   3/16 70/17

**2**

2004 [2]   5/13 5/16
201 [1]   5/3
2013 [2]   5/17 15/7
2014 [1]   15/7
2015 [6]   7/6 8/7 13/8 18/7
27/16 64/18
2016 [7]   66/6 66/21 67/4
67/20 69/10 69/13 72/10
2018 [1]   71/20
2019 [2]   1/17 78/19
20:05 [1]   16/21
21:45 [1]   16/23
254 [1]   2/7
27th [9]   13/8 18/7 27/16
51/5 51/10 64/3 64/18 66/6
66/21
28th [3]   51/6 67/20 72/10
2nd [2]   3/15 67/10

**3**

300 [2]   1/18 2/13

**5**

56/06 [1]   3/20

**8**

8:05 [1]   16/19
8:15 [1]   16/17

**9**

9:45 [1]   16/23

**A**

a.m [1]   1/19
Aaron [1]   15/4
able [3]   29/13 37/11 37/14
about [42]   8/3 13/23 14/3
14/6 16/17 16/19 21/2 21/10
21/21 25/14 28/18 28/22 29/9
29/14 35/15 35/20 38/19 49/5
50/2 53/12 54/11 56/14 57/10
58/8 58/21 60/22 61/21 64/16
65/4 65/8 68/4 68/9 69/5
69/6 69/17 69/18 71/21 76/9
76/11 76/15 76/23 77/5

above [3]   6/2 6/5 54/22
absolutely [6]   8/12 10/21
16/16 20/4 39/22 70/14
accompany [1]   26/7
according [1]   72/19
accurate [21]   7/19 10/8 18/1
18/6 22/6 22/18 22/19 28/13
31/21 35/8 35/18 40/21 44/21
45/7 56/20 58/13 60/19 61/4
65/15 73/14 75/2
accused [2]   11/16 45/3
accusing [1]   21/17
act [1]   22/14
action [2]   37/2 78/16
active [1]   74/5
actually [10]   9/1 11/5 36/16
51/6 51/9 51/14 68/19 69/14
73/6 73/8
ADA [1]   75/10
address [2]   5/3 73/7
adjacent [1]   32/21
admissible [1]   19/3
admission [1]   30/3
advise [1]   70/5
advised [4]   21/7 23/11 58/1
62/20
affairs [7]   3/20 7/3 8/9
10/20 12/22 52/4 56/7
affirmed [1]   73/10
after [13]   24/11 24/15 24/17
36/10 41/1 41/9 44/3 47/13
51/12 58/4 58/22 61/16 69/12
again [4]   50/3 73/14 74/21
74/22
against [15]   12/13 15/13 40/2
44/18 53/21 65/2 65/7 66/8
67/3 67/16 70/21 71/9 71/13
71/21 74/20
agency [1]   21/16
ago [2]   49/3 59/16
agreed [4]   4/3 4/8 4/12 4/16
ahead [1]   42/6
ahold [1]   28/15
ALBERT [5]   2/4 2/5 3/4 3/19
5/7
all [30]   4/8 9/10 11/11
12/13 13/9 15/17 16/1 19/16
31/2 35/13 35/17 39/8 40/17
40/18 40/21 40/22 41/14 42/9
43/6 46/9 47/12 49/23 55/7
57/3 59/15 63/11 70/10 75/17
76/17 78/13
allegedly [1]   23/16
alleging [1]   23/12
almost [1]   53/6
along [1]   57/3
already [5]   16/22 52/21 59/12
75/20 75/21
also [4]   9/3 26/23 35/17
52/3
always [1]   13/1
am [1]   78/15
amended [1]   67/15
another [5]   25/15 26/15 29/4
35/14 40/20
answer [6]   5/20 6/12 6/21
19/4 19/5 63/17
answered [2]   19/22 63/16
any [21]   7/13 8/10 8/16 12/9

15/13 15/14 17/6 21/9 27/1
30/15 48/4 48/19 59/3 60/18
61/3 64/16 66/3 74/5 75/8
78/16 78/17
anyone [8]   15/21 16/4 21/12
23/22 24/4 63/21 66/4 76/20
anything [9]   17/5 20/21 26/19
39/19 42/1 64/17 71/6 75/5
77/8
anytime [1]   74/13
anywhere [3]   18/10 74/4 75/22
apartments [2]   30/22 31/1
apparently [5]   48/11 67/2
68/2 68/23 69/2
appear [1]   29/15
appears [2]   36/12 66/21
applied [2]   13/6 73/13
apply [1]   46/17
April [6]   5/13 66/6 66/21
67/4 67/5 67/21
April 2004 [1]   5/13
April 27th [1]   66/6
are [29]   5/19 6/13 7/13 7/21
7/23 8/11 10/6 11/10 12/5
12/9 15/8 17/13 18/20 25/19
27/22 28/8 30/6 31/20 34/16
41/4 44/23 64/1 65/4 68/8
72/2 73/23 74/18 76/7 76/18
area [7]   31/11 34/22 34/22
48/9 62/16 62/17 62/18
arrest [14]   17/6 40/20 46/6
46/23 49/22 50/9 55/14 56/19
57/5 62/9 62/21 74/5 74/8
74/13
arrested [8]   49/12 58/9 58/16
58/20 62/15 62/23 63/10
73/20
arresting [1]   48/5
articulate [1]   44/8
as [41]   4/9 5/5 5/16 5/18
6/14 8/10 8/14 8/14 9/2 9/16
10/22 11/8 12/12 13/21 17/9
17/11 18/18 21/16 23/22
23/22 25/6 28/5 39/10 39/14
41/1 41/1 43/16 43/20 43/20
43/23 45/1 45/1 47/1 50/9
55/13 56/10 59/17 60/23
64/10 70/5 76/9
aside [2]   64/14 76/6
ask [5]   6/23 13/1 19/17
36/14 62/23
asked [10]   16/10 24/22 43/20
48/7 69/6 69/18 72/15 73/3
76/13 76/17
asking [5]   19/1 34/16 43/12
68/14 73/22
asks [1]   61/8
assaulted [1]   46/21
assign [2]   9/16 11/20
assigned [2]   6/13 7/13 13/20
assigns [1]   11/7 11/9 11/19
assist [1]   49/16
assistance [1]   48/7
Associate's [1]   13/3
associated [1]   10/20
assume [1]   20/7
assuming [2]   35/6 54/23
attached [4]   45/20 54/5 59/22
60/3

**A**

attendance [1]  63/14
attention [1]  13/8
available [1]  50/18
Avenue [1]  2/7
aware [13]  23/23 25/19 30/6
60/18 61/3 70/15 70/20 73/23
74/1 74/2 74/18 75/16 76/3

**B**

back [9]  7/5 17/15 36/13
53/19 61/12 62/8 64/1 66/17
69/16
background [2]  5/10 13/2
bail [3]  50/20 51/18 52/1
ballpark [6]  8/2 8/7 17/2
50/6 63/10 68/21
Ballpark-ish [1]  68/21
barging [1]  21/17
based [10]  21/15 22/13 26/9
30/12 39/15 45/18 48/9 50/18
55/1 59/5
basic [1]  5/10
basically [4]  54/5 57/10
65/19 70/4
basket [3]  54/17 56/12 56/15
be [50]  4/6 4/10 4/14 4/19
6/16 7/9 8/15 9/23 10/22
10/23 11/2 12/7 14/22 19/11
20/18 20/19 25/13 30/19
30/23 32/23 33/20 34/22 35/8
38/18 38/20 40/1 40/2 41/2
41/22 42/14 44/23 46/19
47/15 48/22 50/2 50/4 50/6
50/17 51/8 55/5 58/15 58/20
64/9 66/21 68/1 68/20 74/14
76/5 76/14 76/18
bearing [1]  56/2
became [1]  25/7
because [10]  9/14 20/14 25/15
49/7 49/16 51/17 51/10 58/11
62/6 74/21
become [2]  70/15 70/20
been [29]  5/2 5/11 15/13
19/17 22/4 26/21 30/20 31/4
33/16 34/5 35/5 41/17 41/18
49/7 49/10 50/21 51/4 51/10
51/12 52/2 56/13 58/18 59/12
72/18 75/16 75/21 76/3 76/13
76/18
before [17]  1/15 1/20 28/20
29/12 30/20 34/11 34/12
35/14 36/16 43/2 46/2 50/16
51/15 55/22 59/7 59/9 71/13
behind [2]  68/1 68/16
being [15]  9/20 21/8 21/13
37/11 37/20 37/23 39/15
43/17 46/21 55/20 58/8 58/17
62/13 62/23 78/7
believe [12]  9/19 21/13 22/10
26/21 37/12 48/15 59/14 64/4
64/19 67/5 68/16 72/7
believed [1]  58/6
BENDER [4]  1/9 1/16 3/3 5/1
Bender's [2]  3/8 10/2
best [4]  17/15 21/4 23/17
23/19
better [2]  50/4 68/15

**B**

between [3]  4/3 26/11 38/7
biggest [1]  46/19
bleachers [1]  62/21
booking [1]  47/23
both [2]  9/7 53/8
bottom [2]  27/20 72/8
box [3]  2/6 9/12 62/19
break [2]  66/3 66/4
breaking [1]  21/18
breeched [1]  30/3
Bridget [2]  68/6 68/6
briefly [1]  12/23
broad [1]  76/21
broke [1]  17/20
brought [1]  49/17
Buffalo [1]  2/8
bureau [1]  51/13

**C**

call [8]  8/22 14/12 14/23
21/15 21/19 48/22 50/18 52/8
26/6 49/15
called [5]  14/13 14/14 14/20
26/6 49/15
calling [1]  17/21 17/21
calls [4]  6/12 19/22 22/11
49/4
came [17]  13/21 15/22 15/23
16/5 16/16 16/22 17/16 31/23
34/11 39/1 39/5 42/19 61/7
61/11 61/14 69/16 73/8
can [26]  7/11 8/2 18/3 18/12
19/4 19/5 29/19 30/19 36/13
36/15 37/17 39/7 40/1 42/5
43/3 43/6 43/9 47/16 50/5
50/15 57/22 60/19 66/5 66/16
66/19 67/9
can't [7]  19/6 20/17 26/12
37/7 40/5 43/5 50/17
cannot [1]  32/8
captain [15]  7/9 7/12 9/12
9/13 9/15 10/8 10/10 10/11
10/13 10/14 11/4 11/19 54/17
54/23 56/13
car [4]  62/22 68/2 68/15
69/3
career [3]  5/15 41/15 44/21
case [12]  10/1 10/19 28/18
29/5 29/12 33/8 41/6 50/13
55/12 75/17 75/22 76/4
categorize [1]  12/12
center [1]  16/6
certain [1]  21/2
certification [1]  4/5
certify [2]  78/5 78/15
change [1]  73/4
changed [1]  73/4
channels [3]  51/3 54/16 54/18
charge [16]  3/15 4/19 7/9
7/20 40/20 44/8 44/12 52/1
53/5 65/2 65/21 65/23 67/1
67/7 67/10 68/14
charged [2]  40/12 67/17
charges [15]  40/2 41/8 65/6
66/7 67/3 67/21 69/7 69/8
69/9 69/12 69/20 71/21 72/3
72/4 72/5
CHAUTAUQUA [1]  1/1 78/2
check [6]  48/21 48/23 49/14
50/14 69/21 69/23

**C**

chief [1]  8/5
circumstances [1]  49/11
city [8]  1/8 1/9 1/10 1/11
7/2 7/22 50/16 51/3
Claim [7]  3/16 70/17 70/21
71/4 71/8 71/12 71/20
clear [1]  39/9
client [19]  13/10 19/9 26/11
26/14 29/10 29/17 31/19
31/23 44/18 45/10 48/5 49/12
62/9 65/3 65/5 66/8 67/3
67/16 70/21
client's [12]  26/7 29/3 29/7
30/7 31/4 31/7 33/16 33/20
34/1 38/12 56/19 57/4
Close [2]  8/8 17/2
coincidence [1]  71/23
collected [1]  44/1
College [1]  13/4
come [8]  6/22 8/17 16/18
28/17 35/20 41/17 41/20
61/17
comes [1]  46/20
coming [4]  8/14 52/1 57/11
61/10
command [2]  13/20 16/5
commencing [1]  1/19
comment [1]  26/12
common [5]  30/23 31/11 34/22
46/12 50/12
communication [1]  63/8
community [3]  13/4 22/15
39/17
compare [1]  42/4
compared [1]  41/13
complainant [1]  8/18
complained [1]  14/10
complaint [47]  3/11 3/20 8/15
9/9 10/15 10/20 13/22 14/1
14/3 22/22 23/1 24/6 41/19
44/14 44/17 45/9 52/4 52/10
52/13 52/14 52/22 53/2 53/19
53/21 54/4 54/14 54/21 55/6
55/10 56/2 56/8 56/10 57/7
64/22 67/16 70/13 71/9 71/13
72/18 72/20 73/1 73/2 74/19
75/6 75/19 75/20 75/23
complaints [3]  8/10 15/13
44/21
complete [1]  9/11
completed [2]  51/5 52/17
completely [4]  21/8 21/14
29/10 29/16
concerned [1]  58/18
concluded [1]  77/13
conclusion [1]  44/11
conduct [2]  11/5 12/1
confer [1]  75/10
confidential [1]  76/8
conjunction [1]  57/7
considered [1]  53/20
contradicted [1]  41/7
contradiction [2]  42/10 44/8
contradictory [1]  42/14
contradicts [1]  42/2
conversations [4]  76/7 76/22
77/2 77/4
copy [3]  4/18 54/18 71/6
Corporation [2]  1/18 2/11

## C

correct [81]
could [23]   5/14 11/12 12/6
13/15 19/2 20/18 20/19 30/23
33/16 33/20 34/5 37/1 38/20
40/1 42/17 43/2 50/1 50/3
58/15 58/18 58/20 75/18 76/5
counsel [4]   1/18 2/11 4/5
78/15
county [4]   1/1 74/11 74/16
78/2
County-run [1]   74/11
couple [1]   36/14
course [1]   34/9
court [8]   1/2 40/2 41/3 41/3
45/21 51/12 67/7 69/2
Coworkers [1]   15/11
CR [1]   55/13
created [1]   10/21
credibility [1]   26/4
crime [2]   40/12 40/21
criminal [4]   13/5 25/20 25/22
65/6
crossed [1]   43/10
crowd [1]   63/11
Currently [1]   7/23
custody [1]   14/23
CV [1]   1/6

## D

DA [1]   73/3
damage [5]   59/15 60/18 60/21
60/22 61/4
damaged [1]   59/13
date [14]   13/9 13/13 13/16
25/23 27/19 27/21 28/1 28/4
28/5 28/10 48/1 66/20 72/7
73/6
dated [1]   27/19
day [11]   6/15 6/16 18/14
27/16 39/8 48/6 66/21 71/12
72/14 73/21 78/19
days [1]   6/17
dealt [1]   29/4
debate [2]   39/3 39/8
decide [2]   41/12 75/5
decided [2]   44/7 50/8
decides [2]   41/3 69/20
decision [6]   3/14 66/12 68/4
68/5 68/10 68/11
Decision/Order [2]   3/14 66/12
Defendants [2]   1/13 2/10
degree [1]   13/3
department [16]   5/3 5/12 7/3
7/22 13/22 22/11 39/16 51/4
51/9 55/8 55/8 70/22 73/7
73/12 74/15 77/6
department-run [1]   74/15
Depends [1]   9/8
depicted [1]   56/10
depo [1]   19/3
deposed [3]   76/13 76/14 76/18
deposition [30]   3/7 3/9 3/13
9/10 10/2 18/5 27/4 27/9
27/13 28/18 29/13 29/14
29/16 35/23 36/4 37/13 44/14
45/21 53/16 54/6 55/1 56/23
66/12 67/10 67/13 70/17

describe [5]   5/14 13/15 21/4
49/11 62/15
described [2]   30/12 30/14
desk [1]   13/20
Desnerck [12]   14/12 14/16
17/19 25/17 26/11 27/14 34/2
35/14 36/11 36/15 38/8 58/3
Desnerck's [6]   3/9 25/19 26/4
27/4 36/17 44/6
detail [2]   12/20 43/19
details [1]   24/22
determine [2]   48/13 75/6
determines [1]   46/16
did [80]
didn't [24]   14/7 19/15 21/7
22/15 25/14 25/14 26/1 26/19
30/10 31/6 35/1 35/3 45/13
46/6 58/19 63/7 65/20 67/1
69/14 69/21 69/23 75/1 75/8
75/9
different [16]   5/14 11/10
11/11 19/12 20/2 20/8 20/10
28/18 52/5 52/8 52/17 55/16
55/17 55/20 73/1 75/12
differently [3]   20/6 20/12
20/15
direct [1]   13/7
directed [1]   62/19
directly [1]   42/2
discern [1]   43/3
discussed [1]   72/21
discussion [1]   60/11
dishonest [1]   39/15
dismissal [1]   65/18
dismissed [6]   65/12 65/13
66/1 66/8 74/21 75/21
dispatch [1]   6/21
disposed [1]   26/21
disposition [1]   65/1
do [68]   5/22 6/1 6/12 6/18
6/18 9/6 10/11 12/10 14/5
14/7 15/12 17/4 21/19 23/2
23/4 23/17 25/5 25/12 27/11
28/21 35/3 41/19 42/1 42/15
43/6 43/23 44/2 44/3 44/10
44/23 47/8 47/13 47/19 48/8
48/17 49/1 50/8 50/11 50/13
50/23 54/2 54/3 54/20 55/17
57/20 58/11 63/2 63/3 63/9
63/21 65/1 65/17 65/23 66/3
66/6 68/22 69/7 70/2 70/10
71/7 72/2 72/23 73/19 74/4
75/5 75/8 77/4 78/5
document [6]   3/18 27/10 60/4
60/14 66/17 68/2
documentation [1]   48/19
documenting [1]   8/21
documents [2]   10/7 45/21
DOE [1]   1/11
does [17]   7/2 9/6 11/20 18/9
18/10 18/16 22/11 29/22 37/7
39/12 51/21 51/21 61/5
66/3 66/20 74/14
doesn't [12]   18/18 20/15
21/18 27/19 27/21 32/12
37/12 37/19 39/4 61/6 61/13
61/15
dog [1]   61/12

doing [2]   41/18 46/2
don't [60]   9/19 10/12 12/10
12/10 12/11 12/23 15/1 15/6
16/3 22/7 22/8 22/12 24/21
26/12 27/23 28/23 29/5 29/6
29/12 29/18 29/18 30/22 31/2
31/9 32/15 32/18 33/8 34/1
34/13 34/19 39/3 41/2 42/7
43/1 45/4 48/18 49/23 54/3
55/3 55/4 56/16 58/10 63/2
63/11 63/13 65/11 65/18
65/19 66/2 66/9 66/15 67/5
67/5 71/3 71/5 71/10 71/17
74/7 74/16 76/5
done [6]   24/11 24/16 48/23
52/10 55/22 60/19
door [52]   14/11 14/13 17/20
18/10 18/16 18/19 19/10
19/15 21/17 23/20 29/23
29/23 30/4 30/11 31/9 31/13
31/15 31/16 32/4 32/4 32/10
32/11 32/13 32/14 32/16
32/16 32/19 32/20 32/22 33/6
33/11 33/12 33/13 33/14
33/15 33/16 33/18 33/19 34/6
34/10 34/11 34/14 42/11
42/12 42/16 42/20 42/21
42/22 43/9 43/17 59/12 60/21
doors [2]   32/20 37/1
doorway [7]   38/16 38/17 38/20
38/20 38/21 38/23 43/14
down [4]   7/23 42/4 57/11
78/9
drawing [1]   44/10
driver's [1]   68/16
duly [2]   5/2 78/7
during [1]   44/21
duties [4]   5/15 5/19 70/6
70/9
dwelling [3]   31/12 34/21 35/7

## E

earlier [1]   67/22
East [3]   1/18 2/13 5/4
education [1]   13/2
educational [1]   13/1
eight [2]   8/3 8/4
eighteen [5]   62/1 62/2 62/2
62/4 62/7
either [1]   42/22
ELLIS [27]   1/8 14/4 14/6
14/7 15/5 15/14 17/19 17/20
19/9 22/4 24/7 24/9 24/13
24/20 25/10 26/19 28/18
28/22 29/1 29/2 29/13 35/15
38/8 64/21 65/5 65/9 76/11
Ellis's [1]   15/2
else [6]   21/13 24/4 35/15
61/21 63/6 63/21
employed [2]   5/11 7/22
enclosed [2]   62/17 62/18
ended [1]   55/2
enough [8]   7/18 22/13 26/14
29/19 41/7 44/7 46/11 47/7
entered [5]   32/9 34/12 42/10
42/17 58/3
entirely [1]   12/15
envelope [4]   9/11 68/1 68/3
68/6

**E**

escorted [1]  62/21
especially [1]  33/23
ESQUIRE [2]  2/5 2/12
essentially [1]  66/23
established [1]  32/7
estimate [2]  50/4 50/5
even [5]  34/11 53/23 54/4
69/10 74/17
evening [2]  27/1 27/1
event [2]  48/11 48/14
events [4]  18/21 20/3 26/20
27/2
every [3]  6/15 40/6 55/11
everyone [2]  6/15 8/5
everything [5]  21/5 24/11
24/15 56/2 58/12
evidence [1]  19/3
evidentially [1]  59/11
exact [3]  22/7 25/2 25/4
exactly [4]  12/17 12/19 43/8
56/11
examination [6]  1/15 3/4 3/4
5/6 77/13 78/14
examined [3]  4/17 5/5 78/7
examining [2]  4/17 4/19
except [1]  4/9
exchange [1]  14/23
executed [1]  47/20
Exhibit [14]  10/2 18/5 27/4
27/8 35/23 36/4 44/14 53/16
56/10 60/14 66/12 67/10
67/13 70/17
EXHIBITS [2]  3/6 3/7
existence [1]  13/12
explanatory [1]  5/18

**F**

fact [5]  16/2 31/12 45/10
54/11 71/19
fair [18]  7/18 12/15 16/11
18/6 21/20 22/13 26/9 26/14
29/15 29/19 34/20 35/6 36/19
37/16 38/13 39/5 53/11 77/4
false [11]  44/9 45/10 45/14
45/17 52/11 53/5 58/9 58/15
63/4 67/17 73/9
familiar [1]  12/16
far [4]  8/14 23/22 41/1
43/20
faulty [1]  72/18
feasible [1]  21/19
fellow [2]  76/8 76/22
felt [4]  14/14 39/14 41/7
46/11
female [1]  49/8
few [2]  7/23 22/5
field [1]  62/16
fifteen [1]  12/13
fifty [2]  8/3 8/4
fifty-eight [2]  8/3 8/4
fight [1]  15/1
file [23]  3/20 13/22 35/12
41/7 46/10 47/6 47/9 54/19
55/5 55/7 55/9 56/1 56/7
66/22 67/3 67/6 67/21 69/7
69/8 69/19 72/3 72/4 72/4
filed [21]  8/11 12/12 40/2

41/9 44/12 52/23 53/20 65/2
65/6 67/16 67/19 69/9 69/12
70/21 71/8 71/13 73/13 74/20
74/22 74/23 75/20
filing [5]  4/5 8/14 10/7
63/4 67/17
filled [3]  8/19 52/13 56/9
find [4]  11/12 12/6 42/14
60/8
finding [1]  11/6
findings [2]  11/10 11/12
fine [2]  65/18 67/15
FIORE [2]  2/12 3/4
FIORE-LEHMAN [2]  2/12 3/4
first [8]  8/22 15/2 48/15
48/20 52/9 67/23 73/1 78/7
follow [2]  11/9 41/2
following [2]  31/22 32/22
follows [1]  5/5
football [3]  62/12 62/14
63/12
forced [1]  57/15
forgot [1]  69/3
forgotten [1]  69/17
form [2]  4/9 8/19
formal [7]  3/20 9/18 10/15
22/22 53/20 53/21 56/7
formally [1]  64/6
forms [1]  28/2
forth [1]  78/9
forward [1]  41/17
found [6]  39/23 40/1 54/23
68/1 68/15 68/17
founded [1]  12/7
four [4]  6/17 50/7 60/13
77/1
free [1]  4/18
FREEMAN [10]  1/4 3/15 13/10
17/6 24/3 34/11 35/18 36/8
57/11 60/23
Freeman's [3]  3/10 26/2 35/23
frequently [1]  20/3
friends [2]  15/8 61/11
furnish [1]  4/17
further [4]  4/8 4/12 4/16
78/15

**G**

gab [1]  39/8
game [2]  62/13 62/14 63/12
games [1]  62/18
gave [5]  17/18 56/11 59/6
64/6 69/1
general [2]  21/4 50/13
generally [4]  38/3 38/5 50/11
61/10
get [11]  21/18 25/9 28/15
37/22 38/3 50/15 50/16 50/18
52/20 55/12 61/11
gets [1]  11/19
give [9]  9/14 16/18 19/6
27/21 28/17 29/13 37/8 54/14
69/3
given [8]  10/16 41/2 49/15
51/1 67/23 68/19 68/23 78/13
gives [1]  54/2
giving [2]  10/14 27/22
go [15]  22/22 30/19 31/12
42/6 43/6 46/6 46/23 49/3

50/14 50/15 50/16 54/17 62/8
69/8 75/9
goes [5]  41/3 51/3 54/18
54/22 55/7
going [35]  8/3 13/7 18/23
22/1 27/8 28/21 29/2 29/2
29/7 36/4 40/19 46/16 46/17
48/9 50/17 52/20 53/19 54/19
56/6 57/9 62/12 63/12 64/1
64/18 66/5 67/13 69/18 70/7
72/3 72/16 75/4 76/12 76/14
76/18 77/9
gone [5]  31/19 48/20 51/11
54/16 56/12
Good [1]  5/8
got [17]  13/7 15/12 16/17
23/3 29/13 35/13 35/17 43/22
44/5 50/10 53/1 54/17 55/1
55/19 60/8 68/22 71/6
gotten [1]  31/13
grade [1]  54/22
grounds [1]  65/17
guarantee [1]  50/17
guess [5]  6/19 12/7 29/5
32/23 38/22 50/1 50/5
guys [4]  5/22 51/19 71/19
76/18

**H**

had [49]  12/12 14/10 14/10
15/12 15/19 15/20 16/3 16/22
17/6 17/10 21/7 21/9 21/9
21/20 22/4 23/5 23/12 24/23
25/15 25/16 26/3 29/6 29/22
30/3 30/14 31/3 31/19 35/5
41/6 41/7 41/19 41/20 48/20
55/17 57/3 59/15 59/2 60/23
63/4 65/2 69/13 69/15 69/17
72/18 74/5 75/20 75/21 76/13
76/22
hadn't [1]  41/17
half [1]  17/3
hallway [1]  30/23
hand [3]  9/11 36/13 57/9
handle [2]  21/16 22/11
Handwriting [1]  53/10
happen [3]  18/22 37/17 39/20
happened [18]  16/11 17/11
17/12 17/18 22/20 22/23
23/2 23/14 24/22 24/23 25/3
41/21 41/22 56/16 58/21
58/23 59/15 75/18
Happens [1]  19/16
has [56]  52/2 55/11 62/17
74/8 74/13
have [58]  5/11 5/22 7/3 7/5
9/9 9/19 9/21 12/12 13/3
13/9 15/5 15/20 17/23 20/2
27/19 28/19 33/16 34/5 36/23
39/3 40/11 41/17 41/18 41/19
41/21 42/4 45/19 47/5 47/10
48/1 48/4 49/7 49/10 50/21
51/4 51/9 51/10 53/1 54/3
54/16 55/22 56/12 56/13
58/18 63/18 64/19 66/15 71/2
75/16 75/18 76/3 76/6 76/8
76/17 76/20 76/22 77/11
78/18
having [2]  5/2 77/4

## H

he [127]
he's [14]   7/20 11/8 26/21
 28/5 31/3 33/11 33/15 33/17
 35/7 51/15 58/5 58/23 61/17
 72/15
head [1]   58/10
hear [2]   15/21 58/19
heard [2]   37/22 39/10
held [2]   1/17 40/1
help [1]   6/23
her [63]   13/12 13/16 13/18
 13/23 14/1 14/11 14/13 14/14
 16/4 16/8 16/11 16/18 16/21
 17/9 17/14 17/21 17/21 17/23
 18/7 18/10 19/12 19/15 20/23
 21/5 21/7 21/17 22/18 23/1
 23/3 23/5 24/17 25/8 39/19
 39/22 40/3 40/4 41/10 42/10
 42/10 46/6 47/21 48/7 48/10
 48/15 48/20 49/2 49/13 49/17
 49/18 50/20 56/9 62/20 62/20
 63/3 63/7 64/5 65/7 67/17
 71/4 71/9 71/13 71/21 74/20
her's [1]   44/5
here [17]   19/19 28/10 33/9
 35/22 38/14 38/23 39/7 39/9
 40/6 45/15 47/3 47/4 52/14
 61/8 72/9 73/5 76/12
hereby [2]   4/3 78/5
herein [1]   78/9
hereto [1]   4/4
hers [1]   42/19
herself [2]   15/23 74/3
hey [4]   40/19 43/9 72/2
 76/17
high [1]   62/17
highest [1]   13/2
him [30]   14/12 15/8 23/11
 24/21 24/22 26/7 28/8 28/13
 28/15 28/19 29/1 29/4 29/4
 43/16 43/18 43/20 46/10 51/1
 51/2 57/18 58/4 58/8 58/8
 58/19 58/23 61/8 61/17 69/6
 69/14 69/15
himself [1]   30/11
hired [2]   5/16 15/6
his [14]   5/3 9/12 25/22
 27/20 29/23 30/3 31/20 37/23
 38/7 42/2 42/11 42/20 60/22
 61/11
history [5]   25/20 25/22 75/16
 75/22 76/4
home [7]   25/8 42/11 42/13
 42/19 50/10 50/16 50/18
honest [2]   20/19 25/13
honestly [1]   29/18
hope [1]   55/20
hour [2]   17/2 17/2
hours [2]   16/21 16/23
house [37]   26/7 29/3 29/7
 30/18 30/19 30/22 31/1 31/4
 31/6 31/7 31/11 31/12 31/20
 32/1 32/11 32/19 32/23 33/18
 33/20 34/1 34/6 36/23 38/18
 39/5 39/9 39/10 48/10 48/15
 48/20 49/2 49/13 50/14 57/15
 58/3 61/7 61/10 61/14

houses [1]   30/21
how [29]   5/11 7/21 8/10
 10/14 10/17 13/17 13/17 15/5
 16/13 19/18 21/15 22/14
 28/12 28/15 30/13 32/22
 35/20 39/16 40/11 40/11
 48/13 49/21 50/23 62/15 63/9
 63/13 68/22 73/19 74/16
hum [4]   12/2 26/16 54/8 60/5
hundred [1]   41/16

## I

I'll [3]   7/17 9/18 70/16
I'm [41]   6/7 8/3 10/12 11/13
 13/7 18/23 21/2 22/1 22/4
 24/14 24/22 27/8 31/22 32/3
 32/22 32/23 33/21 36/4 36/18
 39/4 40/19 42/9 47/11 49/4
 52/15 52/20 54/23 55/19
 55/20 55/20 56/6 57/9 58/11
 65/9 67/13 70/7 73/17 74/1
 77/8 77/8 77/9
I've [3]   40/6 60/8 74/17
idea [3]   16/19 36/23 63/18
 70/4 71/2
identical [1]   53/6
Identification [7]   10/4 27/6
 32/4 44/15 66/13 67/11 70/18
ill [1]   26/10
imply [2]   38/3 39/1
incident [14]   10/22 21/10
 36/20 37/16 52/9 52/16 52/17
 55/11 55/12 56/3 56/4 63/22
 64/2 64/3
inconsistent [2]   31/21 38/12
incorporates [1]   11/11
index [4]   1/6 3/1 3/6 56/3
indicate [1]   66/20
indicated [1]   66/19
indicates [4]   36/19 37/4 37/4
 38/6
individual's [1]   12/1
individuals [3]   21/10 42/17
 43/17
information [3]   46/9 49/15
 50/15
initiated [2]   10/15 10/17
inner [16]   29/23 32/4 32/11
 32/14 32/16 32/20 32/22 33/6
 33/12 33/14 33/15 33/17
 33/19 34/6 34/11 34/14
inquire [1]   43/16
inside [12]   6/16 6/18 6/19
 13/21 30/11 30/17 32/23
 33/16 33/20 34/5 38/21 39/16
instance [3]   47/1 50/10 73/20
instances [1]   40/11
instrument [1]   67/17
intentionally [1]   37/19
interacted [1]   13/18
interaction [2]   13/9 13/19
interactions [1]   13/16
intercepted [1]   28/19
interested [1]   78/17
Interesting [1]   28/3
interior [2]   31/13 31/16
internal [9]   3/20 7/3 8/9
 9/16 10/20 12/10 12/20 52/3
 56/7

internet [1]   74/10
interview [5]   16/9 16/14
 17/13 17/16 21/6
interviewed [1]   54/7
investigate [2]   41/12 42/12
investigated [1]   41/18
investigation [1]   9/17
investigations [1]   12/11
involved [1]   25/16
involvement [1]   48/4
is [124]
Isaacson [1]   9/15
ish [1]   68/21
issue [2]   47/3 47/4
issues [1]   50/22
it [190]
it's [25]   5/18 8/21 9/14
 10/16 10/17 31/11 33/19
 34/20 34/23 39/23 46/20
 48/23 50/11 51/12 55/16 57/2
 58/15 59/14 59/22 62/16 70/1
 70/2 72/8 74/16 76/21
its [1]   55/11
itself [4]   32/8 39/2 39/7
 43/21

## J

JACKSON [10]   1/10 23/8 23/10
 24/1 25/13 44/7 60/16 60/17
 64/19 76/15
Jackson's [3]   3/13 53/16
 60/15
jail [1]   49/18
JAMESTOWN [23]   1/8 1/9 1/10
 1/11 1/19 2/14 5/3 5/4 5/12
 7/2 7/22 13/4 13/22 19/19
 22/10 22/14 30/21 39/15
 46/14 70/21 73/11 75/12 77/5
Jefferson [1]   49/20
job [2]   15/19 22/8
JOHN [1]   1/11
judge [21]   46/10 47/5 47/8
 47/14 47/15 50/21 51/1 51/15
 51/19 65/20 69/20 70/1 70/5
 72/19 73/16 73/16 73/18 75/5
 75/11 75/15 76/3
judge's [2]   68/11 70/3
judges [1]   75/12
July [4]   67/20 67/22 71/20
 72/10
June [2]   67/22 69/16
just [33]   7/16 8/1 8/21 12/3
 12/23 14/21 14/21 15/9 20/14
 21/7 22/5 24/18 25/14 26/1
 32/7 35/13 36/16 37/18 37/18
 39/22 41/22 43/18 45/19
 47/16 49/7 55/21 59/5 66/16
 67/15 71/12 73/3 76/13 77/2
justice [1]   13/5

## K

Kathleen [2]   1/20 78/4
keep [2]   14/22 66/5
kicked [8]   14/10 14/12 17/20
 18/9 18/16 18/18 19/9 19/14
kid [1]   61/23
kids [2]   64/8 64/8
kind [2]   5/21 63/16
knew [2]   29/1 72/18

**K**

knock [8]   29/23 31/15 32/4
  32/10 32/13 32/20 33/5 33/13
  33/17 34/10
knocked [5]   32/3 33/12 33/13
  33/17 34/10
knocking [3]   33/15 34/6 34/14
know [79]
knowing [2]   34/1 36/22
knowingly [1]   73/9
knowledge [7]   22/14 23/18
  23/19 26/3 28/19 39/15 59/3
known [2]   15/5 15/20
knows [1]   46/21

**L**

lack [2]   26/4 60/23
LaMancuso [1]   73/16
LaMancuso's [1]   47/15
lapse [1]   74/22
last [1]   66/18
late [4]   68/21 69/19 69/22
  71/20
later [3]   68/17 68/18 69/15
law [2]   2/4 69/21
lawyer [1]   76/7
layout [3]   30/7 34/1 36/22
lead [1]   19/2
leads [2]   32/11 33/18
least [1]   30/4
led [1]   21/13
left [3]   16/22 69/2 71/5
legal [2]   65/19 75/8
LEHMAN [2]   2/12 3/4
let [9]   7/23 18/14 19/17
  43/18 46/10 67/15 69/7 70/4
  75/4
let's [3]   9/8 17/14 62/8
level [1]   13/2
liable [1]   40/2
liar [2]   14/14 17/22
lieutenant [28]   5/23 6/2
  11/21 11/22 11/23 12/6 23/6
  23/7 23/9 24/12 25/13 44/6
  51/13 59/6 59/6 59/9 59/12
  59/23 60/15 60/16 60/17
  64/19 69/5 69/13 72/1 72/12
  72/14 76/15
lieutenant's [4]   59/14 59/18
  59/21 60/20
lieutenants [2]   6/5 6/8
like [17]   8/22 14/21 15/7
  15/19 16/17 26/1 30/13 38/18
  42/5 49/13 49/23 51/6 62/17
  65/20 67/1 73/3 73/6
limited [1]   45/19
line [1]   33/1
literally [2]   35/21 71/17
little [1]   43/19
live [1]   46/22
living [2]   36/20 37/1
lobby [2]   16/4 16/7
located [1]   49/17
location [3]   23/13 49/17
  49/19
lock [4]   17/20 21/18 23/21
  46/17
lodged [1]   15/13
log [1]   48/22

logged [1]   74/17
long [6]   5/11 15/5 16/13
  19/18 49/3 69/16
look [10]   17/5 20/17 25/22
  26/1 27/9 47/10 47/16 52/21
  53/6 60/20
looked [2]   15/16 30/8
looking [7]   30/20 31/1 33/22
  45/9 52/15 66/9 67/8
looks [4]   16/17 47/15 51/6
  73/6
lot [4]   10/1 30/21 44/20
  49/3
LT [3]   1/10 3/13 53/16
lying [2]   20/15 20/18

**M**

made [7]   35/14 40/20 41/12
  45/10 45/14 45/17 78/14
mail [1]   9/12
mailbox [2]   71/5 71/18
mailed [1]   74/18
make [10]   9/18 11/5 15/1
  18/15 19/8 30/11 46/23 56/6
  58/16 73/9
making [4]   20/23 31/3 44/8
  53/5
man [1]   7/18
manila [1]   68/6
mans [1]   7/8
many [7]   7/21 19/22 40/11
  40/11 49/21 63/9 63/13
March [2]   1/17 78/19
MARILYN [1]   2/12
mark [2]   67/9 70/16
marked [10]   10/4 27/6 36/2
  44/15 52/20 52/21 53/14
  66/13 67/11 70/18
matter [4]   72/13 76/9 76/23
  77/5
MATTHEW [13]   2/4 2/5 3/10
  24/3 35/18 35/23 36/8 57/10
  58/1 58/2 60/23 64/13 64/14
Matthew's [2]   42/2 44/5
may [10]   9/23 19/11 67/22
  68/21 69/10 69/13 69/15
  71/21 75/16 76/3
maybe [4]   34/7 50/3 65/4
  69/17
Mayville [1]   69/2
me [42]   6/7 6/23 7/23 10/16
  12/13 16/3 16/18 17/11 17/18
  18/14 19/6 19/11 19/17 21/8
  22/21 23/11 30/12 30/14
  34/16 37/8 37/13 38/17 40/14
  43/11 49/15 53/8 57/20 64/6
  65/20 66/6 67/23 68/6 68/14
  68/17 69/3 69/18 69/18 70/4
  72/15 72/15 73/3 78/8
mean [12]   10/12 20/15 21/3
  24/15 25/5 32/15 37/19 39/2
  43/8 50/3 53/21 70/10
Meaning [1]   25/17 52/7
means [4]   43/10 43/12 43/15
  43/16
meant [1]   32/18
members [1]   77/5
memorialize [1]   17/23
mention [3]   37/7 37/11 58/16

mentioned [1]   64/4
middle [2]   49/20 62/10
mind [2]   20/17 70/10
mine [2]   19/13 59/19
misconduct [1]   11/17
misheard [1]   65/5
misleading [1]   37/20
missing [1]   77/8
mistake [4]   19/8 20/19 37/12
  37/15
mistaken [1]   9/23
mistakes [2]   18/21 37/17
MISTY [6]   1/4 3/15 13/10
  15/21 17/5 34/11
Misty's [2]   39/13 55/13
mom's [1]   61/10
Monday [1]   51/11
monitor [1]   6/21
month [3]   59/15 68/17 68/18
months [2]   15/19 22/5
more [7]   43/19 48/12 49/16
  60/18 63/8 66/19 77/9
morning [5]   5/8 5/9 30/8 31/7
  51/9
most [3]   40/5 40/7 63/2
mother [3]   37/23 38/8 38/15
mother's [1]   42/3
MR [4]   2/5 3/4 3/19 5/7
Mr. [1]   14/12
Mr. Desnerck [1]   14/12
MS [2]   2/12 3/4
Ms. [1]   26/2
Ms. Freeman's [1]   26/2
mud [9]   30/13 30/17 30/23
  33/2 33/4 33/5 33/19 34/21
  35/7
multiple [1]   64/8
my [50]   12/13 13/9 19/6 19/9
  23/5 23/19 26/7 26/11 26/14
  29/2 29/7 29/10 29/17 30/7
  31/4 31/7 31/19 31/23 33/16
  33/20 34/1 37/12 37/14 37/15
  38/12 44/18 45/10 48/5 48/7
  49/11 50/5 54/22 55/1 56/19
  57/4 58/10 61/10 62/7 62/9
  63/16 65/2 66/8 67/3 67/16
  69/5 70/20 71/5 71/18 72/17
  78/18
myself [1]   8/15

**N**

name [3]   15/3 74/14 78/18
named [1]   78/6
names [3]   14/13 17/21 64/6
nature [2]   13/18 14/1
necessarily [2]   39/3 66/15
need [4]   36/13 42/7 66/3
  66/4
needed [1]   25/15
neighbors [2]   64/16 64/16
neither [1]   78/15
never [16]   25/8 30/20 31/4
  35/5 37/4 38/6 39/1 39/4
  40/16 40/20 42/17 46/1 64/5
  74/4 74/7 76/11
new [16]   1/1 1/19 1/21 2/8
  2/14 5/4 15/18 52/1 61/3
  67/3 69/7 69/8 69/9 78/1
  78/5 78/23

**N**

next [2]   23/17 27/20
Nicholas [17]   3/9 14/16 17/19
 25/17 25/19 26/3 26/11 27/13
 34/2 35/14 36/11 36/15 36/17
 38/8 44/5 57/15 58/3
night [7]   15/17 15/18 24/10
 28/9 28/16 46/5 61/9
no [55]   6/4 7/15 7/16 7/17
 12/22 13/11 13/14 14/17
 15/15 19/11 21/11 21/11
 22/12 25/11 25/21 26/1 26/3
 26/22 28/1 28/19 29/8 33/17
 36/23 43/18 45/15 46/7 48/22
 51/14 51/17 51/20 52/5 53/4
 54/2 55/15 59/19 60/21 61/15
 63/7 63/15 63/18 64/4 64/15
 64/15 65/10 65/18 71/2 71/5
 71/22 75/7 75/9 76/10 77/1
 77/7 77/9 77/11
normal [2]   8/21 9/9
not [77]   10/12 11/13 12/15
 12/20 15/18 17/8 19/13 21/2
 21/9 21/13 21/18 22/3 22/11
 24/5 25/11 25/21 26/21 26/23
 30/8 30/14 30/15 31/13 31/20
 31/22 32/9 32/12 33/21 33/9
 33/21 34/22 38/18 39/6 39/12
 40/19 41/4 41/20 42/9 42/12
 45/16 46/8 47/4 48/10 49/14
 52/2 53/3 53/23 55/20 55/22
 57/19 58/1 58/5 58/6 58/23
 59/4 60/18 61/3 61/6 61/7
 61/8 61/13 61/14 61/17 67/21
 69/12 70/3 70/9 71/16 73/17
 73/18 74/23 75/1 75/6 75/16
 75/22 76/3 77/2 77/9
Notary [4]   1/21 5/2 78/4
 78/22
nothing [2]   38/11 39/8
Notice [7]   3/16 70/17 70/21
 71/4 71/7 71/12 71/20
noticed [1]   36/16
notified [4]   8/15 8/17 23/5
 56/14
notions [2]   21/21 22/2
now [10]   13/7 28/3 35/3
 36/18 52/3 55/19 62/3 74/1
 74/2 76/6
nowhere [1]   75/19
number [17]   8/6 10/2 10/19
 10/23 27/4 35/23 44/14 53/16
 55/13 55/13 55/19 56/3 56/3
 56/4 66/12 67/10 70/17
numbers [1]   52/14
numerous [1]   40/8

**O**

object [3]   19/1 22/2 70/8
objections [2]   4/9 78/13
observed [1]   43/6
obtaining [1]   44/4
obviously [1]   18/20 20/2
 26/6 26/10 29/20 36/22 38/23
 43/6 46/22 59/3 60/19 64/9
occasionally [1]   6/14
occasions [1]   40/9
off [11]   11/4 22/9 43/7 47/8

 47/14 51/13 56/11 58/10
 60/10 60/11 73/17
Off-the-record [1]   60/11
offer [1]   57/11
Office [2]   1/17 2/4
officer [62]   1/8 3/20 9/9
 11/16 14/3 14/3 14/6 14/11
 14/16 14/17 14/18 14/19 15/2
 15/5 15/13 17/19 17/20 19/9
 19/18 19/19 19/20 21/16 22/4
 24/6 24/9 24/12 24/20 25/6
 25/10 26/6 26/19 28/18 28/22
 29/1 29/2 29/13 35/15 38/8
 41/19 49/5 49/10 51/14 52/10
 52/12 52/14 52/21 53/2 53/19
 53/21 54/4 54/14 55/6 55/10
 56/2 56/8 57/14 64/21 65/5
 68/17 68/23 69/1 76/11
officer's [1]   11/5
officers [11]   7/13 7/21 48/6
 48/12 49/1 49/16 49/21 50/1
 50/12 76/9 76/23
Oh [5]   7/13 12/7 52/20 57/3
 72/8
okay [86]
once [1]   10/16
one [32]   6/16 7/5 7/18 10/21
 12/7 12/12 16/2 17/4 18/4
 26/14 30/4 34/23 35/2 36/10
 36/15 41/16 42/7 46/2 47/1
 52/10 52/11 52/20 53/13
 55/19 59/22 60/1 60/8 60/8
 64/13 70/12 72/15 72/21
one-man [1]   7/18
ones [2]   41/14 52/10
only [10]   4/19 6/15 12/12
 15/19 16/2 34/23 49/8 51/23
 58/21 62/6
opened [8]   29/22 31/9 32/4
 32/10 32/13 32/19 33/11
 34/10
opening [1]   30/10
operate [1]   39/16
opinion [2]   19/1 19/7
opposed [2]   39/10 50/9
opposite [2]   25/2 25/4
opt [1]   45/16
Order [2]   3/14 66/12
original [5]   56/10 64/1 65/2
 72/18 72/20
originally [5]   17/12 19/11
 49/2 57/14 58/22
other [20]   7/13 8/16 12/8
 12/9 18/14 21/9 27/1 29/16
 40/16 40/17 40/22 41/14 45/3
 47/1 52/22 54/5 54/6 61/9
 64/15 75/19
out [17]   7/1 8/20 34/11
 37/11 37/14 37/23 38/3 39/10
 40/17 41/2 44/17 44/20 45/9
 52/13 54/1 56/9 62/21
outcome [3]   54/20 74/19 78/17
outcomes [1]   12/5
outdoor [2]   48/11 48/14
outer [11]   29/22 30/10 31/9
 31/15 32/4 32/10 32/13 32/15
 32/19 33/13 34/10
outside [4]   30/21 31/2 38/20
 38/23

**over [2]**   57/2 61/11
own [5]   13/15 30/3 41/20
 55/11 63/16

**P**

p.m [2]   16/19 16/23
page [3]   60/13 66/17 66/18
paperwork [8]   9/10 10/1 48/1
 48/23 54/17 66/10 71/18 72/2
part [3]   9/1 48/3 59/19
particular [3]   73/20 74/19
 75/15
parties [2]   4/4 15/1
party [5]   4/17 4/17 4/19
 25/15 78/16
pass [1]   11/4
past [1]   42/22
patrol [1]   9/14
patrolman [1]   5/16
patrolmen [4]   5/20 6/10 6/22
 7/1
pay [1]   54/22
PD [1]   46/14
peace [7]   14/11 14/16 14/18
 14/19 14/22 25/6 26/6
penalty [1]   73/11
people [15]   18/20 18/21 20/2
 20/5 20/12 20/14 27/22 40/8
 40/18 40/23 41/4 54/6 63/2
 63/9 63/13
perceive [1]   20/12
percent [1]   41/16
perfect [1]   73/5
period [1]   22/8
perjury [1]   73/11
person [2]   7/9 46/21
person's [2]   46/19 47/2
personal [1]   59/3
personally [2]   40/14 51/1
perspectives [1]   20/8
phones [1]   6/21
photographs [4]   23/20 30/9
 30/15 31/6
phrase [1]   18/18
pick [2]   48/7 55/21
picked [2]   47/21 48/2
picking [1]   14/22
pictures [2]   30/9 30/15
pile [1]   55/11
place [12]   10/6 17/10 23/16
 28/6 36/20 37/2 37/5 38/7
 61/21 63/23 64/10 78/9
Plaintiff [2]   1/5 2/3
played [1]   62/13
please [2]   5/15 48/4
PO [1]   2/6
point [7]   10/11 17/5 44/1
 64/22 66/3 70/15 70/20
points [1]   20/10
police [24]   1/8 5/3 5/12 7/3
 7/22 13/22 22/10 35/21 36/19
 49/16 55/8 57/2 59/12 61/11
 62/22 68/2 68/15 69/3 70/6
 70/9 70/22 73/7 73/11 77/6
policemen [1]   22/14
policy [2]   8/10 8/13
portion [1]   55/10
possible [4]   12/5 20/21 45/1
 77/3

**P**

possibly [1]   19/8
posted [2]   74/4 74/15
posts [1]   74/11
potential [1]   12/9
Potentially [1]   64/11
practice [1]   46/12
preconceived [3]   21/21 22/2
22/3
present [3]   49/21 63/9 63/22
presented [3]   50/23 51/14
76/2
press [1]   62/19
pretty [5]   15/23 49/4 53/10
58/11 62/17
prior [8]   13/8 13/12 15/13
29/1 29/2 29/7 76/3 78/6
probably [6]   15/20 49/7 50/6
58/16 75/18 77/9
probation [1]   22/9
problem [1]   61/9
procedural [1]   75/22
process [2]   12/18 16/13
processed [1]   8/11
PRODUCTION [1]   3/18
promoted [1]   5/17
property [2]   14/23 45/5
provide [2]   10/7 26/23
providing [1]   73/10
public [4]   1/21 74/9 78/4
78/22
purposes [2]   27/9 42/8
pursue [1]   50/9
put [11]   9/11 9/12 19/15
37/12 56/15 58/11 59/20 62/7
64/20 73/6 73/8

**Q**

question [6]   4/9 11/13 31/22
33/21 63/16 76/21
questioning [1]   33/1
questions [8]   5/11 5/20 6/23
13/1 36/14 69/6 77/10 77/12
quickly [1]   25/7
quite [2]   7/23 20/3

**R**

randomly [1]   21/17
rank [3]   6/2 6/2 6/5
ranks [1]   5/15
re [1]   68/14
re-write [1]   68/14
read [7]   37/8 57/21 57/22
62/6 66/15 66/19 67/14
realize [1]   58/15
really [1]   47/2
recall [7]   14/2 14/5 17/8
58/10 63/2 63/3 77/4
received [1]   71/7
recognize [1]   27/10
recollecting [1]   77/1
recollection [2]   17/15 21/5
record [7]   12/3 17/7 24/18
57/22 60/10 60/11 78/12
records [6]   51/3 51/8 51/11
51/11 55/8 56/13
recount [1]   40/6
recounting [2]   18/20 37/16

referenced [1]   9/20
referring [1]   59/17
reflection [1]   18/6
regards [2]   39/19 72/13
reiterated [1]   22/21
related [2]   56/2 78/16
relating [5]   3/20 55/5 56/8
56/19 57/4
relation [4]   26/20 32/16 71/8
72/23
relationship [1]   29/7
relay [1]   76/21
remember [6]   20/5 24/21 37/7
49/23 63/11 67/6
remind [1]   71/20
reminded [2]   69/18 72/15
rephrase [1]   70/4
report [7]   3/8 8/18 8/21 9/2
9/3 9/7 9/19 10/3 16/15
16/21 37/14 43/20 51/4 52/16
52/23 53/17 53/20 54/3 54/3
56/19 57/2 57/4 59/7 59/21
60/15 62/6 62/7
reported [1]   60/23
Reporter [1]   1/20
reports [6]   5/21 6/22 6/23
52/6 52/9 55/18
request [4]   3/20 9/19 51/19
56/7
requested [1]   70/5
requesting [1]   54/12
REQUESTS [1]   3/18
research [1]   75/8
reserved [1]   4/10
residence [8]   30/7 30/11 32/9
34/12 35/8 42/18 45/6 63/22
respective [1]   4/4
responsible [1]   4/20
review [9]   5/21 6/21 9/15
11/21 12/18 16/15 18/12 42/8
46/10
reviewed [4]   11/19 18/14 44/6
47/5
reviewer [1]   11/12
reviewing [3]   11/8 47/13
51/15
reviews [2]   11/5 11/23
Richmond [1]   2/7
right [37]   6/6 9/14 16/1
26/23 28/4 28/6 28/10 29/11
32/16 34/13 34/18 35/1 35/13
35/17 38/9 43/14 45/11 45/12
45/23 47/12 51/7 51/7 52/14
53/1 53/1 53/6 53/9 57/1
57/19 61/8 65/13 68/4 70/10
72/8 72/11 73/5 76/19
road [2]   6/14 6/16
ROBERT [3]   1/16 3/3 5/1
Roberts [2]   1/20 78/4
room [19]   16/3 16/8 16/9
17/13 17/16 20/23 21/6 30/13
30/17 30/17 30/23 33/2 33/4
33/5 33/19 34/21 35/7 36/20
37/1
run [2]   74/11 74/15
Russell [1]   49/10

**S**

S-A-M-U-E-L-S-O-N [1]   7/12

S-T-I-P-U-L-A-T-I-O-N-S [1]
4/1
safety [2]   46/19 47/2
said [31]   7/16 14/5 16/10
17/14 18/21 19/9 20/22 21/5
24/21 26/14 26/15 35/22
38/18 40/8 42/11 49/23 61/20
63/3 65/20 69/1 69/8 69/19
69/19 72/2 72/3 72/4 72/6
75/4 78/8 78/12 78/16
same [6]   10/22 27/16 55/13
73/16 73/18 76/16
Samuelson [2]   7/10 7/12
saw [5]   37/5 37/7 38/7 39/11
69/1
say [43]   8/3 8/8 9/8 12/3
12/15 16/11 17/3 17/9 17/16
18/10 18/16 19/14 20/14
20/23 21/20 23/9 24/20 25/1
25/4 26/9 29/9 29/15 32/12
33/2 34/20 35/6 36/19 37/16
38/13 39/4 39/5 39/6 39/12
39/19 40/5 40/7 45/2 45/4
45/4 53/11 58/9 61/5 68/8
saying [14]   19/9 22/4 25/2
28/8 33/11 33/17 39/4 39/9
43/9 59/8 59/11 60/3 60/13
69/22
says [13]   16/21 32/10 38/14
42/10 42/14 46/20 46/20 53/4
57/18 57/20 64/5 64/8 72/8
scenario [1]   9/8
scene [3]   23/15 23/20 59/10
school [3]   49/20 62/10 62/17
Sciences [1]   13/6
sealing [1]   4/5
seat [2]   68/1 68/16
second [10]   5/4 17/4 37/8
52/16 57/2 57/10 67/15 70/11
71/8 71/13
secondary [1]   67/6
secured [1]   23/20
see [20]   14/19 17/6 27/10
28/12 31/6 34/8 36/15 36/18
37/1 37/11 37/14 42/1 52/19
64/17 67/7 69/20 69/21 70/1
70/10 75/11
seeing [1]   42/9
seen [1]   30/15
self [1]   5/18
self-explanatory [1]   5/18
send [2]   47/4 51/12
sent [5]   9/22 46/9 67/7 68/6
70/1
separate [5]   10/23 16/8 31/10
52/10 52/22
September [7]   7/6 8/7 13/8
18/7 27/16 64/3 64/18
September 27th [5]   13/8 18/7
27/16 64/3 64/18
sergeant [9]   1/9 1/16 3/3 5/1
5/17 5/19 6/14 10/2 11/20
sergeants [3]   6/5 6/8 6/10
served [4]   71/4 71/12 71/17
71/19
set [4]   50/20 51/19 51/23
78/9
Seventeen [1]   19/21
Sgt [1]   3/8

**S**

shall [3]   4/6 4/10 4/13
she [84]
sheet [1]   8/22
sheets [1]   52/9
shift [1]   8/16
short [1]   22/8
shorthand [2]   1/20 78/10
should [6]   9/21 34/8 69/7
 69/7 72/3 72/4
show [4]   27/8 36/4 48/19
 67/13
showed [2]   17/19 45/21
showing [1]   74/5
shows [1]   6/15
side [1]   74/11
sign [2]   9/10 23/5
signature [2]   27/20 47/15
signed [12]   39/23 47/8 47/14
 51/13 59/23 60/16 67/20 72/8
 73/10 73/17 75/10 75/15
signing [2]   4/13 40/12
similar [1]   53/10
single [3]   31/11 34/21 35/7
single-unit [2]   34/21 35/7
sir [6]   5/8 35/16 36/9 60/2
 60/16 62/11
sit [3]   39/7 40/5 42/4
site [2]   74/10 74/15
sites [1]   74/5
six [1]   15/19
sixty [1]   8/8
slow [1]   55/20
so [96]
some [14]   5/10 5/19 11/7
 21/20 26/10 29/6 30/9 55/5
 64/10 69/6 70/15 70/20 74/9
 74/9
someone [14]   8/14 11/9 14/22
 20/15 38/3 40/12 43/8 45/3
 46/18 46/20 52/1 61/10 74/8
 74/13
someone's [2]   20/17 50/14
something [14]   10/19 11/11
 15/7 15/16 20/14 29/10 29/16
 35/15 51/18 53/23 61/21
 65/12 65/21 71/15
sometimes [2]   18/21 20/5
somewhat [1]   34/5
somewhere [5]   47/23 48/22
 50/6 50/15 54/19
son [2]   16/18 16/22
sorry [13]   7/17 11/15 17/4
 31/22 32/3 36/18 47/11 55/19
 55/20 63/19 64/2 65/4 65/9
sort [8]   8/10 11/17 15/14
 29/6 55/5 64/10 74/9 74/9
sounded [1]   30/13
sounds [1]   14/21
space [1]   45/19
speak [11]   7/17 8/17 23/22
 24/2 24/9 24/12 28/21 29/19
 61/6 61/13 69/14
speaking [5]   21/12 23/11 38/5
 39/14 72/1
speaks [1]   39/2
specific [4]   8/9 8/19 45/1
 55/9

specifically [4]   6/19 14/6
 39/4 61/8
specify [2]   45/13 45/16
spell [1]   7/11
spoke [7]   13/17 13/23 59/8
 59/9 69/5 69/15 72/12
spoken [6]   21/9 64/12 64/17
 69/13 76/8 76/20
spot [2]   27/21 28/1
standing [1]   42/21
standpoint [1]   31/18
start [1]   5/10
started [5]   38/16 38/17 38/23
 56/18 58/22
state [8]   1/1 1/21 18/9
 29/22 75/20 78/1 78/5 78/23
stated [10]   16/10 16/10 17/14
 31/23 32/3 37/22 39/14 58/2
 58/2 62/9
statement [64]   3/10 8/23 9/4
 9/7 18/1 18/6 18/11 19/15
 21/1 21/2 23/3 24/17 25/9
 25/16 27/1 27/5 27/17 28/13
 29/23 31/3 32/8 33/23 34/2
 34/8 35/13 35/14 35/17 35/22
 36/1 36/7 36/11 36/17 37/5
 38/7 38/11 38/12 39/2 39/7
 39/13 39/23 40/6 40/13 41/1
 41/10 41/13 42/2 42/3 42/10
 42/16 43/2 43/18 43/19 44/6
 44/9 45/10 52/1 53/5 54/2
 57/12 58/9 58/12 63/5 64/5
 73/9
statements [10]   27/23 40/17
 40/22 41/6 41/9 43/22 43/23
 44/4 45/13 45/17
states [2]   57/14 61/3
stating [1]   5/2
station [2]   35/22 57/11
stealing [1]   45/4
steam [1]   21/19
still [4]   33/21 70/2 72/3
 72/4
stipulated [4]   4/3 4/8 4/12
 4/16
stole [2]   45/4 45/5
story [2]   17/18 58/4
Street [3]   1/18 2/13 5/4
strike [1]   48/4
subject [2]   24/6 64/21
submit [1]   51/4
submitted [1]   75/11
subscribed [1]   78/18
subsequent [1]   27/2
subsequently [1]   44/3
such [7]   45/5 45/5 45/5 45/6
 45/6 45/6 47/1
sufficient [4]   46/4 55/2 70/2
 75/11
Sunday [1]   51/10
superintendent [1]   60/22
supervise [3]   5/20 6/8 6/10
supervision [1]   6/20
supervisor [4]   8/15 8/16 9/6
 13/21
supervisors [1]   51/23
supplemental [7]   3/9 53/17
 59/15 59/18 59/21 60/15
 60/20

supplementary [2]   56/19 59/6
supporting [6]   3/13 45/20
 54/5 55/1 56/23 73/10
supposed [1]   28/17
SUPREME [1]   1/2
sure [35]   10/14 12/7 15/1
 15/10 15/23 17/4 18/13 18/15
 20/9 20/11 20/13 20/19 20/21
 24/14 24/22 27/11 34/23
 35/12 37/10 41/5 42/6 43/8
 43/13 47/18 49/4 50/5 50/11
 52/3 56/1 58/11 58/17 63/3
 66/11 73/17 74/23
surprise [2]   71/11 71/15
swear [1]   26/19
swore [2]   44/17 45/9
sworn [11]   5/2 8/23 9/4 9/7
 23/3 27/22 38/6 39/23 40/13
 44/20 78/7
system [2]   11/10 55/21

**T**

take [9]   8/18 9/1 9/9 9/10
 16/8 16/14 27/9 47/16 60/19
taken [10]   9/3 17/10 27/13
 27/15 40/6 40/18 40/22 41/14
 78/8 78/9
taking [4]   24/17 37/2 39/13
 63/23
talk [2]   58/8 75/9
talked [2]   54/11 76/11
talking [7]   16/3 29/9 38/19
 65/4 65/8 68/4 68/9
talks [2]   57/10 60/22
taught [1]   44/23
technical [1]   65/11
technically [4]   6/14 10/12
 10/16 11/8
tell [8]   6/7 32/8 40/4 42/17
 43/2 43/5 43/9 43/11
telling [16]   17/10 17/11
 21/22 22/15 22/21 39/20
 40/19 40/23 41/4 57/19 58/1
 58/5 58/6 58/22 58/23 61/17
tells [1]   37/13
terms [6]   6/19 12/6 13/16
 51/18 65/19 72/17
testified [1]   5/5
testifying [1]   28/5
testimony [6]   4/13 4/18 4/20
 31/19 31/20 78/13
than [5]   19/12 40/16 47/2
 64/15 73/1
thank [4]   48/3 73/5 74/18
 77/10
that [350]
that's [33]   8/5 9/1 10/17
 11/16 12/20 22/19 28/5 30/13
 34/16 38/22 45/15 46/1 47/12
 49/5 52/22 54/22 55/17 56/23
 57/20 59/19 60/14 61/20
 63/20 65/10 65/18 67/7 67/14
 67/15 69/8 69/10 72/7 75/22
 77/2
their [6]   4/4 25/16 41/20
 57/15 62/18 74/14
them [12]   9/10 12/12 21/16
 38/15 44/2 44/6 46/22 48/17
 54/3 64/13 75/9 76/17

T

then [46]   5/18 9/3 9/6 9/15
9/16 10/10 11/4 11/23 12/5
14/13 16/10 17/15 17/23
22/20 22/23 23/2 23/4 23/14
33/5 43/23 45/20 45/20 46/5
47/5 49/14 49/17 50/16 51/11
51/21 52/16 54/18 56/13
56/18 57/18 58/2 58/2 61/20
62/2 62/4 69/5 69/12 71/23
72/17 73/8 73/19 74/1
there [66]   8/10 8/19 10/1
10/19 11/10 12/9 14/21 15/12
16/17 18/19 18/17 25/6 25/16
26/10 26/13 28/1 28/4 30/14
30/20 31/10 33/2 33/4 34/21
35/5 38/11 39/8 41/22 43/19
44/7 47/6 47/23 48/10 48/12
48/19 49/14 50/1 50/16 52/2
52/5 52/8 52/9 52/12 52/16
53/1 53/1 53/4 55/2 55/5
55/9 56/1 56/1 57/2 59/4
61/9 62/12 63/7 63/12 64/5
64/20 68/22 73/8 73/12 73/21
74/9 74/9 77/1
there's [2]   9/3 48/22
thereafter [1]   78/10
thereof [3]   26/4 60/23 78/17
these [12]   8/11 10/7 13/1
26/20 27/2 28/1 30/23 37/1
42/17 43/17 46/2 52/9
they [59]   6/22 6/23 8/17
8/17 8/18 12/11 14/13 14/23
17/21 18/9 18/16 18/18 20/17
27/23 29/6 29/9 31/19 31/20
38/14 39/1 39/4 39/9 39/16
41/16 41/18 42/10 42/12
42/19 42/20 43/2 43/9 43/10
45/1 46/20 46/22 47/21 48/8
48/9 48/10 48/11 48/13 48/15
48/16 48/20 48/20 48/21
49/13 49/14 49/15 49/16
50/16 50/18 53/6 61/7 61/14
61/16 64/9 64/12 64/17
they're [4]   8/16 30/22 46/22
53/7
thing [3]   5/21 26/14 66/16
things [2]   20/5 20/12
think [13]   9/22 10/6 11/7
15/6 15/18 21/7 22/15 25/14
25/14 43/11 43/15 62/4 64/7
thinking [4]   43/5 50/12 65/8
77/8
third [3]   1/18 2/13 25/15
this [79]
those [5]   7/5 41/3 41/9
43/22 44/4
though [2]   53/23 69/10
thought [3]   46/4 47/6 69/6
threat [1]   46/22
threatened [1]   14/14
three [2]   6/16 50/6
threshold [4]   42/22 43/3 43/3
43/10
through [7]   4/4 33/5 37/9
51/3 54/16 54/18 67/14
throughout [1]   5/15
Tim [2]   23/8 23/9

time [26]   4/10 16/18 16/22
19/16 19/23 22/5 22/7 22/8
28/10 31/2 35/1 35/3 36/16
40/6 45/6 49/3 50/9 51/23
61/23 66/7 69/15 73/7 74/21
74/22 78/9 78/14
timely [2]   75/1 75/6
times [3]   6/13 30/21 40/11
today [1]   30/16
told [16]   19/11 19/14 22/18
39/22 48/16 48/17 57/18 58/4
58/23 59/5 59/11 61/16 61/17
65/20 66/23 68/17
too [5]   52/4 52/13 66/6
69/19 69/22
took [16]   18/7 23/1 23/16
27/17 28/6 28/8 28/12 36/7
36/10 36/10 36/20 37/5 38/7
41/9 61/21 64/10
top [3]   28/11 53/4 58/10
tracking [1]   32/23
transcribed [1]   78/10
transcript [2]   4/13 4/18
transport [1]   63/7
transporting [1]   49/5
trial [1]   1/15 4/10
tried [1]   48/10
trigger [1]   74/14
true [3]   41/2 58/12 78/12
truth [12]   22/16 22/22 39/21
40/19 40/23 41/4 57/19 58/2
58/5 58/7 59/1 61/17
truthful [4]   21/8 21/14 41/16
58/17
truthfulness [1]   21/21 41/13
try [1]   61/11
trying [1]   55/21
turn [1]   66/17
turned [3]   41/2 51/8 74/3
two [14]   20/14 31/1 32/20
35/2 41/6 42/5 43/22 52/5
52/8 52/10 52/17 55/17 59/15
75/12
type [2]   21/15 45/19
typed [1]   45/19
typewritten [1]   78/11
typically [1]   27/23

U

Um [4]   12/2 26/16 54/8 60/5
Um-hum [4]   12/2 26/16 54/8
60/5
under [1]   73/11
understand [1]   34/13
understanding [2]   11/13 33/21
Understood [6]   7/2 8/6 15/2
46/3 46/5 74/18
unfounded [2]   12/8 12/14
unilaterally [1]   51/21
unit [10]   7/3 7/8 7/14 7/18
31/10 31/12 34/21 35/2 35/2
35/7
units [1]   7/5
unrelated [2]   29/10 29/17
until [5]   4/10 30/8 30/15
31/7 50/10
untrue [1]   40/1
up [23]   6/15 7/17 11/9 14/22
17/5 17/15 17/19 41/2 46/1

46/18 47/4 47/21 48/2 48/7
51/12 55/21 62/19 65/22 67/7
70/1 75/9 75/10 77/9
upon [7]   10/7 26/10 42/21
44/10 50/20 71/12 77/13
upset [1]   25/7
us [2]   14/23 67/15
use [2]   18/3 42/7
used [1]   70/3
usually [3]   11/22 27/22 58/11

V

vacation [1]   69/15
vantage [1]   20/10
veracity [1]   41/13
version [1]   78/11
versions [1]   20/3
very [6]   12/23 22/8 25/7
25/7 66/18 69/16
volume [1]   50/19

W

waiting [3]   16/4 50/10 62/22
waived [2]   4/6 4/14
walk [2]   33/4 33/5
walked [3]   32/19 35/21 62/18
want [10]   8/2 19/6 27/9
43/11 47/18 57/20 57/23
66/16 66/19 67/14
wanted [5]   22/22 36/14 48/12
49/16 58/19
warned [1]   40/18
warrant [24]   3/12 46/10 46/17
47/6 47/9 47/10 47/13 47/19
48/21 48/23 49/13 50/14
50/21 51/16 52/2 54/12 62/20
63/4 73/14 74/6 74/8 74/14
75/16 76/2
warrants [2]   17/6 74/12
was [182]
wasn't [7]   26/13 37/21 39/20
47/2 69/16 73/12 74/1
way [10]   22/11 30/12 33/22
36/12 45/18 46/1 57/15 65/21
77/1 78/17
we [55]   6/1 6/13 6/15 7/23
8/22 9/1 9/9 9/11 9/14 10/6
13/1 18/3 21/16 22/12 25/14
25/15 25/16 30/19 30/21 32/3
32/7 32/8 32/15 32/18 33/8
34/1 34/13 35/1 39/3 39/7
43/1 43/2 43/6 44/7 44/12
46/9 46/22 47/4 47/13 50/11
50/13 50/14 50/14 50/15
50/17 51/4 54/2 54/3 62/16
62/18 62/19 62/20 64/1 67/9
69/7
we'll [2]   5/10 50/16
we're [5]   6/14 14/21 19/3
38/19 50/17
we've [1]   30/20
web [3]   74/5 74/11 74/15
Wednesday [1]   51/5
week [2]   6/16 69/17
well [14]   9/2 19/2 19/8
33/19 34/7 38/19 38/22 52/8
52/19 53/2 64/13 69/19 70/16
72/1
went [16]   23/15 25/6 25/8

**W**

went... **[13]**   31/10 31/15
33/11 42/11 47/21 48/6 48/15
48/21 49/2 49/13 49/17 62/16
62/18
were **[39]**   17/21 29/9 32/21
37/19 38/14 39/9 39/13 40/22
42/12 42/20 43/2 43/9 43/14
45/14 45/17 46/21 48/3 48/9
48/16 49/1 49/14 49/21 50/1
50/12 52/9 54/11 59/4 62/19
63/9 63/13 64/12 64/16 65/8
66/8 66/22 69/12 71/4 71/19
75/4
what **[119]**
What's **[2]**   13/2 35/10
when **[49]**   6/18 6/19 6/22
15/22 17/13 17/16 18/20
20/23 25/4 27/15 27/22 30/8
30/19 31/3 31/9 33/15 34/3
36/20 37/16 39/13 44/23
47/19 47/21 48/1 50/18 51/15
61/20 63/10 63/22 65/23 67/6
67/19 67/23 68/8 68/19 69/5
69/8 69/16 71/1 71/2 71/3
71/7 71/8 71/17 72/6 73/8
74/8 74/23 76/2
where **[21]**   10/6 23/15 30/6
32/15 34/2 34/14 34/16 37/1
37/8 46/21 49/15 49/19 50/15
52/2 52/12 54/20 62/17 62/19
62/19 72/8 77/13
WHEREOF **[1]**   78/18
whether **[20]**   15/12 31/10 32/8
32/20 33/8 35/2 36/23 41/3
43/1 43/2 43/10 46/16 55/3
61/6 61/13 63/21 66/7 69/21
75/1 75/6
which **[9]**   38/12 47/8 47/14
49/11 61/9 66/7 70/12 72/12
76/7
while **[2]**   21/5 38/15
who **[18]**   7/8 9/15 11/5 11/19
11/20 23/7 23/11 24/2 27/17
48/17 49/1 49/6 49/9 50/20
54/14 59/6 64/5 69/1
whoever **[2]**   11/7 41/18
whole **[5]**   16/13 16/14 30/22
66/16 76/9
whom **[1]**   56/11
why **[10]**   12/23 25/12 27/19
45/16 46/8 48/8 50/8 55/17
67/21 69/12
will **[5]**   4/17 4/19 16/18
26/10 48/1
window **[2]**   37/12 37/15
without **[5]**   21/12 33/23 36/22
59/3 66/9
witness **[3]**   78/6 78/13 78/18
witnessed **[1]**   64/17
witnesses **[2]**   3/1 64/9
WKS **[1]**   1/6
word **[1]**   50/4
worded **[2]**   65/21 73/3
wording **[4]**   65/11 67/1 68/15
73/12
words **[3]**   13/15 45/3 75/19
work **[2]**   6/15 15/9

working **[6]**   8/16 13/21 22/5
49/8 56/18 72/14
works **[1]**   74/16
worth **[1]**   77/2
would **[71]**   6/15 7/9 8/7 8/8
8/15 8/22 9/9 9/14 9/15 9/16
10/7 10/10 10/22 10/23 11/2
12/7 12/11 14/22 15/19 17/3
20/7 21/19 29/15 32/22 33/5
34/22 35/8 36/23 38/3 38/17
39/1 39/20 40/2 40/5 40/7
41/17 41/18 41/19 42/4 45/2
46/19 46/23 47/4 47/5 47/10
48/21 49/7 49/10 50/2 50/4
50/6 50/13 50/14 50/21 51/4
51/8 51/9 51/12 51/23 51/23
54/16 54/17 55/5 56/12 56/13
64/9 64/19 68/20 71/11 71/15
76/20
wouldn't **[2]**   41/20 55/23
Wozneak **[1]**   72/14
wrap **[1]**   77/9
write **[4]**   6/22 37/14 43/19
68/14
Writer **[1]**   58/1
writes **[1]**   58/9
writing **[1]**   19/12
written **[3]**   44/9 53/8 66/23
wrong **[1]**   66/23
wrote **[8]**   19/12 43/7 46/1
53/11 54/1 65/21 72/7 75/10

**Y**

yard **[1]**   38/14
yeah **[17]**   6/13 10/18 11/14
15/9 17/13 19/16 32/17 33/10
45/2 50/3 51/23 55/7 56/4
66/11 66/19 68/5 70/23
year **[1]**   67/22
years **[2]**   12/13 19/21
years' **[1]**   77/2
yelled **[1]**   37/23
yelling **[3]**   38/15 42/12 42/16
Yep **[3]**   29/21 60/21 69/11
yes **[86]**
yet **[3]**   26/21 53/14 76/18
YORK **[9]**   1/1 1/19 1/21 2/8
2/14 5/4 78/1 78/5 78/23
you **[292]**
you're **[23]**   6/18 6/19 12/15
19/1 19/14 23/22 33/22 40/19
42/21 43/12 46/16 46/17
58/17 59/8 59/11 59/17 60/3
60/13 68/4 69/22 73/21 74/2
74/23
you've **[9]**   19/17 19/22 40/8
40/18 40/18 40/20 40/22
41/14 44/20
younger **[1]**   61/23
your **[24]**   5/14 5/15 5/19
12/20 13/1 13/2 13/7 13/15
13/16 17/15 18/5 21/4 22/13
23/7 23/17 39/15 41/14 44/21
59/21 65/5 70/5 76/7 76/8
76/22
yourself **[3]**   6/12 46/18 75/5