1

**KEVIN WISE**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
----------------------------------------
**CHRISTIAN POWELL,**

                            Plaintiff,

              - vs -      **Index Number
                          21-CV-00721**

**CITY OF JAMESTOWN,
CITY OF JAMESTOWN CLERK,
JAMESTOWN POLICE DEPARTMENT,
JAMESTOWN POLICE CHIEF TIMOTHY JACKSON,
COUNTY OF CHAUTAUQUA,
CHAUTAUQUA COUNTY SHERIFF'S OFFICE,
CHAUTAUQUA COUNTY SHERIFF JAMES B. QUATTRONE,
CHAUTAUQUA COUNTY UNDERSHERIFF DARRYL W. BRALEY,
JOHN DOES 1-10, said names being fictitious
but intended to be any other individual/officers
involved in the within incident and employees
of the CITY OF JAMESTOWN and/or JAMESTOWN POLICE
DEPARTMENT in their individual and official
capacities,
and JOHN DOES 1-10, said names being fictitious
but intended to be any other individual/officers
involved in the within incident and employees
of the COUNTY OF CHAUTAUQUA and/or CHAUTAUQUA
COUNTY SHERIFF'S OFFICE in their individual and
official capacities,**

                          Defendants.
----------------------------------------
            Examination Before Trial of **KEVIN WISE,**

taken pursuant to Federal Rules, via virtual

teleconference, on August 16, 2023, commencing at

12:33 p.m., before PATRICK MCLAUGHLIN, Notary

Public.

2

1   APPEARANCES:          **SHAW & SHAW, P.C.**
                          **BY BLAKE ZACCAGNINO, ESQ.**
2                         4819 South Park Avenue
                          Hamburg, New York 14075
3                         Appearing for the Plaintiff.

4                         **CORPORATION COUNSEL**
                          **CITY OF JAMESTOWN**
5                         **BY ELLIOT S. RAIMONDO, ESQ.**
                          200 East Third Street
6                         Jamestown, New York 14701
                          Appearing for the City of Jamestown
7                         and affiliated Defendants.

8                         **HANCOCK ESTABROCK LLP**
                          **BY MARY L. D'AGOSTINO, ESQ.**
9                         100 AXA Tower
                          100 Madison Street
10                        Syracuse, New York 13202
                          Appearing for the City of Jamestown
11                        and affiliated Defendants.

12

13

14

15          (STIPULATIONS:  Waive filing of

16       the transcript, waive Oath of the Referee,

17       reserve all objections until trial, with

18       exception of objections as to form.)

19

20

21

22

23

**MCCANN & MCCANN REPORTING**

**INDEX**

**EXHIBITS:**                                                          **PAGE:**

＊ ＊ ＊ ＊ ＊

**EXAMINATIONS:**                                                      **PAGE:**

BY MR. ZACCAGNINO                                                          4
BY MS. D'AGOSTINO                                                         70

＊ ＊ ＊ ＊ ＊

**MCCANN & MCCANN REPORTING**

4

1          **MR. RAIMONDO:**  Yes.  The witness is Officer

2    Kevin, K-E-V-I-N, Wise, W-I-S-E.

3          **THE REPORTER:**  Any objection to the remote

4    notarization?

5          **MR. ZACCAGNINO:**  No.

6          **MR. RAIMONDO:**  None from the city.

7          **MS. D'AGOSTINO:**  Reserve read and sign, yes,

8    please.

9

10   **K E V I N   W I S E,** 201 East Second Street,

11   Jamestown, New York 14701, after being duly called

12   and sworn, testified as follows:

13

14          **EXAMINATION BY MR. ZACCAGNINO:**

15

16          **Q.**  Hi, Officer.  I am Blake Zaccagnino.  I

17   represent Christian Powell.  He was involved in a

18   few different incidents that took place back in

19   December of 2020 involving the Jamestown police.

20          The first thing I wanted to ask you was:

21   What do you prefer I call you?  Officer?  Is that

22   okay or is there anything else?

23          **A.**  Yeah.  That's fine.

1      **Q.**    Okay.  Before we get started, I just

2  want to go over some quick rules.  You know, the

3  main thing is I just want to make sure you

4  understand my questions because sometimes I'm

5  confusing or I -- you know, I'll get ahead of

6  myself.

7          So just let me know if -- you know, if you

8  don't understand what I'm asking you.  And then

9  it's -- it's really hard on Zoom because there's a

10  slight delay.

11          So if we could just do our best to have one

12  person talking at a time, that would be great.

13      **A.**    Okay.

14      **Q.**    Is that okay?  Perfect.

15          I have -- I have a bunch of questions for

16  you at the beginning about your education and your

17  background and training.

18          So you know, I can refer you to those -- I

19  can refer you to the time frames that I'm

20  interested in for that part of it, but if I ask you

21  about, you know, a policy and procedure or, you

22  know, how things were at a particular time, I'm

23  mainly interested in how things were in December of

*Wise - Zaccagnino - 08/16/23*

6

```
 1   2020, if that's okay.

 2        A.    Okay.

 3        Q.    So I was wondering if you could just

 4   briefly take us through your education and

 5   training, maybe from high school until now.  Just

 6   the high points.  It doesn't have to be anything

 7   extensive.

 8        A.    Okay.  I graduated from Faulkner High

 9   School.  From there, I went -- I got my associate's

10   degree at Jamestown Community College, and then I

11   got my bachelor's degree out at SUNY Fredonia.

12        After that, I went into the Chautauqua

13   Sheriff's Academy in 2016 and graduated in 2017.

14        Q.    And what jobs have you had, maybe from

15   the time that you got out of the academy until now?

16        A.    Out of the academy, I got hired at the

17   Town of Ellicott Police Department as a police

18   officer.  I worked there until September of 2018,

19   when I got hired at Jamestown Police Department as

20   a police officer, and that's where I've been since.

21        Q.    And -- oh.  So you've -- you've been at

22   Jamestown ever since?

23        A.    Correct.
```

1      **Q.**    Can you just briefly take us through

2   your day-to-day activities within the different

3   jobs as a police officer that you've had?

4      **A.**    So we patrol.  We work the -- we work

5   the city jail.  We help out with community-service

6   details, traffic, traffic control.

7      **Q.**    And back in December of 2020, what was

8   your -- what was your official position with the

9   City of Jamestown?  Like, what was the job title?

10      **A.**    Police officer.

11      **Q.**    And what was your day-to-day activities

12   with Jamestown?  Were you mainly on patrol or were

13   you in the jail setting or a combination of both?

14      **A.**    Yeah.  Primarily, we're on patrol, but

15   we have a rotation where whoever hasn't worked the

16   jail in the longest period of time, they would be

17   the first one up to work the jail.  So it's, like,

18   once every week or two that we work a jail shift.

19      **Q.**    And what's involved in the working the

20   jail shift?  Like, what are the daily activities if

21   you're assigned on the jail shift?

22      **A.**    Well, first, you would -- you would

23   check -- check the jail at the beginning of the

*Wise - Zaccagnino - 08/16/23*

1 shift to make sure there's no contraband, any

2 weapons or anything, anything wrong with any of the

3 cells.

4       And your duty in there would be to, you

5 know, watch -- watch over the -- the prisoners,

6 make sure they're safe, healthy, that they don't

7 need anything.

8       We -- we would also have, like -- we'd

9 perform checks every half hour and -- and complete

10 bookings with finger and photos as well as

11 obtaining property from inmates as they are coming

12 into the jail.

13       And then we have the suicide screenings

14 and -- and constant-watch program where those

15 type -- people that fall under those categories

16 would be placed up front where we could observe

17 them for the duration of the time they're in the

18 jail so they can't harm themselves.

19       **Q.**  And you mentioned the checks or the

20 different rounds that you would do where you're

21 checking in on inmates.  Can you describe that

22 process at all or any sort of policy and procedure

23 that's followed for that?

1      **A.**   So at least every half hour, you have

2  to perform a check.  You have a fob with -- there's

3  little fob -- fobs on the wall that we have to hit,

4  make sure it beeps.

5      And what you would do is you'd go to each

6  wing where the prisoners are located, check on

7  them, make sure that they're okay, they don't need

8  anything.

9      And then after you check, what you would do

10  is you document what each inmate is currently doing

11  so, that way, we can keep a log of it.

12      **Q.**   And you mentioned the log.  Is that --

13  is that a paper log or is it kept electronically?

14      **A.**   It's a paper log.

15      **Q.**   And it generally just would notate the

16  time of the check and then what -- and then what

17  the officer observed in the check?

18      **A.**   Yeah.  It lists the time of the check,

19  the location of the inmate, and then what their

20  current status is; if they're sleeping, if they're

21  awake, if they're reading, whatever they're doing.

22      **Q.**   And you mentioned the suicide

23  screening --

*Wise - Zaccagnino - 08/16/23*

10

1      **A.**    Yes.

2      **Q.**    -- and inmates that might fall into

3   that category.

4         Can you just describe what that is and what

5   type of inmate would fall within that category?

6      **A.**    So we have -- some inmates will come

7   into the jail, and the officers that were on scene

8   will advise the -- they'll advise the jailer if the

9   inmate coming in has made any comments of self

10  harm, harm to others, or shown any behavior that

11  might reflect that.

12        And if a person does, you know, display

13  that, then the arresting officer can let the jailer

14  know so that he can put that person on a constant

15  watch so they're within his sight throughout the

16  entire time that they're in the jail until

17  arraignment.

18        And the -- so anybody that would -- that

19  would want to harm themselves or others would fall

20  into that category, but we also have the suicide

21  screening in the jail where we would -- we would go

22  down through a list of questions and -- and ask.

23        That way, we can determine if the person

1  falls under that category or not.

2      **Q.**   Okay.  And this might sound silly, but

3  what are -- but what's the purpose of an inmate

4  that is -- falls within that category of having

5  suicidal ideations or harming themselves?

6      Like, what's the main reason why they're

7  under constant observation, you know, just based on

8  your training and experiences?

9      **A.**   The reason we put them under a constant

10  watch is so -- like, if we already have -- if we

11  already have an idea that they have thoughts or

12  behavior that show that they want to harm

13  themselves or others, we want to be able to watch

14  them the entire time to make sure they're not going

15  to harm us, they're not going to harm other

16  inmates, they're not going to harm themselves.

17      That way, while they're in the jail, they're

18  safe as well.

19      **Q.**   And what sort of precautions does -- or

20  have you taken or you observed taken at Jamestown

21  regarding inmates that fall within that category of

22  constant observation to prevent self harm?

23      For example, like, a restraint chair, a

*Wise - Zaccagnino - 08/16/23*

1  padded room, a helmet, is there -- can you talk to

2  us about any sort of tools that Jamestown would

3  have to use in that situation?

4       **MS. D'AGOSTINO:**  Objection.  You can answer

5  if you understand the question.

6       **THE WITNESS:**  One of the -- so one of the

7  tools that we do have is the -- is the restraint

8  chair.  If somebody is in the jail and they are --

9  if they're trying to harm themselves or if I'm

10  completing a check and they're trying to harm me,

11  that's when we would utilize -- we would utilize

12  the restraint chair.

13       If the person displays those types of

14  behavior, unless they needed -- if they needed some

15  sort of medical assistance in between, we wouldn't

16  put them in the chair to get -- to get seen.

17

18       **BY MR. ZACCAGNINO:**

19       **Q.**  And can you describe what the -- what

20  the -- sorry -- what the restraint chair is and how

21  it prevents people from harming either officers or

22  themselves?

23       **A.**  The restraint chair's a padded chair

*Wise - Zaccagnino - 08/16/23*

13

1   with straps that's attached to the floor that it --

2   it will -- it will hold their arms, legs,

3   shoulders, waist down.

4        That way, they can't -- they can't continue

5   to perform these behaviors.

6        **Q.**   And in what situations do you, you

7   know, based on your training -- training and

8   experiences or policy and procedure would someone

9   be placed in the restraint chair?

10        Like, what sort of -- what sort of

11   observations would warrant that, I guess?

12        **A.**   I mean, if they have -- typically, it's

13   going to be if they have -- if they have a suicide

14   attempt or they start harming themselves in the

15   jail or, like I said, harming -- trying to harm us.

16        **Q.**   And where are the -- the inmates that

17   are under constant observation kept?

18        Are they kept in certain areas of the jail

19   or is it -- you know, can you describe that for us?

20        **A.**   So we have three locations where we can

21   keep -- well, four if you count the restraint

22   chair, where we can keep people that are constant

23   watch.

1        We're in the booking room, and we have a --

2   a bench that's in with us that we attach handcuffs

3   to and leg shackles.

4        So we have the booking room where they could

5   be kept.  We have the hall bench, which is within

6   sight of us through the window; and the tank, which

7   is also in sight through the window; and then the

8   restraint chair.

9        **Q.**   And in those different areas, can you

10  describe how an inmate that's under constant watch

11  is restrained?  Like, if they're handcuffed to

12  something or if they're free to roam around in a

13  cell, can you describe that for each location?

14       **A.**   So in the tank -- the tank is the only

15  spot where they would be free to roam around.

16       The hall bench and the booking bench would

17  have eye hooks where we can attach handcuffs or we

18  can hook the leg restraints to the metal posts that

19  go to the floor.

20       So they would have -- on the hall bench or

21  the booking bench, they would have at least one

22  form, whether it be a handcuff or a leg shackle.

23       **Q.**   And how is it determined where a

 1 | constant-observation inmate is kept?

 2 | **A.** That's up to the jailer at the time.

 3 | **Q.** Okay. And is it up to the -- regarding

 4 | what sort of supervision a person is getting, for

 5 | example constant or non-constant or, you know,

 6 | something different, is that a decision that's made

 7 | by the officers that were on scene and interacting

 8 | with the person that's in custody or is that a

 9 | decision made by the jailer or somebody at the

10 | jail?

11 | **A.** It's a combination of the -- the

12 | arresting officers that are on scene because they

13 | have the first contact with the person.

14 | So anybody at the jail is not going to know

15 | if this person, you know, made any suicidal

16 | comments, tried to harm themselves. They're not

17 | going to have any of that information.

18 | So it's a combination of the arresting

19 | officer, the jailer based on -- because people are

20 | going to be in with others, other inmates, if they

21 | do something in front of him or he's going the same

22 | person that provides the suicide screening.

23 | So between the arresting officer's

1 observation, the suicide screening, any

2 observations made by the jailer.  And then the

3 shift commander also can make that decision.

4      **Q.**  Can you tell us about any -- any

5 training or experiences you've had regarding

6 handling an inmate in a jail setting who is either,

7 you know, like, thrashing or hitting their head off

8 the wall or doing anything similar to that other

9 than what we've talked about?

10      **A.**  If somebody was hitting their head off

11 the wall, typically, I would place them in the

12 restraint chair at that time because that's our --

13 that's our method in the jail to prevent them from

14 any self-destructive behavior.

15      **Q.**  Okay.  Okay.  And is -- is there any

16 sort of process of re-evaluation of an inmate in

17 whether or not they would go into a restraint chair

18 based on their -- based on their behavior while

19 they're in the jail?

20      So for example, if they're -- maybe they

21 were -- they were self harming at one point and

22 then maybe they calmed down and they -- they got

23 worse again, is there any sort of process of

1 re-evaluation that happens?

2       **A.**    So like, on scene, if the person is

3 doing things like that, but then they deescalate

4 themselves or we're able to deescalate them on the

5 way to the jail or while they're in the booking

6 room, if they start to deescalate, we kind of come

7 down with them.

8       I'm not going to stick somebody in the chair

9 that's just visibly upset or, you know, not -- not

10 attempting to harm themselves or us at that time.

11       But if the behavior begins again, then

12 that's when I would place somebody in the restraint

13 chair.  If we're in the jail and that behavior

14 starts again, then we would do that.

15       **Q.**    And have you had any experiences with

16 inmates who -- who were on constant observation and

17 who, you know, harm themselves at one point and

18 then you're observing them and you're noticing that

19 they're not -- you know, they haven't harmed

20 themselves again but they're getting upset and

21 agitated and you're kind of on alert to say, okay,

22 I need to put the person in the restraint chair or

23 take some other action to prevent self harm?

1        **A.**    Are you asking if they attempted to

2   harm themselves in the jail?

3        **Q.**    Yeah.  So if they either harm

4   themselves or attempted it at one point and -- you

5   know, when they were in your custody and then maybe

6   they calmed down and then they're -- you're

7   noticing them getting upset and you -- getting

8   upset and kind of leaning towards doing it again,

9   harming themselves again.

10       **A.**    It's -- so it's if they harmed

11  themselves, attempted to harm themselves in the

12  jail, then they would go -- they would be placed in

13  the restraint chair.  So if they had done that,

14  they would be placed in the restraint chair.

15       If we were to pull them out of the restraint

16  chair and now they've calmed down after the two

17  hours is up, they've calmed down, they're fine

18  again and I can tell they're getting agitated, I

19  can't just stick somebody in the chair just simply

20  because they're upset, agitated because I think

21  they might do something.

22       There has to be something to go along with

23  it, so whether that be an inmate hitting his head

1  or trying to hang himself or something along those

2  lines.

3       **Q.**   And in those situations where maybe

4  someone was in the chair and then they're --

5  they're taken out and then they seemed to have

6  calmed down but you can tell they're getting

7  agitated, can you tell us about any sort of policy

8  and procedure that you follow in that situation

9  where, you know -- I know that you can't put them

10  back in the chair just because you think they're

11  getting agitated.

12       But are there any extra precautions that you

13  take to say, okay, I can't put this person in the

14  chair, but I can tell that they're getting

15  really -- really frustrated so I'm going -- I'll

16  just making something up -- give them a helmet or

17  sit next to them to make sure they're not going to

18  hit their head or do anything to harm themselves?

19       **A.**   So we don't have any helmets or

20  anything in our jail.  And typically, in our jail,

21  there's one jailer, and there could be a number of

22  inmates.  So we could -- we wouldn't be able to sit

23  with them the entire time.

1   Typically, if I could tell someone was
2 getting agitated, getting upset, they're still
3 going to be on constant watch because they, you
4 know, met that criteria.

5   Somebody like that, I might try to verbally
6 deescalate them and talk to them; you know, try to
7 figure out what's going on; see if they want some
8 water; see if they want a blanket; try to work with
9 them to try to help calm them down.

10   **Q.** Okay.  And can you tell us what 9.41
11 means, 9.41?

12   **A.** So a person that is in a state where
13 they wish to harm themselves or others, they would
14 fall under the mental hygiene 9.41 where we would
15 transport that person to the hospital.

16   Or if they're already in the jail, we would
17 make them a 9.41 constant where, after arraignment,
18 they would be taken to the -- the hospital to be --
19 to receive psychiatric evaluation.

20   **Q.** Okay.  And from my understanding,
21 there's a difference between maybe you're just
22 observing someone that's odd behavior, not to be
23 disrespectful, but that's not charged with a crime

1  versus someone that's a 9.41 that is charged with a

2  crime?

3       Are those different policies and procedures

4  for both of those scenarios?

5       **A.**   So if -- if we're on a call and there's

6  no arrests to be made and the person, you know,

7  falls under the 9.41 criteria, that person would be

8  taken straight to the hospital because we have no

9  reason to transport them to our jail.

10       The -- once somebody's in our custody,

11  whether it be they had a warrant or, you know, new

12  charges, once they're in our custody and they begin

13  to, you know, make suicidal comments, they try to

14  harm themselves, try to harm us, then we would --

15  we would just leave the 9.41 paperwork, and that

16  would be given to the jailer so he knows they're on

17  constant watch, they need to go down to the

18  hospital after -- after they are released.

19       That's -- that's the entire point of our

20  observation with the suicide screenings and

21  constant watch.

22       **Q.**   And when is someone -- well, who -- is

23  it always a Jamestown officer or City of Jamestown

1   employee who makes that call at -- in the jail,

2   whether someone's a 9.41 or not or does that -- is

3   that decided by someone else?

4         **A.**   So as long as it's our arrest, yeah,

5   they would be -- if it's an arrest that was made by

6   a Jamestown officer or it's something that occurred

7   in the jail, then it would -- it would always be a

8   Jamestown Police Department officer.

9         But sometimes, we have -- we have prisoners

10   come in from the Town of Ellicott or the Sheriff's

11   Department where they might make a comment to them

12   and they can advise us depending on whatever their

13   procedure is.

14         **Q.**   And you've kind of -- and you've

15   explained it in detail, but what information does

16   that give you regarding the amount of supervision

17   that an -- that an -- that an inmate needs if you

18   know, okay, this person -- maybe you weren't

19   involved in this arrest, but you know this person

20   is a 9.41.

21         Like, what does that tell you about the

22   level of supervision needed on an inmate and maybe

23   what their particular needs are to make sure that

1 they don't hurt themselves?

2      **A.**   Once -- once I have that information,

3 that's when I would -- at that point, I know

4 they're on constant watch, they have to stay in

5 front of me.

6      I know they're going to be -- typically,

7 they're going to be the most needy inmates in the

8 jail.  So they're going to get -- primarily,

9 they're going to get your attention first because

10 they're up there with you.

11      A lot of times, they're in the booking room

12 with you, so you can engage with them, you can talk

13 to them and try to deescalate them to try to -- you

14 know, to try to help them through.

15      **Q.**   Okay.  Okay.  I'm just going to jump

16 around a bit because we've covered a good amount of

17 the initial questions I wanted to ask you.

18      Other than -- other than the -- the 9.41 and

19 putting inmate on constant observation, can you

20 tell us about any other policies and procedures

21 that would apply to a situation where you suspect

22 that an inmate is going through some sort of a

23 mental health crisis or their mental health is just

*Wise - Zaccagnino - 08/16/23*

1  deteriorating?

2      **A.**    Are you asking me if -- so if they

3  haven't met, like, the constant-watch criteria and

4  you think they might be -- or are you saying

5  they're already on constant watch?

6      **Q.**    Yeah.  They're already on constant,

7  yeah.

8      **A.**    I mean, if you think they're getting

9  worse while they're already in the jail, it's not

10  like, you know, a medical issue where, you know,

11  EMS can come to the jail and evaluate this person,

12  then they would remain on constant watch and you

13  would pay attention to them and try to talk to

14  them.

15      **Q.**    Did you say pay attention to them a

16  little more or just pay attention to them?

17      **A.**    You know, if you think that they are

18  deteriorating, you're probably -- you would focus

19  more on the -- on that inmate versus one that's

20  just in a cell sleeping.

21      **Q.**    And what sort -- based on your

22  experiences, what sort of -- for lack of a better

23  term, signs and symptoms, do you look out for on an

1  inmate that's in your care or a suspect that's in

2  your care that might have a mental health condition

3  that's getting worse and worse and worse?

4       **A.**   Typically, you're watching for the

5  self-destructive behavior where they're hitting

6  their head; they're, you know, trying to -- trying

7  to hurt themselves; trying to break the cuffs or

8  shackles off of the bench.

9       You're watching for any -- any cues like

10 that to where, you know, you would need to

11 intervene.

12      **Q.**   Got it.  Okay.  And did you -- did you

13 receive any sort of specific training regarding any

14 sort of mental health conditions, for example, like

15 a PTSD or an anxiety disorder or, you know,

16 anything similar to that?

17      **A.**   I know we -- we talked about it in

18 the -- in the academy a little bit, just how to

19 deal with emotionally disturbed persons and --

20 yeah.

21      **Q.**   Okay.  Is there any medical -- is there

22 any medical staff at the Jamestown jail?

23      **A.**   We don't have any medical staff at the

1   jail.  Jamestown Fire Department is connected to

2   the police department, so they're just through the

3   garage.

4           Typically, if we call to EMS and they're

5   going by, they'll come into the jail and ALSTAR, if

6   needed, as well.

7           **Q.**   Okay.

8           **A.**   Yeah.

9           **Q.**   Is there -- is there any part of the

10  suicide-screening process that involves questioning

11  the -- the inmate or suspect regarding any sort of

12  past mental health diagnoses or treatment?

13          **A.**   Yeah.  There's a question on the

14  suicide screening that asks if they've ever

15  received mental health counseling.

16          **Q.**   And how does that play into the result

17  of the suicide screening?  Like, what is that --

18  what is that -- like, if the answer was yes or

19  no -- or I'm sorry -- if the answer to that was

20  yes, if they had a previous treatment or previous

21  diagnosis, how does that play into the amount of

22  supervision that you give them?

23          **A.**   So simply the fact that they had

 1  previous mental health -- received mental health

 2  assistance anywhere, that -- that wouldn't make

 3  them a constant watch by saying yes or no.

 4       It would be off the jail officer's

 5  observations and if they're currently -- if they

 6  tell you they've had a past suicide attempt within

 7  the previous year, you know, if they have nothing

 8  to look forward to, those -- those are the -- those

 9  are the ones that would automatically make them a

10  constant watch.

11       Them wanting to harm themselves, that --

12  that would create the 9.41 as well as the constant

13  watch.

14       **Q.**   Okay.  So basically, the -- so the

15  suicide screening, does that -- is that the

16  questionnaire that you go through that leads to

17  the -- leads to the 9.41 or are they two separate

18  things?

19       **A.**   They can be separate.  They can be

20  together.  It just depends on how that inmates

21  answers -- how they answer the questions.

22       They can be a 9.41 before I even read them

23  the questions.  Sometimes I just read them to kind

 1  of gauge, you know, where they're at.

 2       Maybe they were suicidal on scene, but now

 3  they've calmed themselves down.  I still like to

 4  ask them so I know, plus it allows me to talk to

 5  the person and try to deescalate them.

 6       **Q.**  Did it jump up?  So the suicide

 7  screening, does that -- basically, does that

 8  determine -- that just goes to the amount of

 9  supervision that someone needs?  Is that --

10       **A.**   Yeah.  The suicide screening helps

11  determine if they're going to be constant watch or

12  if they're going to be placed in the male block.

13  Yeah.

14       **Q.**   And have you had any -- have you had

15  any experiences in -- you know, I'm assuming in the

16  question that you had a similar experience with

17  Christian, but I'll -- I'll get to that in a bit.

18       But have you had any experiences other than

19  Christian with inmates that were banging their

20  heads off walls or banging their head off the

21  ground or off of objects trying to harm themselves?

22       **A.**   Yeah.  In the jail, I've had -- I've

23  had people start to hit their heads.

1          **Q.**    And other than what we talked about --
2    I think you mentioned putting them in the restraint
3    chair and/or putting them on constant observation.
4          Are there any other precautions that you've
5    taken -- that you've taken in that situation, where
6    you've observed someone hitting their head off the
7    walls or off of objects or off the ground?
8          **A.**    I have not.  The restraint chair is the
9    thing I've used.
10          **Q.**    Okay.  I want to shift gears and talk
11    about any training or experiences that you had in
12    the use of force in general.
13          **A.**    Yeah.  We received training in the --
14    in the sheriff's academy for use of force, and then
15    we receive yearly use-of-force training through the
16    department.
17          **Q.**    And can you describe for us just
18    generally what the Use of Force Continuum is?
19          **A.**    So the Use of Force Continuum helps us
20    determine -- based on the person, the suspect,
21    their actions and behavior, helps us determine what
22    level of force is reasonable to use at that -- at
23    that time.

*Wise - Zaccagnino - 08/16/23*

1    **Q.**    And can you -- can you describe for us

2    the -- the different levels of resistance that are

3    within the Use of Force Continuum and then what

4    level of response that you can give to a certain

5    level of resistance?

6    **A.**    So first would be on the -- the

7    suspect, subject's side; psychological

8    intimidation, like them taking a shirt off; just

9    showing any sort of, like, fighting behavior;

10   verbal noncompliance, where they're not listening

11   to our verbal commands; passive resistance, where

12   they would be just, like, dead weight; like,

13   defensive resistance, tensing up, trying to --

14   they're trying to pull away; then, like, active --

15   actively resisting, where the person's actively

16   trying to fight with us.

17        And then the next level would be if they

18   were trying to -- if they were trying to harm us,

19   like, with a deadly weapon or kill us.  Then that

20   would be the last level.

21        And then on our side, it would be our -- our

22   presence.  So when we show up, we're in uniform.

23   They know that we're a police officer, our verbal

1  commands.

2       Then we have soft-hand techniques, which are

3  grabs and takedowns; and hard, empty-hand

4  techniques, which would be strikes, kick, anything

5  of that nature.

6       Then it would be weapons, like TASER and OC

7  spray, and then deadly physical force would be at

8  the top.

9       **Q.**   And what sort of response can you give

10  if someone's passively resisting?  For example,

11  they're just -- they're just being dead weight,

12  what sort of force can you use in that situation?

13       **A.**   So if somebody's just passively

14  resisting and they're dead weight, at that point,

15  we can -- we can use, like, soft, empty-hand

16  techniques where we're using takedowns or we're

17  going hands-on at that point.

18       **Q.**   And have you received any sort of

19  specific training or have you had any sort of

20  specific experiences with using force on an inmate

21  during the course of an arrest that is either

22  threatening self harm or doing any sort of action

23  to harm themselves?

1    **A.**    Yeah.  I've had -- I've had people in

2    the past that have been attempting to harm

3    themselves or threatening -- threatening harm.

4        And that's when we try to do what we can to

5    try to, obviously, prevent that.

6        **Q.**    And what sort of precautions or steps

7    do you take in that situation to prevent self harm?

8        **A.**    Well, the -- if -- if they're just

9    stating that they want to harm themselves, then

10   that's where the 9.41 process would begin.  We

11   would complete that.

12       If they're actively trying to harm

13   themselves, like hitting their head, we would -- we

14   would post on their head by placing our hand on the

15   back of their head, that way -- or the side of

16   their head.

17       That way, they can't get any leverage to

18   continue banging their head.

19       **Q.**    Can you tell us about any sort of

20   policy and procedure that applies to a situation

21   where you have an inmate that, during the course of

22   an arrest, is threatening self harm or actually

23   doing actions to harm themselves regarding how you

1  would -- you would restrain them and transport them

2  to the jail without them harming themselves

3  further?

4          **A.**    Typically, if -- if we're able to, we

5  would -- we have -- we always handcuff in the back.

6  That way, they don't have access to -- you know,

7  their hands aren't free.

8          But we would transport and, if needed, we

9  would -- we could stop, address the situation, try

10  to get them to calm down.

11          But typically, we would transport to the

12  jail, since it's a short distance away, and then

13  address the situation there.

14          If it was something where that person needed

15  medical attention immediately, we would have EMS

16  meet us or transport to a local hospital.

17          **Q.**    And now, on December 10 of 2020, you

18  were a Jamestown officer, right --

19          **A.**    Yes.

20          **Q.**    -- Jamestown employee on that night?

21          **A.**    Yes.

22          **Q.**    And were you -- were you working that

23  night?

*Wise - Zaccagnino - 08/16/23*

34

1        **A.**    Yes.

2        **Q.**    Okay.  And who -- what shift were you

3    on on December 10 of 2020?

4        **A.**    Night shift, which is eleven to seven.

5        **Q.**    Okay.  And who was on the night shift

6    with you?

7        **A.**    That night, I know Lieutenant Ward was

8    the shift commander.  Officer Schimek, he was on

9    the command deck.  Officer Conklin was in the city

10    jail.  Myself and Officer Obergfell were on patrol

11    and Officer Johanson was on patrol that night.

12        **Q.**    Okay.  Okay.  I just want to ask you --

13    I'm just going to ask you some quick questions

14    regarding some specific policies, and then I'll get

15    into what your interactions with Christian were

16    that night.  Okay?

17        **A.**    Okay.

18        **Q.**    And really, the only thing I'm

19    interested in on these policies is if you recognize

20    them and if, to your knowledge, they were in effect

21    on December 10 of 2020.  That's all I'm really

22    interested in.

23        **A.**    Okay.

*Wise - Zaccagnino - 08/16/23*

1          **Q.**   So let me share my screen here.  Okay.

2          Can you see my screen?

3          **A.**   Yes.

4          **Q.**   Okay.  So I want to show you -- and I

5    may -- and I was able to do it where you could see

6    a preview, so this should go a little bit smoother.

7          So I'm showing you what's marked as

8    Plaintiff's A.  Do you see that on the screen where

9    it's got an A on the top-right corner, and then it

10   has number 1.11.01 and then, subject, use of force?

11         Do you see that?

12         **A.**   Yes.

13         **Q.**   And my question is -- and I can page

14   down, but if you've seen this before and if -- if

15   this was a policy that was in effect on December 10

16   of 2020.

17         **A.**   Yes.

18         **Q.**   Okay.  Okay.  So yes to both?

19         **A.**   Yes.

20         **Q.**   Okay.  Okay.  I want to show you what

21   has been marked as Plaintiff's B.  And just in case

22   I got the numbering mixed up, it has number

23   2.02.12.  And the subject is psychiatric evaluation

1 and transports.  Do you see that?

2          **A.**    Yes.

3          **Q.**    Okay.  And same question:  If you've

4 seen it before and if it was in effect on December

5 10 of 2020.  And I can page -- I can page through

6 it.

7          **A.**    Yes.

8          **Q.**    Okay.  Okay.  Yeah.  And it looks like,

9 at the bottom left-hand corner of these policies,

10 it has issued and revised, so that would probably

11 tell us as well.  Okay.

12          I want to go to Plaintiff's Exhibit C.  And

13 so Plaintiff's Exhibit C has policy number 4.02.05

14 and has prisoner custody transport and treatment.

15          Same questions:  If you've seen this before

16 and if it appears to be the policy that was in

17 effect -- a policy that was in effect on December

18 10 of 2020.

19          **A.**    Yes.

20          **Q.**    Okay.  Okay.  And now I'm showing you

21 Exhibit D.  It's policy number 4.05.01, and it has

22 suicide prevention program development.  And it

23 says, effective April 15th of 1994.

1          Have you seen this policy before and was it

2   in effect on December 10 of 2020?

3          **A.**    Yes.

4          **Q.**    Okay.  And then the last one, which I

5   believe is exhibit Plaintiff's D, which has policy

6   number 4.05.08, and it has suicide prevention

7   program referrals of prisoners for mental and

8   medical health service.

9          Have you seen this before and was it the --

10  a policy that was effective on December 10 of 2020?

11         **A.**    Yes.

12         **Q.**    Okay.  I might have mixed that one up,

13  but I'm showing you on the screen policy number

14  4.05.01, and it's suicide prevention program

15  development effective April 15th, 1994.

16         Do you recognize this?  Is this what we

17  just -- did we just look at this one?

18         **MR. RAIMONDO:**  I think we just looked at

19  this one, Blake.

20         **MR. ZACCAGNINO:**  Okay.  Sorry about that.

21  I'm a little mixed up.  Let me see.  I think we

22  might have looked at this one, but -- here.

23

1          **BY MR. ZACCAGNINO:**

2          **Q.**   Here.   The 4.05.01 was just the suicide

3    prevention program development, and it's one page.

4          So have you seen this before and was it in

5    effect on December 10 of 2020?

6          **A.**   Yes.

7          **Q.**   Okay.   All right.   I can stop sharing

8    my screen for now.

9          So I was wondering if I could ask you -- you

10   know, I figure the easiest way that I could do this

11   is to ask you about -- you know, just -- just

12   generally what your -- what your interactions were

13   with Christian Powell on December 10th of 2020

14   maybe from start to finish.

15         And then I can kind of break it down if need

16   be or just kind of jump in to ask you questions, if

17   that's all right.

18         **A.**   Okay.   So the Chautauqua County

19   Sheriff's Department responded to a call at 111

20   Barrett Avenue to speak with Mr. Powell regarding a

21   larceny of titles, and it was stuff with his kids.

22         At an address on -- I believe it was Stone

23   Road that was outside the city.   So when he called,

1  we were advised that Mr. Powell had a valid felony

2  arrest warrant for criminal contempt, first, out of

3  Jamestown.

4          So myself and Officer Obergfell were

5  dispatched to back up the sheriff's car, which was

6  Deputy Madonia.

7          When we arrived on scene, Deputy Madonia

8  spoke with Mr. Powell regarding -- regarding the

9  incident that he -- he had called about, what he

10  wanted to discuss.

11          And at the end of their conversation,

12  Mr. Powell -- throughout their conversation,

13  Mr. Powell was very -- very agitated.

14          He was -- you know, we were trying to

15  deescalate and trying to get him to calm down

16  because it's three in the morning and he's outside

17  yelling and causing a disturbance.

18          So when Deputy Madonia was done speaking to

19  Mr. Powell, Deputy Madonia advised him of his

20  warrant.  So once he was advised of his -- once he

21  was advised of the warrant, he -- he stated no, and

22  he began to reach into his pockets.

23          And at this time, Mr. Powell hadn't been

1  searched.  We didn't know if he had any knives,

2  guns, weapons, anything to harm us on his person.

3       So when he started to reach into his pocket,

4  myself and Officer Obergfell took control of his

5  wrists, and we were attempting to place him into

6  custody and trying to get his hands behind his back

7  because he had the felony -- the felony warrants.

8       He was a threat to us at that time because

9  we don't know what he's -- what he's going to do.

10       He's -- and then at that time, he began to

11  tense up.  He was yelling.  He refused to put his

12  hands behind his back.  He was trying to curl them

13  in front of him and pull away from us.

14       So after several attempts of trying to calm

15  him down, getting him to put his hands behind his

16  back, we used our -- our training, which is

17  handcuff while on the ground because it's a -- a

18  better position for us to gain control.

19       So Officer Obergfell and I performed a

20  two-officer takedown.  I bear-hugged Powell's legs,

21  and that way, he couldn't -- he couldn't run.

22       And Officer Obergfell lowered him to the

23  ground with the arm that he was trying to gain

 1  control of.

 2          I -- so I anchored his legs to the ground by

 3  hugging his legs so he couldn't thrash and kick and

 4  try to get back up because that's a threat to us.

 5          When his hands are underneath him because we

 6  don't know what's in his grabbable area at the

 7  time.

 8          So Officer Obergfell and Deputy Madonia

 9  began to attempt to extract Mr. Powell's hands.

10          We -- we tried talking to him throughout --

11  throughout the arrest.  We -- we tried to get him

12  to comply.  He refused.

13          So they -- they began extracting his hands,

14  pulling them out from underneath him to place the

15  wrist restraints on.

16          At that time, Mr. Powell's mother came

17  outside.  I didn't know it was his mother at the

18  time, but she started approaching us.  I advised

19  her to stay back, which she did, and she was also

20  trying to assist us in calming Christian down.

21          Once -- once we were able to get the wrist

22  restraints on, we -- we kind of got up off him a

23  little bit to just apply pressure just to hold him

 1 | onto the ground so he wasn't thrashing around

 2 | trying to run away or anything.

 3 |     We just kind of sat with him there trying to

 4 | talk to him trying to deescalate him because he was

 5 | clearly agitated.

 6 |     And we advised him that we'll stand you up

 7 | as soon as you calm down.  We tried talking to him

 8 | numerous times.

 9 |     At one point, he was banging his head off of

10 | the gravel, and Officer Obergfell stated that --

11 | that he was bleeding.

12 |     So at that point, I called for -- I called

13 | for EMS for them to come to evaluate Mr. Powell,

14 | make sure there was nothing that needed immediate

15 | attention from medical staff.

16 |     He continued to, you know, show aggressive

17 | behavior and, you know, noncompliance verbally.  So

18 | we -- we stayed with him on the ground.

19 |     We were eventually able to stand him up.

20 | And once we got him up, we were able to check his

21 | pockets.  He -- he was then walked over to a marked

22 | patrol car.

23 |     And we were attempting to place Mr. Powell

1  into the back of the car.  He was still being

2  aggressive.

3       We advised EMS to meet us at the jail.  It's

4  a better location.  It's close.  Jamestown Fire

5  Department's connected to the police department, so

6  we knew that they could meet us immediately.

7       So we decided to just have them meet us

8  there.  We didn't want to put ALSTAR or the fire

9  department in harm's way out in the dark where you

10 can't really see and he's still being aggressive.

11      So we -- we went and placed him in the back

12 of the car.  He was kicking at the car.  We were

13 trying to place him in the back.

14      We were able to get him in Officer

15 Obergfell's car, and then Officer Obergfell

16 transported him to the city jail.

17      **Q.**   And you mentioned that, at one point,

18 he was -- Christian was hitting his head off the

19 gravel?

20      **A.**   Yes.

21      **Q.**   Was that after he was -- after he was

22 handcuffed or was it in the process of being

23 handcuffed?

*Wise - Zaccagnino - 08/16/23*

44

1      **A.**   I was holding -- I was holding

2  Mr. Powell's legs, so my face and body cam was

3  mostly down and those guys were in front of me.  So

4  I couldn't say if it was before or after.

5      **Q.**   And do you know how many -- do you have

6  an estimate of how many times he hit his head on

7  the ground, if it was one time, five times, or

8  something in the middle or something else?

9      **A.**   That, I'm not sure on.

10     **Q.**   Okay.  And can you tell us about

11 anything that was done to either prevent Christian

12 from hitting his head -- hitting his head off the

13 ground or preventing him from self harm just based

14 on your interactions with him prior to using force?

15     **A.**   I'm sorry.  Could you repeat that?

16     **Q.**   Sure.  Can you tell us about any sort

17 of -- any sort of precautions that you took to

18 prevent Christian from banging -- or from hitting

19 his head off the ground?

20     **A.**   I believe Officer Obergfell, he placed

21 his hand on his head to get head control.  That

22 way, Christian could no longer lift his head off

23 the ground to continue to bang his head.

**MCCANN & MCCANN REPORTING**

1       **Q.**   And how is he -- how was he restrained

2    at that point?  Was he -- were the handcuffs behind

3    him or in front of him or --

4       **A.**   I'm not sure if he was -- I'm not sure

5    if he was handcuffed yet at that point, but once we

6    did place the wrist restraints on, they were behind

7    his back.

8       **Q.**   Okay.  And then he was put into the

9    patrol car?

10      **A.**   Yes.

11      **Q.**   Okay.  Was anything done differently as

12   far as how he was restrained within the patrol car

13   to prevent him from any further -- further self

14   harm, for example just, you know, maybe handcuffing

15   his ankle or, you know, preventing further movement

16   or was there anything further done beyond

17   handcuffing him and placing him in the back of the

18   car to prevent further self harm?

19      **A.**   Just the handcuffs at that point in

20   time.

21      **Q.**   And I know that you -- or you might

22   have mentioned this earlier, but -- I think you

23   mentioned -- and you can tell me if I'm wrong.

1       If a prisoner or someone in custody is

2   engaging in self harm on the way to where you're

3   transporting him, you have the option of stopping

4   and going in to address the -- you know, address

5   the suspect?

6       **A.**   Yeah.  If -- so if somebody's -- if

7   they're trying to escape the handcuffs, if they're

8   trying to, you know, damage our car or hurt

9   themselves, we always have the option of stopping,

10  calling for another car wherever our location is to

11  stop -- or try to help any further behavior from --

12  yeah -- from him hurting himself or damaging our

13  property or trying to escape.

14      **Q.**   Did you have any further -- any further

15  interactions with Christian beyond the 111 Barrett

16  and then placing him in the patrol car?

17      **A.**   After that, I responded to the city

18  jail just to assist.

19      **Q.**   And what were your interactions or

20  observations with Christian when he got to the

21  jail?

22      **A.**   Once he was in the jail, he was -- he

23  was kind of -- he was crying.  He was upset, and he

1  would just -- you know, he would start yelling at

2  us.

3          He was -- he was clearly -- clearly

4  agitated, and he would just -- he would kind of go

5  up and down emotionally as he were trying to get

6  his -- as we were trying to get his property from

7  him.

8          **Q.**   And then can you tell us about any

9  observations that you had of him maybe from the

10  time you first got to the -- when you first got to

11  the jail until -- until his arraignment?

12         **A.**   I was only in the jail for the period

13  of time where we -- where we gathered his property.

14  And then after that, I went back out on patrol.

15         **Q.**   And was it -- was it your understanding

16  that, on the way to -- on the way from 111 Barrett

17  to Jamestown jail that Christian was bashing his

18  head off the -- the inside of the patrol car?

19         **A.**   I was not aware of that.

20         **Q.**   Okay.  And did you have any -- did you

21  have any knowledge that -- or is it your

22  understanding that when he first got to the jail

23  and he was taken out of the car, that he hit his

1  head off the trunk of the patrol car?

2       Do you have any knowledge of that?

3       **A.**   I was advised by other officers, but I

4  never saw anything because I wasn't there.

5       **Q.**   And -- and was Christian put into the

6  restraint chair at least from the -- the point

7  that -- or during the time frame that you observed

8  him at the jail?

9       **A.**   No.

10       **Q.**   Okay.  And can you tell us -- and I

11  think you mentioned it earlier, but you can tell me

12  if I'm wrong -- anything that Christian said or any

13  threats that he made during the course of your

14  interaction either at 111 Barrett or at the -- or

15  at the jail where he was threatening self harm or

16  threatening suicide?

17       **A.**   When -- when he was on the ground on

18  Barrett Ave when we were -- when we were

19  handcuffing and he was striking his head, he made

20  suicidal comments.

21       **Q.**   And did he make any other suicidal

22  comments or -- you know, I know that you mentioned

23  when he was at the jail he was crying.  You know,

 1 did he make any sort of other statements that he
 2 wanted to die or anything that you observed?
 3          **A.**   I don't recall.
 4          **Q.**   When -- what was he crying about?  Do
 5 you -- do you remember, like, if it was a -- if it
 6 was regarding his kids or just -- just the general
 7 situation of him being arrested?
 8          **MS. D'AGOSTINO:**  Objection.  You can answer
 9 if you know.
10          **THE WITNESS:**  I'm not exactly sure.  He --
11 he'd mentioned his kids.  He'd mentioned the title.
12 He'd mentioned his -- his girlfriend or
13 ex-girlfriend and not having slept.
14
15          **BY MR. ZACCAGNINO:**
16          **Q.**   And I -- you know, how would you
17 describe -- you know, you pretty much already done
18 it, but how would you describe his behavior at the
19 Jamestown jail based on your observations?
20          You know, I know you mentioned he seemed
21 agitated, but can you describe -- can you tell us
22 how you would describe his behavior at the
23 Jamestown jail based on your observations?

1      **A.**    He went through -- he went through a

2  bunch of emotions from being upset, like I said, to

3  crying to angry to -- he just was kind of all over

4  the place.

5      **Q.**    Did it seem like he was -- he was

6  having some sort of a mental health crisis or if he

7  was just really upset based on the circumstances?

8      **A.**    That, I'm not sure.  Obviously, we had

9  already completed -- at that point, he was already

10  a 9.41 constant watch, so he -- he had already fit

11  that criteria for mental health.

12      **Q.**    Okay.  And then I know that you -- your

13  observations of him at the jail, at the actual

14  jail, was limited, but did you learn any other

15  information regarding Christian's behaviors from

16  the time that you last observed him at the jail

17  until he -- until he left the facility?

18      **A.**    No.  I was on other calls.

19      **Q.**    Okay.  Were you made aware of any

20  further -- any further instances of self harm or

21  self-harming actions that he did from the time that

22  you last observed him at Jamestown jail until he

23  left the facility?

1        **A.**    I was not.

2        **Q.**    Okay.  Okay.  And I think you mentioned

3   who was on the shift or -- and tell me if I'm

4   wrong.  I think you mentioned who was on the scene.

5        And did you tell us who was at the Jamestown

6   jail when you were there?  I don't remember if I

7   asked you that.

8        **A.**    I don't believe you asked.

9        So Officer Conklin, he was the jail officer

10  that day.  Our shift commander, Lieutenant Ward, he

11  was in the jail.

12       Officer Schimek, he was in the jail.  I was

13  in the jail.  Officer Obergfell was in the jail,

14  and Officer Kaitlin Johanson was in the jail.

15       **Q.**    How many other suspects or inmates were

16  at the jail at the time?

17       **A.**    I don't recall.

18       **Q.**    Okay.  Okay.  Can you tell us how

19  many -- I think you mentioned -- well, I can ask

20  you this:  Were there three officers on scene at

21  111 Barrett and then Christian and his mom?

22       Were those the only people that were on

23  scene that you were aware of?

1          **A.**    Those were the only ones that I was

2    aware of at the time.  I do remember that, as I was

3    leaving, a neighbor came outside, but that's --

4    that's all I remember.

5          **Q.**    And I think you mentioned that

6    Christian's mom came out at one point and was kind

7    of coming near the scene.

8          Was she interfering with your arrest at all

9    or did she just kind of show up and you said, hey,

10   back up, and then she was -- you know, she was

11   done?

12         **A.**    Yeah.  She came out.  I advised her to

13   stay back, and she complied.

14         **Q.**    And when -- when you advised Christian

15   that he had warrants and that you had to take him

16   in, did he try to run away at all?

17         **A.**    He didn't try to run.  He just started

18   reaching into his pockets.

19         **Q.**    Okay.  And on -- in your search of him,

20   did he end up having any weapons on him at the time

21   or no?

22         **A.**    I don't recall him having any weapons.

23         **Q.**    And what was he wearing?  Was he

1  wearing his pajamas or was he in jeans or do you

2  know what he was wearing?

3       **A.**   I remember him saying he had a

4  200-dollar pair of jeans on.

5       **Q.**   And what were his -- what charges came

6  out of the incident at 111 Barrett?  Like, were

7  they misdemeanors or felonies or what level of

8  criminal charge came out of that incident?

9       **A.**   Well, so in the beginning, he had the

10 felony arrest warrant.  And then at the scene, he

11 additionally was charged with criminal mischief,

12 four; obstructing governmental administration; and

13 resisting arrest, which are misdemeanors.

14      **Q.**   And the felony -- you said felony

15 contempt?

16      **A.**   Yeah.  He had a felony criminal

17 contempt first arrest warrant.

18      **Q.**   Was it -- what was the nature of the

19 contempt?  Was it violating an order of protection

20 or --

21      **A.**   That, I don't -- I don't know.

22      **Q.**   Okay.  Okay.  Do you know if it was a

23 violent -- if it was considered to be, like, a

1 violent -- I don't know if the term would be

2 violent violation of the order or if it was just he

3 had an order -- he had an order of protection in

4 favor of someone else and the allegation was just

5 that he was present in violating it?  Do you know?

6          **A.**    That, I'm not sure.

7          **Q.**    Okay.  Did you hear Christian, at any

8 point at 111 Barrett, ask to be sent to the

9 hospital for mental health evaluation?

10          **A.**    I don't remember him saying anything.

11 I do remember his mom saying something regarding

12 that.

13          **Q.**    What was she saying about that?  Do you

14 remember?

15          **A.**    I just remember she was trying to

16 deescalate and trying to calm him down so we could

17 stand him up.  We were telling him, we're going to

18 get you up, you just got to calm down, you just got

19 to calm down.

20          And she had said that he needs a mental

21 health eval, and that was shortly after he was

22 banging his head on the ground, which at that

23 point --

1    **Q.**   Okay.

2    **A.**   Which, at that point, he was banging

3  his head and making suicidal comments.  So he was

4  already going to get an eval once released from --

5  or after arraignment at our jail.

6    **Q.**   Did he make any sort of statements

7  regarding having, like, a prior appointment at

8  Jones Hill -- Jones Hill facility for a psychiatric

9  issue or --

10    **A.**   I don't recall.

11    **Q.**   Okay.  And other than what we've talked

12  about, was there anything else done in responses to

13  his mom informing you, like, hey, he's -- he

14  probably needs mental health evaluation?

15    **A.**   I guess -- what are you asking with

16  that?

17    **Q.**   I'm sorry.  I could rephrase.  Any sort

18  of extra precautions taken of -- you know, of -- in

19  response to being made aware that he may have some

20  pre-existing psychiatric issue or, you know,

21  anything else done to prevent him from acting out

22  his self-harming behaviors?

23    **A.**   At that point, we'd taken most of the

1  precautions that we -- we have available.  We made

2  him a 9.41.  We made him a constant watch in the

3  jail.  We had attempted to use head control to

4  prevent him from further harming himself, so --

5       **Q.**   Okay.  Did Christian, at any point at

6  111 Barrett, express that it -- that his handcuffs

7  were too tight?

8       **A.**   I don't recall.

9       **Q.**   Do you recall if his handcuffs were

10  ever -- if the tightness was ever adjusted at any

11  point at 111 Barrett?

12       **A.**   That, I'm not sure because the other

13  officers, they handcuffed him.  I was holding on

14  his legs.

15       **Q.**   Okay.  Okay.  On scene at -- well, I

16  could ask this as a more general question.

17       Was there any point at either 111 Barrett or

18  at the jail that you observed one of the other

19  officers on scene jump in to either prevent another

20  officer from using a certain type of force or take

21  some -- some other action to prevent him from

22  harming himself or were you guys pretty much in

23  agreement on -- on how the situation was being

1 handled?

2        **MS. D'AGOSTINO:** Objection. You can answer

3 if you understand the question.

4        **THE WITNESS:** Yeah. I'm not sure -- I'm not

5 sure what you're asking.

6        **MR. ZACCAGNINO:** Oh. Sure. So what I'm

7 asking is: At any point during your interaction

8 with Christian, whether it was at 111 Barrett when

9 force was used or your observations of him at the

10 jail, did -- were all of the officers pretty much

11 in agreement with how to handle the situation or

12 was there disagreement regarding, you know, okay, I

13 shouldn't use this -- you know, this amount of

14 force should not be used or this amount of

15 supervision should not be used?

16        Do you know what I'm asking? It's a bad

17 question, but I don't know if you understand it.

18        **MS. D'AGOSTINO:** Objection. You can answer

19 if you understand the question.

20        **THE WITNESS:** Yeah. Like, on scene, the

21 force that was used was all agreed upon by all of

22 us. We have a subject that is -- you know, he

23 already has felony arrest warrants.

1        He is not showing us his hands, which are a

2   threat to us when he's placing them in his pockets

3   and we're not sure what he's going to pull out,

4   whether it be weapons.

5        He's actively resisting our arrest at that

6   point in time.  So at that time, he's -- he's

7   actively resisting, so using -- using takedowns

8   are, you know, well within our ability for that

9   level of use of force for reasonableness.

10

11        **BY MR. ZACCAGNINO:**

12        **Q.**   Was he slammed up against the car in

13   the driveway at 111 Barrett?

14        **A.**   No.

15        **Q.**   Did Christian throw any punches at

16   officers or -- or kick officers at all?

17        **A.**   He attempted to kick at us when we --

18   when we placed him in the patrol car.  He tried

19   kicking the car.  And then when we placed him in

20   the car, he tried rolling on his side and kicking

21   out the door at us.  But other than that, I'm not

22   sure if he tried anything else once in the jail.

23        **Q.**   Okay.  And was there -- was there any

1  point during the course of his arrest at 111

2  Barrett where he broke free of -- of -- of any of

3  the officers or was -- during the course of his

4  arrest, did at least one officer have contact with

5  him as far as, like, you know, holding on to him?

6         **A.**    We had contact with him.

7         **Q.**    Okay.  Okay.  Had you had any prior

8  experiences with Christian before that night?

9         **A.**    I don't recall.  I know -- I remember

10  on my body cam, I had stated that I hadn't seen him

11  in a while.  For myself, sometimes I use that as a

12  deescalation tactic because sometimes, it calms

13  them down, like, maybe it's a familiar face.

14         So I'm not sure on that.

15         **Q.**    Okay.  Did he express to -- to anyone

16  on the scene during the course of his arrest at 111

17  Barrett that he -- he couldn't breathe?

18         **A.**    Yeah.  He stated that while he was on

19  the ground as he was yelling and cursing at us.

20         **Q.**    Were there any sort of adjustments made

21  to that -- made in response to that?

22         **A.**    At that point in time, we -- I was

23  still kind of anchoring his legs.  Deputy Madonia,

1   I believe, was holding his -- I think it was his

2   right-shoulder area down.

3          So there was no -- no direct pressure to his

4   neck.  There was no -- there was no adjustment made

5   immediately until he calmed down, and then we --

6   and then we stood him up.

7          **Q.**   Okay.  And at what point during the

8   course of his arrest at 111 did -- did -- you know,

9   I know that you can't -- you can't speak for how

10  the other officers were feeling, obviously, but at

11  what point did you feel that Christian was no

12  longer a threat to -- no longer a threat to you as

13  far as harming you?

14         **A.**   When he -- when he, like, stopped

15  tensing up -- I mean, we could feel he kind of --

16  he stopped tensing up.  He was starting to -- he

17  was starting to be able to talk to us.

18         He asked to be stood up, and at that point

19  in time, we felt that it was time to, you know,

20  stand him up, see if he would remain calm.  That

21  way, we could continue the arrest and transport.

22         **Q.**   Do you know if -- if Christian was

23  given a mental health evaluation per the 9.41

1   before his arraignment or after?

2          **A.**    That, I'm not sure.  My shift ended

3   at -- at seven that day.  So after that, I'm not

4   sure what -- what took place.

5          **Q.**    And is it the -- is it the general

6   practice and procedure to -- that if an inmate is a

7   9.41, they generally will get seen at a hospital

8   after -- after the arraignment and then they're

9   kind of out of your -- they're kind of out of your

10  care?

11         **A.**    Correct.  So if they were -- if they

12  were released -- released on their own recognizance

13  or whatever after arraignment, they wouldn't be

14  permitted to -- they would have to address the

15  mental health 9.41 first.

16         So they would be transported to the hospital

17  before everything was done, but if they were --

18  I've never worked a day shift in the jail, so I

19  can't speak for what happens if they are being sent

20  to -- if they're being sent to Mayville or -- I'm

21  not sure at what point the eval is done.

22         **Q.**    And when you left your shift, which --

23  was that -- that was at 7:00 a.m.?

1          **A.**    Correct.

2          **Q.**    Was Christian still there at the jail

3    when you left?

4          **A.**    That, I'm not sure.

5          **Q.**    And you went to -- when you first got

6    to 111 Barrett, was that at about 3:00 a.m. --

7          **A.**    Yes.

8          **Q.**    -- or 2:33?  Okay.

9          Do you know when he left Jamestown booking

10   or no?

11         **A.**    That, I'm not sure.

12         **Q.**    Do you, by chance, know who was on the

13   day shift on December 10th?

14         **A.**    I don't.

15         **Q.**    Okay.  Did -- did Christian make any

16   statements to you during the course of your

17   interactions with him that he was drinking, that he

18   had been drinking?

19         **A.**    I don't recall that.

20         **Q.**    I just want to go through -- if you can

21   just give me two minutes, I just want to make sure

22   I have all of the exhibits up, and then I will get

23   you finished fairly quickly.  Is that okay?

1          Okay.  Just give me one minute.

2

3          (Whereupon, a recess was then taken.)

4

5          **BY MR. ZACCAGNINO:**

6          **Q.**   Officer, do you know -- I think you

7    mentioned that EMS was called -- that -- sorry --

8    that EMS was called from the scene at 111 Barrett?

9          **A.**   Yes.  I called for them.

10         **Q.**   And what was the reason why it was

11   called or why EMS was called?

12         **A.**   I heard Officer Obergfell state that he

13   was bleeding after he hit his head.  So any time

14   there's any sort of, you know, possible injury, we

15   aren't medical professionals so we like to get the

16   person evaluated to get, you know, a better

17   opinion.

18         **Q.**   And did -- did Christian get any injury

19   during the course of the arrest that was caused by

20   the officers -- by any of the officers using force

21   that you're aware of?

22         **A.**   Not that I'm aware of.

23         **Q.**   And did EMS meet him at the -- the

1  jail --

2         **A.**    Yes.

3         **Q.**    -- or on the scene?  Okay.

4         And then did you observe any other -- other

5  than EMS on the scene, I understand he -- he got

6  some additional care after, but was that the only

7  care that you observed him getting while he was at

8  the jail and then you were kind of off -- you know,

9  you were not involved?

10        **A.**    Yeah.  Once -- once we got his property

11 and ALSTAR evaluated him, after that, I didn't have

12 any more contact with him.

13        **Q.**    Okay.  And what -- what injuries did

14 you notice on him after the -- after he was brought

15 from 111 to the scene -- or to booking?

16        **A.**    Once we got to the jail, I noticed that

17 he had some scrapes -- I can't remember on which

18 side on his forehead -- that were from him bashing

19 his head on the ground.

20        And then I know ALSTAR was checking out a --

21 I believe it was a finger that was bleeding, but

22 other than that, those were the -- those were the

23 only two I was aware of.

1        **Q.**   Okay.  I just want to go through some

2   exhibits here, and I'll go through them quickly.

3   The only thing I'm interested in is if you've seen

4   them before and if they're a fair and accurate

5   representation of the document.

6        **A.**   Okay.

7        **Q.**   So let me -- let me go to my Dropbox

8   again.  I like Dropbox.  It's easy.  Let's see.

9        Okay.  So I want to show you -- I think we

10  marked this one as Plaintiff's Exhibit F, but I can

11  just -- I can describe it.

12       It has Jamestown Police Department report

13  day Thursday 12/10/2020 at 0253.  And then on the

14  top, because I think this was -- this was E-filed.

15  It just has the case number, case 121 and then

16  00721.  Do you recognize this document here?

17       **A.**   Yes.  That's an incident report.

18       **Q.**   The incident report?  Okay.  And does

19  this -- does it appear to be fair and accurate?

20       **A.**   Yes.

21       **Q.**   Okay.  Okay.  I'm showing you that -- I

22  think this one was marked as G, but I'm not

23  completely sure, but I can just describe it.

1          It has -- the top-left corner has case file

2     number 1044, and then it has filed date 8/23/21,

3     page 5 of 9 in the left corner.

4          Do you recognize this document?

5          **A.**    That is an incident report that Officer

6     Conklin completed in the jail.

7          **Q.**    Okay.  And does it appear to be fair

8     and accurate?

9          **A.**    I didn't write that report, so --

10         **Q.**    Okay.  Okay.  That's fair enough.

11         Okay.  I'm showing you -- I had it marked as

12    Plaintiff's H, but it -- just for reference, it has

13    case file number 1018 on the top left, and it has

14    Jamestown Police Department.  And then it has filed

15    8/30/21, page 5 of 7.

16         Do you recognize this document here?

17         **A.**    That's a -- it appears to be an

18    incident report completed by day shift, by --

19         **Q.**    Okay.

20         **A.**    -- by Officer Conti.  So I've never

21    seen that.

22         **Q.**    Okay.  Okay.  I want to show you what's

23    been marked as Plaintiff's Exhibit I, I believe,

Case 1:21-cv-00721-MAV-JJM    Document 38-10    Filed 09/19/23    Page 67 of 88

*Wise - Zaccagnino - 08/16/23*

1  but this is a use-of-force form.

2        And just so that we can refer to it later,

3  it has document number 14-3 on the top middle.

4        Do you recognize this?

5        **A.**   Yes.  It's a -- actually, keep going

6  down on it.  Yeah.  That's the use-of-force report

7  that Officer Obergfell completed --

8        **Q.**   Okay.

9        **A.**   -- and the shift commander signed off

10  on.

11        **Q.**   And does it appear to be fair and

12  accurate -- a fair and accurate representation of

13  it?

14        **A.**   Yes.

15        **Q.**   Okay.  I'm not sure -- I don't think we

16  went over this one, but I could be wrong.  I had

17  this marked as Exhibit J -- or I'm sorry --

18  plaintiff's J, case file number 1044.

19        And it has document 14-5 on the top, filed

20  8/27/21.  Do you recognize this document here?

21        **A.**   I do not.  That's a jail incident

22  completed by Officer Conklin.

23        **Q.**   Okay.  The last exhibit I want to show

**MCCANN & MCCANN REPORTING**

 1  you is -- I guess it's not marked as K, but it has

 2  M on the top and is -- has -- has request for

 3  examination of person, document number 14-3.

 4        It looks like the 9.41 document.  Do you

 5  recognize this?

 6        **A.**   Yes.  That's the 9.41 I completed.

 7        **Q.**   Oh.  You completed this one?

 8        **A.**   Yes.

 9        **Q.**   Okay.  And is it fair and accurate?

10        **A.**   Yes.

11        **Q.**   Okay.  Did you review anything to

12  prepare for today as far as documents or anything?

13        **A.**   Yeah.  I reviewed my body cam.  I

14  reviewed the original incident, the informations,

15  the resisting, the obstructing, the criminal

16  mischief, the use-of-force report, the mental

17  health -- the mental health 9.41 report, and then

18  went over some of the GOs.

19        **Q.**   And is there -- do you have a

20  discipline -- a discipline file at Jamestown

21  police?

22        **A.**   Are you saying have I been personally

23  disciplined or do we have one for each officer?

1      **Q.**    Yeah.  Just in general if you have one

2    for each officer.

3      **A.**    Yeah.  I believe they document it.  I

4    don't have any disciplinary issues that I'm aware

5    of.

6      **Q.**    Have you -- have you given any previous

7    testimony either civilly or criminally?

8      **A.**    Criminally, I have.

9      **Q.**    Okay.  Just for, like, DWIs and things

10    like that or --

11      **A.**    Yeah.  For felony arrests and then,

12    yeah, like, DWI.

13      **Q.**    Okay.  Have you ever been named in a

14    lawsuit for -- other than -- or I'm sorry.

15      Have you either been involved in a lawsuit

16    other than this one for your -- regarding your work

17    as an officer?

18      **A.**    No.

19      **MR. ZACCAGNINO:**  Okay.  That's all I have

20    for you.  Either Mary or Elliott might have some

21    follow-ups, but I appreciate your time.

22      **THE WITNESS:**  Okay.  Thank you.

23      **MR. ZACCAGNINO:**  Thank you.

1    **MS. D'AGOSTINO:** Officer, do you need

2 another break?  I just have a couple questions for

3 you.  It should be pretty quick.

4    **THE WITNESS:** I should be okay.

5    **MS. D'AGOSTINO:** Okay.

6

7    **EXAMINATION BY MS. D'AGOSTINO:**

8

9    **Q.** When opposing counsel was questioning

10 you, you said that you didn't believe Mr. Powell

11 was trying to run.  Do you remember testifying to

12 that?

13    **A.** I do, yeah.

14    **Q.** Is flight a prerequisite for you to use

15 force?

16    **A.** Yes.

17    **Q.** Is flight a prerequisite for you to use

18 force?

19    **A.** Like, when can we use force to --

20    **Q.** Yeah.  In order for you to use force,

21 does someone have to flee from you or are there

22 other circumstances where you can use force?

23    **A.** Oh.  There's other circumstances.

*Wise - D'Agostino - 08/16/23*

1  Sorry.

2       **Q.**   Okay.  And then do you recall being

3  asked about whether Mr. Powell was kicking or

4  hitting at the officers?

5       **A.**   Yes.

6       **Q.**   Is that type of behavior a prerequisite

7  for you using force?

8       **A.**   If we're being kicked at, yeah, we

9  would use force.

10      **Q.**   Okay.  But does someone that you're

11 trying to arrest -- do they have to be attempting

12 to assault you in order for you for use force?

13      **A.**   No.  There's other -- other --

14      **Q.**   Okay.  What type of resistance would

15 you say that -- when you were trying to take

16 Mr. Powell into custody, what type of resistance

17 was he exhibiting?

18      **A.**   I would say, like, defensive

19 resistance.  He was pulling away.  He was tensing

20 up.  He -- yeah.  He was verbally noncompliant.

21      **Q.**   So in terms of his level of resistance,

22 is it something beyond passive resistance that he

23 was displaying?

*Wise - D'Agostino - 08/16/23*

1      **A.**    Yeah.  I believe so.  Because he's --

2  he's pulling away at that point in time, not

3  allowing us to take him into custody.

4      **Q.**    Okay.  And you indicated that you

5  didn't recall whether, after he was searched,

6  whether he had any weapons on him.  Do you remember

7  testifying about that?

8      **A.**    Yes.

9      **Q.**    But at the time you were trying to take

10  him into custody, did you know for certain that he

11  did not have weapons on him?

12      **A.**    We had no idea if he had anything on

13  him at that point in time.

14      **Q.**    And were you the officer that placed

15  handcuffs on him?

16      **A.**    No.  Officer Obergfell did.

17      **Q.**    Okay.  And if you had any indication

18  that another officer placed handcuffs on him that

19  were too tight, would you have loosened them for

20  Mr. Powell?

21      **A.**    Yes.  I would have intervened at that

22  point.

23      **Q.**    Okay.  When handcuffs are placed on an

1  arrestee, is it possible for them to become tighter

2  just by the arrestee's own movements?

3        **A.**    Yeah.  If the arrestee's really pulling

4  away and not allowing us to, you know, carefully

5  handcuff him, naturally, the handcuffs are going to

6  continue to tighten until we're able to calm them

7  down.  And there's a lock on the cuffs that stop --

8  stop them from tightening any further.

9        **Q.**    Okay.  Did you use any force on him

10  after you felt that Mr. Powell was no longer a

11  threat?

12        **A.**    Like, after we stood him up?

13        **Q.**    Correct.

14        **A.**    After we stood him up, no.

15        **Q.**    And at any point during that evening or

16  the early-morning hours, did you use hand strikes

17  on him?

18        **A.**    No.

19        **Q.**    Did you use knee strikes on him?

20        **A.**    No.

21        **Q.**    Did you use any less-than-lethal

22  tactics on him?

23        **A.**    No.

1      **Q.**    Did you observe any of your fellow

2   officers use hand strikes?

3      **A.**    No.

4      **Q.**    Did you observe any of your fellow

5   officers use knee strikes?

6      **A.**    No.

7      **Q.**    Did you observe any of your fellow

8   officers use less-than-lethal tactics on him?

9      **A.**    No.

10      **Q.**    And you indicated that you were the

11   officer that called EMS, correct?

12      **A.**    Yes.

13      **Q.**    And again, why did you call EMS?

14      **A.**    Officer Obergfell stated that he was

15   bleeding, so I wanted to get him evaluated

16   immediately.

17      **Q.**    Did you cause -- did you have any

18   reason to believe that you, during your use of

19   force, caused that bleeding on Mr. Powell?

20      **A.**    No.

21      **Q.**    What did you understand caused that

22   bleeding?

23      **A.**    Mr. Powell striking his head into the

1  ground.

2      **Q.**   And when you and your fellow officers

3  took him to the ground, did you have any indication

4  or belief that he was going to start banging his

5  head on the ground?

6      **A.**   No.

7      **Q.**   Were you involved in his transportation

8  to the jail after he was placed in the back of the

9  vehicle?

10      **A.**   No.  Officer Obergfell was.

11      **Q.**   Okay.  And when you arrived at the

12  facility, were you involved in removing him from

13  the vehicle?

14      **A.**   No.

15      **Q.**   Okay.  Were you present when EMS

16  responded to the jail?

17      **A.**   Yes.

18      **Q.**   And do you recall Mr. Powell's

19  interactions with EMS?

20      **A.**   He was hostile with them.  He wasn't

21  initially letting them check on him.

22      **Q.**   Are you a medical health professional?

23      **A.**   No.

1          **Q.**    Are you a mental health professional?

2          **A.**    No.

3          **Q.**    Does EMS have any say in terms of

4    whether an individual is transported for mental

5    health evaluation?

6          **A.**    Typically, it's just going to be if

7    there's a medical reason.

8          **Q.**    So if EMS felt that he needed to be

9    evaluated, would he have been taken to the

10   hospital?

11         **A.**    Yes.

12         **Q.**    And do you recall at what point you

13   completed the 9.41?

14         **A.**    As we completed all of the paperwork, I

15   advised the jailer that he was going to be a 9.41.

16   So he knew that the paper would be coming back, but

17   we just completed all the paperwork together

18   following the arrest.

19         **Q.**    And did you complete the 9.41 because

20   you were concerned about his behavior?

21         **A.**    Yes.

22         **Q.**    And were you disciplined as a result of

23   this incident?

1      **A.**    No.

2      **MS. D'AGOSTINO:**  I don't have any further

3  questions.

4      **MR. ZACCAGNINO:**  I don't have anything

5  further.

6          (Deposition concluded at 2:17 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

78

1                    **ERRATA SHEET**

2

3    PAGE         LINE

4    _____      _____          CHANGE: _____

5                                  REASON: _____

6    _____      _____          CHANGE: _____

7                                  REASON: _____

8    _____      _____          CHANGE: _____

9                                  REASON: _____

10   _____      _____          CHANGE: _____

11                                 REASON: _____

12   _____      _____          CHANGE: _____

13                                 REASON: _____

14   _____      _____          CHANGE: _____

15                                 REASON: _____

16   _____      _____          CHANGE: _____

17                                 REASON: _____

18   _____      _____          CHANGE: _____

19                                 REASON: _____

20

21

22

23

79

1          I hereby CERTIFY that I have read the

2     foregoing 77 pages, and that they are a true and

3     accurate transcript of the testimony given by me in

4     the above entitled action on August 16, 2023.

5

6

7                              ------------------------

                               Kevin Wise
8

9     Sworn to before me this

10

11     -------- day of  ---------, 2023.

12

13     --------------------------

14     NOTARY PUBLIC.

15

16

17

18

19

20

21

22

23

80

```
 1  STATE OF NEW YORK)

 2                      ss:

 3  COUNTY OF ERIE)

 4

 5       I DO HEREBY CERTIFY as a Notary Public in and

 6  for the State of New York, that I did attend and

 7  report the foregoing deposition, which was taken

 8  down by me in a verbatim manner by means of machine

 9  shorthand.  Further, that the deposition was then

10  reduced to writing in my presence and under my

11  direction.  That the deposition was taken to be

12  used in the foregoing entitled action.  That the

13  said deponent, before examination, was duly sworn

14  to testify to the truth, the whole truth and

15  nothing but the truth, relative to said action.

16

17

18                      --------------------------
19                      PATRICK MCLAUGHLIN,
                        Notary Public.
20

21

22

23
```

**MCCANN & MCCANN REPORTING**

## 0

**00721** [1] - 65:10
**0253** [1] - 65:7

## 1

**1.11.01** [1] - 35:9
**10** [9] - 33:16, 34:2, 34:20, 35:14, 36:4, 36:17, 37:1, 37:9, 38:3
**1018** [1] - 66:7
**1044** [2] - 65:19, 67:12
**10th** [2] - 38:11, 62:9
**111** [18] - 38:17, 46:13, 47:14, 48:12, 51:18, 53:3, 54:5, 56:3, 56:8, 56:14, 57:5, 58:9, 58:20, 59:12, 60:4, 62:2, 63:2, 64:9
**12/10/2020** [1] - 65:7
**121** [1] - 65:9
**14-3** [2] - 66:20, 67:20
**14-5** [1] - 67:13
**14701** [1] - 4:11
**15th** [2] - 36:22, 37:14
**1994** [2] - 36:22, 37:14

## 2

**2.02.12** [1] - 35:22
**200-dollar** [1] - 53:1
**201** [1] - 4:10
**2016** [1] - 6:13
**2017** [1] - 6:13
**2018** [1] - 6:18
**2020** [13] - 4:19, 6:1, 7:7, 33:16, 34:2, 34:20, 35:15, 36:4, 36:17, 37:1, 37:9, 38:3, 38:11
**2:17** [1] - 76:23
**2:33** [1] - 62:4

## 3

**3:00** [1] - 62:2

## 4

**4.02.05** [1] - 36:12
**4.05.01** [3] - 36:20, 37:13, 37:23
**4.05.08** [1] - 37:5

## 5

**5** [2] - 65:20, 66:9

## 7

**7** [1] - 66:9
**7:00** [1] - 61:19

## 8

**8/23/21** [1] - 65:19
**8/27/21** [1] - 67:14
**8/30/21** [1] - 66:9

## 9

**9** [1] - 65:20
**9.41** [25] - 20:9, 20:10, 20:13, 20:16, 20:23, 21:6, 21:14, 22:1, 22:19, 23:17, 27:11, 27:16, 27:21, 32:9, 50:7, 55:22, 60:19, 61:3, 61:11, 67:21, 67:23, 68:11, 76:7, 76:9, 76:13

## A

**a.m** [2] - 61:19, 62:2
**ability** [1] - 58:5
**able** [11] - 11:13, 17:3, 19:21, 33:3, 35:4, 41:19, 42:17, 42:18, 43:12, 60:13, 72:23
**Academy** [1] - 6:13
**academy** [4] - 6:15, 6:16, 25:17, 29:13
**access** [1] - 33:5
**accurate** [6] - 64:21, 65:13, 66:2, 67:6, 68:3
**acting** [1] - 55:18
**action** [3] - 17:22, 31:21, 56:18
**actions** [3] - 29:20, 32:22, 50:18
**active** [1] - 30:13
**actively** [5] - 30:14, 32:11, 58:2, 58:4
**activities** [3] - 7:2, 7:11, 7:20
**actual** [1] - 50:10
**additional** [1] - 63:23
**additionally** [1] - 53:8
**address** [6] - 33:8, 33:12, 38:20, 46:2, 61:10
**adjusted** [1] - 56:7
**adjustment** [1] - 59:23
**adjustments** [1] - 59:16
**administration** [1] -

53:9
**advise** [3] - 10:8, 22:11
**advised** [11] - 38:22, 39:17, 39:18, 39:19, 41:16, 42:4, 43:1, 48:1, 52:9, 52:11, 76:9
**aggressive** [3] - 42:14, 42:23, 43:8
**agitated** [10] - 17:20, 18:17, 18:19, 19:6, 19:10, 20:1, 39:11, 42:3, 47:2, 49:18
**agreed** [1] - 57:18
**agreement** [2] - 56:20, 57:8
**ahead** [1] - 5:5
**alert** [1] - 17:20
**allegation** [1] - 54:1
**allowing** [2] - 71:20, 72:21
**allows** [1] - 28:3
**ALSTAR** [4] - 26:4, 43:6, 64:5, 64:14
**amount** [6] - 22:15, 23:15, 26:20, 28:7, 57:10, 57:11
**anchored** [1] - 40:23
**anchoring** [1] - 59:19
**angry** [1] - 49:23
**ankle** [1] - 45:13
**answer** [7] - 12:4, 26:17, 26:18, 27:20, 49:6, 56:22, 57:15
**answers** [1] - 27:20
**anxiety** [1] - 25:14
**appear** [3] - 65:13, 66:1, 67:5
**applies** [1] - 32:19
**apply** [2] - 23:20, 41:21
**appointment** [1] - 55:4
**appreciate** [1] - 69:15
**approaching** [1] - 41:16
**April** [2] - 36:22, 37:14
**area** [2] - 41:4, 59:21
**areas** [2] - 13:17, 14:8
**arm** [1] - 40:21
**arms** [1] - 13:1
**arraignment** [7] - 10:17, 20:16, 47:9, 55:2, 60:20, 61:4, 61:9
**arrest** [21] - 22:3, 22:4, 22:18, 31:10, 32:21, 38:23, 41:9, 52:5, 53:7, 53:10, 53:14,

57:20, 58:2, 58:20, 58:23, 59:12, 60:4, 60:17, 63:13, 71:5, 76:12
**arrested** [1] - 49:5
**arrestee** [1] - 72:18
**arrestee's** [2] - 72:19, 72:20
**arresting** [4] - 10:13, 15:11, 15:17, 15:22
**arrests** [2] - 21:5, 69:5
**arrived** [2] - 39:5, 75:5
**assault** [1] - 71:6
**assigned** [1] - 7:21
**assist** [2] - 41:18, 46:16
**assistance** [2] - 12:15, 27:1
**associate's** [1] - 6:9
**assuming** [1] - 28:14
**attach** [2] - 14:1, 14:16
**attached** [1] - 12:23
**attempt** [3] - 13:13, 27:5, 41:7
**attempted** [5] - 17:23, 18:3, 18:10, 55:23, 58:13
**attempting** [5] - 17:9, 32:1, 40:3, 42:21, 71:5
**attempts** [1] - 40:12
**attention** [6] - 23:8, 24:12, 24:14, 24:15, 33:14, 42:13
**automatically** [1] - 27:8
**available** [1] - 55:21
**Ave** [1] - 48:16
**Avenue** [1] - 38:18
**awake** [1] - 9:21
**aware** [9] - 47:17, 50:16, 51:20, 51:22, 55:16, 63:15, 63:16, 64:17, 68:21

## B

**bachelor's** [1] - 6:11
**background** [1] - 5:17
**bad** [1] - 57:13
**bang** [1] - 44:21
**banging** [8] - 28:18, 28:19, 32:17, 42:7, 44:16, 54:19, 54:22, 74:21
**Barrett** [17] - 38:18, 46:13, 47:14, 48:12, 48:16, 51:18, 53:3, 54:5, 56:3, 56:8,

56:14, 57:5, 58:9, 58:21, 59:13, 62:2, 63:2
**based** [11] - 11:7, 13:6, 15:18, 16:17, 24:20, 29:19, 44:11, 49:16, 49:20, 50:4
**bashing** [2] - 47:15, 64:12
**bear** [1] - 40:18
**bear-hugged** [1] - 40:18
**become** [1] - 72:18
**beeps** [1] - 9:4
**began** [4] - 39:20, 40:8, 41:7, 41:11
**begin** [2] - 21:11, 32:9
**beginning** [3] - 5:16, 7:23, 53:6
**begins** [1] - 17:10
**behavior** [17] - 10:10, 11:12, 12:14, 16:13, 16:17, 17:10, 17:12, 20:21, 25:4, 29:20, 30:8, 42:15, 46:9, 49:15, 49:19, 70:23, 76:14
**behaviors** [3] - 13:4, 50:12, 55:19
**behind** [5] - 40:4, 40:10, 40:13, 44:23, 45:4
**belief** [1] - 74:21
**bench** [7] - 14:1, 14:4, 14:15, 14:19, 14:20, 25:7
**best** [1] - 5:11
**better** [4] - 24:21, 40:16, 43:2, 63:10
**between** [3] - 12:15, 15:22, 20:20
**beyond** [1] - 45:14
**bit** [5] - 23:15, 25:17, 28:16, 35:5, 41:21
**Blake** [2] - 4:16, 37:18
**blanket** [1] - 20:7
**bleeding** [6] - 42:9, 63:7, 64:15, 74:9, 74:13, 74:16
**block** [1] - 28:11
**body** [3] - 43:23, 59:6, 68:7
**booking** [8] - 13:23, 14:3, 14:15, 14:20, 17:4, 23:10, 62:5, 64:9
**bookings** [1] - 8:10
**bottom** [1] - 36:8
**break** [3] - 25:6,

38:13, 69:19
**breathe** [1] - 59:13
**briefly** [2] - 6:4, 7:1
**broke** [1] - 58:21
**brought** [1] - 64:8
**bunch** [2] - 5:15, 49:22
**BY** [7] - 4:14, 12:17, 37:22, 49:12, 58:7, 62:22, 70:1

## C

**calm** [10] - 20:8, 33:9, 39:13, 40:12, 42:5, 54:13, 54:15, 54:16, 60:16, 72:23
**calmed** [7] - 16:21, 18:5, 18:15, 18:16, 19:5, 28:2, 60:1
**calming** [1] - 41:18
**calms** [1] - 59:8
**cam** [3] - 43:23, 59:6, 68:7
**car** [19] - 39:3, 42:20, 42:22, 43:10, 43:13, 45:7, 45:10, 45:16, 46:6, 46:8, 46:14, 47:16, 47:21, 47:22, 58:8, 58:14, 58:15, 58:16
**care** [5] - 24:23, 25:1, 61:6, 63:23, 64:1
**carefully** [1] - 72:21
**case** [6] - 35:20, 65:9, 65:18, 66:7, 67:12
**categories** [1] - 8:15
**category** [6] - 10:3, 10:5, 10:20, 11:1, 11:4, 11:21
**caused** [3] - 63:13, 74:13, 74:15
**causing** [1] - 39:15
**cell** [2] - 14:12, 24:19
**cells** [1] - 8:3
**certain** [4] - 13:17, 30:3, 56:17, 72:4
**chair** [24] - 11:23, 12:8, 12:12, 12:16, 12:19, 12:22, 13:8, 13:21, 14:7, 16:11, 16:16, 17:7, 17:12, 17:21, 18:12, 18:13, 18:15, 18:18, 19:3, 19:9, 19:13, 29:2, 29:7, 48:4
**chair's** [1] - 12:22
**chance** [1] - 62:8
**charge** [1] - 53:5
**charged** [3] - 20:22,

20:23, 53:8
**charges** [2] - 21:11, 53:2
**Chautauqua** [2] - 6:12, 38:16
**check** [11] - 7:23, 9:2, 9:6, 9:9, 9:16, 9:17, 9:18, 12:10, 42:18, 75:15
**checking** [2] - 8:21, 64:14
**checks** [2] - 8:9, 8:19
**Christian** [27] - 4:17, 28:16, 28:18, 34:14, 38:11, 41:18, 43:16, 44:9, 44:16, 44:20, 46:13, 46:18, 47:15, 48:3, 48:10, 51:18, 52:11, 54:4, 56:2, 57:5, 58:11, 59:4, 60:7, 60:18, 61:21, 62:11, 63:12
**Christian's** [2] - 50:12, 52:3
**circumstances** [3] - 50:4, 70:16, 70:17
**City** [2] - 7:9, 21:22
**city** [6] - 4:6, 7:5, 34:8, 38:21, 43:14, 46:15
**civilly** [1] - 69:1
**clearly** [3] - 42:3, 47:1
**close** [1] - 43:2
**College** [1] - 6:10
**combination** [3] - 7:13, 15:10, 15:17
**coming** [4] - 8:11, 10:9, 52:4, 76:10
**command** [1] - 34:8
**commander** [4] - 16:2, 34:7, 51:7, 67:3
**commands** [2] - 30:10, 30:23
**comment** [1] - 22:10
**comments** [6] - 10:9, 15:15, 21:12, 48:18, 48:20, 54:23
**Community** [1] - 6:10
**community** [1] - 7:5
**community-service** [1] - 7:5
**complete** [3] - 8:9, 32:10, 76:13
**completed** [10] - 50:6, 65:23, 66:12, 67:1, 67:16, 67:23, 68:1, 76:7, 76:8, 76:11
**completely** [1] - 65:17
**completing** [1] - 12:10
**complied** [1] - 52:10
**comply** [1] - 41:10

**concerned** [1] - 76:14
**concluded** [1] - 76:23
**condition** [1] - 25:1
**conditions** [1] - 25:13
**confusing** [1] - 5:5
**Conklin** [4] - 34:8, 51:6, 65:23, 67:16
**connected** [2] - 25:23, 43:3
**considered** [1] - 53:20
**constant** [29] - 8:14, 10:14, 11:7, 11:9, 11:22, 13:16, 13:21, 14:9, 14:23, 15:4, 17:15, 20:2, 20:16, 21:16, 21:20, 23:3, 23:18, 24:2, 24:4, 24:5, 24:11, 27:2, 27:9, 27:11, 28:10, 29:2, 50:7, 55:22
**constant-observation** [1] - 14:23
**constant-watch** [2] - 8:14, 24:2
**contact** [4] - 15:12, 58:23, 59:2, 64:6
**contempt** [4] - 38:23, 53:12, 53:14, 53:16
**Conti** [1] - 66:14
**continue** [3] - 13:3, 32:17, 44:21, 60:17, 72:23
**continued** [1] - 42:14
**Continuum** [3] - 29:17, 29:18, 30:2
**contraband** [1] - 8:1
**control** [6] - 7:6, 40:2, 40:16, 40:22, 44:19, 55:23
**conversation** [2] - 39:9, 39:10
**corner** [4] - 35:8, 36:8, 65:18, 65:20
**correct** [5] - 6:23, 61:7, 61:20, 73:7, 74:5
**counsel** [1] - 70:3
**counseling** [1] - 26:14
**count** [1] - 13:20
**County** [1] - 38:16
**couple** [1] - 69:19
**course** [9] - 31:20, 32:20, 48:11, 58:20, 58:22, 59:12, 60:4, 62:12, 63:13
**covered** [1] - 23:15
**create** [1] - 27:11
**crime** [2] - 20:22, 21:1
**criminal** [5] - 38:23,

53:5, 53:8, 53:13, 68:9
**criminally** [1] - 69:1, 69:2
**crisis** [2] - 23:22, 50:3
**criteria** [4] - 20:3, 21:6, 24:2, 50:8
**crying** [4] - 46:21, 48:21, 49:2, 49:23
**cues** [1] - 25:8
**cuffs** [2] - 25:6, 73:1
**curl** [1] - 40:10
**current** [1] - 9:20
**cursing** [1] - 59:15
**custody** [10] - 15:7, 18:4, 21:9, 21:11, 36:13, 40:4, 45:22, 71:10, 71:20, 72:4

## D

**D'AGOSTINO** [9] - 4:7, 12:4, 49:6, 56:22, 57:15, 69:18, 69:22, 70:1, 76:19
**daily** [1] - 7:20
**damage** [1] - 46:6
**damaging** [1] - 46:10
**dark** [1] - 43:7
**date** [1] - 65:19
**day-to-day** [2] - 7:2, 7:11
**dead** [3] - 30:11, 31:10, 31:13
**deadly** [2] - 30:18, 31:6
**deal** [1] - 25:18
**December** [14] - 4:19, 5:23, 7:7, 33:16, 34:2, 34:20, 35:14, 36:3, 36:16, 37:1, 37:9, 38:3, 38:11, 62:9
**decided** [2] - 22:2, 43:5
**decision** [3] - 15:5, 15:8, 16:2
**deck** [1] - 34:8
**deescalate** [1] - 17:2, 17:3, 17:5, 20:5, 23:12, 28:4, 39:13, 42:2, 54:13
**deescalation** [1] - 59:8
**defensive** [2] - 30:12, 71:12
**degree** [2] - 6:10, 6:11
**delay** [1] - 5:10
**department** [4] - 26:1, 29:15, 43:3, 43:7

**Department** [8] - 6:17, 6:19, 22:7, 22:10, 25:23, 38:17, 65:6, 66:8
**Department's** [1] - 43:3
**Deposition** [1] - 76:23
**Deputy** [6] - 39:4, 39:5, 39:16, 39:17, 41:6, 59:19
**describe** [6] - 8:21, 10:4, 12:18, 13:18, 14:9, 14:12, 29:16, 29:23, 49:14, 49:15, 49:18, 49:19, 65:5, 65:17
**destructive** [2] - 16:13, 25:4
**detail** [1] - 22:14
**details** [1] - 7:6
**deteriorating** [2] - 23:23, 24:17
**determine** [5] - 10:23, 28:7, 28:10, 29:19, 29:20
**determined** [1] - 14:22
**development** [3] - 36:21, 37:14, 38:1
**diagnoses** [1] - 26:11
**diagnosis** [1] - 26:20
**die** [1] - 48:23
**difference** [1] - 20:20
**different** [7] - 4:18, 7:2, 8:20, 14:8, 15:5, 21:2, 30:1
**differently** [1] - 45:9
**direct** [1] - 59:22
**disagreement** [1] - 57:9
**disciplinary** [1] - 68:21
**discipline** [2] - 68:14
**disciplined** [2] - 68:17, 76:16
**discuss** [1] - 39:8
**disorder** [1] - 25:14
**dispatched** [1] - 39:3
**display** [1] - 10:12
**displaying** [1] - 71:17
**displays** [1] - 12:13
**disrespectful** [1] - 20:22
**distance** [1] - 33:11
**disturbance** [1] - 39:15
**disturbed** [1] - 25:18
**document** [11] - 9:10, 64:22, 65:10, 65:21, 66:10, 66:20, 67:13, 67:14, 67:20, 67:21,

68:20
**documents** [1] - 68:6
**done** [11] - 18:12,
39:16, 44:9, 45:9,
45:14, 49:14, 52:8,
55:9, 55:18, 61:13,
61:17
**door** [1] - 58:17
**down** [28] - 10:22,
13:2, 16:21, 17:6,
18:5, 18:15, 18:16,
19:5, 20:8, 21:16,
28:2, 33:9, 35:13,
38:13, 39:13, 40:13,
41:18, 42:5, 44:1,
47:3, 54:13, 54:15,
54:16, 59:9, 59:21,
60:1, 66:23, 73:1
**drinking** [2] - 62:13,
62:14
**driveway** [1] - 58:9
**Dropbox** [2] - 65:1,
65:2
**duly** [1] - 4:11
**duration** [1] - 8:17
**during** [13] - 31:20,
32:20, 48:5, 48:11,
57:4, 58:20, 58:22,
59:12, 60:3, 62:12,
63:13, 73:9, 74:12
**duty** [1] - 8:4
**DWI** [1] - 69:6
**DWIs** [1] - 69:3

## E

**E-filed** [1] - 65:8
**early** [1] - 73:10
**early-morning** [1] -
73:10
**easiest** [1] - 38:8
**East** [1] - 4:10
**easy** [1] - 65:2
**education** [2] - 5:16,
6:4
**effect** [7] - 34:19,
35:14, 36:3, 36:16,
37:1, 38:3
**effective** [3] - 36:22,
37:9, 37:14
**either** [11] - 12:20,
16:5, 18:2, 31:20,
44:9, 48:12, 56:14,
56:16, 69:1, 69:9,
69:14
**electronically** [1] -
9:13
**eleven** [1] - 34:3
**Ellicott** [2] - 6:17, 22:9
**Elliott** [1] - 69:14

**emotionally** [2] -
25:18, 47:3
**emotions** [1] - 49:22
**employee** [2] - 21:23,
33:19
**empty** [1] - 31:2, 31:14
**empty-hand** [2] - 31:2,
31:14
**EMS** [16] - 24:10, 26:3,
33:14, 42:11, 43:1,
63:1, 63:2, 63:5,
63:17, 63:22, 74:5,
74:7, 75:9, 75:13,
75:20, 76:2
**end** [2] - 39:9, 52:17
**ended** [1] - 60:21
**engage** [1] - 23:11
**engaging** [1] - 45:23
**entire** [4] - 10:16,
11:14, 19:22, 21:18
**escape** [2] - 46:5,
46:11
**estimate** [1] - 44:4
**eval** [3] - 54:18, 55:1,
61:17
**evaluate** [2] - 24:10,
42:11
**evaluated** [4] - 63:10,
64:5, 74:9, 76:3
**evaluation** [8] - 16:15,
16:23, 20:18, 35:22,
54:6, 55:11, 60:19,
75:22
**evening** [1] - 73:9
**eventually** [1] - 42:17
**ex** [1] - 49:11
**ex-girlfriend** [1] -
49:11
**exactly** [1] - 49:8
**examination** [1] -
67:20
**EXAMINATION** [2] -
4:14, 70:1
**example** [6] - 11:23,
15:4, 16:19, 25:13,
31:9, 45:12
**Exhibit** [6] - 36:11,
36:12, 36:20, 65:4,
66:17, 67:11
**exhibit** [1] - 37:4,
67:17
**exhibiting** [1] - 71:11
**exhibits** [2] - 62:18,
64:19
**existing** [1] - 55:17
**experience** [1] - 28:15
**experiences** [10] -
11:8, 13:7, 16:4,
17:14, 24:21, 28:14,
28:17, 29:10, 31:19,

59:4
**explained** [1] - 22:14
**express** [2] - 56:3,
59:11
**extensive** [1] - 6:7
**extra** [2] - 19:11, 55:15
**extract** [1] - 41:7
**extracting** [1] - 41:11
**eye** [1] - 14:16

## F

**face** [2] - 43:23, 59:9
**facility** [4] - 50:14,
50:20, 55:5, 75:6
**fact** [1] - 26:22
**fair** [7] - 64:21, 65:13,
66:1, 66:4, 67:5,
67:6, 68:3
**fairly** [1] - 62:19
**fall** [6] - 8:15, 10:2,
10:5, 10:19, 11:21,
20:13
**falls** [3] - 11:1, 11:4,
21:6
**familiar** [1] - 59:9
**far** [4] - 45:10, 59:1,
60:9, 68:6
**Faulkner** [1] - 6:8
**favor** [1] - 54:1
**fellow** [4] - 73:18,
73:21, 74:1, 74:19
**felonies** [1] - 53:4
**felony** [9] - 38:22,
40:5, 53:7, 53:11,
53:13, 57:20, 69:5
**felt** [3] - 60:15, 73:4,
76:2
**few** [1] - 4:18
**fight** [1] - 30:15
**fighting** [1] - 30:8
**figure** [2] - 20:6, 38:8
**file** [4] - 65:18, 66:7,
67:12, 68:14
**filed** [4] - 65:8, 65:19,
66:8, 67:13
**fine** [2] - 4:23, 18:16
**finger** [2] - 8:10, 64:15
**finish** [1] - 38:12
**finished** [1] - 62:19
**fire** [1] - 43:6
**Fire** [2] - 25:23, 43:2
**first** [13] - 4:20, 7:17,
7:22, 15:12, 23:8,
30:5, 38:23, 47:8,
47:20, 53:14, 61:11,
62:1
**fit** [1] - 50:7
**five** [1] - 44:5
**flee** [1] - 70:15

**flight** [2] - 70:8, 70:11
**floor** [2] - 12:23, 14:18
**fob** [2] - 9:2, 9:3
**fobs** [1] - 9:3
**focus** [1] - 24:17
**follow** [2] - 19:7, 69:15
**follow-ups** [1] - 69:15
**followed** [1] - 8:23
**following** [1] - 76:12
**follows** [1] - 4:12
**force** [22] - 29:11,
29:13, 29:14, 29:21,
31:6, 31:11, 31:19,
35:9, 44:12, 56:17,
57:6, 57:11, 57:18,
58:6, 63:14, 66:18,
66:23, 68:10, 70:9,
70:12, 70:13, 70:14,
70:16, 71:1, 71:3,
71:6, 73:3, 74:13
**Force** [3] - 29:17,
29:18, 30:2
**forehead** [1] - 64:12
**form** [3] - 14:21, 66:18
**forward** [1] - 27:7
**four** [2] - 13:20, 53:9
**frame** [1] - 48:5
**frames** [1] - 5:19
**Fredonia** [1] - 6:11
**free** [4] - 14:11, 14:14,
33:6, 58:21
**front** [6] - 8:16, 15:20,
23:4, 40:11, 44:1,
45:1
**frustrated** [1] - 19:14

## G

**gain** [2] - 40:16, 40:21
**garage** [1] - 26:2
**gathered** [1] - 47:11
**gauge** [1] - 27:23
**gears** [1] - 29:9
**general** [5] - 29:11,
49:4, 56:13, 61:1,
68:18
**generally** [4] - 9:15,
29:17, 38:10, 61:3
**girlfriend** [2] - 49:10,
49:11
**given** [3] - 21:15,
60:19, 68:23
**GOs** [1] - 68:12
**governmental** [1] -
53:9
**grabbable** [1] - 41:4
**grabs** [1] - 31:2
**graduated** [2] - 6:8,
6:13
**gravel** [2] - 42:8, 43:17

**great** [1] - 5:12
**ground** [18] - 28:20,
29:6, 40:15, 40:21,
40:23, 41:22, 42:16,
44:5, 44:11, 44:17,
44:21, 48:15, 54:19,
59:15, 64:13, 74:18,
74:20, 74:22
**guess** [3] - 13:10,
55:12, 67:18
**guns** [1] - 39:23
**guys** [2] - 44:1, 56:19

## H

**half** [2] - 8:9, 9:1
**hall** [3] - 14:4, 14:15,
14:19
**hand** [8] - 31:1, 31:2,
31:14, 32:13, 36:8,
44:19, 73:10, 73:19
**handcuff** [4] - 14:21,
33:4, 40:15, 72:22
**handcuffed** [5] -
14:10, 43:20, 43:21,
45:3, 56:10
**handcuffing** [3] -
45:12, 45:15, 48:17
**handcuffs** [11] - 14:1,
14:16, 44:23, 45:17,
46:5, 56:3, 56:6,
72:9, 72:12, 72:17,
72:22
**handle** [1] - 57:8
**handled** [1] - 56:21
**handling** [1] - 16:5
**hands** [9] - 31:16,
33:6, 40:4, 40:10,
40:13, 41:3, 41:7,
41:11, 57:21
**hands-on** [1] - 31:16
**hang** [1] - 18:23
**hard** [2] - 5:9, 31:2
**harm** [42] - 8:18,
10:10, 10:19, 11:12,
11:15, 11:16, 11:22,
12:9, 12:10, 13:14,
15:15, 17:9, 17:16,
17:22, 18:1, 18:2,
18:10, 19:17, 20:12,
21:13, 27:10, 28:20,
30:17, 31:21, 31:22,
32:1, 32:2, 32:6,
32:8, 32:11, 32:21,
32:22, 39:23, 44:11,
45:12, 45:16, 45:23,
48:13, 50:17
**harm's** [1] - 43:7
**harmed** [2] - 17:18,
18:9

4

**harming** [12] - 11:5, 12:20, 13:13, 13:14, 16:20, 18:8, 33:1, 50:18, 55:19, 56:1, 56:19, 60:9
**head** [32] - 16:6, 16:9, 18:22, 19:17, 25:5, 28:19, 29:5, 32:12, 32:13, 32:14, 32:15, 32:17, 42:7, 43:16, 44:4, 44:10, 44:17, 44:19, 44:20, 44:21, 47:16, 47:22, 48:17, 54:19, 54:23, 55:23, 63:7, 64:13, 74:17, 74:22
**heads** [2] - 28:19, 28:22
**health** [21] - 23:22, 25:1, 25:13, 26:11, 26:14, 26:23, 37:7, 50:3, 50:8, 54:6, 54:18, 55:11, 60:19, 61:11, 68:11, 75:16, 75:18, 75:22
**healthy** [1] - 8:6
**hear** [1] - 54:4
**heard** [1] - 63:6
**helmet** [2] - 12:1, 19:15
**helmets** [1] - 19:18
**help** [4] - 7:5, 20:8, 23:13, 46:9
**helps** [3] - 28:9, 29:18, 29:20
**hi** [1] - 4:16
**high** [2] - 6:5, 6:6
**High** [1] - 6:8
**Hill** [2] - 55:5
**himself** [4] - 18:23, 46:10, 56:1, 56:19
**hired** [2] - 6:16, 6:19
**hit** [6] - 9:3, 19:17, 28:22, 44:4, 47:21, 63:7
**hitting** [11] - 16:6, 16:9, 18:22, 25:4, 29:5, 32:12, 43:16, 44:10, 44:16, 70:21
**hold** [2] - 13:1, 41:21
**holding** [5] - 43:22, 56:10, 59:1, 59:20
**hook** [1] - 14:17
**hooks** [1] - 14:16
**hospital** [9] - 20:14, 20:17, 21:7, 21:17, 33:15, 54:6, 61:3, 61:12, 76:4
**hostile** [1] - 75:14
**hour** [2] - 8:9, 9:1

**hours** [2] - 18:16, 73:10
**hugged** [1] - 40:18
**hugging** [1] - 41:1
**hurt** [3] - 22:23, 25:6, 46:6
**hurting** [1] - 46:10
**hygiene** [1] - 20:13

## I

**idea** [2] - 11:11, 72:6
**ideations** [1] - 11:5
**immediate** [1] - 42:12
**immediately** [4] - 33:14, 43:4, 60:1, 74:10
**incident** [10] - 39:7, 53:3, 53:5, 65:11, 65:12, 65:22, 66:12, 67:15, 68:8, 76:17
**incidents** [1] - 4:18
**indicated** [2] - 71:21, 74:4
**indication** [2] - 72:11, 74:20
**individual** [1] - 75:21
**information** [4] - 15:16, 22:14, 23:1, 50:12
**informations** [1] - 68:8
**informing** [1] - 55:10
**initial** [1] - 23:16
**injuries** [1] - 64:7
**injury** [2] - 63:8, 63:12
**inmate** [20] - 9:10, 9:19, 10:5, 10:9, 11:3, 14:9, 14:23, 16:5, 16:15, 18:22, 22:16, 22:21, 23:18, 23:21, 24:18, 24:23, 26:10, 31:19, 32:20, 61:2
**inmates** [14] - 8:11, 8:21, 10:2, 10:6, 11:16, 11:21, 13:15, 15:19, 17:15, 19:21, 23:6, 27:19, 28:18, 51:12
**inside** [1] - 47:16
**instances** [1] - 50:17
**interacting** [1] - 15:6
**interaction** [2] - 48:12, 57:4
**interactions** [7] - 34:14, 38:10, 44:12, 46:13, 46:17, 62:13, 75:13
**interested** [5] - 5:20,

5:23, 34:18, 34:21, 64:20
**interfering** [1] - 52:5
**intervene** [1] - 25:10
**intervened** [1] - 72:15
**intimidation** [1] - 30:7
**involved** [7] - 4:17, 7:19, 22:18, 64:3, 69:9, 75:1, 75:6
**involves** [1] - 26:9
**involving** [1] - 4:19
**issue** [3] - 24:9, 55:6, 55:17
**issued** [1] - 36:9
**issues** [1] - 68:21

## J

**jail** [83] - 7:5, 7:13, 7:16, 7:17, 7:18, 7:20, 7:21, 7:23, 8:12, 8:18, 10:7, 10:16, 10:21, 11:17, 12:8, 13:14, 13:17, 15:9, 15:13, 16:5, 16:12, 16:18, 17:4, 17:12, 18:1, 18:11, 19:19, 20:15, 21:8, 21:23, 22:6, 23:7, 24:8, 24:10, 25:21, 25:23, 26:4, 27:3, 28:21, 33:1, 33:11, 34:9, 43:1, 43:14, 46:16, 46:19, 46:20, 47:9, 47:10, 47:15, 47:20, 48:6, 48:13, 48:21, 49:16, 49:20, 50:10, 50:11, 50:13, 50:19, 51:3, 51:6, 51:8, 51:9, 51:10, 51:11, 51:13, 55:2, 55:23, 56:15, 57:7, 58:18, 61:14, 61:21, 63:18, 64:2, 64:10, 65:23, 67:15, 75:2, 75:10
**jailer** [9] - 10:8, 10:13, 15:1, 15:8, 15:18, 16:1, 19:20, 21:15, 76:9
**Jamestown** [28] - 4:11, 4:19, 6:10, 6:19, 6:22, 7:9, 7:12, 11:20, 12:2, 21:22, 22:5, 22:7, 25:21, 25:23, 33:17, 33:19, 39:1, 43:2, 47:15, 49:16, 49:20, 50:19, 51:2, 62:5, 65:6, 66:8, 68:14

**jeans** [2] - 52:21, 53:1
**job** [1] - 7:9
**jobs** [2] - 6:14, 7:3
**Johanson** [2] - 34:10, 51:11
**Jones** [2] - 55:5
**jump** [4] - 23:14, 28:5, 38:14, 56:16

## K

**Kaitlin** [1] - 51:11
**keep** [4] - 9:11, 13:20, 13:21, 66:22
**kept** [5] - 9:13, 13:16, 13:17, 14:4, 14:23
**Kevin** [1] - 4:2
**KEVIN** [1] - 4:2
**kick** [4] - 31:3, 41:1, 58:12, 58:13
**kicked** [1] - 71:2
**kicking** [4] - 43:10, 58:15, 58:16, 70:20
**kids** [3] - 38:19, 49:4, 49:9
**kill** [1] - 30:18
**kind** [19] - 17:5, 17:20, 18:7, 22:13, 27:22, 38:13, 38:14, 41:20, 42:1, 46:21, 47:2, 49:23, 52:3, 52:6, 59:19, 60:11, 61:5, 64:2
**knee** [2] - 73:13, 73:22
**knives** [1] - 39:22
**knowledge** [3] - 34:19, 47:19, 47:23
**knows** [1] - 21:15

## L

**lack** [1] - 24:21
**larceny** [1] - 38:19
**last** [5] - 30:19, 37:3, 50:13, 50:19, 67:17
**lawsuit** [2] - 69:8, 69:9
**leads** [2] - 27:15, 27:16
**leaning** [1] - 18:7
**learn** [1] - 50:11
**least** [4] - 9:1, 14:20, 48:4, 58:23
**leave** [1] - 21:14
**leaving** [1] - 51:23
**left** [9] - 36:8, 50:14, 50:20, 61:18, 61:22, 62:5, 65:18, 65:20, 66:7
**left-hand** [1] - 36:8
**leg** [3] - 14:2, 14:17,

14:21
**legs** [7] - 13:1, 40:18, 40:23, 41:1, 43:23, 56:11, 59:19
**less** [2] - 73:15, 74:2
**less-than-lethal** [2] - 73:15, 74:2
**lethal** [2] - 73:15, 74:2
**letting** [1] - 75:15
**level** [9] - 22:21, 29:21, 30:3, 30:4, 30:16, 30:19, 53:4, 58:6, 71:15
**levels** [1] - 30:1
**leverage** [1] - 32:16
**Lieutenant** [2] - 34:6, 51:7
**lift** [1] - 44:20
**limited** [1] - 50:11
**lines** [1] - 19:1
**list** [1] - 10:22
**listening** [1] - 30:9
**lists** [1] - 9:18
**local** [1] - 33:15
**located** [1] - 9:6
**location** [4] - 9:19, 14:12, 43:2, 46:8
**locations** [1] - 13:19
**lock** [1] - 73:1
**log** [4] - 9:11, 9:12, 9:13, 9:14
**longest** [1] - 7:16
**look** [3] - 24:22, 27:7, 37:16
**looked** [2] - 37:17, 37:21
**looks** [2] - 36:7, 67:21
**loosened** [1] - 72:13
**lowered** [1] - 40:20

## M

**Madonia** [6] - 39:4, 39:5, 39:16, 39:17, 41:6, 59:19
**main** [2] - 5:3, 11:6
**male** [1] - 28:11
**marked** [9] - 35:6, 35:20, 42:19, 65:4, 65:16, 66:5, 66:17, 67:11, 67:18
**Mary** [1] - 69:14
**Mayville** [1] - 61:16
**mean** [3] - 13:11, 24:7, 60:11
**means** [1] - 20:10
**medical** [11] - 12:15, 24:9, 25:20, 25:21, 25:22, 33:14, 37:7, 42:13, 63:9, 75:16,

76:1
**meet** [5] - 33:15, 43:1, 43:4, 43:5, 63:17
**mental** [21] - 20:13, 23:22, 25:1, 25:13, 26:11, 26:14, 26:23, 37:6, 50:3, 50:8, 54:6, 54:17, 55:11, 60:19, 61:11, 68:10, 68:11, 75:18, 75:21
**mentioned** [18] - 8:19, 9:12, 9:22, 29:1, 43:15, 45:20, 45:21, 48:9, 48:20, 49:9, 49:10, 49:17, 50:22, 51:1, 51:16, 52:2, 63:1
**met** [2] - 20:3, 24:2
**metal** [1] - 14:17
**method** [1] - 16:12
**middle** [1] - 44:6, 66:20
**might** [12] - 10:2, 10:11, 11:2, 18:20, 20:4, 22:10, 24:3, 25:1, 37:11, 37:21, 45:19, 69:14
**minute** [1] - 62:20
**minutes** [1] - 62:17
**mischief** [2] - 53:8, 68:10
**misdemeanors** [2] - 53:4, 53:10
**mixed** [3] - 35:21, 37:11, 37:20
**mom** [4] - 51:18, 52:3, 54:8, 55:10
**morning** [2] - 39:14, 73:10
**most** [2] - 23:6, 55:20
**mostly** [1] - 44:1
**mother** [2] - 41:14, 41:15
**movement** [1] - 45:13
**movements** [1] - 72:19
**MR** [15] - 4:1, 4:5, 4:6, 4:14, 12:17, 37:17, 37:19, 37:22, 49:12, 57:3, 58:7, 62:22, 69:13, 69:17, 76:21
**MS** [9] - 4:7, 12:4, 49:6, 56:22, 57:15, 69:18, 69:22, 70:1, 76:19

## N

**named** [1] - 69:7
**naturally** [1] - 72:22

**nature** [2] - 31:4, 53:15
**near** [1] - 52:4
**neck** [1] - 59:23
**need** [7] - 8:7, 9:7, 17:21, 21:16, 25:9, 38:13, 69:18
**needed** [8] - 12:14, 22:21, 26:5, 33:7, 33:13, 42:12, 76:2
**needs** [5] - 22:16, 22:22, 28:8, 54:17, 55:11
**needy** [1] - 23:6
**neighbor** [1] - 51:23
**never** [3] - 48:2, 61:14, 66:14
**new** [1] - 21:10
**New** [1] - 4:11
**next** [2] - 19:16, 30:16
**night** [8] - 33:19, 33:22, 34:3, 34:4, 34:6, 34:10, 34:15, 59:4
**non** [1] - 15:4
**non-constant** [1] - 15:4
**noncompliance** [2] - 30:9, 42:15
**noncompliant** [1] - 71:14
**none** [1] - 4:6
**notarization** [1] - 4:4
**notate** [1] - 9:15
**nothing** [2] - 27:6, 42:12
**notice** [1] - 64:8
**noticed** [1] - 64:10
**noticing** [2] - 17:17, 18:6
**number** [13] - 19:20, 35:9, 35:21, 36:12, 36:20, 37:5, 37:12, 65:9, 65:19, 66:7, 66:20, 67:12, 67:20
**numbering** [1] - 35:21
**numerous** [1] - 42:6

## O

**Obergfell** [15] - 34:9, 39:2, 40:2, 40:17, 40:20, 41:6, 42:8, 43:13, 44:18, 51:10, 63:6, 67:1, 72:10, 74:8, 75:4
**Obergfell's** [1] - 43:13
**objection** [5] - 4:3, 12:4, 49:6, 56:22, 57:15

**objects** [2] - 28:20, 29:6
**observation** [9] - 11:7, 11:22, 13:16, 14:23, 15:23, 17:15, 21:19, 23:18, 29:2
**observations** [9] - 13:10, 16:1, 27:4, 46:18, 47:7, 49:16, 49:20, 50:10, 57:6
**observe** [5] - 21:16, 63:21, 73:18, 73:21, 74:1
**observed** [9] - 9:17, 11:20, 29:5, 48:5, 48:23, 50:13, 50:19, 56:15, 64:1
**observing** [2] - 17:17, 20:21
**obstructing** [2] - 53:9, 68:9
**obtaining** [1] - 8:11
**obviously** [3] - 32:4, 50:5, 60:6
**OC** [1] - 31:5
**occurred** [1] - 22:5
**odd** [1] - 20:21
**officer** [24] - 6:18, 6:20, 7:3, 7:10, 9:17, 10:13, 15:18, 21:22, 22:5, 22:7, 30:22, 33:17, 40:18, 51:6, 56:17, 58:23, 62:23, 68:17, 68:19, 69:11, 69:18, 72:8, 72:12, 74:5
**Officer** [28] - 4:1, 4:16, 4:21, 34:7, 34:8, 34:9, 34:10, 39:2, 40:2, 40:17, 40:20, 41:6, 42:8, 43:12, 43:13, 44:18, 51:6, 51:9, 51:10, 51:11, 63:6, 65:22, 66:14, 67:1, 67:16, 72:10, 74:8, 75:4
**officer's** [2] - 15:22, 27:3
**officers** [20] - 10:7, 12:20, 15:6, 15:11, 48:1, 51:17, 56:10, 56:16, 57:7, 58:12, 58:22, 60:6, 63:14, 70:21, 73:19, 73:22, 74:2, 74:19
**official** [1] - 7:8
**once** [17] - 7:18, 21:9, 21:11, 23:1, 39:18, 41:19, 42:18, 45:3, 46:20, 55:1, 58:18,

64:4, 64:10
**one** [30] - 5:11, 7:17, 12:6, 14:20, 16:20, 17:16, 18:3, 19:20, 24:18, 37:3, 37:11, 37:16, 37:18, 37:21, 38:1, 42:7, 43:15, 44:5, 52:3, 56:15, 58:23, 62:20, 65:4, 65:16, 67:10, 68:1, 68:17, 68:18, 69:10
**ones** [2] - 27:8, 51:21
**opinion** [1] - 63:11
**opposing** [1] - 70:3
**option** [2] - 46:1, 46:7
**order** [6] - 53:16, 53:22, 53:23, 70:14, 71:6
**original** [1] - 68:8
**outside** [4] - 38:21, 39:14, 41:15, 51:23
**own** [2] - 61:8, 72:19

## P

**p.m** [1] - 76:23
**padded** [2] - 12:1, 12:22
**page** [6] - 35:12, 36:4, 38:1, 65:20, 66:9
**pair** [1] - 53:1
**pajamas** [1] - 52:21
**paper** [3] - 9:13, 9:14, 76:10
**paperwork** [3] - 21:14, 76:8, 76:11
**part** [2] - 5:20, 26:8
**particular** [2] - 5:22, 22:22
**passive** [2] - 30:10, 71:16
**passively** [2] - 31:9, 31:12
**past** [3] - 26:11, 27:5, 32:1
**patrol** [13] - 7:4, 7:12, 7:14, 34:9, 34:10, 42:20, 45:7, 45:10, 46:14, 47:12, 47:16, 47:22, 58:14
**pay** [3] - 24:12, 24:14, 24:15
**people** [7] - 8:15, 12:20, 13:21, 15:18, 28:22, 31:23, 51:19
**per** [1] - 60:19
**perfect** [1] - 5:14
**perform** [3] - 8:9, 9:2, 13:4
**performed** [1] - 40:17

**period** [2] - 7:16, 47:10
**permitted** [1] - 61:10
**person** [26] - 5:12, 10:12, 10:14, 10:23, 12:13, 15:3, 15:7, 15:12, 15:14, 15:21, 17:1, 17:21, 19:12, 20:11, 20:14, 21:5, 21:6, 22:17, 22:18, 24:10, 28:4, 29:19, 33:13, 39:23, 63:10, 67:20
**person's** [1] - 30:14
**personally** [1] - 68:16
**persons** [1] - 25:18
**photos** [1] - 8:10
**physical** [1] - 31:6
**place** [10] - 4:18, 16:10, 17:11, 40:3, 41:12, 42:21, 43:11, 45:4, 50:1, 60:23
**placed** [16] - 8:16, 13:8, 18:11, 18:13, 28:11, 43:9, 44:18, 58:14, 58:15, 72:8, 72:12, 72:17, 75:2
**placing** [3] - 32:13, 45:15, 46:14, 57:22
**plaintiff's** [1] - 67:12
**Plaintiff's** [8] - 35:7, 35:20, 36:11, 36:12, 37:4, 65:4, 66:6, 66:17
**play** [2] - 26:15, 26:20
**plus** [1] - 28:3
**pocket** [1] - 40:1
**pockets** [4] - 39:20, 42:19, 52:15, 57:22
**point** [36] - 16:20, 17:16, 18:3, 21:18, 23:2, 31:13, 31:16, 42:7, 42:10, 43:15, 44:23, 45:3, 45:17, 48:4, 50:6, 52:3, 54:5, 54:20, 54:22, 55:20, 56:2, 56:8, 56:14, 57:4, 58:3, 58:20, 59:18, 60:3, 60:7, 60:14, 61:17, 71:19, 72:7, 72:16, 73:9, 76:6
**points** [1] - 6:6
**police** [9] - 4:19, 6:17, 6:20, 7:3, 7:10, 26:1, 30:22, 43:3, 68:15
**Police** [5] - 6:17, 6:19, 22:7, 65:6, 66:8
**policies** [5] - 21:2, 23:19, 34:13, 34:18,

36:8
**policy** [14] - 5:21, 8:22, 13:7, 19:6, 32:19, 35:14, 36:12, 36:15, 36:16, 36:20, 36:23, 37:4, 37:9, 37:12
**position** [2] - 7:8, 40:16
**possible** [2] - 63:8, 72:18
**post** [1] - 32:13
**posts** [1] - 14:17
**Powell** [18] - 4:17, 38:11, 38:18, 38:22, 39:6, 39:10, 39:11, 39:17, 39:21, 42:11, 42:21, 70:4, 70:20, 71:10, 72:14, 73:4, 74:13, 74:17
**Powell's** [5] - 40:18, 41:7, 41:14, 43:23, 75:12
**practice** [1] - 61:2
**pre** [1] - 55:17
**pre-existing** [1] - 55:17
**precautions** [7] - 11:19, 19:11, 29:3, 32:5, 44:15, 55:15, 55:21
**prefer** [1] - 4:21
**prepare** [1] - 68:6
**prerequisite** [3] - 70:8, 70:11, 70:23
**presence** [1] - 30:21
**present** [2] - 54:2, 75:9
**pressure** [2] - 41:21, 59:22
**pretty** [4] - 49:14, 56:19, 57:7, 69:20
**prevent** [13] - 11:22, 16:12, 17:22, 32:4, 32:6, 44:9, 44:16, 45:11, 45:16, 55:18, 56:1, 56:16, 56:18
**preventing** [2] - 44:11, 45:13
**prevention** [4] - 36:21, 37:5, 37:13, 38:1
**prevents** [1] - 12:20
**preview** [1] - 35:5
**previous** [5] - 26:19, 26:23, 27:6, 68:23
**primarily** [2] - 7:14, 23:7
**prisoner** [2] - 36:13, 45:22
**prisoners** [4] - 8:5,

9:6, 22:8, 37:6
**procedure** [7] - 5:21, 8:22, 13:7, 19:7, 22:12, 32:19, 61:2
**procedures** [2] - 21:2, 23:19
**process** [6] - 8:22, 16:15, 16:22, 26:9, 32:9, 43:20
**professional** [2] - 75:16, 75:18
**professionals** [1] - 63:9
**program** [5] - 8:14, 36:21, 37:6, 37:13, 38:1
**property** [5] - 8:11, 46:11, 47:4, 47:11, 64:4
**protection** [2] - 53:16, 53:23
**provides** [1] - 15:21
**psychiatric** [4] - 20:18, 35:22, 55:5, 55:17
**psychological** [1] - 30:6
**PTSD** [1] - 25:14
**pull** [4] - 18:14, 30:13, 40:11, 57:23
**pulling** [4] - 41:12, 71:13, 71:19, 72:20
**punches** [1] - 58:11
**purpose** [1] - 11:3
**put** [11] - 10:14, 11:9, 12:16, 17:21, 19:8, 19:12, 40:9, 40:13, 43:6, 45:6, 48:3
**putting** [3] - 23:18, 29:1, 29:2

**Q**

**questioning** [2] - 26:9, 70:3
**questionnaire** [1] - 27:15
**questions** [11] - 5:4, 5:15, 10:22, 23:16, 27:20, 27:22, 34:12, 36:14, 38:14, 69:19, 76:20
**quick** [3] - 5:2, 34:12, 69:20
**quickly** [2] - 62:19, 64:19

**R**

**RAIMONDO** [3] - 4:1,

4:6, 37:17
**re** [2] - 16:15, 16:23
**re-evaluation** [2] - 16:15, 16:23
**reach** [2] - 39:20, 40:1
**reaching** [1] - 52:15
**read** [3] - 4:7, 27:21, 27:22
**reading** [1] - 9:21
**really** [8] - 5:9, 19:14, 34:17, 34:20, 43:8, 50:4, 72:20
**reason** [6] - 11:6, 11:9, 21:8, 63:4, 74:12, 76:1
**reasonable** [1] - 29:21
**reasonableness** [1] - 58:6
**receive** [3] - 20:18, 25:12, 29:14
**received** [4] - 26:14, 26:23, 29:12, 31:17
**recess** [1] - 62:21
**recognizance** [1] - 61:8
**recognize** [8] - 34:18, 37:15, 65:10, 65:21, 66:10, 66:21, 67:14, 67:22
**refer** [3] - 5:18, 5:19, 66:19
**reference** [1] - 66:6
**referrals** [1] - 37:6
**reflect** [1] - 10:11
**refused** [2] - 40:9, 41:10
**regarding** [17] - 11:21, 15:2, 16:4, 22:15, 25:12, 26:10, 32:22, 34:13, 38:18, 39:6, 49:4, 50:12, 54:8, 55:4, 57:9, 69:10
**released** [4] - 21:17, 55:1, 61:8
**remain** [2] - 24:11, 60:16
**remember** [13] - 49:3, 51:3, 51:22, 52:1, 52:23, 54:7, 54:8, 54:11, 54:12, 59:5, 64:11, 70:5, 71:23
**remote** [1] - 4:3
**removing** [1] - 75:6
**repeat** [1] - 44:13
**rephrase** [1] - 55:14
**report** [9] - 65:6, 65:11, 65:12, 65:22, 66:3, 66:12, 66:23, 68:10, 68:11
**REPORTER** [1] - 4:3

**represent** [1] - 4:17
**representation** [2] - 64:22, 67:6
**request** [1] - 67:19
**reserve** [1] - 4:7
**resistance** [9] - 30:1, 30:4, 30:10, 30:12, 71:8, 71:10, 71:13, 71:15, 71:16
**resisting** [7] - 30:14, 31:9, 31:13, 53:10, 58:2, 58:4, 68:9
**responded** [2] - 38:17, 46:15, 75:10
**response** [4] - 30:3, 31:8, 55:16, 59:17
**responses** [1] - 55:9
**restrain** [1] - 32:23
**restrained** [3] - 14:10, 44:22, 45:10
**restraint** [18] - 11:23, 12:7, 12:12, 12:19, 12:22, 13:8, 13:20, 14:7, 16:11, 16:16, 17:11, 17:21, 18:12, 18:13, 18:14, 29:1, 29:7, 48:4
**restraints** [4] - 14:17, 41:13, 41:20, 45:4
**result** [2] - 26:15, 76:16
**review** [1] - 68:5
**reviewed** [2] - 68:7, 68:8
**revised** [1] - 36:9
**right-shoulder** [1] - 59:21
**Road** [1] - 38:21
**roam** [1] - 14:11, 14:14
**rolling** [1] - 58:16
**room** [5] - 12:1, 13:23, 14:3, 17:5, 23:10
**rotation** [1] - 7:15
**rounds** [1] - 8:20
**rules** [1] - 5:2
**run** [5] - 40:19, 41:23, 52:13, 52:14, 70:5

**S**

**safe** [2] - 8:6, 11:18
**sat** [1] - 42:1
**saw** [1] - 48:2
**scenarios** [1] - 21:3
**scene** [2] - 10:7, 15:6, 15:11, 17:1, 28:1, 39:5, 51:1, 51:17, 51:20, 52:4, 53:7, 56:12, 56:16,

57:17, 59:12, 63:2, 63:20, 63:22, 64:9
**Schimek** [2] - 34:7, 51:9
**school** [1] - 6:5
**School** [1] - 6:9
**scrapes** [1] - 64:11
**screen** [5] - 34:23, 35:1, 35:7, 37:12, 38:6
**screening** [10] - 9:23, 10:21, 15:21, 15:23, 26:9, 26:13, 26:16, 27:14, 28:6, 28:9
**screenings** [2] - 8:13, 21:19
**search** [1] - 52:16
**searched** [2] - 39:22, 71:22
**Second** [1] - 4:10
**see** [11] - 20:6, 20:7, 35:1, 35:4, 35:7, 35:10, 35:23, 37:20, 43:8, 60:16, 65:2
**seem** [1] - 50:2
**self** [17] - 10:9, 11:22, 16:13, 16:20, 17:22, 25:4, 31:21, 32:6, 32:21, 44:11, 45:11, 45:16, 45:23, 48:13, 50:17, 50:18, 55:19
**self-destructive** [2] - 16:13, 25:4
**self-harming** [2] - 50:18, 55:19
**sent** [3] - 54:5, 61:15, 61:16
**separate** [2] - 27:16, 27:18
**September** [1] - 6:18
**service** [2] - 7:5, 37:7
**setting** [2] - 7:13, 16:5
**seven** [2] - 34:3, 60:22
**several** [2] - 40:12
**shackle** [1] - 14:21
**shackles** [2] - 14:2, 25:7
**share** [1] - 34:23
**sharing** [1] - 38:5
**Sheriff's** [3] - 6:13, 22:9, 38:17
**sheriff's** [2] - 29:13, 39:3
**shift** [18] - 7:18, 7:20, 7:21, 8:1, 16:2, 29:9, 34:1, 34:3, 34:4, 34:7, 50:23, 51:7, 60:21, 61:14, 61:18, 62:9, 66:12, 67:3
**shirt** [1] - 30:7

**short** [1] - 33:11
**shortly** [1] - 54:18
**shoulder** [1] - 59:21
**shoulders** [1] - 13:2
**show** [9] - 11:12, 30:21, 35:3, 35:19, 42:14, 52:6, 65:3, 66:16, 67:17
**showing** [7] - 30:8, 35:6, 36:19, 37:12, 57:21, 65:15, 66:5
**shown** [1] - 10:10
**side** [5] - 30:6, 30:20, 32:14, 58:16, 64:12
**sight** [3] - 10:15, 14:5, 14:6
**sign** [1] - 4:7
**signed** [1] - 67:3
**signs** [1] - 24:22
**silly** [1] - 11:2
**similar** [3] - 16:7, 25:15, 28:15
**simply** [2] - 18:18, 26:22
**sit** [2] - 19:16, 19:21
**situation** [12] - 12:3, 19:7, 23:20, 29:4, 31:11, 32:6, 32:19, 33:8, 33:12, 49:5, 56:20, 57:8
**situations** [2] - 13:5, 19:2
**slammed** [1] - 58:8
**sleeping** [2] - 9:20, 24:19
**slept** [1] - 49:11
**slight** [1] - 5:10
**smoother** [1] - 35:5
**soft** [2] - 31:1, 31:14
**soft-hand** [1] - 31:1
**someone** [13] - 13:7, 19:3, 19:23, 20:21, 20:23, 21:21, 22:2, 28:8, 29:5, 45:22, 54:1, 70:15, 71:4
**sometimes** [5] - 5:4, 22:8, 27:22, 59:7, 59:8
**soon** [1] - 42:5
**sorry** [9] - 12:19, 26:18, 37:19, 44:13, 55:14, 63:1, 67:11, 69:8, 70:18
**sort** [32] - 8:22, 11:19, 12:2, 12:15, 13:9, 15:3, 16:15, 16:22, 19:6, 23:21, 24:20, 24:21, 25:12, 25:13, 26:10, 30:8, 31:8, 31:11, 31:17, 31:18,

31:21, 32:5, 32:18, 44:14, 44:15, 48:22, 50:3, 55:3, 55:14, 59:16, 63:8
**sound** [1] - 11:2
**speaking** [1] - 39:16
**specific** [4] - 25:12, 31:18, 31:19, 34:13
**spot** [1] - 14:14
**spray** [1] - 31:6
**staff** [3] - 25:21, 25:22, 42:13
**stand** [4] - 42:4, 42:17, 54:14, 60:16
**start** [6] - 13:13, 17:5, 28:22, 38:12, 46:22, 74:21
**started** [4] - 5:1, 40:1, 41:16, 52:14
**starting** [2] - 60:12, 60:13
**starts** [1] - 17:13
**state** [2] - 20:11, 63:6
**statements** [3] - 48:22, 55:3, 62:12
**stating** [1] - 32:8
**status** [1] - 9:20
**stay** [3] - 23:3, 41:17, 52:10
**stayed** [1] - 42:16
**steps** [1] - 32:5
**stick** [2] - 17:7, 18:18
**still** [6] - 20:1, 28:2, 42:22, 43:8, 59:19, 61:21
**Stone** [1] - 38:20
**stood** [4] - 60:2, 60:14, 73:6, 73:8
**stop** [5] - 33:8, 38:5, 46:9, 73:1, 73:2
**stopped** [2] - 60:10, 60:12
**stopping** [2] - 46:1, 46:7
**straight** [1] - 21:7
**straps** [1] - 12:23
**Street** [1] - 4:10
**strikes** [5] - 31:3, 73:10, 73:13, 73:19, 73:22
**striking** [2] - 48:17, 74:17
**stuff** [1] - 38:19
**subject** [3] - 35:9, 35:22, 57:19
**subject's** [1] - 30:6
**suicidal** [7] - 11:5, 15:14, 21:12, 28:1, 48:18, 48:19, 54:23
**suicide** [19] - 8:13,

9:22, 10:20, 13:12, 15:21, 15:23, 21:19, 26:9, 26:13, 26:16, 27:5, 27:14, 28:5, 28:9, 36:21, 37:5, 37:13, 37:23, 48:14
**suicide-screening** [1] - 26:9
**SUNY** [1] - 6:11
**supervision** [6] - 15:3, 22:15, 22:21, 26:21, 28:8, 57:12
**suspect** [6] - 23:20, 24:23, 26:10, 29:19, 30:6, 46:3
**suspects** [1] - 51:12
**sworn** [1] - 4:12
**symptoms** [1] - 24:22

**T**

**tactic** [1] - 59:8
**tactics** [2] - 73:16, 74:2
**takedown** [1] - 40:18
**takedowns** [3] - 31:2, 31:15, 58:4
**tank** [3] - 14:5, 14:13
**TASER** [1] - 31:5
**techniques** [3] - 31:1, 31:3, 31:15
**tense** [1] - 40:9
**tensing** [4] - 30:12, 60:11, 60:12, 71:13
**term** [2] - 24:22, 53:21
**terms** [2] - 71:15, 75:20
**testified** [1] - 4:12
**testifying** [2] - 70:5, 72:1
**testimony** [1] - 69:1
**THE** [7] - 4:3, 12:6, 49:8, 57:1, 57:17, 69:16, 69:21
**themselves** [33] - 8:18, 10:19, 11:5, 11:13, 11:16, 12:9, 12:21, 13:13, 15:15, 17:3, 17:9, 17:16, 17:19, 18:1, 18:3, 18:8, 18:10, 19:17, 20:12, 21:13, 22:23, 25:6, 27:10, 28:2, 28:20, 31:22, 32:2, 32:8, 32:12, 32:22, 33:1, 46:7
**they've** [5] - 18:15, 18:16, 26:13, 27:5, 28:2
**thoughts** [1] - 11:11

**thrash** [1] - 41:1
**thrashing** [2] - 16:6, 41:22
**threat** [6] - 40:6, 41:2, 57:22, 60:8, 73:5
**threatening** [6] - 31:21, 32:2, 32:21, 48:13, 48:14
**threats** [1] - 48:11
**three** [3] - 13:19, 39:14, 51:17
**throughout** [4] - 10:15, 39:10, 41:8, 41:9
**throw** [1] - 58:11
**Thursday** [1] - 65:7
**tight** [2] - 56:4, 72:13
**tighten** [1] - 72:23
**tightening** [1] - 73:2
**tighter** [1] - 72:18
**tightness** [1] - 56:7
**title** [2] - 7:9, 49:9
**titles** [1] - 38:19
**today** [1] - 68:6
**together** [2] - 27:19, 76:11
**took** [5] - 4:18, 40:2, 44:15, 60:23, 74:20
**tools** [2] - 12:2, 12:7
**top** [8] - 31:7, 35:8, 65:8, 65:18, 66:7, 66:20, 67:13, 67:19
**top-left** [1] - 65:18
**top-right** [1] - 35:8
**towards** [1] - 18:7
**Town** [2] - 6:17, 22:9
**traffic** [2] - 7:6
**training** [12] - 5:17, 6:5, 11:8, 13:6, 16:4, 25:12, 29:10, 29:12, 29:14, 31:18, 40:14
**transport** [8] - 20:14, 21:8, 32:23, 33:7, 33:10, 33:15, 36:13, 60:17
**transportation** [1] - 75:1
**transported** [3] - 43:14, 61:12, 75:21
**transporting** [1] - 46:1
**transports** [1] - 35:23
**treatment** [3] - 26:11, 26:19, 36:13
**tried** [7] - 15:15, 41:8, 41:9, 42:5, 58:14, 58:16, 58:18
**trunk** [1] - 47:22
**try** [18] - 20:4, 20:5, 20:7, 20:8, 21:12, 21:13, 23:12, 23:13,

24:12, 28:4, 32:3, 32:4, 33:8, 41:2, 46:9, 52:13, 52:14
**trying** [36] - 12:9, 12:10, 13:14, 18:23, 25:5, 25:6, 28:20, 30:12, 30:13, 30:15, 30:17, 32:11, 39:12, 39:13, 40:4, 40:10, 40:12, 40:21, 41:18, 41:23, 42:1, 42:2, 43:11, 46:5, 46:6, 46:11, 47:3, 47:4, 54:12, 54:13, 70:5, 71:5, 71:9, 72:3
**two** [6] - 7:18, 18:15, 27:16, 40:18, 62:17, 64:17
**two-officer** [1] - 40:18
**type** [6] - 8:15, 10:5, 56:17, 70:23, 71:8, 71:10
**types** [1] - 12:13
**typically** [10] - 13:11, 16:10, 19:19, 19:23, 23:5, 25:3, 26:3, 33:3, 33:10, 75:23

**U**

**under** [8] - 8:15, 11:1, 11:7, 11:9, 13:16, 14:9, 20:13, 21:6
**underneath** [2] - 41:3, 41:12
**uniform** [1] - 30:21
**unless** [1] - 12:14
**up** [36] - 7:17, 8:16, 15:1, 15:2, 18:16, 19:15, 23:9, 28:5, 30:12, 30:21, 35:21, 37:11, 37:20, 39:3, 40:9, 41:2, 41:20, 42:4, 42:17, 42:18, 47:3, 52:6, 52:7, 52:17, 54:14, 54:15, 58:8, 60:2, 60:11, 60:12, 60:14, 60:16, 62:18, 71:14, 73:6, 73:8
**ups** [1] - 69:15
**upset** [9] - 17:8, 17:19, 18:6, 18:7, 18:19, 20:1, 46:21, 49:22, 50:4
**use-of-force** [4] - 29:14, 66:18, 66:23, 68:10
**utilize** [2] - 12:11

## V

**valid** [1] - 38:22
**vehicle** [2] - 75:3, 75:7
**verbal** [3] - 30:9, 30:10, 30:22
**verbally** [3] - 20:4, 42:15, 71:14
**versus** [2] - 20:23, 24:18
**violating** [2] - 53:16, 54:2
**violation** [1] - 53:22
**violent** [3] - 53:20, 53:21, 53:22
**visibly** [1] - 17:8

## W

**W-I-S-E** [1] - 4:2
**waist** [1] - 13:2
**walked** [1] - 42:19
**wall** [3] - 9:3, 16:7, 16:10
**walls** [2] - 28:19, 29:6
**Ward** [2] - 34:6, 51:7
**warrant** [7] - 13:10, 21:10, 38:23, 39:18, 39:19, 53:7, 53:14
**warrants** [3] - 40:5, 52:12, 57:20
**watch** [21] - 8:5, 8:14, 10:15, 11:10, 11:13, 13:22, 14:9, 20:2, 21:16, 21:20, 23:3, 24:2, 24:4, 24:11, 27:2, 27:9, 27:12, 28:10, 50:7, 55:22
**watching** [2] - 25:3, 25:8
**water** [1] - 20:7
**weapon** [1] - 30:18
**weapons** [8] - 8:2, 31:5, 39:23, 52:17, 52:19, 58:1, 71:23, 72:5
**wearing** [3] - 52:20, 52:21, 52:22
**week** [1] - 7:18
**weight** [3] - 30:11, 31:10, 31:13
**window** [2] - 14:5, 14:6
**wing** [1] - 9:6
**Wise** [1] - 4:2
**wish** [1] - 20:12
**WITNESS** [6] - 12:6, 49:8, 57:1, 57:17, 69:16, 69:21
**witness** [1] - 4:1

**wondering** [2] - 6:3, 38:7
**worse** [5] - 16:22, 24:8, 25:2
**wrist** [3] - 41:13, 41:19, 45:4
**wrists** [1] - 40:3
**write** [1] - 66:3

## Y

**year** [1] - 27:6
**yearly** [1] - 29:14
**yelling** [4] - 39:15, 40:9, 46:22, 59:15
**York** [1] - 4:11

## Z

**ZACCAGNINO** [12] - 4:5, 4:14, 12:17, 37:19, 37:22, 49:12, 57:3, 58:7, 62:22, 69:13, 69:17, 76:21
**Zaccagnino** [1] - 4:16
**Zoom** [1] - 5:9

**MCCANN & MCCANN REPORTING**