1

**CARTER DAVID OBERGFELL**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------
**CHRISTIAN POWELL,**

                    Plaintiff,

              - vs -        **Index Number
                           21-CV-00721**

**CITY OF JAMESTOWN,
CITY OF JAMESTOWN CLERK,
JAMESTOWN POLICE DEPARTMENT,
JAMESTOWN POLICE CHIEF TIMOTHY JACKSON,
COUNTY OF CHAUTAUQUA,
CHAUTAUQUA COUNTY SHERIFF'S OFFICE,
CHAUTAUQUA COUNTY SHERIFF JAMES B. QUATTRONE,
CHAUTAUQUA COUNTY UNDERSHERIFF DARRYL W. BRALEY,
JOHN DOES 1-10, said names being fictitious
but intended to be any other individual/officers
involved in the within incident and employees
of the CITY OF JAMESTOWN and/or JAMESTOWN POLICE
DEPARTMENT in their individual and official
capacities,
and JOHN DOES 1-10, said names being fictitious
but intended to be any other individual/officers
involved in the within incident and employees
of the COUNTY OF CHAUTAUQUA and/or CHAUTAUQUA
COUNTY SHERIFF'S OFFICE in their individual and
official capacities,**

                    Defendants.
-----------------------------------------

Examination Before Trial of **CARTER DAVID OBERGFELL,**

taken pursuant to Federal Rules, via virtual

teleconference, on August 16, 2023, commencing at

10:16 a.m., before PATRICK MCLAUGHLIN, Notary

Public.

**MCCANN & MCCANN REPORTING**

2

```
 1   APPEARANCES:        SHAW & SHAW, P.C.
                         BY BLAKE ZACCAGNINO, ESQ.
 2                       4819 South Park Avenue
                         Hamburg, New York 14075
 3                       Appearing for the Plaintiff.

 4                       CORPORATION COUNSEL
                         CITY OF JAMESTOWN
 5                       BY ELLIOT S. RAIMONDO, ESQ.
                         200 East Third Street
 6                       Jamestown, New York 14701
                         Appearing for the City of Jamestown
 7                       and affiliated Defendants.

 8                       HANCOCK ESTABROCK LLP
                         BY MARY L. D'AGOSTINO, ESQ.
 9                       100 AXA Tower
                         100 Madison Street
10                       Syracuse, New York 13202
                         Appearing for City of Jamestown
11                       and affiliated Defendants.

12

13

14

15           (STIPULATIONS:  Waive filing of

16        the transcript, waive Oath of the Referee,

17        reserve all objections until trial, with

18        exception of objections as to form.)

19

20

21

22

23
```

**MCCANN & MCCANN REPORTING**

3

**INDEX**

1

2   **EXHIBITS:**                                          **PAGE:**

3    PLAINTIFF'S      Jamestown Police                        4
     EXH. A          Department General Order
4                    1.11.01.  Three Pages.
     PLAINTIFF'S      Jamestown Police                        4
5    EXH. B          Department General Order
                     2.02.12.  Four Pages.
6    PLAINTIFF'S      Jamestown Police                        4
     EXH. C          Department General Order
7                    4.02.05.  Six Pages.
     PLAINTIFF'S      Jamestown Police                        4
8    EXH. D          Department General Order
                     4.05.08.  Four Pages.
9    PLAINTIFF'S      Jamestown Police                        4
     EXH. F          Department Incident Report
10                   Dated 12/10/20.  Two
                     Pages.
11   PLAINTIFF'S      Jamestown Police                        4
     EXH. G          Department Use of Force
12                   Form. Document 14-3.  Two
                     Pages.
13   PLAINTIFF'S      Jamestown Police                        4
     EXH. H          Department Case File #1044
14                   Incident Report.  Document
                     14-5.  Two Pages.
15   PLAINTIFF'S      Jamestown Police                        5
     EXH. I          Department Case File #1018
16                   Incident Report.  Two
                     Pages.
17   PLAINTIFF'S      EMS Call Document 14-7.                 5
     EXH. J          Eight Pages.
18   PLAINTIFF'S      Request for Examination of              5
     EXH. K          Person.  Document 14-3.
19                   One Page.

20                         * * * * *

21   **EXAMINATIONS:**                                    **PAGE:**

22    BY MR. ZACCAGNINO                                      6
      BY MS. D'AGOSTINO                                      99
23
                           * * * * *

**MCCANN & MCCANN REPORTING**

4

1          The following was marked for Identification:

2          PLAINTIFF'S EXH. A  Jamestown Police

3                              Department General Order

4                              1.11.01.  Three Pages.

5          PLAINTIFF'S EXH. B  Jamestown Police

6                              Department General Order

7                              2.02.12.  Four Pages.

8          PLAINTIFF'S EXH. C  Jamestown Police

9                              Department General Order

10                             4.02.05.  Six Pages.

11         PLAINTIFF'S EXH. D  Jamestown Police

12                             Department General Order

13                             4.05.08.  Four Pages.

14         PLAINTIFF'S EXH. F  Jamestown Police

15                             Department Incident Report

16                             Dated 12/10/20.  Two Pages.

17         PLAINTIFF'S EXH. G  Jamestown Police

18                             Department Use of Force Form.

19                             Document 14-3.  Two Pages.

20         PLAINTIFF'S EXH. H  Jamestown Police

21                             Department Case File #1044

22                             Incident Report.  Document

23                             14-5.  Two Pages.

5

```
 1          PLAINTIFF'S EXH. I  Jamestown Police
 2                          Department Case File #1018
 3                          Incident Report.  Two Pages.
 4          PLAINTIFF'S EXH. J  EMS Call Document 14-7.
 5                          Eight Pages.
 6          PLAINTIFF'S EXH. K  Request for Examination
 7                          of Person.  Document 14-3.
 8                          One Page.
 9          MR. RAIMONDO:  The witness's identity is
10   State Trooper Carter, C-A-R-T-E-R, Obergfell,
11   O-B-E-R-G-F-E-L-L.
12          THE REPORTER:  Any objections to remote
13   notarization?
14          MR. ZACCAGNINO:  No.
15          MR. RAIMONDO:  None from the city.
16          MS. D'AGOSTINO:  Reserve read and sign, yes,
17   please.
18
19   C A R T E R   D A V I D   O B E R G F E L L, 200 East
20   Third Street, Jamestown, New York, 14701, after
21   being duly called and sworn, testified as follows:
22
23
```

MCCANN & MCCANN REPORTING

1          **EXAMINATION BY MR. ZACCAGNINO:**

2

3          **Q.**   Hi, Trooper.  I'm Blake Zaccagnino.  I

4    represent Christian Powell.  He was involved in a

5    few different incidents with the Jamestown Police

6    back in December of 2020.

7          The first thing I want to ask you was:  What

8    do you want me to call you?  Do you want me to call

9    you Trooper?  You know, anything you prefer.  I

10   don't want to be disrespectful.  I want to, you

11   know, make sure --

12          **A.**   You can call me Trooper Obergfell.

13          **Q.**   Okay.

14          **A.**   Whatever.  Yes, sir.

15          **Q.**   Okay.  Okay.  Before we start, I just

16   wanted to make sure that -- you know, I just wanted

17   to go over a couple of different ground rules.

18          The first one, I just want to, first and

19   foremost, understand the questions I'm asking.

20   Sometimes, you know, I'll be talking fast and I

21   might be confusing.  So just let me know.  I'm not

22   trying to trick you or anything.

23          And then the second thing is just to make

1  sure we can have one person talking at a time

2  because it's extremely hard over Zoom because

3  there's a delay with the sound and all that.  So

4  I'll do my best to do that for you.  Okay?

5        **A.**    Yes, sir.

6        **Q.**    And I have a bunch of questions about

7  your background and training, which I'll get into

8  in the beginning.

9        Not anything extensive or super long, but

10  you know, I'll refer you to the different time

11  frames that I'm interested in regarding that.

12        But mainly, I'm interested in how things

13  were back in December of 2020 at Jamestown, you

14  know, if I ask you about a policy or something like

15  that.  Okay?

16        **A.**    Okay.

17        **Q.**    So Trooper, I was wondering if you

18  could just briefly take us through your education

19  and training, maybe from high school until now.

20        It doesn't have to be, you know, at every

21  detail, but just the main points of your education

22  and training.

23        **A.**    Sure.  Well, I was -- I graduated high

*Obergfell - Zaccagnino - 08/16/23*

8

1   school in 2016, and then I -- I went from there on

2   to -- I did two years with Jamestown Community

3   College.  Mostly, that was on the -- at the Olean

4   campus.  A lot of it was online.

5         In 2018 -- in September of 2018, I started

6   with the Chautauqua County Sheriff's Academy, and I

7   was sponsored by the Cattaraugus County Sheriff's

8   Office to go to that.

9         I completed my training there in 2019, and

10  started working as a -- as an officer going from

11  there.

12        Did you want me to go into the training --

13        **Q.**   Sure.

14        **A.**   So it was -- there was academic

15  training in classroom.  There was physical training

16  every day.  It ranged from everything going from

17  penal law to, you know -- you know, doing scenarios

18  and that sort of thing.

19        So basically, encompassing, you know, the

20  basic training needed to become a police officer.

21        **Q.**   And now, when you finished your -- the

22  training that you talked about, what was your first

23  job as an officer?

**MCCANN & MCCANN REPORTING**

1       **A.**    So I was sponsored by the Cattaraugus

2   County Sheriff's Office.  I did my -- my initial

3   field training with them.  I had a part-time job

4   with them pretty much right out -- right out the

5   gate, graduating.

6           Shortly after that, I was hired by the

7   Franklinville Police Department -- it's a

8   village -- and I did that for a few months.

9           In November of 2019, I was hired full time

10  by the Village of Allegany Police Department.  And

11  at that time, I was working that full-time job and

12  then my part-time job with Franklinville and the

13  Cattaraugus County Sheriff's Office.

14          So I had -- had three jobs -- three jobs at

15  that time as a police officer.  And then in January

16  of 2020, I got hired by the City of Jamestown.

17      **Q.**    Okay.  And --

18      **A.**    At that time, I resigned from those

19  other agencies when I got hired by the City of

20  Jamestown.

21      **Q.**    And then now you're currently with the

22  New York State Troopers?

23      **A.**    Yes, sir.

1      **Q.**   When did you start with them?

2      **A.**   In November of 2022, I started with the

3 state police and I've been there since then.

4      **Q.**   Why did you leave Jamestown?

5      **A.**   I was just looking for a -- just a

6 bigger agency, more opportunity, benefits.  That's

7 really all it boils down to.

8      **Q.**   Can you take us through -- you know, I

9 have a general idea, but just the day-to-day,

10 your -- your day-to-day activities, I guess, with

11 each of those agencies?

12     So I know that you mentioned Cattaraugus

13 County, Franklinville, the Village of -- did you

14 say the Village of Allegany?

15      **A.**   Allegany, yes, sir.

16      **Q.**   And then the City of Jamestown, can you

17 just briefly take us through your day-to-day

18 activities with them or with each agency?

19      **A.**   Yes, sir.  So the only -- the only

20 agency where my role would have been a little bit

21 different was the Cattaraugus County Sheriff's

22 Office.

23     I did do some road patrol work there, but

1  most of that was court security and then some

2  prisoner transports.

3        But then moving onto Franklinville,

4  Allegany, and Jamestown, that was road patrol.  So

5  answering calls for service, conducting traffic

6  stops, just normal day-to-day activities of a

7  police officer.

8        **Q.**   And can you tell us about any sort of

9  training and experiences that you got in

10  supervising prisoners or inmates in general?

11       **A.**   Well, we -- we receive training in the

12  sheriff's academy regarding taking prisoners into

13  custody, but in terms of training I received

14  with -- are you referring to in the jail or --

15       **Q.**   I would say in -- maybe in both

16  scenarios.  So if you arrest somebody when you're

17  on the road and then -- you know, versus when you

18  have someone at the jail.

19       Just supervising an inmate when you have

20  them in your custody, you know, that's mainly what

21  I'm interested in.

22       **A.**   Right.  So we're trained that, whenever

23  we arrest somebody, that we take them into our

1  custody, they are under our supervision; they're

2  under our care.

3       We are to, you know, provide them the

4  supervision and care that we're required to do.

5       Basically, that's -- that's what the

6  training amounts to, is that, when we take somebody

7  into custody, they're our responsibility.

8       **Q.**   And can you -- can you tell us about

9  any sort of training or experiences, you know, just

10  kind of building on that that you got regarding

11  supervising inmates who might be suicidal and/or

12  have a tendency to harm themselves?

13       **A.**   Right.  So our -- our -- we have, in

14  New York, we have mental health law, specifically

15  9.41.

16       So when we have prisoners that, you know,

17  make ideations or actions that give us reasonable

18  cause to believe that they're going to be a threat

19  to themselves or others, we file 9.41 paperwork,

20  which is -- it requires them to receive a mental

21  health evaluation.

22       **Q.**   And how does that work, the 9.41?  Can

23  you just kind of take us through, I guess, the

1 process of if you -- if you identify someone who,

2 like you said, is suicidal or making some sort of

3 ideations, what sort -- can you take us through the

4 process that you would go through regarding a 9.41?

5 **A.** Well, the process can vary depending on

6 the circumstances. So depending on -- ultimately,

7 when we file 9.41 paperwork, the individual is

8 going to receive some kind of mental health

9 evaluation from a certified facility.

10 So in the City of Jamestown, that was UPMC

11 Chautauqua. They are capable of handling mental

12 health evaluation, and they have staff on duty to

13 handle those situations.

14 So depending on -- like I said, the

15 situations can vary. Ultimately, what's going to

16 happen is we're going to fill out a form that

17 details what we observed, what -- what the subject

18 said, what their actions were, fill out a form that

19 details everything.

20 We will transport them to the hospital

21 either in our car or sometimes we would transport

22 them in an ambulance, again, depending on the

23 circumstances.

1        And essentially, drop them to the care, we

2   would turn them over to the hospital, the care of

3   the hospital.  We would give them the appropriate

4   paperwork.  And at that point, generally, they

5   would be out of our custody.

6        **Q.**   And then are there situations where you

7   send someone to UPMC and then they're evaluated and

8   it's determined that they can go back into your

9   care?

10        **A.**   Well, like I said, generally, once we

11   take them to the hospital and we turn them over to

12   the hospital, all our proceedings with them are

13   complete.

14        So I never had -- I don't believe that I

15   observed a case where we dropped them off at the

16   hospital for a 9.41, they were in our custody, we

17   took them to the hospital, and then went back to

18   the hospital to take them back into our custody

19   afterwards, aside of if something happened at the

20   hospital where they needed to be taken into custody

21   again.

22        **Q.**   And is that -- is that a decision

23   that -- that would be made by the City of Jamestown

1   officers based on their observations whether or not

2   you would send them to UPMC as a 9.41 or is that

3   something that has to come from a higher entity or,

4   you know, some other entity outside of the City of

5   Jamestown police?

6        **A.**   No, sir.  Any officer can observe

7   actions that would lead us to believe that they're

8   going to be a threat to themselves or others, and

9   we can make that determination.

10        **Q.**   And can you tell us about, I guess -- I

11   don't know the best way to phrase this, but the --

12   I don't want to say the amount of suicidal

13   ideations or self-harming threats an inmate would

14   have to make or someone that you have in your

15   custody to make prior to you sending them out

16   for -- sending them out to UPMC as a 9.41.

17        Is there any sort of time frame that you

18   give or can you take us through that -- that

19   process?

20        **A.**   Time frame as to what?  I don't

21   necessarily understand.

22        **Q.**   Sure.  So for example, if an inmate is

23   saying, you know, I want to kill myself, or is, you

1 know, hitting their head off a wall or something

2 like that, is there a time frame that you give, you

3 know, to allow that sort of behavior to continue or

4 those threats to be made before you send them out

5 to a 9.41?

6       Like, if it's a one-time threat or one-time

7 incident, do you automatically send them out to

8 a -- is it 9.41 or is there sort of a time frame

9 where you observe, let them calm down possibly, and

10 then you would keep them in your custody?

11       **A.**   Well, again, the situations vary

12 greatly between -- because not necessarily

13 everybody that we 9.41 is being taken into custody

14 for criminal charges.

15       So the -- the time in which from -- the time

16 from which we hear or observe actions or ideations

17 that lead us to believe that they're a threat to

18 themselves or others can vary from the time that

19 they actually go to the hospital.

20       So there's -- there's no -- there is no time

21 requirement, per se, that there -- or amount of

22 statements that we need to hear to -- that

23 doesn't -- that does not change the time in which

1  we transport them to the hospital for their

2  evaluation.

3       **Q.**   And based on your training and

4  experiences in Jamestown policy, what side of the

5  spectrum would you lean as far as when you would

6  send somebody out for a 9.41 if, for example -- I

7  guess on one end of the spectrum, if they were to

8  make one 9.41, say, for example, I'm going to kill

9  myself or one incident of self harm that you

10 observe where you say, this one person did this one

11 incident and they have to be 9.41 or are you closer

12 to the side of giving them time to maybe settle

13 down?

14      Because I'm guessing a lot of people that

15 you bring into your custody are pretty upset, so

16 are you -- which end of the spectrum were you at

17 when you were working at Jamestown?

18      **A.**   So again, that is -- if they make -- as

19 a police officer, we're required to -- if they make

20 any ideations whatsoever, it doesn't -- regardless

21 of whether they make it and then five minutes

22 later, they're okay, if they make any ideation

23 where we believe it was a credible threat of harm

 1  to themselves or others, we're required to file

 2  that paperwork regardless of, you know, five

 3  minutes later they're fine.

 4          We still have to file that paperwork, and

 5  then the hospital staff and counselors can

 6  determine whether or not that they're their mental

 7  state has calmed.

 8          **Q.**   And you -- what's the -- what's your

 9  understanding based on your training and

10  experiences of what the reasoning is for that, for

11  the 9.41?

12          **A.**   To -- as, I guess in simple terms, to

13  protect themselves from self harm or -- and to

14  protect other people if they're threatening other

15  people from them -- from them harming them.

16          **Q.**   And when you were working at

17  Jamestown -- and I guess, you know, I'll -- I'll

18  get into your memory of your interactions with

19  Christian that night.

20          But aside from that experience, have you had

21  any other experiences where you dealt with inmates

22  that were either threatening suicide, threatening

23  self harm, or physically harming themselves in one

1  way or the other when you had them in your custody?

2         **A.**    Yes, sir.

3         **Q.**    And how often would that happen?  Is

4  that something that you experienced on, like, a

5  daily basis, weekly, monthly, or do you have any

6  estimate of time --

7         **A.**    That's -- that's very difficult to

8  speak to, how often it was, but I've had -- I've

9  had multiple experiences of taking prisoners into

10  custody that were -- that exhibit those behaviors

11  and made those statements.

12         **Q.**    And what sort of other precautions do

13  you take, you know, based on your training and

14  experiences in those situations where -- you know,

15  I'm assuming that you probably have to take time to

16  fill out the 9.41 paperwork, and you know, it

17  probably takes time for them to get transported to

18  the hospital.

19         So what sort of precautions are taken in the

20  interim time frame, I guess, from maybe your first

21  observation of threats of self harm or suicidal

22  ideation or actual self harm and when they're out

23  of your care?

1        You know, like, do you -- do you know what

2    I'm saying?  I'm sorry.  That was a long question.

3        **A.**    Are you speaking to when we have

4    somebody in our custody as in -- in our jail?

5        Because there are -- there are -- the

6    situations vary greatly from if we have criminal

7    charges on somebody and they were being held in our

8    jail to if we didn't have a criminal charges and

9    they were going straight to the hospital.

10        **Q.**    Yeah.  So I'm speaking more to the

11    situation where someone has criminal charges

12    against them and either in transport, you know,

13    from the scene of a crime to the jail and in the

14    jail.  That's mainly what I'm interested in.

15        **A.**    So if someone's been arrested on

16    criminal charges and they need to go to the jail,

17    to whether that be booking procedures or waiting on

18    an arraignment, when somebody makes those comments

19    or actions that lead us to believe they're a threat

20    to themselves or others, they would become a

21    constant watch.

22        So basically what that means, when they're

23    in the jail, we have a jail officer in the City of

1  Jamestown.

2      They would be standing by, and they would

3  have to be within the sight of the officer, and --

4  and they're under constant supervision, basically,

5  to protect them from themselves.

6      So whether that means that they're waiting

7  for their arraignment or being booked, they're

8  under the constant supervision of the jail officer.

9      **Q.**   And what's the -- and you know, again,

10  it may seem obvious, and I apologize if it does,

11  but what's the main reasoning for that based on

12  your training and experiences, the -- you know,

13  putting someone like that under constant

14  observation?

15      **A.**   Right.  So it's -- if somebody makes

16  suicidal ideations, it's -- to make sure that they

17  aren't able to -- so the -- can you ask the

18  question again, sir?

19      **Q.**   Sure.  What's the main reason of why

20  someone in that category would be put under

21  constant observation?

22      **A.**   Right.  So if somebody is making

23  suicidal ideations or actions that lead us to

*Obergfell - Zaccagnino - 08/16/23*

1  believe that, it's to protect them from being able

2  to complete those statements that they -- or that

3  they made and, you know, make sure that they don't

4  become -- they don't have the ability to -- to

5  commit suicide while they're in our custody and so

6  on.

7      **Q.**    And now, is -- are the policies -- the

8  policies and procedures that we've talked about, do

9  they differ if you have an inmate or a -- you know,

10  someone that's in your custody that maybe is not

11  making suicidal ideations, but is, for example,

12  banging their head off a wall or punching a wall or

13  doing things like that where they're harming

14  themselves, are there any different policies and

15  procedures that apply to that other than what we've

16  already talked about or is it all pretty similar

17  where, if someone's acting out actions of self

18  harm, it would be the -- the policy and procedure

19  would be pretty similar to if they're making

20  suicidal ideations?

21      **A.**    Yep.  If somebody begins harming

22  themselves, they would become a constant watch as

23  well.

**MCCANN & MCCANN REPORTING**

 1       **Q.**    Okay.  Okay.  And how does that play

 2  into the -- the 9.41 that we talked about?

 3       So -- because it sounded like, earlier --

 4  and I'm sorry.  I could just be misunderstanding

 5  that, but if someone that you're dealing with makes

 6  a suicidal threat, then they're brought to the

 7  hospital as a 9.41.

 8       But how does that -- how does that play into

 9  the constant observation?

10       **A.**    Okay.

11       **Q.**    Does it differ?

12       **A.**    Well, everybody that -- I guess there's

13  a constant watch in the jail doesn't necessarily

14  mean that they're a 9.41.

15       So there are other criteria that we had in

16  place in the jail that would -- that would

17  constitute somebody as a constant watch, but if

18  somebody is a 9.41, they are automatically a

19  constant watch.

20       And once they are done with their

21  proceedings in the jail, whether that be booking or

22  awaiting their arraignment, they would be

23  transported to the hospital for their evaluation.

*Obergfell - Zaccagnino - 08/16/23*

24

1      **Q.**    Oh.  I gotcha.

2      **A.**    Whereas everybody that is a constant

3  watch -- not everybody that's a constant watch

4  doesn't necessarily get a mental health evaluation

5  once they're done with the proceeding.

6      **Q.**    Gotcha.  Okay.  Okay.  And what sort

7  of -- I guess, what sort of techniques or tools

8  does -- does Jamestown have in a

9  constant-observation scenario to prevent an inmate

10  from -- from self harm?

11      For example, I saw a reference in some of

12  the paperwork in the video to, like, a restraint

13  chair?

14      You know, can you talk to us about any tools

15  that Jamestown has available to prevent an inmate

16  from harming themselves?

17      **A.**    Right.  So there is -- there is a

18  restraint chair in the jail.  I would say -- I

19  would probably say that that's the only tool in the

20  jail to prevent them from harming themselves, aside

21  from the other restraints that we had, whether that

22  be the -- the temporary wrist restraints that were

23  on the bench or -- it really is the temporary wrist

1 restraints and then the restraint chair.

2       **Q.**   Are there any sort of -- you know,

3 like, padded cell or protected cell or, you know,

4 like a -- and this can sound kind of odd, but like

5 a helmet that inmates wear if they're thrashing and

6 hitting their head that Jamestown had?

7       **A.**   No, sir.

8       **Q.**   Okay. Okay. And can you talk to us

9 about the -- just the, I guess, general policies

10 and procedures regarding constant observation and,

11 I guess, where it would happen?

12       For example, I know from watching video in

13 this case, it seemed like Christian was -- when he

14 was at the Jamestown booking, he was on a bench,

15 and then there was an officer that was at a desk

16 that, you know, was able to see him.

17       Is that generally where constant -- constant

18 observations happen or --

19       **A.**   So there -- there's a few places where

20 a constant watch can be put. And that -- that also

21 depends on -- that can depend on a bunch of --

22 multiple different scenarios.

23       So there's -- there's policies regarding

1  whether the -- the jail officer that day is a male

2  or female, and there's policies regarding how many

3  males and females are constant watches and who is

4  in the jail.

5      If you have multiple constant-watch

6  prisoners, obviously, you can't put six people on

7  one bench.  So there -- there is -- the booking

8  bench is what -- what you saw in the video, and

9  that's what that's referred to.

10      That's one area where somebody is able to

11  wait for their proceedings under constant watch.

12  There is one cell that is able to be used for

13  constant watches that's in the view of the jail

14  officer.

15      And there is another bench in the hallway

16  that is able to be used for constant watches that's

17  also in the view from in the booking -- in the

18  booking area.

19      And then the restraint chair is also there

20  where -- when need be, the prisoners can go there.

21      Like I said, there are different -- there's

22  different situations where it dictates where

23  people -- where people will sit.

1  **Q.** And what situations, based on your

2 training and experiences at Jamestown, are inmates

3 put into the restraint chair and --

4   **A.** Right.

5   **Q.** -- and --

6   **A.** So when somebody is actively resisting

7 and actively -- actively creating harm to

8 themselves, in that moment, if they're performing

9 those actions, they would go into the restraint

10 chair.

11   **Q.** Okay.  Okay.  And -- and what function

12 does the restraint chair play?  It just kind of

13 locks them in place and then they can't, you know,

14 perform self-harming acts or --

15   **A.** Yeah.  It -- it basically immobilizes

16 the subject.  Their -- their both wrists would be

17 immobilized.  Both ankles would be immobilized.

18   There's also a strap that would come over

19 their chest preventing them from being able to move

20 their chest up and down.  The chair's padded.

21   **Q.** Okay.  I'm just jumping around on the

22 background section because we've covered a lot.  So

23 let me see.

1        Can you tell us about, I guess, any sort of

2   training or experiences that you've had, I guess,

3   in any of your time working as a trooper or an

4   officer or sheriff where you observe someone that

5   you have in custody, their -- their mental health

6   kind of deteriorates or gets worse over a period of

7   time?

8        Because I'm guessing there's a lot of

9   situations where if you arrest someone in the

10  middle of the night, the -- there's going to be

11  a -- you know, there could be several hours before

12  their arraignment.

13       You know, have you observed that sort of

14  thing happen in any of your experiences?

15       **A.**   Have I observed somebody's

16  mental-health state deteriorate as they were in

17  custody?  Is that the question?

18       **Q.**   Yeah.  Yes.

19       **A.**   Yes.  I've -- I've observed people that

20  have come to the jail and then -- me working as a

21  jail officer, it was on rotation.

22       So there were multiple shifts where I was

23  the jail officer.  And I have seen people come in

```
 1   and, as the night goes on, they become a constant

 2   watch or a 9.41 constant, whereas they came in and

 3   did not constitute constant supervision, but as the

 4   night went on, that changed and they became

 5   constant watch.  Yes, I have observed that.

 6        Q.   And what sort of -- and I -- I don't

 7   want to sound disrespectful, but -- so I don't know

 8   if this is the proper term, but what sort of, for

 9   lack of a better term, signs and symptoms do you

10   look out for in someone that is going through that

11   process of where you're observing them?

12        You know, maybe they come in in one mental

13   state and, as the night goes on, they're getting

14   worse and worse.  Are there any hallmark or typical

15   signs and symptoms that you see?

16        A.   I would say that the statements that

17   they're making to me is probably the biggest.

18   Whatever kind of ideations they're having, I would

19   say, is the biggest indicator of what -- what their

20   mental state is.

21        And then obviously, when it progresses to --

22   to their actions, that also becomes different.

23        Those are all indicators of their mental
```

1  health and whether or not they need to have

2  constant supervision.

3       **Q.**    And I would guess -- and you can tell

4  me if I'm wrong, but the worse off that you're

5  seeing someone as far as, you know, what we've been

6  talking about, their mental health getting worse

7  and worse and worse, they're making statements over

8  time, they seem to be -- you know, maybe they

9  started as not a constant observation, but then

10  they go to one, you're -- as that happens, you're

11  on higher alert of, I have to watch this person to

12  make sure that they don't hurt themselves or acts

13  out in their ideations?

14       **A.**    You're saying as they are -- as -- when

15  they become a constant watch?

16       **Q.**    Yeah.

17       **A.**    Yep.   When -- yep.   When somebody

18  becomes a constant watch, they're on constant watch

19  for a reason, whether that be their statements or

20  their actions.

21       And that is -- that's the whole purpose, is

22  to -- to, you know, maintain that they're not able

23  to complete any kind of suicidal actions.

1      **Q.**   And the same would go for -- for just

2  self harm in general?  So for example, hitting

3  their -- banging their head off a wall or punching

4  a wall or things like that?

5      **A.**   Right.

6      **Q.**   Okay.  Okay.  Did you receive any sort

7  of training in -- with the City of Jamestown

8  regarding mental health conditions in general and

9  how to respond to certain, you know, mental health

10  disorders or was it just kind of general training

11  and, you know, things that we've been talking

12  about?

13      **A.**   We received general training in the

14  sheriff's academy.  There is -- there was a mental

15  health block of curriculum that we received.

16      I don't -- I do not recall any in-service

17  training with the City of Jamestown regarding

18  mental health response.

19      **Q.**   Okay.  Okay.  And we talked about

20  constant observation.  What are the other levels of

21  observation?

22      Is there just -- is there, like, hourly and

23  then, you know, every ten minutes or can you

1  explain the different levels of supervision other

2  than constant?

3       **A.**    Sure.  When I was in Jamestown, the

4  jail officer is required to conduct a jail check,

5  we called it, every 30 minutes.

6       So that -- it's -- it's just every 30

7  minutes -- at least every 30 minutes.  So if -- if

8  something comes up and a jail check is conducted,

9  you know, at 25 minutes, as long as the next one's

10  conducted within another 30 minutes, that was per

11  policy.

12      So if somebody wasn't a constant watch,

13  every 30 minutes, you would, essentially, walk by

14  them, look at their state, and then mark down in a

15  jail book -- it was the -- the jail log that they

16  were secure and okay.

17      **Q.**    And I've had a few -- I haven't had any

18  other cases with Jamestown, but I've had a few with

19  the County of Erie at their holding center.

20      And I know that they have, like, a log book

21  that has, like, you know, the times of their checks

22  and what they observed.

23      Is that -- is what you described pretty

1   similar to what they have at Jamestown?

2          **A.**    I don't necessarily know what Erie

3   County has.

4          I don't know what they mark down in their

5   logs, but in Jamestown, it was just a lined log,

6   and you would mark down a time that you conducted

7   the check where all the prisoners were and their

8   state and then sign your initials saying you

9   conducted the check and that was every 30 minutes.

10         I -- I'm not exactly -- I would have to see

11  what Erie County's log book looked like.

12         **Q.**    And it's -- would that log book say who

13  was -- who did the checks or who made the

14  observations?  I know you mentioned, you know, put

15  had their initials, but would they have the name of

16  the person?

17         **A.**    Your ID number would be on the -- on

18  the check.

19         **Q.**    Okay.

20         **A.**    And then -- yes.

21         **Q.**    And the reason for that -- is the

22  reason for that the same as we've been talking

23  about, just to make sure that the inmates are fine

1    and not harming themselves or not in any sort of

2    harm or, you know, in any sort of distress or in

3    need of help?

4            **A.**    Yes, sir.

5            **Q.**    Okay.  Okay.  Okay.  I want to shift

6    gears a bit and just to talk about any sort of

7    training and experiences you had in the use of

8    force in general.

9            **A.**    Sure.  So at the -- well, do you want

10    me to speak to the use of -- the training that I

11    have now or the training that I had prior to

12    December of 2020?

13            **Q.**    Maybe all.  You know, all training is

14    fine.

15            **A.**    Okay.  So when I went to the sheriff's

16    academy and graduated in 2019, prior to graduating,

17    we received training on the use of force, you know,

18    article 35.

19            We received training and defensive tactics

20    and techniques that we can use to maintain control

21    of subjects.

22            Later in my time in Jamestown, I actually --

23    I received training to become a DCJS defensive

1    tactics instructor.

2          Then obviously going through the State

3    Police Academy, I received additional training in

4    defensive tactics and use of force.

5          And the state academy and the sheriff's

6    academy have very similar curriculums regarding use

7    of force and defensive tactics, but the additional

8    training that I have, it was receiving

9    certification to become a defensive tactics

10   instructor while I was here in the City of

11   Jamestown.  That does not transfer over to the

12   state police, though.

13         **Q.**   Okay.  Okay.  And part of that training

14   in the use of force, did it involve studying the

15   Use of Force Continuum?

16         **A.**   Yes, sir.

17         **Q.**   And I don't need you to go into great

18   detail, but can you just describe in layman's terms

19   when the Use of Force Continuum is?

20         **A.**   Sure.  So there's different levels of

21   resistance that we can receive as officers.  So

22   there's passive resistance, which can essentially

23   be described as, you know, dead weight.  Right?

1          So if we're trying to take somebody into

2     custody and they're just kind of laying there as

3     dead weight, I would say that's probably the best

4     description of just, like, a passive resistance.

5          Once we get into active resistance, that

6     is -- that is them -- they're making actions that

7     are -- it's resisting whatever actions that the

8     police officer is directing them to do.

9          So pulling away; running away; tensing their

10    arms; you know, refusing to put hands behind back,

11    that would be considered active resistance.

12          Then you can get into combative and

13    assaultive behavior.  That's obviously them

14    fighting back.

15          So once they begin fighting back, whether

16    they're pushing, shoving, kicking, that gets into

17    combative and assaultive resistance.

18          And then obviously, moving forward from

19    that, you get into deadly-force situations where

20    they're actively trying to, you know, harm you or

21    use lethal force against you.

22          In terms of our -- our end of the -- the

23    officer's end of the use-of-force spectrum, we have

1  different levels of use of force that we can use.

2       And that starts as simple as verbal

3  commands.  Verbal commands can be considered a use

4  of force.

5       And then we get into soft-hand techniques,

6  which, you know, can be kind of described as, you

7  know, like grappling, you know, just using --

8  manipulating body parts, using soft hands so

9  there's no striking involved or anything like that.

10       You have hard-hand techniques.  That would

11  get into striking, so punching, kicking, kneeing,

12  using strikes against a combative subject.

13       Then there's -- we have intermediate

14  weapons.  So that looks like TASER, pepper spray,

15  batons.

16       And then you go further down the line into

17  use of deadly force.  So obviously, whatever deadly

18  force -- or whatever means of deadly force that is,

19  that would be our -- that's -- that is the peak of

20  our -- of our end of the spectrum.

21       **Q.**  Are there any sort of deescalation

22  techniques that you learned to try and use the

23  least amount of force as possible in a situation?

*Obergfell - Zaccagnino - 08/16/23*

38

1       **A.**    Right.  So any time that we are

2   arresting somebody, we're -- it's our

3   responsibility to use the least amount of force

4   necessary to take them into custody.

5       There -- there's obviously talking to

6   somebody, trying to, you know, use verbal commands.

7   It's obvious that's the goal, but when it -- when

8   the situation escalates, sometimes, you

9   unfortunately have to use more force than just

10  verbal commands.

11      **Q.**    And can you talk to us about any -- any

12  training or experiences that you had -- that you've

13  had regarding the use of force that -- or I don't

14  know if I want to say the use of force, but the --

15  handling a situation where you're trying to get

16  somebody into handcuffs or, you know, you're trying

17  to get them into your custody, and they're doing

18  things like bashing their head -- their head off

19  the ground or doing other things -- other actions

20  of self harm?

21      **A.**    Any training that I have regarding

22  handling subjects like that?

23      **Q.**    Mm-hmm.

1      **A.**   Okay.  Well I would -- I would refer

2  back to the training that I received in the academy

3  for defensive tactics and the use of force.

4          When we're in a situation like that, we have

5  to take everything into consideration.  And when

6  we're -- when we're dealing with a resisting

7  subject, our main priority is taking that subject

8  into custody.  Right?

9          So getting there as quickly and efficiently

10  as possible, getting that subject into custody so

11  we can move on and provide the aid is what our goal

12  is.

13      **Q.**   Okay.  And is there any sort of

14  training that -- training or techniques that you

15  use in that situation where you're trying to get

16  someone into custody and they're hitting their head

17  off the ground or thrashing and they're -- you

18  know, you can see that they're hurting -- they're

19  hurting themselves?  I'm sorry.

20      **A.**   Right.  So just maintaining --

21  maintaining as much control of the subject as

22  possible.  So whether that be using -- we would

23  call it, like, a knee-on-top position.

1      So just basically, you know, controlling an

2 upper-body area using kind of, like, the shin area

3 of your leg, like, kneeling down on the body, chest

4 area, abdomen area, just upper body in general,

5 just using that pressure to maintain control of the

6 subject.

7      We have techniques that -- wrapping up legs

8 to control the lower body of the subject.

9      Those are all ways that we are able to

10 control the actions of somebody while we are

11 attempting to take them into custody.

12      **Q.**   And -- and you know, from what it

13 sounds like -- and again, correct me if I'm

14 wrong -- that that's a goal and a priority for you

15 as a police officer to get someone into custody and

16 to, I guess, not injure them or let them injure

17 themselves, right?  That's --

18      **A.**   Using the minimal force necessary to

19 get somebody into custody is our goal.

20      **Q.**   Okay.  And then can you talk to us

21 about any sort of policy and procedure that you

22 would -- that you've -- you would follow in the

23 situation of -- you know, that we've been talking

1 about, where you're dealing with a person that is

2 in your custody who, during the course of an

3 arrest, is, again, thrashing, harming themselves.

4     Is there any sort of process or procedure

5 that you follow in getting them in your vehicle and

6 transporting them to bookings to prevent them from

7 continuing the self-harming behavior as far as,

8 like, different restraints or, you know, a

9 different way that they're put into the car?

10     Is there any sort of policy and procedure on

11 that?

12     **A.**   Not to my knowledge.

13     **Q.**   Are there any sort of precautions

14 that -- that you would take in that situation -- in

15 those situations where you've dealt with that type

16 of inmate as far as transporting them to make

17 sure -- make sure that they don't hurt themselves

18 in a similar way on the way to wherever you're

19 transporting them, whether it be booking or court

20 or somewhere else?

21     **A.**   In the patrol car, it's difficult

22 because there's a barrier between us and the -- and

23 the -- somebody who's been taken into custody.

1      But there have been times where we would
2  ride, like, in an ambulance and maintain control in
3  an ambulance, but in a patrol car, it's difficult.
4      The -- I would say getting them to the -- to
5  the location where you're transporting them as
6  quick as possible and safe as possible is what
7  would be the -- the course of action that we would
8  take.
9      **Q.**  And are there any -- are there any
10  situations where you would hand -- handcuff a
11  self-harming inmate or -- you know, that's kind of
12  a general term, but an inmate that -- that we've
13  been talking about doing actions of self harm over
14  the course of an arrest where, you know, you would
15  restrain them differently as far as handcuffing
16  them in the front or, you know, handcuffing
17  their -- I'm just kind of making stuff up --
18  handcuffing their wrist to their ankles or
19  something like that?
20      Is there any sort of different restraint
21  procedure that you follow --
22      **A.**  No, sir.
23      **Q.**  -- regarding -- okay.  Okay.

 1          And that barrier that -- that you mentioned

 2    in the Jamestown police cars, what is it made out

 3    of?  Is it, like, Plexiglass or --

 4          **A.**    I'm not exactly sure the material that

 5    it's made out of, but it would appear to be, like,

 6    a Plexiglass window.

 7          **Q.**    Okay.  Okay.  And in -- and in December

 8    of 2020 -- in December of 2020, you were working

 9    for City of Jamestown, right?

10          **A.**    Yes, sir.

11          **Q.**    Okay.  Okay.  And I think you mentioned

12    your -- what was your official job title in -- on

13    December 10th of 2020?

14          **A.**    Patrolman.

15          **Q.**    Okay.  And were you -- were you working

16    on that day, December 10th of 2020?

17          **A.**    Yes, sir.

18          **Q.**    Can you tell us the -- I guess, the --

19    the shift that you were -- that the -- I'm sorry --

20    the shift that you worked that day as far as the

21    time frame?

22          **A.**    Yes, sir.  It would be 11:00 p.m. to

23    7:00 a.m.

1      **Q.**    Who did you -- who did you work with?

2      **A.**    In terms of that night, that evening?

3      **Q.**    Sure.  Yes.

4      **A.**    So it would have been the supervisor

5    that night was Lieutenant Robert Ward.  We had a

6    command officer on the desk; that would be -- at

7    the time, he was a patrolman.  Now, he's a

8    sergeant.

9          That would be Christopher Schimek, Patrolman

10   Kaitlin Johanson, Mark Conklin, Kevin Wise, and

11   then myself.

12     **Q.**    Okay.  And was that the whole -- can

13   you -- I'm sorry.  I could rephrase.

14         Who was working on road patrol and who was

15   working at -- is it -- is it Jamestown booking?  Is

16   that what you would call it?

17     **A.**    The city jail, city holding center,

18   either way.  Our -- our jail officer was Mark

19   Conklin.

20     **Q.**    Was there only one jail officer that

21   would -- or only one officer that would be in the

22   jail and then everyone else is on their own?

23     **A.**    Well, so there's a desk officer working

1  the front desk and the command desk for either

2  walk-in complaints or whatever that may be.

3       There's a jail officer who's responsible for

4  the jail and then yes, aside from that, everybody

5  else would be assigned to working road patrol.

6       **Q.**   Okay.  And do you know what period of

7  time Christian was -- was in -- in the custody of

8  Jamestown on December 10th of 2020?

9       **A.**   Our -- I believe our interaction with

10 him began around 3:00 a.m.  I'm not exactly sure on

11 the exact time, but I believe it was approximately

12 3:00 a.m.

13      And then I -- I would leave at 7:00 a.m.,

14 and he would still be in the jail when I left --

15 left work that day and day shift would take over

16 the responsibility of the jail.  I do not know what

17 time he would have left the custody of Jamestown.

18      **Q.**   Okay. Yeah.  And I'm -- yeah.  I'm

19 guessing because his -- if he was arraigned the

20 following day, which I think he was, it

21 obviously -- it would be after your shift?  It

22 ended at seven?

23      **A.**   I would be off duty, yes, sir.

1      **Q.**   And do you know -- and it's okay if you

2   don't, but do you know who was working on the day

3   shift on December 10th?

4      **A.**   I do not recall that, no, sir.

5      **Q.**   Okay.  Okay.  I just want to show you

6   quickly, I'm not going to -- because I'm trying to

7   keep this to two hours, but I just want to show you

8   some policies really quickly.

9      And I'm -- we've already covered most of the

10  stuff in them, so I'm just going to ask you if you

11  recognize the policy and whether or not it was a

12  policy that was in effect on the day of the

13  incident.  Okay?

14     **A.**   Okay.

15     **Q.**   And I appreciate your patience.  Thank

16  you.  Okay.  Okay.  Let's see here.

17     Okay.  I'm just going to share my screen

18  really quick.  Can you see my screen?

19     **A.**   Yes, sir.

20     **Q.**   Okay.  Great.  Let me go to -- let me

21  see here.  Okay.

22     Okay.  So I just want to show you what's

23  been marked -- well, it hasn't been marked -- well,

1  it's -- it has an A circled on the top-right

2  corner, and I added that so we can have something

3  to identify it by.

4          But I'm showing you what -- what is -- it

5  hasn't been marked.

6          **MR. ZACCAGNINO:**  Elliott and Mary, do you

7  want to mark it as Exhibit A or something?

8          **MS. D'AGOSTINO:**  Why don't we do Plaintiff's

9  A?

10          **MR. ZACCAGNINO:**  Okay.  Cool.  Plaintiff's

11  A?  Okay.

12

13          **BY MR. ZACCAGNINO:**

14          **Q.**    Okay.  I'm showing you what's been

15  marked as Plaintiff's A.  It's three pages, and on

16  the top, it says Jamestown Police Department,

17  General Order 1.11.01, use of force.  And it says,

18  effective date, February 27th of 1990.

19          Now, I -- I pulled this off the Internet, so

20  I -- I just want -- I could go through it.  I just

21  want to ask you whether or not this was the -- or

22  if this policy was in effect on December 10 of

23  2020.  Okay?

1      **A.**    Yes, sir.

2      **Q.**    And I could page down.  I don't know if

3  you need me to show you everything, but -- and then

4  it looks like, on the third page -- I added page

5  numbers as well just so we can refer to them -- it

6  has different revise dates.

7         And it looks like 4/1/16 might have been the

8  last one.  Does this appear to be the use-of-force

9  policy that was in force on December 10, 2020?

10     **A.**    Yes, sir.

11     **Q.**    Okay.  I'm sorry.  My screen is all --

12  okay.

13        I want to show you what's been -- what will

14  be marked as Plaintiff's B.  This is -- it has

15  Jamestown Police Department General Order on the

16  top and, under subject, it says, psychiatric --

17  psychiatric evaluation, slash, transports.

18        I could page through.  It's four pages.  I

19  just wanted to know if -- if this policy was in

20  effect on December 10 of 2020.

21     **A.**    I believe so, yes, sir.

22     **Q.**    Okay.  And I could go to the bottom,

23  too, and it probably -- it says issued 4/21/1990.

1   It has the most recent revised date, 1/30/15.

2          Okay.  Okay.  Yeah.  And I pulled all of

3   these off the Internet, so I'm sure we can always

4   refer back to it.  So -- okay.

5          I'm showing you what will be marked as

6   Plaintiff's Exhibit C, and it has a C on the

7   top-right corner, and it has 4.02.05, prisoner

8   custody transport and treatment.

9          Can you tell us if this policy was effective

10  on December 10 of 2020?

11         **A.**    Yes, sir.

12         **Q.**    Okay.  And then on the bottom, it just

13  has revised date 4/2/09?  Okay.

14         So this appears -- this policy appears as if

15  it was effective on December 10 of 2020?

16         **A.**    Yes, sir.

17         **Q.**    Okay.  Okay.  I'm almost through the

18  policies.  Let's see.

19         And then I have Jamestown Police Department

20  General Order on the top, and then maybe we can

21  mark this as Plaintiff's Exhibit D.  There's a D on

22  the top-right corner.

23         It has, subject, suicide prevention program

1  referrals of prisoners for mental health and

2  medical health service.

3         Does this policy appear -- I'm sorry.  Was

4  this policy in effect on December 10, 2020?

5         **A.**   Yes, sir.

6         **Q.**   Okay.  And then just looking at the

7  bottom, it has revised date 3/21/12.  So I'm --

8  okay.

9         And then the last policy is -- I'm sorry.

10         Okay.  I'm showing you what will be marked

11  as Plaintiff's Exhibit E.  There's a D on the top,

12  but I guess we could use this as E, and it has

13  number 4.05.08.

14         And it has, subject, suicide prevention

15  program referrals of prisoners for mental health

16  and medical health service.

17         Was this policy in effect on December 10 of

18  2020?

19         **A.**   Yes, sir.

20         **Q.**   Okay.  Okay.  I can stop my sharing for

21  now and go back to that shortly.  Okay.  I'm sorry.

22  I just want to jump ahead in my notes here.

23         Okay.  So I figured that the easiest way

1  that I could probably do this is ask you generally

2  about your interactions with Christian on December

3  10 of 2020, if any.

4       And then I could kind of break it down per

5  incident because there was a few different

6  incidents, and then I'll go through that with you.

7       And then I just have some incident reports

8  that I just want to glance over with you.  Okay?

9       **A.**   Okay.

10      **Q.**   Okay.  So I was just wondering if you

11  could take us through your interactions with

12  Christian Powell on December 10 of 2020 from start

13  to finish.

14      **A.**   Sure.  So I was working just

15  regularly-scheduled patrol.  I was dispatched to

16  assist the Chautauqua Sheriff's Office, as they

17  were -- it was -- a deputy in Fredonia was handling

18  a call to service that occurred outside of our

19  jurisdiction in -- in Chautauqua County.

20      However, the complainant, meaning Christian

21  Powell, the caller, was in the city at the time.

22      So Deputy Madonia was responding to the

23  Barrett Street -- he was responding to Barrett

1   Street to go to that call for service and speak to

2   Christian regarding the details of that.

3           As he was responding to that, I was notified

4   by my dispatch that he was handling a call for

5   service with Christian Powell who had confirmed

6   arrest warrants from the City of Jamestown.

7           So I responded to 111 Barrett with my

8   partner, Kevin Wise, to assist Deputy Madonia while

9   he handled that call for service.

10          And once that call to service was satisfied,

11  then we would take Christian Powell into custody

12  stemming from that warrant that we had out of our

13  department.

14          So I respond on scene.  I believe Deputy

15  Madonia was already there speaking to Christian.  I

16  stood by as Deputy Madonia handled that call for

17  service, which again, that happened outside of our

18  jurisdiction.

19          My partner, Kevin Wise, also arrived on

20  scene.  He was -- he arrived after I did, and we

21  were both standing by waiting for Deputy Madonia to

22  satisfy that call.

23          And then once that call for service was

1 satisfied and Deputy Madonia obtained all the

2 information that he needed to handle what he needed

3 to satisfy that call for service, we advised

4 Christian of the warrant that we had for him out of

5 our agency.

6        Once we advised him that he was going to be

7 under arrest, we made physical contact with

8 Christian for the purpose of placing his hands

9 behind his back to apply the temporary restraints

10 or handcuffs.

11        Once we made physical contact with

12 Christian -- well, once I made physical contact

13 with Christian, I could immediately feel that his

14 arm had tensed up and he was refusing to put his

15 hand behind his back.

16        I gave him verbal commands to place his

17 hands behind his back, and he refused to do so.

18        And at this point -- and this is in the

19 winter.  This is at night.  We -- we did not know

20 why he was refusing to put his hands behind his

21 back.

22        He had multiple layers of clothing on.  We

23 don't know what he has in his pockets.  We don't

1  know what he has underneath those layers of

2  clothing.

3      He is actively resisting our commands to

4  place his hands behind his back.  At this point, we

5  made a determination to place him on the ground to

6  better maintain control of his actions.

7      When the subject is on the ground, it gives

8  us -- it gives us more control to dictate the

9  situation.

10     So we perform just -- I -- I know I was on

11  his arm, and Officer Wise was -- he maintained

12  control of the legs during the take down.

13     I -- I don't recall where Deputy Madonia

14  was.  I don't recall if he was on the other arm or

15  not, but I know I was on one arm and Officer Wise

16  was on the legs.

17     But we performed multiple-officer takedown

18  where I was in control of his upper body and

19  Officer Wise maintained control of Christian's

20  lower body, and we placed him on the ground.

21     Once we placed him on the ground, I moved to

22  a knee-on-top position to maintain control of

23  Christian's upper-body area, and Officer Wise

1  maintained control of Christian's lower legs,

2  basically just wrapping up his legs.

3        Deputy Madonia, I do know that, at this

4  time, he was assisting in handcuffing.  So at this

5  time, Christian was on the ground and his hands

6  were in the -- like, a turtle position, hidden

7  underneath his body.

8        So he is laying on his stomach, face down.

9  I am knee on top.  I have my -- my shin area

10  maintaining pressure on his upper body.

11        Officer Wise is on his legs, and now we need

12  to perform hand extractions to be able to place him

13  into custody using temporary wrist restraints.

14        So his hands are underneath.  We begin to

15  perform hand extractions.  And again, it's dark

16  out.  He has multiple layers of clothing on.  We

17  don't know what's in his pockets.

18        We don't know at this time why he's

19  resisting our commands and resisting arrest.  So we

20  begin to focus on getting those hands out because

21  that is -- that is our main priority at the time,

22  is placing him into custody.

23        So as I'm performing hand extractions,

1  Christian begins to hit his head against the

2  ground.  He does that for a period of time, and

3  then he stops.

4          All throughout this incident, Christian is

5  making multiple statements.  He's -- he's acting in

6  an elevated state.  He was belligerent, refusing

7  our commands.

8          So he begins to hit his head against the

9  ground.  He stops for a period of time.  As we're

10 placing handcuffs on him, he is continuing to

11 resist.

12         He's continuing to make -- he would not

13 relax, so we're maintaining pressure down on him.

14 Once we place the handcuffs on, he begins to hit

15 his head, again, against the ground.

16         At that time, I notice that there was blood

17 coming from his face, and I noticed that, during

18 the interaction and the struggle with Christian, a

19 flashlight had come out from one of the -- one of

20 our kits and fallen on the ground.

21         And I believe that that was what Christian

22 was hitting his head on to cause the -- cause the

23 bleeding.

1          So I removed the flashlight from that area,

2   and I -- I maintained pressure on Christian's head

3   so he wasn't able to lift it off the ground to

4   continue smacking it on the ground.

5          At some time during this interaction, my

6   partner, Officer Wise, had already called to EMS

7   due to the bleeding.

8          Once we -- once Christian did relax, we were

9   able to stand him up and start a preliminary search

10  of his pockets, basically for the purpose of

11  transporting him so to make sure that he doesn't

12  have any weapons on him that can harm me or any

13  other officers while we're transporting.

14         So we performed that search, and again, that

15  is -- it's difficult to do in the winter, multiple

16  layers on.  It's very difficult to do a thorough

17  search in those conditions, when somebody's

18  handcuffed.

19         So we performed that search, and we begin to

20  move him to marked patrol unit, J4, which was my

21  vehicle.

22         And once we get to the vehicle, Christian

23  again became -- he became belligerent.  He was

1    resisting.

2          He would not go into the vehicle despite our

3    verbal commands to him to get into the car.  I

4    unlock the vehicle and open up the -- the rear door

5    for Christian to be placed in the car.

6          He refuses to get in the car, so I went

7    around to the driver's side.  We were on the

8    passenger side at this time.

9          I went around to the driver's side.  I

10   actually got into the car, and I pulled him into

11   the vehicle from the driver's side.

12         At that time, again, Christian was

13   resisting.  He was not complying with our commands.

14         EMS was advised to meet us in the jail at

15   this time.  So rather than them coming to the

16   scene, we wanted to get him in an environment where

17   it was easier to control him.

18         So again, we don't know why he's resisting

19   us at this time.  We don't know what else he has on

20   him.  So we advise EMS to stand by in the area of

21   the jail.

22         So when it was safe for them to come in and

23   evaluate Christian's injuries -- so --

1      **Q.**   And now -- now -- I'm sorry.  I don't
2  mean to interrupt you.

3         Was this -- was EMS called to 111 Barrett or
4  are you talking -- you called to say, meet us at
5  booking or at the jail?

6      **A.**   My partner was the one who was
7  communicating with dispatch regarding EMS.  I --
8  from what I recall, I believe that, originally,
9  they were -- he wanted EMS to work towards 111
10 Barrett.

11        But as the situation progressed and
12 Christian continued to resist, it was determined
13 that they would meet us in the jail area for a
14 better environment to maintain control of
15 Christian.

16     **Q.**   Okay.  And then what happened from the
17 point of transport to booking?  So you know, when
18 you eventually got him in the car to when he was at
19 the jail?

20     **A.**   Right.  So as Christian was in my back
21 seat, as soon as I got into the driver's seat, I
22 advised my command officer, who was -- who was
23 working in the police station at the time, to meet

1  me in the jail area to assist with controlling

2  Christian.

3          And Christian began to hit his head off the

4  barrier that divided the driver's-seat area and the

5  back-seat area.

6          So at this time, priority is getting him

7  to -- to an area that we can control him and secure

8  him as fast and as safely as possible.

9          So I began to transport to the city jail

10  area, which was less than two minutes away from 111

11  Barrett.  So within two minutes, I get to the jail.

12          There was actually a couple instances where

13  I hit a red light at an intersection, and I

14  activated my emergency lights to be able to go

15  through that red light and be able to get him to

16  the jail area quicker to provide medical assistance

17  and secure him faster.

18          So I believe that there are two --

19          Q.    And what was -- what was the reason for

20  that?  Because he just kept bashing his head on

21  the -- was he hitting his head on the divider

22  between -- you know, that we talked about earlier

23  that's in the car that separates the prisoners from

1 the officer?

2          **A.**    Yes.

3          **Q.**    Okay.

4          **A.**    Yep.  So the -- the reason -- what was

5 the reason for that?  You asked --

6          **Q.**    Oh.  The reason that you wanted to get

7 to the jail as soon as possible and secure him.

8          **A.**    Right.  So basically, the sooner that

9 we got him secured and controlled, the sooner that

10 we could have EMS personnel evaluate his injuries.

11          **Q.**    Okay.

12          **A.**    So I believe that there were two

13 intersections that I hit a red light at, and I

14 activated my emergency lights to go through the

15 intersection to get to the jail faster.

16          Once I get to the jail, the City of

17 Jamestown's Police Department and jail is located

18 underneath the city office building.  So I get into

19 the police parking garage, which is where there's a

20 sally port.

21          A sally port is basically an area where we

22 park our vehicles while we are transporting our

23 prisoners to or from the jail.  It's just a

1 contained area that's kind of separated from the

2 rest of the police vehicles.

3        I think that there was already a vehicle

4 parked in the sally port, so I just parked in the

5 sally-port area.

6        At that time, Lieutenant Robert Ward was

7 already there.  Officer Johanson, Kaitlin Johanson;

8 Officer Mark Conklin; and then Officer Christian

9 Schimek, they were already standing by awaiting me

10 to get into the area.

11        Once I got out of my vehicle, we have

12 procedures in the city that we are not allowed to

13 take any kind of firearm into the jail area.

14        So I got out of my vehicle, and I went to go

15 secure my -- my issued-duty weapon in the locker

16 area.

17        And basically, the reason for doing that

18 was, because of Christian's actions while we were

19 on scene and his actions in the vehicle, everything

20 that he was stating to us, all of his -- his

21 aggression towards us, I did not want to have to be

22 maintaining control of Christian while securing my

23 duty weapon before going into the jail area.

1          So I got out.  I secured my duty weapon, and

2     as I was walking back to my vehicle, the four

3     officers that I had previously mentioned were

4     already awaiting me to get into the area.  They

5     were already removing Christian from the vehicle.

6          Once Christian got out of the vehicle, he

7     turned.  He got out of the vehicle and was

8     originally facing those four officers.

9          Once he got out, he turned and faced toward

10    the vehicle again, and he hit his head multiple

11    times against the trunk area of the vehicle, just

12    kind of bending at the waist and hit his head

13    against the trunk area.

14         He was again placed on the ground, and

15    again, this is to maintain control of him.

16         Once -- if we can put the subject in between

17    a fixed object and us, it gives us more vantage to

18    control that subject.  So --

19         **Q.**   And -- I'm sorry.  I didn't mean to

20    interrupt you.

21         So just to back up briefly, so on scene, I

22    think you mentioned when in the -- during the

23    course of your arrest and trying to put him in

1  handcuffs, he was hitting his head off the ground?

2      **A.**   Correct.

3      **Q.**   Do you know how many times he -- he did

4  that?

5      **A.**   I -- I don't know exactly how many

6  times he did that, no, sir.

7      **Q.**   Okay.  Do you think it was -- because I

8  know that you -- and tell me if I'm wrong, but I

9  think you mentioned that a couple different

10 occasions where he was doing it once, and then he

11 stopped and then he did it again?

12     **A.**   Yes, sir.

13     **Q.**   Can you tell us about anything that was

14 done after the first time he did it from the --

15 from the first time he did it to the second time to

16 prevent him from doing it again?

17     **A.**   Well, again, our main concern is

18 getting him into custody because, at the time,

19 we -- we don't know why he's acting and resisting

20 the way that he is.

21         So from the time that he hit his head

22 against the ground initially, he relaxed.  And

23 again, we're focusing on making sure that he's not

1 reaching for weapons, he's not reaching for

2 something that can hurt us.

3        So my focus was, once he relaxed, my focus

4 went from him hitting his head to making sure that

5 he was placed into custody.

6        So it wasn't until the second time that he

7 was -- I believe he was handcuffed the second time

8 that he did it -- that I looked underneath his head

9 and noticed that there was a flashlight there,

10 which is what I believe caused the contusion and

11 the bleeding.

12        I removed the flashlight at that time and

13 then just maintained pressure on his head so he

14 wasn't going to lift it off the ground.

15        **Q.**   And then, I know you mentioned on the

16 way to -- from the time you got him in the car

17 while he was on his way to the jail, he was hitting

18 his head against the divider between you -- yeah --

19 you and the other officer.

20        Do you have an estimate of how many times he

21 hit his head on the middle divider?

22        **A.**   Well, I don't know how many times he

23 actually hit his head.  I believe it was two

1  instances, though, of essentially, like, rapid --

2  rapid hits against the divider.

3       Right as I began transport, leaving the

4  scene, there was an instance of it and then another

5  instance as I turned onto East Second Street, which

6  is where the -- where the police department is

7  located.

8       He began to do it again.  And at that time,

9  we were seconds away from the police station.  And

10  I -- there was another red light that we hit that I

11  activated my emergency lights to go through the red

12  light to get him into the station faster.

13       Q.   And other -- from what it sounds

14  like -- and you can tell me if I'm wrong -- the

15  steps that you took from the time he was in the car

16  to the time that he was at the jail to prevent any

17  further self harm was to basically get there as

18  fast as you could, right?  That was pretty much the

19  main thing that you did?

20       A.   That was -- that was my main concern,

21  was getting him to the jail as fast as possible and

22  as safely as possible, yes.

23       Q.   And in between the first instance when

1  he was in the patrol car and he started banging his

2  head to the second instance, did you do anything

3  else as far as, for example, pulling over and

4  getting out and being -- you know, trying to

5  restrain him further or anything or you were

6  just -- you know, your focus was to just get there

7  because you were close?

8        **A.**   I did not pull over to get out and

9  restrain him further, no, sir.

10       **Q.**   Okay.  Okay.  And then you mentioned --

11  so he's -- you get him to the jail, and then you're

12  putting your gun away and then he's bashing his

13  head -- was it on the trunk of the patrol car?

14       **A.**   It was the trunk area, yes, sir.

15       **Q.**   Okay.  And then you described who was

16  on scene, the officers on scene.

17       And then in the car with you -- I'm sorry.

18       Can you tell me who was with you in the car?

19       **A.**   I was by myself in the vehicle.

20       **Q.**   Oh.  You were by yourself.  Okay.

21       And then you mentioned who was there right

22  when you got on scene, right?  We talked about

23  who -- or I'm sorry.  Right when you got to

 1  booking, who came to --

 2          **A.**    Yes, sir.

 3          **Q.**    -- your aid there?  Okay.  Okay.

 4          And then do you know how many times he hit

 5  his head off the trunk of the car?

 6          **A.**    I -- I don't recall the exact number.

 7  It was more than one.

 8          **Q.**    And was there anything done from the

 9  time that you first got to booking until he started

10  hitting his head to prevent that from happening as

11  far as, like, you know, providing extra restraints

12  or, you know, any -- any -- any other precaution or

13  was your focus just to try to get him in and get

14  your gun into --

15          **A.**    So you're saying from the time that we

16  exited the vehicle until the time that he hit his

17  head?

18          **Q.**    Yes.

19          **A.**    That was immediate.  As soon as he got

20  out of the vehicle and my partners were able to

21  place hands on him, his immediate action was to

22  turn around and hit his head off the trunk of the

23  vehicle.

1    There wouldn't have been time to place extra

2    restraints on him at that time to prevent him from

3    doing that.

4        **Q.**   And I mean, by that point, did you have

5    a, you know -- and this could sound silly, but by

6    that point, he had hit his head on the ground at

7    111 Barrett, you know, however many times, then

8    inside of the car, then on the trunk.

9        I mean, at that point, was -- did you have

10   knowledge that he was -- he had a -- you know, he

11   was either suicidal or had a tendency to try to

12   harm himself because he had done it multiple times

13   at that point?

14       **A.**   I had knowledge that he had done it

15   multiple times prior to him hitting his head off

16   the trunk, but I had -- for me to say that I would

17   know what he continued to do, I can't speak to what

18   I would have seen in the future.

19       **Q.**   Okay.  And you -- on my end, I

20   apologize.  I think my -- my connection's bad.

21       What did you say?  You had knowledge that --

22       **A.**   I had knowledge that he had hit his

23   head prior to getting out of the car.

1      **Q.**    Okay.  Okay.  Okay.  And I mean, what

2  did you -- based on your training and experiences,

3  what was your takeaway as far as the amount of

4  supervision that Christian was -- was going to need

5  in the jail based on his actions and why do you

6  feel that way?

7      **A.**    Well, it was already -- prior to

8  getting him into the jail, he had already made --

9  with his actions and his statements, he made more

10  than enough for us to make him a constant watch.

11      So it was -- prior to getting him into the

12  jail, he was already determined to be a 9.41

13  constant watch.

14      **Q.**    Gotcha.  Okay.  Okay.  And then can you

15  take us through -- or pick up -- and I apologize.

16  I cut you off.

17      Pick up from the time that you -- maybe

18  after he hit his head on the trunk of the car at

19  the jail to the -- the -- you know, and beyond.

20      **A.**    Sure.  So once he hit his head on the

21  trunk, again, he was placed on the ground just to

22  continue maintaining as much control of him as

23  possible and to prevent him from continuing to hit

1  his head on that trunk.

2        Once he was on the ground, he -- he relaxed

3  at this point.  We got him up, and he was

4  cooperative.  So he actually -- he cooperatively

5  walked into the jail.

6        And once we get him into the jail, again,

7  our -- our main priority -- because -- because of

8  how much clothing he had on because of the time of

9  year, it was very difficult to perform a full

10  search on scene.

11        So once we get him into the jail, we

12  maintained the temporary wrist restraints on his

13  hands.  And I believe it was Chris Schimek, Officer

14  Christopher Schimek, who began to retrieve all the

15  property from him.

16        So this is going in every single pocket of

17  his jacket, of his pants, everything, basically,

18  taking everything away from him besides one shirt;

19  one pair of underwear; one pair of pants; a pair of

20  socks; and then in some cases, a pair of shoes.

21        But they -- we're required to take any laces

22  out of shoes.  So depending on the kind of shoes,

23  sometimes people would just remain in their socks.

*Obergfell - Zaccagnino - 08/16/23*

1          So we began to take his property from him.

2    Once we were comfortable with the search, what we

3    could do prior to taking off the temporary wrist

4    restraints, those came off.

5          And at this time, we were able to take his

6    jacket off and complete the search.

7          Again, at this time, Christian became

8    relaxed.  He became cooperative.  He was not

9    displaying any further actions of harming himself

10   while we were taking his property, and he -- he

11   appeared to have calmed down.

12         I completed the property log, and then once

13   that was complete, like I said, Christian became

14   cooperative and calm.

15         And I left the jail area to start my

16   paperwork, and that was the end of that -- my

17   interaction from the -- the start of me arriving at

18   Barrett to me leaving the jail.

19         There may have been instances where I went

20   back to the jail to secure photos, but the incident

21   in and of itself, that's when I left the -- the

22   area.

23         **Q.**    Oh.  Okay.  Okay.  And what was he

1  saying -- can you tell us about any threats of self

2  harm or suicidal ideations that he made during the

3  course of your interactions with him?

4        **A.**   He made multiple threats of self harm.

5  He made multiple threats that he wanted to die.

6  I -- I can't -- I don't remember enough to quote

7  what he said, but it was multiple times he made

8  suicidal ideations and -- and threats that he

9  wanted -- he wanted police to harm him and that he

10  wanted to harm himself.

11        **Q.**   And then -- so you mentioned that he

12  was -- he was marked as a 9.41 constant observation

13  when he got there?

14        **A.**   Yes, sir.

15        **Q.**   And now -- you know, I'm not going to

16  show you the video.  It's, like, five hours long,

17  but what period of time was he in -- you know, to

18  your knowledge -- because I know that we talked

19  about earlier, where, if someone's a 9.41,

20  generally, they're -- and you can tell me if I have

21  a misunderstanding.

22        Generally, they're sent to the hospital

23  pretty quickly and that, from your experiences, you

 1  haven't really had it where someone's a 9.41, they

 2  go in the hospital and then they're back in your

 3  care.

 4          Do you know the amount of time that passed

 5  from the time that he was at the jail to when he

 6  was sent to UPMC for a mental health evaluation per

 7  the 9.41?

 8          **A.**    Well, again, I mentioned that

 9  situations vary greatly.  So there are situations

10  where, when somebody is a 9.41 constant, they would

11  remain at the jail as a 9.41 constant and complete

12  their proceedings in the jail, whether that be

13  their booking or their arraignment prior to being

14  transported.

15          There -- there are not times where somebody

16  is a 9.41 constant and we take them to receive

17  their mental health evaluation and then we bring

18  them back to the jail.  They complete their

19  criminal proceedings prior to being transported to

20  the hospital.

21          So I -- again, I left for the day.  I went

22  off duty at 7:00 a.m., so I do not know the exact

23  amount of time that would have passed between him

1 entering the jail and him receiving his mental

2 health evaluation just because I don't know what

3 time he got arraigned.

4       So I know that, from approximately

5 3:00 a.m., when my encounter started with him, he

6 was in the jail shortly after that.

7       So at least from 3:00 a.m. to 7:00 a.m., I

8 know he was in the jail.  I don't know what time he

9 was arraigned during the day and then transported

10 to UPMC.

11       **Q.**  And is -- is the reason for that --

12 because obviously, the Jamestown -- the Jamestown

13 booking is -- it's not -- it's more of like a

14 temporary holding center.

15       And then once somebody is arraigned, they

16 generally go to, like, Mayville or -- you know, I

17 don't want to say an actual jail, but you know what

18 I mean, where it's not just a booking --

19       **A.**  Right.  The purpose of the holding --

20 or the purpose of the Jamestown city jail is to

21 maintain custody of somebody that is awaiting their

22 arraignment.  So we don't hold people post their

23 arraignment.

1        So once they're arraigned, they're either

2    going to be released on their own recognizance;

3    released under supervision; or if the judge is able

4    to set bail and feels it's appropriate, set bail

5    and at that time they'll be transported to Mayville

6    at the Chautauqua County Jail.

7        **Q.**    Is there any medical staff at Jamestown

8    booking?

9        **A.**    Well, the -- there -- we don't have

10   medical staff on -- that's assigned to our city

11   jail, but the -- the fire department is located in

12   the same building that the police department is,

13   and they would regularly walk through the parking

14   lot to evaluate subjects.

15       **Q.**    Gotcha.  Okay.  When you were on scene

16   at 111 Barrett, can you tell us about how many

17   officers were on scene versus the amount of either

18   suspects or other -- other witnesses that were on

19   scene?

20       **A.**    It was myself, Officer Kevin Wise, and

21   then Deputy Madonia, in terms of officers.  And

22   then Christian Powell was on scene and then his

23   mother, Sue Powell, was also on scene.

1      **Q.**    And where was Sue when this was

2   happening?  Like, was she at her doorway or was she

3   interfering with you guys at all or no?

4      **A.**    I -- I wasn't concerned with Sue.

5   My -- my concern was primarily with Christian.  So

6   I -- I don't know exactly where she was.

7      I just know that Christian was making

8   comments to her and that she was in the area.

9      **Q.**    Okay.  And I think you mentioned

10   earlier that he -- he tried to flee or he moved

11   back a little bit.  Can you describe that?

12      You know, if he -- if he made any attempts

13   to get away from you guys at the scene at 111

14   Barrett and then how far he actually got?

15      **A.**    No.  I didn't mention that he tried to

16   flee or get away.  I said that he resisted.

17      So he refused to place his hands behind his

18   back, and he maintained the same area that he was

19   in.  He didn't attempt to flee from us, but he was

20   refusing to put his hands behind his back and

21   keeping his arms in a position in front of him.

22      **Q.**    Had you had any previous interactions

23   with Christian before that night?

*Obergfell - Zaccagnino - 08/16/23*

78

1        **A.**    Not that I recall.  Not that I recall.

2        **Q.**    Okay.  Do you know, did anyone -- did

3    anyone else that was on the scene or at the jail,

4    to your knowledge?  If you don't, that's okay.

5        **A.**    I -- I can't speak for any interactions

6    that they had, but I do not recall any interactions

7    that I had with Christian prior to this incident.

8        **Q.**    And from the time that you let

9    Christian know that he was -- that he was going to

10   be under arrest and you had to bring him in to the

11   time that force was used, did he make any sort of

12   threats of harm to the -- to you guys?

13       **A.**    I don't recall.

14       **Q.**    Okay.  Okay.  Now, it seemed like, from

15   my -- and you can tell me if this -- if this is

16   what your memory was, but it seems like there was

17   pretty lengthy conversation between the Chautauqua

18   County Sheriff and Christian, and then, you know,

19   before you guys actually tried to bring him into

20   your custody.

21       But can you tell us about any sort of

22   conversation that you had -- that you had with him

23   or the other Jamestown officers had with him prior

 1  to using force and trying to get him into custody?

 2       **A.**   Sure.  So not -- very, very little was

 3  said.  Like I said, it was -- it was the sheriff's

 4  office call to service.

 5       So in regards to handling that, Deputy

 6  Madonia took lead on that conversation.  There --

 7  there may have been a couple comments made

 8  regarding that situation, but I don't -- I don't

 9  recall exactly what was said.  Very, very little

10  conversation.

11       Once Deputy Madonia more or less cued that

12  he was complete with what he needed to handle,

13  he -- he stated to Christian that there was some

14  other matters that needed to be taken care of and

15  that he was referring to the warrant that we had

16  out for him.

17       **Q.**   Okay.  Okay.

18       **A.**   One -- once he made that comment,

19  basically, we explained that he had a warrant out

20  of our agency and that he was going to be under

21  arrest.

22       And at that time, we -- we made physical

23  contact with him, and that's when that incident

1  started.

2      **Q.**    And what was -- what was his -- what

3  were the warrants for?  Do you know if they were

4  for, like, misdemeanors or felonies or --

5      **A.**    It was a felony arrest warrant.

6      **Q.**    And do you know the -- just the basic

7  details of it, like if it was, like, violating an

8  order of protection or --

9      **A.**    It was -- it was a felony arrest

10  warrant for criminal contempt, first, stemming from

11  a domestic incident.

12      **Q.**    And was it contempt of -- like, did he

13  not show up for court or something or did he

14  just -- did he just violate an order of protection

15  or --

16      **A.**    I believe it was a violation of an

17  order of protection.

18      **Q.**    Okay.  Okay.  And do you know what --

19  what he was eventually charged with, if there

20  were -- and you don't have to give the exact

21  details, but if they were misdemeanors or felonies?

22      **A.**    From -- from the warrant or from this

23  incident?

1      **Q.**   I would say maybe both, if you could

2    describe.

3      **A.**   Well, the incident, I have very little

4    knowledge on what the incident from the warrant is

5    stemming from.  I didn't have anything to do with

6    that call to service.

7           So all I know is that he had the warrant for

8    the criminal contempt, first, stemming from that

9    domestic incident.

10          Regarding our incident that I dealt with

11   him, he was charged with obstructing government

12   administration; he was charged with resisting

13   arrest and criminal mischief fourth.

14     **Q.**   And are those all misdemeanors or are

15   those felonies?

16     **A.**   Those are all misdemeanors.

17     **Q.**   Okay.  Okay.  Now, I know that you

18   mentioned his -- his hands were -- were they down

19   at his sides and he was tensing up or were they

20   underneath him or -- I guess, from the time that

21   you were first trying to make the arrest until the

22   time you actually had him in handcuffs?

23     **A.**   So when I first made physical contact

*Obergfell - Zaccagnino - 08/16/23*

82

```
 1  with him, his arm, his hands were down at his

 2  sides, maybe a little bit down in front of him.

 3        And they were just -- they were down at his

 4  sides when he started to tense up and refused to

 5  put his hands behind his back.

 6        Q.   Now, during that period of time, did --

 7  did it appear like he was reaching for anything,

 8  like he was reaching for a gun or reaching for his

 9  pockets or anything that you were able to --

10        A.   Well, the arm -- the arm that I was

11  controlling, I -- I did not see him reach --

12  reaching for anything.

13        But again, I don't know why he is tensing up

14  and refusing our commands.  So I don't know if he's

15  tensing up in an attempt to move his hand towards a

16  pocket or underneath his jacket and into his

17  waistline.

18        All I know is I was trying to move his hand

19  behind his back, and he was refusing to put his

20  hand behind his back.

21        Q.   And then at one point, he was -- he was

22  taken down to the ground.  Can you just describe

23  that takedown and, I guess, what parts of his body
```

1  hit the ground or what parts -- what parts of your

2  body hit the ground?  If you could just give a

3  general description of that.

4         **A.**   Sure.  So it was -- it was a

5  multiple-officer takedown.  So I -- I -- again, I

6  don't -- I don't recall where Deputy Madonia was at

7  this time.  I don't know if he was on the other

8  arm.

9         I do know Officer Wise maintained control of

10  Christian's lower body, so I maintained control of

11  Christian's upper body.

12         Officer Wise maintained control of his lower

13  body and his legs, and we basically -- we moved him

14  to the ground.

15         So once -- once Officer Wise had control of

16  his legs, I was able to put pressure down on his

17  upper body and place him onto the ground.  He went

18  onto the ground face down.

19         I don't know what body part made contact

20  with the ground first, but I -- Officer Wise

21  maintained control of his legs as we went down to

22  the ground, and I maintained control of his upper

23  body and moved to a knee-on-top position, like I

1    described earlier.

2         **Q.**    Okay.  And then from the time that you

3    had him in handcuffs and you were bringing him into

4    the car, was he slammed on top -- or slammed on a

5    car in the driveway of 111 Barrett?

6         **A.**    He -- he was -- he was positioned

7    against the vehicle, but he was not slammed against

8    that vehicle.

9         **Q.**    And how was he positioned?  Was he just

10   kind of pushed towards it or what -- can you

11   describe how he was positioned?

12        **A.**    Yes, sir.  So he was -- he was facing

13   towards the vehicle.  We were behind him, and he

14   was -- we maintained pressure against him and the

15   vehicle.

16        Like I explained earlier, when we can put a

17   fixed object in between us -- or when we can put

18   the subject between us and a fixed object, it

19   allows for greater control of that subject.

20        So whether that be the ground or whether

21   that be a vehicle, when we're able to position him

22   against a fixed object, we can control him better.

23        That was for the purpose of making sure that

 1  he didn't have any weapons immediately accessible

 2  to him while we were transporting.

 3          **Q.**   And during -- during the time that that

 4  force was first used and the time he was in

 5  handcuffs, did Christian ever throw any punches or

 6  kicks at officers or no?

 7          **A.**   I don't remember -- I don't recall him

 8  attempting to strike me.  I can't speak for the

 9  other officers, though.

10          **Q.**   Okay.  Okay.  Did Christian, at any

11  point during your interactions, make any mention of

12  wanting to go to Jones Hill?

13          I'm not even sure what that is.  I think it

14  might be like a psychiatric or mental health

15  hospital?  Did he make any requests for that?

16          **A.**   Any requests to go where?

17          **Q.**   Jones Hill.

18          **A.**   Jones Hill?

19          **Q.**   I don't know what that is, but I think

20  it might be, like, a mental health --

21          **A.**   It's a mental health facility that we

22  have in the city.  I don't recall him requesting

23  that.

1      **Q.**    And from your -- from your interactions

2  with him from start to finish -- I know we talked

3  earlier about how you've had experiences in the

4  past where you're -- you have an inmate in your

5  custody and you're observing their condition get

6  worse and worse, their mental health condition get

7  worse and worse.

8          Did that appear that that was the case for

9  Christian or no?

10      **A.**    Well, like I said earlier, Christian

11 was -- he had a -- he would be in a very elevated

12 state, and then he calmed down.

13          And it -- I would say that, when we got him

14 into the jail, he -- his condition appeared to --

15 to improve.

16          So when we were on scene and speaking to him

17 regarding the call of service, when Deputy Madonia

18 was speaking to him, the condition worsened as we

19 advised him of the warrant.

20          And then as we got to the jail and once we

21 got him into the jail, I would say that, from what

22 I observed, his condition improved as he calmed

23 down.  He became cooperative.  He -- his elevated

1  state decreased.

2      **Q.**   Okay.  And you were saying that, from

3  the time that you went to do your paperwork until

4  the time that you left, you -- do you have any

5  personal knowledge of what happened over that

6  period of time?

7      **A.**   No, sir.

8      **Q.**   Okay.  Okay.  So I can jump over that

9  stuff.

10      What -- what injuries did Christian get

11  when -- as a result of the -- the arrest or just in

12  the course of his arrest at 111 Barrett?

13      **A.**   The most significant one would have

14  been his contusion to his head.  And there was a --

15  there was bleeding coming from the head.

16      And I believe that was the extent of his

17  injuries during the course of the arrest.

18      **Q.**   And did he make any -- any requests or

19  any statements to you or any of the other officers

20  on scene or on his way to the jail that his

21  handcuffs were too tight?

22      **A.**   I don't recall.

23      **Q.**   Okay.  Do you know if his handcuffs

1    were loosened at all from the time he -- he was

2    arrested on scene at 111 until he was brought into

3    the jail?

4            **A.**    I don't believe that the handcuffs were

5    loosened at all from the time that we placed them

6    on to the time that they were taken off, but they

7    were double locked to prevent him from being able

8    to tighten them, whether that be from him leaning

9    on them while he's in the vehicle or pushing them

10   against the seat.

11           They were double locked to prevent them

12   going tighter without -- with his own actions.

13           **Q.**    Okay.  I know we're running short on

14   time.  I'm just going to ask you a few more

15   questions, and then I'll just go through some of

16   the incident reports, which they say what they say.

17           I'm mainly just interested if you can tell

18   me if it's a fair and accurate representation of

19   the report that I'm showing you.  Okay?

20           **A.**    Yes, sir.

21           **Q.**    And I appreciate your patience again

22   and everyone else's patience with me.

23           So the -- the -- do you have an estimate of

1  the -- the time frame of your observations of

2  Christian from the time you first got to booking

3  until you went to -- until you went to do your

4  paperwork and it was done?

5        Was it, like, 20 minutes?  Was it an hour?

6        **A.**    That -- that's very difficult for me to

7  estimate how much time I actually spent with him.

8  I would say it would be -- it would be in the

9  vicinity of an hour.

10       **Q.**    Okay.  Okay.  And -- and did you make

11  any observations of Christian harming himself,

12  whether it be by bashing his head up against the

13  wall while he was at Jamestown jail over the course

14  of the night or slamming his hands on the -- on the

15  bench or punching a wall or -- did you make any

16  observations of that from the time that you got to

17  the jail until you were done -- until you were done

18  with him?

19       **A.**    Like I said, when my -- my interaction

20  with him in the jail, he was cooperative, relaxed.

21  He calmed down.

22       He was -- from when I got into the jail and

23  the time I left, he did not display those -- those

1  behaviors.

2      **Q.**   And on the video, I'm not sure if it

3  was your -- your body cam or not, but I could just

4  ask it.

5      Did you -- did you make any statement to one

6  of the other officers that, when you were in the --

7  the process of putting your gun away that you

8  wanted to put him in the restraint chair because he

9  was fighting or something like that?

10     **A.**   I believe I did make a statement

11 regarding the chair, yes.

12     **Q.**   And what was the reason for that?  Was

13 it just because of everything you observed, the

14 threats and the actions that he was doing?

15     **A.**   Correct.  So when -- when somebody's

16 displaying those behaviors, putting somebody --

17 putting a -- a resisting subject in the restraint

18 chair, it can be very -- it can be difficult and it

19 takes multiple people.

20     So I was basically giving them a heads up

21 and there was going to be a good chance that he was

22 going to be in the restraining chair.

23     He -- like I said, once he stood back up,

1  after hitting his head on the vehicle, he became

2  cooperative.

3         And there's a lot of restrictions regarding

4  restraint chair because of how much it restricts a

5  subject's body.

6         There's actually time limits on how long

7  somebody's allowed to stay in that restraint chair.

8         When a subject becomes cooperative, your

9  justification for putting them into that chair, it

10 would be -- the justification for putting him into

11 the chair while he's being cooperative would be

12 strained.

13        When he becomes calm and relaxed while

14 allowing use to retrieve his property from him, we

15 can't go from him being in that state to going, now

16 we're going to restrict all of your body movement

17 and place you in the restraint chair that's going

18 to do this.

19        So at the time when he was actively harming

20 himself and actively resisting us, it would have

21 been appropriate to place him in the chair.

22        However, when he became cooperative and

23 relaxed, that justification would be removed, and

*Obergfell - Zaccagnino - 08/16/23*

1   we did not place him in the chair because of the

2   way that he -- his state became calm.

3        **Q.**   Okay.  Okay.  And from the time that

4   you -- that you guys got to the jail to your last

5   interaction was with him, did you observe anything

6   other than having him handcuffed on the -- on the

7   bench within the vision of the officer that was

8   going to be observing him to prevent him from, for

9   example, hitting his head off the wall again or

10  talk -- you know, I know he calmed down, but did

11  you make any other observations of any other

12  precautions taken other than that?

13       **A.**   Well, it -- like I said, he was under

14  constant -- constant watch, and he was handcuffed

15  to the booking bench.  Aside from that, I don't

16  believe there were any other precautions used.

17       **Q.**   Okay.  I'm just going to show you

18  quickly because I know we're a little over time,

19  but I know we started late.  So I'll make this

20  quick.

21       I just want to go through some incident

22  reports that I have and just ask you if they appear

23  to be fair and accurate and then I will have you on

1  your way.  Okay?

2       Thank you everyone for your patience.

3       **MS. D'AGOSTINO:**  Hey Blake.

4       **MR. ZACCAGNINO:**  Yes.

5       **MS. D'AGOSTINO:**  It's Mary.  I'm just going

6  to switch from my phone to my computer.  So I'm

7  just going to sign off, but I'll sign right back

8  on.

9       **MR. ZACCAGNINO:**  Okay.  Awesome.  Thank you.

10

11       **BY MR. ZACCAGNINO:**

12       **Q.**   Okay.  I'm just going to share my

13  screen here quickly.  Okay.  So Trooper, I just

14  want to show you what will be marked as -- I think

15  we're on F.  Plaintiff's Exhibit F.  I have an E

16  that I wrote on top because I apparently can't -- I

17  don't know the order of letters in the alphabet,

18  but -- but so this will be marked as Plaintiff's

19  Exhibit F.

20       And it has Jamestown Police Department on

21  the top-left corner.  And then right underneath, it

22  has Thursday December 10th of 2020, report time,

23  253.

1          I just want to show you this document.  It's

2     two pages, and I just want to know if you've seen

3     this before and if this is a fair and accurate

4     representation of it.

5          **A.**    Yes, sir.  I've seen it before, and

6     it's fair and accurate.

7          **Q.**    Okay.  Thank you.  Let me go to the

8     next.  Okay.  And I'm showing you what -- there's

9     an F on the top, but I think we're on Plaintiff's

10    Exhibit G.  It has Jamestown Police Department Use

11    of Force Form, and it has the date as December 10

12    of 2020.

13          Again, have you seen this before and is it a

14    fair and accurate representation of it?

15          **A.**    Yes, sir.  And it's fair and accurate.

16          **Q.**    Okay.  Okay.  And it's annoying because

17    it used to have -- it would give me a preview, but

18    now we have -- okay.

19          So I'm showing you what has been marked --

20    what will be marked as Plaintiff's Exhibit H, and

21    it has a -- a G on the top.  And it has case file

22    number 1044 on the top-left corner.

23          Do you recognize this document here?

1      **A.**    Yes, sir.

2      **Q.**    Okay.  And is it a fair and accurate

3  representation of it?

4      **A.**    This is actually -- this was written by

5  Officer Conklin.

6      **Q.**    Gotcha.  Okay.  Okay.  So you're not --

7      **A.**    I -- I've seen -- I've seen and

8  reviewed the -- the document, but I -- I can't

9  necessarily speak to it because this is his report.

10     **Q.**    Okay.  Okay.  I'm showing you what has

11  been marked as -- what will be marked as

12  Plaintiff's Exhibit I, and it has an H on the top.

13  And it has -- did we already go over this one or

14  no?

15     **A.**    I believe this is what we just went

16  over.

17     **Q.**    Oh.  I'm sorry.  I'm sorry about that.

18  Here we go.  Okay.  So I want to show you what will

19  be marked as Plaintiff's Exhibit I, and it has an I

20  on the top.  And then it has case file number 1018

21  on the top left.  Have you seen this document

22  before?

23     **A.**    I've seen it, yes, sir.

1      **Q.**    Okay.  And is it a fair -- fair and

2  accurate?

3      **A.**    Again, this is another report.  I

4  believe that these incidents happened after I was

5  off duty.

6      **Q.**    Oh.  Okay.

7      **A.**    This was completed by a day-shift

8  officer.

9      **Q.**    Okay.  Okay.  And the name -- does it

10  say the same of the officer that completed this?

11      **A.**    I believe it's Officer Conti.

12      **Q.**    Conti.  Okay.  Okay.  And then -- let

13  me see.

14          Exhibit J.  It's -- this would -- yeah.

15  Plaintiff's Exhibit J.  It has document 14-7 in the

16  middle because I think it was -- it was E-filed

17  from a prior motion on the case.  Do you recognize

18  this or no?

19      **A.**    No, sir.

20      **Q.**    Okay.  Okay.  Yeah.  I think the rest

21  is from after you left.

22          And then the last document that I want to

23  show you is Plaintiff's Exhibit J.  It has an M on

1  the front -- or on the middle, and it has case --

2  or it has case 1:21-CV-00721-GWC document 14-3.

3        Do you recognize this?

4        **A.**    Yes, sir.

5        **Q.**    Okay.  And what is this document here?

6        **A.**    This is the 9.41 form.

7        **Q.**    And did you fill this out?

8        **A.**    Officer Wise filled this out.  This is

9  the form that we -- we give to the hospital staff.

10 So they have a better understanding of what the

11 condition of the patient is.

12       **Q.**    And from -- from your understanding,

13 Christian would have been seen at UPMC in response

14 to this after his arraignment?

15       **A.**    Yes, sir.

16       **Q.**    Okay.  Did you review anything to

17 prepare for today?

18       **A.**    Yes, sir.

19       **Q.**    What did you review, just everything

20 that we've gone over or --

21       **A.**    Yes, sir.  I reviewed -- I reviewed the

22 incident report, the use of force, my body-cam

23 footage from the incident, and I reviewed with our

1   attorneys.

2       **Q.**   Okay.  And have you testified

3   previously in any sort of -- in any civil case or

4   any criminal cases?

5       **A.**   Yes, sir.  Criminal cases.

6       **Q.**   Okay.  So all in criminal cases.  Did

7   the -- the City of Jamestown, did they have any --

8   any discipline file that they kept on you?

9       **A.**   There would have been a discipline

10   file.  I had never received any disciplinary

11   action.

12       **Q.**   Okay.  And have there been any other

13   either -- I don't know if the term would be

14   civilian complaints filed against you or any other

15   prior lawsuits filed against you that you're aware

16   of?

17       **A.**   No, sir.

18       **MR. ZACCAGNINO:**  Okay.  I appreciate your

19   time.  Thank you so much.  Elliott and Mary might

20   have some follow-ups, but I appreciate your time.

21   Thank you.

22       **THE WITNESS:**  Yes, sir.

23       **MS. D'AGOSTINO:**  I just have a couple of

 1 questions, but Trooper, do you want to take a break

 2 or are you good to move forward?

 3       **THE WITNESS:**  I wouldn't mind a quick break.

 4       **MS. D'AGOSTINO:**  Okay.  Do you want to take

 5 five minutes?

 6       **THE WITNESS:**  Sure.

 7       (A recess was then taken.)

 8

 9       **EXAMINATION BY MS. D'AGOSTINO:**

10

11       **Q.**   And sir, I just have a couple of

12 questions for you, and then Blake may have some

13 follow-up questions, but I promise that we're

14 getting towards the end of this.

15       **A.**   Yes, ma'am.

16       **Q.**   So you indicated during the first

17 incident that Mr. Powell was tensing up his hands

18 when you tried to take him into custody; is that

19 correct?

20       **A.**   Yes, ma'am.

21       **Q.**   If you're trying to take someone into

22 custody and they're tensing up, does that -- is

23 your understanding of your training, does that type

*Obergfell - D'Agostino - 08/16/23*

1  of behavior permit you to use force?

2      **A.**    Yes, ma'am.

3      **Q.**    During your entire interaction with

4  Mr. Powell, did you use any hand strikes?

5      **A.**    No, ma'am.

6      **Q.**    Did you use any knee strikes during

7  your entire interaction with Mr. Powell?

8      **A.**    No, ma'am.

9      **Q.**    Did you use any force beyond strikes?

10 So I'm thinking of chemical sprays or a baton or

11 anything like that?

12     **A.**    No, ma'am.

13     **Q.**    What was the nature of the force that

14 you used against Mr. Powell?

15     **A.**    Soft-hand techniques only.

16     **Q.**    And were the soft-hand techniques that

17 you used on Mr. Powell -- were they designed to

18 overcome the resistance that he was displaying?

19     **A.**    Yes, ma'am.  Simply to maintain control

20 of the resisting subject.

21     **Q.**    And you were the one that placed

22 handcuffs on him, correct?

23     **A.**    Yes, ma'am.

*Obergfell - D'Agostino - 08/16/23*

1      **Q.**    Is it possible for an arrestee to

2  tighten up the handcuffs given their behavior

3  during an arrest?

4      **A.**    Yes, ma'am.

5      **Q.**    Is it a prerequisite for an arrestee to

6  strike or attempt to strike you to use force?

7      **A.**    No, ma'am.

8      **Q.**    Are you aware of what force was being

9  used by other officers on the scene?

10      **A.**    I know that Officer Wise was

11  maintaining control of the legs.  I -- I don't -- I

12  don't remember what Deputy Madonia was doing, aside

13  from when we got him onto the ground, he was

14  assisting me in controlling his arms.

15      **Q.**    Okay.  Your fellow officer, did you

16  observe him using any hand strikes?

17      **A.**    No, ma'am.

18      **Q.**    Did you observe him using any knee

19  strikes?

20      **A.**    No, ma'am.

21      **Q.**    Did you observe your fellow officer

22  using anything other than soft-hand-control

23  techniques?

*Obergfell - D'Agostino - 08/16/23*

1      **A.**    No, ma'am.

2      **Q.**    If you believed that the -- strike

3  that.

4           When Mr. Powell was taken to the ground, did

5  he appear to be injured to you?

6      **A.**    No, ma'am.

7      **Q.**    You indicated that you witnessed

8  Mr. Powell had some contusion and bleeding; is that

9  correct?

10      **A.**    Yes, ma'am.

11      **Q.**    Do you have reason to believe that you

12  or your fellow officer caused that?

13      **A.**    No, ma'am.

14      **Q.**    Who caused the contusion and bleeding

15  to Mr. Powell's head?

16      **A.**    From my understanding and from what I

17  observed, he was causing that injury to his -- to

18  himself by hitting his head on the ground.

19      **Q.**    When you brought him to the ground, did

20  you have any reason to believe that he was going to

21  begin engaging some self-harming behavior?

22      **A.**    No, ma'am.

23      **Q.**    At what time did you become aware that

1  the EMS had been called to respond to Mr. Powell's

2  injuries?

3       **A.**   I know that EMS was called while we

4  were still on the ground with him, my partner.  I

5  don't know the exact time, though, but we were

6  still maintaining control of him on the ground.

7       **Q.**   Was the ambulance called before

8  Mr. Powell was in custody or after he was in

9  custody?

10      **A.**   I don't recall if the handcuffs were on

11 him prior to him -- prior to EMS being called or

12 not.

13      **Q.**   Okay.  After he was placed in the back

14 of your patrol vehicle and you're transporting him

15 to the jail, did you have any reason to believe

16 that he would have been hitting his head on the --

17 the divider between the front seat and the back

18 seat?

19      **A.**   After he had already done that?

20      **Q.**   No.  After he was already placed in the

21 back seat, did you have any reason to believe that

22 he would begin hitting his head again prior to him

23 actually hitting his head?

1          **A.**    No, ma'am.

2          **Q.**    Would it have been safe for you to stop

3    the vehicle and secure him when you were working by

4    yourself that evening?

5          **A.**    No, ma'am.

6          **Q.**    When you ultimately arrived at the jail

7    and -- you indicated that you had to go put your

8    gun somewhere is that correct?

9          **A.**    Yes, ma'am.

10          **Q.**    So how far away were you from him when

11    he hit his head on the back of the vehicle?

12          **A.**    When I was walking back, I was within

13    five to ten feet from him.

14          **Q.**    Were there other officers surrounding

15    him at that time?

16          **A.**    Yes, ma'am.

17          **Q.**    If -- did you have any reason to

18    believe that he was going to hit his head again on

19    the back of the vehicle when you arrived at the

20    jail?

21          **A.**    No, ma'am.

22          **Q.**    Were you present when EMS arrived at

23    the jail?

1      **A.**   I don't -- I don't recall if I was

2  there when EMS was there.

3      **Q.**   Are you a medical professional?

4      **A.**   No, ma'am.

5      **Q.**   Do you know if Mr. Powell refused

6  medical treatment when EMS arrived?

7      **A.**   According to one of the reports, I

8  believe he refused, but I don't -- I don't recall

9  being there for him refusing that.

10     **MS. D'AGOSTINO:**  Okay.  No further

11  questions.

12     **MR. ZACCAGNINO:**  I'm all set.  Thank you.

13     **MS. D'AGOSTINO:**  Okay.  Thank you.

14     (Deposition concluded at 12:21 p.m.)

15                *   *   *

16

17

18

19

20

21

22

23

106

1                              **ERRATA SHEET**

2

3    PAGE        LINE

4    _____     _____          CHANGE: _____

5                                 REASON: _____

6    _____     _____          CHANGE: _____

7                                 REASON: _____

8    _____     _____          CHANGE: _____

9                                 REASON: _____

10   _____     _____          CHANGE: _____

11                                REASON: _____

12   _____     _____          CHANGE: _____

13                                REASON: _____

14   _____     _____          CHANGE: _____

15                                REASON: _____

16   _____     _____          CHANGE: _____

17                                REASON: _____

18   _____     _____          CHANGE: _____

19                                REASON: _____

20

21

22

23

**MCCANN & MCCANN REPORTING**

107

1          I hereby CERTIFY that I have read the

2   foregoing 106 pages, and that they are a true and

3   accurate transcript of the testimony given by me in

4   the above entitled action on August 16, 2023.

5

6

7                          ------------------------

8                          Carter David Obergfell

9   Sworn to before me this

10

11   -------- day of  ---------, 2023.

12

13   --------------------------

14   NOTARY PUBLIC.

15

16

17

18

19

20

21

22

23

108

```
 1   STATE OF NEW YORK)

 2                     ss:

 3   COUNTY OF ERIE)

 4

 5        I DO HEREBY CERTIFY as a Notary Public in and

 6   for the State of New York, that I did attend and

 7   report the foregoing deposition, which was taken

 8   down by me in a verbatim manner by means of machine

 9   shorthand.  Further, that the deposition was then

10   reduced to writing in my presence and under my

11   direction.  That the deposition was taken to be

12   used in the foregoing entitled action.  That the

13   said deponent, before examination, was duly sworn

14   to testify to the truth, the whole truth and

15   nothing but the truth, relative to said action.

16

17

18                     _____

19                     PATRICK MCLAUGHLIN,
                       Notary Public.

20

21

22

23
```

**MCCANN & MCCANN REPORTING**

**#**

**#1018** [1] - 5:2
**#1044** [1] - 4:21

**1**

**1.11.01** [1] - 4:4
**1.11.O1** [1] - 47:16
**1/30/15** [1] - 48:23
**10** [10] - 47:21, 48:8, 48:19, 49:9, 49:14, 50:3, 50:16, 51:2, 51:11, 94:8
**1018** [1] - 95:17
**1044** [1] - 94:19
**10th** [5] - 43:13, 43:16, 45:8, 46:3, 93:20
**111** [10] - 52:6, 59:2, 59:8, 60:9, 69:6, 76:15, 77:12, 84:4, 87:11, 88:1
**11:00** [1] - 43:22
**12/10/20** [1] - 4:16
**12:21** [1] - 105:11
**14-3** [3] - 4:19, 5:7, 96:22
**14-5** [1] - 4:23
**14-7** [2] - 5:4, 96:12
**14701** [1] - 5:20
**1990** [1] - 47:17
**1:21-CV-00721-GWC** [1] - 96:22

**2**

**2.02.12** [1] - 4:7
**20** [1] - 89:4
**200** [1] - 5:19
**2016** [1] - 8:1
**2018** [2] - 8:5
**2019** [3] - 8:9, 9:9, 34:16
**2020** [20] - 6:6, 7:13, 9:16, 34:12, 43:8, 43:13, 43:16, 45:8, 47:22, 48:8, 48:19, 49:9, 49:14, 50:3, 50:17, 51:2, 51:11, 93:20, 94:9
**2022** [1] - 10:2
**25** [1] - 32:9
**253** [1] - 93:20
**27th** [1] - 47:17

**3**

**3/21/12** [1] - 50:6
**30** [6] - 32:5, 32:6, 32:7, 32:10, 32:13,

33:9
**35** [1] - 34:18
**3:00** [4] - 45:10, 45:12, 75:4, 75:6

**4**

**4.02.05** [2] - 4:10, 49:6
**4.05.08** [2] - 4:13, 50:12
**4/1/16** [1] - 48:6
**4/2/09** [1] - 49:12
**4/21/1990** [1] - 48:22

**7**

**7:00** [4] - 43:23, 45:13, 74:21, 75:6

**9**

**9.41** [30] - 12:15, 12:19, 12:22, 13:4, 13:7, 14:16, 15:2, 15:16, 16:5, 16:8, 16:13, 17:6, 17:8, 17:11, 18:11, 19:16, 23:2, 23:7, 23:14, 23:18, 29:2, 70:11, 73:11, 73:18, 73:23, 74:6, 74:9, 74:10, 74:15, 97:3

**A**

**a.m** [5] - 45:13, 74:21, 75:4, 75:6
**a.m.** [3] - 43:23, 45:10, 45:12
**abdomen** [1] - 40:4
**ability** [1] - 22:4
**able** [21] - 21:17, 22:1, 25:16, 26:10, 26:12, 26:16, 27:19, 30:22, 40:9, 55:11, 57:2, 57:8, 60:13, 60:14, 68:19, 72:4, 76:2, 82:8, 83:15, 84:20, 88:6
**academic** [1] - 8:14
**academy** [6] - 11:12, 31:14, 34:16, 35:5, 35:6, 39:2
**Academy** [2] - 8:6, 35:3
**accessible** [1] - 84:23
**according** [1] - 105:4
**accurate** [8] - 88:17, 92:22, 93:23, 94:3, 94:11, 94:12, 94:22,

95:22
**acting** [3] - 22:17, 56:4, 64:18
**action** [3] - 42:7, 68:20, 98:8
**actions** [24] - 12:17, 13:18, 15:7, 16:16, 20:19, 21:23, 22:17, 27:9, 29:22, 30:20, 30:23, 36:6, 36:7, 38:19, 40:10, 42:13, 54:5, 62:17, 62:18, 70:4, 70:8, 72:8, 88:11, 90:13
**activated** [3] - 60:13, 61:13, 66:10
**active** [2] - 36:5, 36:11
**actively** [7] - 27:6, 27:7, 36:20, 54:2, 91:18, 91:19
**activities** [3] - 10:10, 10:18, 11:6
**acts** [2] - 27:14, 30:12
**actual** [2] - 19:22, 75:16
**added** [2] - 47:2, 48:3
**additional** [2] - 35:3, 35:7
**administration** [1] - 81:11
**advise** [1] - 58:19
**advised** [5] - 53:2, 53:5, 58:13, 59:21, 86:18
**afterwards** [1] - 14:19
**agencies** [2] - 9:19, 10:11
**agency** [5] - 10:6, 10:18, 10:20, 53:4, 79:19
**aggression** [1] - 62:20
**ahead** [1] - 50:21
**aid** [2] - 39:11, 68:2
**alert** [1] - 30:11
**Allegany** [4] - 9:10, 10:14, 10:15, 11:4
**allow** [1] - 16:3
**allowed** [2] - 62:11, 91:6
**allowing** [1] - 91:13
**allows** [1] - 84:18
**almost** [1] - 49:16
**alphabet** [1] - 93:15
**ambulance** [4] - 13:22, 42:2, 42:3, 103:4
**amount** [8] - 15:12, 16:21, 37:23, 38:3, 70:2, 74:3, 74:22, 76:16

**amounts** [1] - 12:6
**ankles** [2] - 27:17, 42:18
**annoying** [1] - 94:13
**answering** [1] - 11:5
**apologize** [3] - 21:10, 69:19, 70:14
**appear** [7] - 43:5, 48:7, 50:2, 82:6, 86:7, 92:21, 102:2
**appeared** [2] - 72:10, 86:13
**apply** [2] - 22:15, 53:8
**appreciate** [4] - 46:15, 88:20, 98:15, 98:17
**appropriate** [3] - 14:3, 76:3, 91:20
**area** [32] - 26:10, 26:18, 40:2, 40:4, 54:22, 55:8, 56:23, 58:19, 59:12, 59:23, 60:3, 60:4, 60:6, 60:9, 60:15, 61:20, 61:23, 62:4, 62:9, 62:12, 62:15, 62:22, 63:3, 63:10, 63:12, 67:13, 72:14, 72:21, 77:7, 77:17
**arm** [8] - 53:13, 54:10, 54:13, 54:14, 81:23, 82:9, 83:7
**arms** [3] - 36:10, 77:20, 101:11
**arraigned** [5] - 45:19, 75:2, 75:8, 75:14, 75:23
**arraignment** [8] - 20:18, 21:7, 23:22, 28:12, 74:12, 75:21, 75:22, 97:11
**arrest** [19] - 11:16, 11:23, 28:9, 41:2, 42:14, 52:5, 53:6, 55:18, 63:22, 78:9, 79:20, 80:4, 80:8, 81:12, 81:20, 87:10, 87:11, 87:16, 100:23
**arrested** [2] - 20:15, 88:1
**arrestee** [2] - 100:21, 101:2
**arresting** [1] - 38:2
**arrived** [6] - 52:18, 52:19, 104:3, 104:16, 104:19, 105:3
**arriving** [1] - 72:16
**article** [1] - 34:18
**aside** [6] - 14:19, 18:20, 24:20, 45:4,

92:14, 101:9
**assaultive** [2] - 36:13, 36:17
**assigned** [2] - 45:5, 76:9
**assist** [3] - 51:15, 52:7, 59:23
**assistance** [1] - 60:15
**assisting** [2] - 55:3, 101:11
**assuming** [1] - 19:15
**attempt** [3] - 77:18, 82:14, 101:3
**attempting** [2] - 40:11, 85:7
**attempts** [1] - 77:11
**attorneys** [1] - 97:21
**automatically** [2] - 16:7, 23:18
**available** [1] - 24:15
**awaiting** [4] - 23:22, 62:8, 63:3, 75:20
**aware** [4] - 98:12, 101:5, 102:20
**awesome** [1] - 93:8

**B**

**back-seat** [1] - 60:4
**background** [2] - 7:7, 27:22
**bad** [1] - 69:19
**bail** [2] - 76:3
**banging** [3] - 22:12, 31:3, 66:23
**Barrett** [12] - 51:22, 52:6, 59:2, 59:9, 60:10, 69:6, 72:17, 76:15, 77:13, 84:4, 87:11
**barrier** [3] - 41:22, 43:1, 60:3
**based** [8] - 15:1, 17:3, 18:9, 19:13, 21:11, 27:1, 70:1, 70:4
**bashing** [4] - 38:18, 60:19, 67:11, 89:11
**basic** [2] - 8:20, 80:5
**basis** [1] - 19:5
**baton** [1] - 100:7
**batons** [1] - 37:15
**became** [10] - 29:4, 57:22, 72:6, 72:7, 72:12, 86:22, 90:23, 91:21, 92:1
**become** [9] - 8:20, 20:20, 22:4, 22:22, 29:1, 30:15, 34:23, 35:9, 102:20
**becomes** [4] - 29:22,

30:18, 91:7, 91:12
**began** [7] - 45:10, 60:2, 60:8, 66:2, 66:7, 71:13, 71:23
**begin** [6] - 36:15, 55:13, 55:19, 57:18, 102:18, 103:19
**beginning** [1] - 7:8
**begins** [4] - 22:21, 55:23, 56:7, 56:13
**behavior** [6] - 16:3, 36:13, 41:7, 99:21, 100:22, 102:18
**behaviors** [3] - 19:10, 89:23, 90:15
**behind** [12] - 36:10, 53:8, 53:14, 53:16, 53:19, 54:3, 77:16, 77:19, 82:4, 82:18, 82:19, 84:12
**belligerent** [2] - 56:5, 57:22
**bench** [8] - 24:23, 25:14, 26:7, 26:8, 26:15, 89:14, 92:6, 92:14
**bending** [1] - 63:11
**benefits** [1] - 10:6
**best** [3] - 7:4, 15:11, 36:3
**better** [5] - 29:9, 54:5, 59:13, 84:21, 97:7
**between** [11] - 16:12, 41:22, 60:21, 63:15, 65:17, 66:22, 74:22, 78:16, 84:16, 84:17, 103:14
**beyond** [2] - 70:18, 100:6
**bigger** [1] - 10:6
**biggest** [2] - 29:17, 29:19
**bit** [4] - 10:20, 34:6, 77:10, 82:1
**Blake** [3] - 6:3, 93:2, 99:9
**bleeding** [6] - 56:22, 57:6, 65:10, 87:14, 102:5, 102:11
**block** [1] - 31:15
**blood** [1] - 56:15
**body** [22] - 37:8, 40:2, 40:3, 40:4, 40:8, 54:17, 54:19, 54:22, 55:6, 55:9, 82:22, 83:1, 83:9, 83:10, 83:12, 83:16, 83:18, 83:22, 90:2, 91:4, 91:15, 97:19
**body-cam** [1] - 97:19

**boils** [1] - 10:7
**book** [4] - 32:15, 32:20, 33:11, 33:12
**booked** [1] - 21:7
**booking** [18] - 20:17, 23:21, 25:14, 26:7, 26:17, 26:18, 41:19, 44:15, 59:4, 59:16, 67:23, 68:8, 74:12, 75:12, 75:17, 76:7, 89:1, 92:14
**bookings** [1] - 41:6
**bottom** [3] - 48:21, 49:11, 50:6
**break** [3] - 51:3, 98:21, 98:23
**briefly** [3] - 7:18, 10:17, 63:20
**bring** [4] - 17:15, 74:16, 78:9, 78:18
**bringing** [1] - 84:2
**brought** [3] - 23:6, 88:1, 102:16
**building** [3] - 12:10, 61:17, 76:11
**bunch** [2] - 7:6, 25:21
**BY** [4] - 6:1, 47:12, 93:9, 99:6

## C

**caller** [1] - 51:20
**calm** [4] - 16:9, 72:13, 91:12, 92:1
**calmed** [6] - 18:7, 72:10, 86:11, 86:21, 89:20, 92:9
**cam** [2] - 90:2, 97:19
**campus** [1] - 8:4
**capable** [1] - 13:11
**car** [22] - 13:21, 41:9, 41:21, 42:3, 58:2, 58:4, 58:5, 58:9, 59:17, 60:22, 65:15, 66:14, 66:23, 67:12, 67:16, 67:17, 68:4, 69:7, 69:22, 70:17, 84:3, 84:4
**care** [8] - 12:2, 12:4, 14:1, 14:2, 14:9, 19:23, 74:2, 79:13
**cars** [1] - 43:2
**Carter** [1] - 5:10
**CARTER** [1] - 5:10
**case** [9] - 14:15, 25:13, 86:7, 94:18, 95:17, 96:14, 96:21, 96:22, 97:23
**Case** [2] - 4:21, 5:2
**cases** [5] - 32:18,

71:19, 98:1, 98:2, 98:3
**category** [1] - 21:20
**Cattaraugus** [5] - 8:7, 9:1, 9:13, 10:12, 10:21
**caused** [3] - 65:9, 102:9, 102:11
**causing** [1] - 102:14
**cell** [3] - 25:3, 26:12
**center** [3] - 32:19, 44:17, 75:13
**certain** [1] - 31:9
**certification** [1] - 35:9
**certified** [1] - 13:9
**chair** [18] - 24:13, 24:18, 25:1, 26:19, 27:3, 27:10, 27:12, 90:7, 90:10, 90:17, 90:21, 91:3, 91:6, 91:8, 91:10, 91:16, 91:20, 91:23
**chair's** [1] - 27:20
**chance** [1] - 90:20
**change** [1] - 16:23
**changed** [1] - 29:4
**charged** [3] - 80:18, 81:10, 81:11
**charges** [5] - 16:14, 20:7, 20:8, 20:11, 20:16
**Chautauqua** [6] - 8:6, 13:11, 51:15, 51:18, 76:5, 78:16
**check** [5] - 32:4, 32:8, 33:7, 33:9, 33:18
**checks** [2] - 32:21, 33:13
**chemical** [1] - 100:7
**chest** [3] - 27:19, 27:20, 40:3
**Chris** [1] - 71:12
**Christian** [52] - 6:4, 18:19, 25:13, 45:7, 51:1, 51:11, 51:19, 52:1, 52:4, 52:10, 52:14, 53:3, 53:7, 53:11, 53:12, 55:4, 55:23, 56:3, 56:17, 56:20, 57:7, 57:21, 58:4, 58:11, 59:11, 59:14, 59:19, 60:1, 60:2, 62:7, 62:21, 63:4, 63:5, 70:3, 72:6, 72:12, 76:21, 77:4, 77:6, 77:22, 78:6, 78:8, 78:17, 79:12, 85:4, 85:9, 86:8, 86:9, 87:9, 89:1, 89:10, 97:10

**Christian's** [8] - 54:18, 54:22, 54:23, 57:1, 58:22, 62:17, 83:9, 83:10
**Christopher** [2] - 44:9, 71:13
**circled** [1] - 47:1
**circumstances** [2] - 13:6, 13:23
**City** [14] - 9:16, 9:19, 10:16, 13:10, 14:23, 15:4, 20:23, 31:7, 31:17, 35:10, 43:9, 52:5, 61:15, 98:4
**city** [10] - 5:15, 44:17, 51:20, 60:8, 61:17, 62:11, 75:19, 76:9, 85:21
**civil** [1] - 97:23
**civilian** [1] - 98:11
**classroom** [1] - 8:15
**close** [1] - 67:6
**closer** [1] - 17:11
**clothing** [5] - 53:21, 54:1, 55:15, 71:7
**College** [1] - 8:3
**combative** [3] - 36:12, 36:17, 37:12
**comfortable** [1] - 72:1
**coming** [3] - 56:16, 58:14, 87:14
**command** [3] - 44:6, 45:1, 59:21
**commands** [11] - 37:3, 38:6, 38:10, 53:15, 54:2, 55:18, 56:6, 58:2, 58:12, 82:13
**comment** [1] - 79:17
**comments** [3] - 20:18, 77:7, 79:6
**commit** [1] - 22:5
**communicating** [1] - 59:6
**Community** [1] - 8:2
**complainant** [1] - 51:19
**complaints** [2] - 45:2, 98:11
**complete** [8] - 14:13, 22:2, 30:23, 72:5, 72:12, 74:10, 74:17, 79:11
**completed** [4] - 8:9, 72:11, 96:4, 96:7
**complying** [1] - 58:12
**computer** [1] - 93:5
**concern** [3] - 64:16, 66:19, 77:4
**concerned** [1] - 77:3
**concluded** [1] -

105:11
**condition** [6] - 86:4, 86:5, 86:13, 86:17, 86:21, 97:8
**conditions** [2] - 31:8, 57:16
**conduct** [1] - 32:4
**conducted** [4] - 32:8, 32:10, 33:6, 33:9
**conducting** [1] - 11:5
**confirmed** [1] - 52:4
**confusing** [1] - 6:21
**Conklin** [4] - 44:10, 44:19, 62:7, 95:2
**connection's** [1] - 69:19
**consideration** [1] - 39:5
**considered** [2] - 36:11, 37:3
**constant** [42] - 20:21, 21:4, 21:8, 21:13, 21:21, 22:22, 23:9, 23:13, 23:17, 23:19, 24:2, 24:3, 24:9, 25:10, 25:17, 25:20, 26:3, 26:5, 26:11, 26:13, 26:16, 29:1, 29:2, 29:3, 29:5, 30:2, 30:9, 30:15, 30:18, 31:20, 32:2, 32:12, 70:9, 70:12, 73:11, 74:9, 74:10, 74:15, 92:13
**constant-observation** [1] - 24:9
**constant-watch** [1] - 26:5
**constitute** [2] - 23:17, 29:3
**contact** [6] - 53:6, 53:10, 53:11, 79:22, 81:22, 83:18
**contained** [1] - 61:23
**contempt** [3] - 80:9, 80:11, 81:7
**Conti** [2] - 96:8, 96:9
**continue** [3] - 16:3, 57:3, 70:21
**continued** [2] - 59:11, 69:16
**continuing** [4] - 41:7, 56:9, 56:11, 70:22
**Continuum** [2] - 35:15, 35:19
**control** [32] - 34:20, 39:21, 40:5, 40:8, 40:10, 42:2, 54:5, 54:7, 54:11, 54:17,

54:18, 54:21, 54:23, 58:16, 59:13, 60:6, 62:21, 63:14, 63:17, 70:21, 83:8, 83:9, 83:11, 83:14, 83:20, 83:21, 84:18, 84:21, 100:16, 101:8, 101:19, 103:3
**controlled** [1] - 61:8
**controlling** [4] - 40:1, 59:23, 82:10, 101:11
**contusion** [4] - 65:9, 87:13, 102:5, 102:11
**conversation** [4] - 78:16, 78:21, 79:5, 79:9
**cool** [1] - 47:10
**cooperative** [9] - 71:3, 72:7, 72:13, 86:22, 89:19, 91:1, 91:7, 91:10, 91:21
**cooperatively** [1] - 71:3
**corner** [5] - 47:2, 49:6, 49:21, 93:19, 94:19
**correct** [7] - 40:13, 64:1, 90:14, 99:16, 100:19, 102:6, 104:5
**counselors** [1] - 18:5
**County** [11] - 8:6, 8:7, 9:2, 9:13, 10:13, 10:21, 32:19, 33:3, 51:18, 76:5, 78:17
**County's** [1] - 33:11
**couple** [6] - 6:17, 60:11, 64:8, 79:6, 98:20, 99:8
**course** [8] - 41:2, 42:7, 42:14, 63:22, 73:2, 87:11, 87:16, 89:12
**court** [3] - 11:1, 41:19, 80:12
**covered** [2] - 27:22, 46:9
**creating** [1] - 27:7
**credible** [1] - 17:23
**crime** [1] - 20:13
**criminal** [12] - 16:14, 20:6, 20:8, 20:11, 20:16, 74:18, 80:9, 81:7, 81:12, 98:1, 98:2, 98:3
**criteria** [1] - 23:15
**cued** [1] - 79:10
**curriculum** [1] - 31:15
**curriculums** [1] - 35:6
**custody** [46] - 11:13, 11:20, 12:1, 12:7, 14:5, 14:16, 14:18,

14:20, 15:15, 16:10, 16:13, 17:15, 19:1, 19:10, 20:4, 22:5, 22:10, 28:5, 28:17, 36:2, 38:4, 38:17, 39:8, 39:10, 39:16, 40:11, 40:15, 40:19, 41:2, 41:23, 45:7, 45:17, 49:7, 52:10, 55:12, 55:21, 64:17, 65:4, 75:20, 78:19, 78:23, 86:4, 99:15, 99:19, 103:5, 103:6
**cut** [1] - 70:15

# D

**D'AGOSTINO** [9] - 5:16, 47:8, 93:2, 93:4, 98:20, 99:1, 99:6, 105:7, 105:10
**daily** [1] - 19:5
**dark** [1] - 55:14
**date** [5] - 47:17, 48:23, 49:12, 50:6, 94:8
**Dated** [1] - 4:16
**dates** [1] - 48:5
**day-shift** [1] - 96:4
**day-to-day** [4] - 10:9, 10:10, 10:17, 11:6
**DCJS** [1] - 34:23
**dead** [2] - 35:23, 36:3
**deadly** [4] - 36:19, 37:17, 37:18
**deadly-force** [1] - 36:19
**dealing** [3] - 23:5, 39:6, 41:1
**dealt** [3] - 18:21, 41:15, 81:9
**December** [20] - 6:6, 7:13, 34:12, 43:7, 43:8, 43:13, 43:16, 45:8, 46:3, 47:21, 48:8, 48:19, 49:9, 49:14, 50:3, 50:16, 51:1, 51:11, 93:20, 94:8
**decision** [1] - 14:22
**decreased** [1] - 86:23
**deescalation** [1] - 37:21
**defensive** [6] - 34:19, 34:23, 35:4, 35:7, 35:9, 39:3
**delay** [1] - 7:3
**Depart** [1] - 93:18
**department** [4] - 52:12, 66:5, 76:10, 76:11

**Department** [15] - 4:3, 4:6, 4:9, 4:12, 4:15, 4:18, 4:21, 5:2, 9:7, 9:10, 47:15, 48:14, 49:18, 61:16, 94:7
**Deposition** [1] - 105:11
**deputy** [1] - 51:16
**Deputy** [14] - 51:21, 52:7, 52:13, 52:15, 52:20, 52:23, 54:12, 55:2, 76:20, 79:4, 79:10, 83:5, 86:16, 101:9
**describe** [5] - 35:18, 77:10, 81:1, 82:21, 84:10
**described** [5] - 32:23, 35:23, 37:6, 67:14, 83:23
**description** [2] - 36:4, 83:2
**designed** [1] - 100:14
**desk** [5] - 25:15, 44:6, 44:23, 45:1
**despite** [1] - 58:1
**detail** [2] - 7:21, 35:18
**details** [3] - 13:17, 13:19, 52:1, 80:6, 80:20
**deteriorate** [2] - 28:6, 28:16
**determination** [2] - 15:9, 54:4
**determine** [1] - 18:6
**determined** [3] - 14:8, 59:11, 70:11
**dictate** [1] - 54:7
**dictates** [1] - 26:22
**die** [1] - 73:4
**differ** [2] - 22:9, 23:11
**different** [18] - 6:5, 6:17, 7:10, 10:21, 22:14, 25:22, 26:21, 26:22, 29:22, 32:1, 35:20, 37:1, 41:8, 41:9, 42:20, 48:5, 51:4, 64:8
**differently** [1] - 42:15
**difficult** [8] - 19:7, 41:21, 42:3, 57:14, 57:15, 71:8, 89:5, 90:17
**directing** [1] - 36:8
**disciplinary** [1] - 98:7
**discipline** [2] - 98:5, 98:6
**disorders** [1] - 31:10
**dispatch** [2] - 52:3, 59:6

**dispatched** [1] - 51:14
**display** [1] - 89:22
**displaying** [3] - 72:8, 90:15, 100:15
**disrespect** [1] - 6:10
**disrespectful** [1] - 29:7
**distress** [1] - 34:2
**divided** [1] - 60:3
**divider** [5] - 60:20, 65:17, 65:20, 66:1, 103:14
**Document** [4] - 4:19, 4:22, 5:4, 5:7
**document** [8] - 93:21, 94:20, 95:5, 95:18, 96:12, 96:19, 96:22, 97:2
**domestic** [2] - 80:10, 81:8
**done** [10] - 23:20, 24:5, 64:13, 68:7, 69:11, 69:13, 89:3, 89:16, 103:16
**door** [1] - 58:3
**doorway** [1] - 77:1
**double** [2] - 88:6, 88:10
**down** [27] - 10:7, 16:9, 17:13, 27:20, 32:14, 33:4, 33:6, 37:16, 40:3, 48:1, 51:3, 54:11, 55:7, 56:12, 72:10, 81:17, 81:23, 82:1, 82:2, 82:21, 83:15, 83:17, 83:20, 86:11, 86:22, 89:20, 92:9
**driver's** [5] - 58:6, 58:8, 58:10, 59:20, 60:3
**driver's-seat** [1] - 60:3
**driveway** [1] - 84:4
**drop** [1] - 14:1
**dropped** [1] - 14:15
**due** [1] - 57:6
**duly** [1] - 5:21
**during** [16] - 41:2, 54:11, 56:16, 57:4, 63:21, 73:1, 75:8, 82:5, 85:2, 85:10, 87:16, 99:13, 99:23, 100:3, 100:23
**duty** [7] - 13:12, 45:23, 62:14, 62:22, 62:23, 74:21, 96:2

# E

**E-filed** [1] - 96:13

**easier** [1] - 58:16
**easiest** [1] - 50:22
**East** [2] - 5:19, 66:4
**education** [2] - 7:18, 7:21
**effect** [5] - 46:12, 47:21, 48:19, 50:3, 50:16
**effective** [3] - 47:17, 49:8, 49:14
**efficiently** [1] - 39:9
**Eight** [1] - 5:5
**either** [9] - 13:21, 18:22, 20:12, 44:18, 45:1, 69:10, 75:23, 76:16, 98:10
**elevated** [3] - 56:5, 86:10, 86:22
**Elliott** [2] - 47:6, 98:16
**emergency** [3] - 60:13, 61:13, 66:10
**EMS** [14] - 5:4, 57:5, 58:13, 58:19, 59:2, 59:6, 59:8, 61:9, 102:21, 102:23, 103:8, 104:19, 104:22, 105:3
**encompassing** [1] - 8:19
**encounter** [1] - 75:4
**end** [8] - 17:7, 17:16, 36:22, 36:23, 37:20, 69:18, 72:15, 99:11
**ended** [1] - 45:22
**engaging** [1] - 102:18
**entering** [1] - 74:23
**entire** [2] - 99:23, 100:4
**entity** [2] - 15:3, 15:4
**environment** [2] - 58:15, 59:13
**Erie** [3] - 32:19, 33:2, 33:11
**escalates** [1] - 38:8
**essentially** [4] - 14:1, 32:13, 35:22, 65:23
**estimate** [4] - 19:6, 65:19, 88:22, 89:6
**evaluate** [3] - 58:22, 61:9, 76:13
**evaluated** [1] - 14:7
**evaluation** [10] - 12:21, 13:9, 13:12, 17:2, 23:23, 24:4, 48:16, 74:5, 74:16, 75:1
**evening** [2] - 44:2, 104:1
**eventually** [2] - 59:17, 80:18

**exact** [5] - 45:11, 68:5, 74:21, 80:19, 103:2
**exactly** [6] - 33:10, 43:4, 45:10, 64:4, 77:5, 79:8
**Examination** [1] - 5:6
**EXAMINATION** [2] - 6:1, 99:6
**example** [9] - 15:22, 17:6, 17:8, 22:11, 24:11, 25:12, 31:2, 67:2, 92:8
**EXH** [10] - 4:2, 4:5, 4:8, 4:11, 4:14, 4:17, 4:20, 5:1, 5:4, 5:6
**exhibit** [2] - 19:10, 96:11
**Exhibit** [12] - 47:7, 49:5, 49:20, 50:10, 93:13, 93:17, 94:7, 94:17, 95:9, 95:16, 96:12, 96:20
**exited** [1] - 68:15
**experience** [1] - 18:20
**experienced** [1] - 19:4
**experiences** [16] - 11:9, 12:9, 17:4, 18:10, 18:21, 19:9, 19:14, 21:12, 27:2, 28:2, 28:14, 34:7, 38:12, 70:1, 73:22, 86:2
**explain** [1] - 32:1
**explained** [2] - 79:18, 84:15
**extensive** [1] - 7:9
**extent** [1] - 87:15
**extra** [2] - 68:10, 68:23
**extractions** [3] - 55:11, 55:14, 55:22
**extremely** [1] - 7:2

## F

**face** [3] - 55:7, 56:16, 83:17
**faced** [1] - 63:8
**facility** [2] - 13:9, 85:20
**facing** [2] - 63:7, 84:11
**fair** [9] - 88:17, 92:22, 93:23, 94:3, 94:11, 94:12, 94:22, 95:21
**fallen** [1] - 56:19
**far** [11] - 17:5, 30:5, 41:7, 41:16, 42:15, 43:20, 67:2, 68:10, 70:2, 77:13, 104:7
**fast** [4] - 6:20, 60:7,

66:17, 66:20
**faster** [3] - 60:16, 61:14, 66:11
**February** [1] - 47:17
**feet** [1] - 104:10
**fellow** [3] - 101:12, 101:18, 102:9
**felonies** [3] - 80:3, 80:20, 81:14
**felony** [2] - 80:4, 80:8
**female** [1] - 26:2
**females** [1] - 26:3
**few** [7] - 6:5, 9:8, 32:9, 32:17, 32:18, 51:4, 88:13
**field** [1] - 9:3
**fighting** [3] - 36:14, 36:15, 90:8
**figured** [1] - 50:22
**file** [8] - 12:19, 13:7, 18:1, 18:4, 94:18, 95:17, 98:5, 98:7
**File** [2] - 4:21, 5:2
**filed** [3] - 96:13, 98:11, 98:12
**fill** [4] - 13:16, 13:18, 19:16, 97:4
**filled** [1] - 97:5
**fine** [3] - 18:3, 33:23, 34:14
**finish** [2] - 51:12, 86:1
**finished** [1] - 8:21
**fire** [1] - 76:10
**firearm** [1] - 62:12
**first** [17] - 6:7, 6:18, 8:22, 19:20, 64:13, 64:14, 66:22, 68:8, 80:9, 81:7, 81:20, 81:22, 83:19, 85:3, 89:1, 99:13
**five** [5] - 17:21, 18:2, 73:15, 99:2, 104:10
**fixed** [4] - 63:16, 84:16, 84:17, 84:21
**flashlight** [4] - 56:18, 56:23, 65:8, 65:11
**flee** [3] - 77:9, 77:15, 77:18
**focus** [1] - 55:19, 65:2, 67:5, 68:12
**focusing** [1] - 64:22
**follow** [5] - 40:22, 41:5, 42:21, 98:17, 99:10
**follow-up** [1] - 99:10
**follow-ups** [1] - 98:17
**following** [2] - 4:1, 45:20
**follows** [1] - 5:21
**footage** [1] - 97:20

**force** [32] - 34:8, 34:17, 35:4, 35:7, 35:14, 36:19, 36:21, 36:23, 37:1, 37:4, 37:17, 37:18, 37:23, 38:3, 38:9, 38:13, 38:14, 39:3, 40:18, 47:16, 48:7, 48:8, 78:10, 78:23, 85:3, 97:19, 99:21, 100:6, 100:10, 101:3, 101:5
**Force** [4] - 4:18, 35:15, 35:19, 94:8
**foremost** [1] - 6:19
**form** [4] - 13:16, 13:18, 97:3, 97:6
**Form** [2] - 4:18, 94:8
**forward** [2] - 36:18, 98:22
**four** [3] - 48:17, 63:1, 63:7
**Four** [2] - 4:7, 4:13
**fourth** [1] - 81:12
**frame** [7] - 15:17, 15:20, 16:2, 16:8, 19:20, 43:21, 88:23
**frames** [1] - 7:11
**Franklinville** [4] - 9:7, 9:12, 10:13, 11:3
**Fredonia** [1] - 51:16
**front** [6] - 42:16, 45:1, 77:20, 82:1, 96:21, 103:14
**full** [4] - 6:10, 9:9, 9:11, 71:8
**full-time** [1] - 9:11
**function** [1] - 27:11
**future** [1] - 69:17

## G

**garage** [1] - 61:18
**gate** [1] - 9:5
**gears** [1] - 34:6
**general** [11] - 10:9, 11:10, 25:9, 31:2, 31:8, 31:10, 31:13, 34:8, 40:4, 42:12, 83:2
**General** [7] - 4:3, 4:6, 4:9, 4:12, 47:16, 48:14, 49:19
**generally** [7] - 14:4, 14:10, 25:17, 50:23, 73:19, 73:21, 75:15
**given** [1] - 100:22
**glance** [1] - 51:7
**goal** [4] - 38:7, 39:11, 40:14, 40:19
**gotcha** [5] - 24:1,

24:6, 70:13, 76:14, 95:3
**government** [1] - 81:10
**graduated** [2] - 7:23, 34:16
**graduating** [2] - 9:5, 34:16
**grappling** [1] - 37:7
**great** [2] - 35:17, 46:20
**greater** [1] - 84:18
**greatly** [3] - 16:12, 20:6, 74:8
**ground** [36] - 6:17, 38:19, 39:17, 54:4, 54:6, 54:19, 54:20, 55:4, 56:1, 56:8, 56:14, 56:19, 57:2, 57:3, 63:13, 63:23, 64:21, 65:13, 69:5, 70:20, 71:1, 82:21, 82:23, 83:1, 83:13, 83:16, 83:17, 83:19, 83:21, 84:19, 101:10, 102:1, 102:15, 102:16, 103:1, 103:3
**guess** [19] - 10:10, 12:23, 15:10, 17:7, 18:12, 18:17, 19:20, 23:12, 24:7, 25:9, 25:11, 28:1, 28:2, 30:3, 40:16, 43:18, 50:11, 81:19, 82:22
**guessing** [3] - 17:14, 28:8, 45:19
**gun** [5] - 67:11, 68:13, 82:7, 90:6, 104:5
**guys** [5] - 77:2, 77:12, 78:11, 78:18, 92:3

## H

**hallmark** [1] - 29:14
**hallway** [1] - 26:15
**hand** [15] - 37:5, 37:10, 42:10, 53:14, 55:11, 55:14, 55:22, 82:14, 82:17, 82:19, 100:1, 100:12, 100:13, 101:13, 101:19
**handcuff** [1] - 42:10
**handcuffed** [4] - 57:17, 65:6, 92:5, 92:13
**handcuffing** [4] - 42:15, 42:16, 42:18, 55:3

**handcuffs** [14] - 38:16, 53:9, 56:9, 56:13, 63:23, 81:21, 84:2, 85:4, 87:20, 87:22, 88:3, 100:19, 100:22, 103:7
**handle** [3] - 13:13, 53:1, 79:11
**handled** [2] - 52:8, 52:15
**handling** [6] - 13:11, 38:15, 38:22, 51:16, 52:3, 79:4
**hands** [18] - 36:10, 37:8, 53:7, 53:16, 53:19, 54:3, 55:4, 55:13, 55:19, 68:20, 71:12, 77:16, 77:19, 81:17, 81:23, 82:4, 89:13, 99:14
**hard** [2] - 7:2, 37:10
**hard-hand** [1] - 37:10
**harm** [23] - 12:12, 17:9, 17:23, 18:13, 18:23, 19:21, 19:22, 22:18, 24:10, 27:7, 31:2, 34:2, 36:20, 38:20, 42:13, 57:11, 66:16, 69:11, 73:1, 73:3, 73:8, 73:9, 78:11
**harming** [16] - 15:13, 18:15, 18:23, 22:13, 22:21, 24:16, 24:20, 27:14, 34:1, 41:3, 41:7, 42:11, 72:8, 89:10, 91:18, 102:18
**head** [49] - 16:1, 22:12, 25:6, 31:3, 38:18, 39:16, 55:23, 56:7, 56:14, 56:21, 57:1, 60:2, 60:19, 60:20, 63:9, 63:11, 63:23, 64:20, 65:3, 65:7, 65:12, 65:17, 65:20, 65:22, 67:1, 67:12, 68:4, 68:9, 68:16, 68:21, 69:5, 69:14, 69:22, 70:17, 70:19, 70:23, 87:13, 87:14, 89:11, 90:23, 92:8, 102:12, 102:15, 103:13, 103:19, 103:20, 104:8, 104:15
**heads** [1] - 90:19
**health** [24] - 12:14, 12:21, 13:8, 13:12, 24:4, 28:5, 28:16, 30:1, 30:6, 31:8,

31:9, 31:15, 31:18, 49:23, 50:1, 50:14, 50:15, 74:5, 74:16, 75:1, 85:13, 85:19, 85:20, 86:5
**hear** [2] - 16:16, 16:22
**held** [1] - 20:7
**helmet** [1] - 25:5
**help** [1] - 34:3
**hi** [1] - 6:3
**hidden** [1] - 55:5
**high** [2] - 7:19, 7:23
**higher** [1] - 15:3, 30:11
**Hill** [3] - 85:11, 85:16, 85:17
**himself** [6] - 69:11, 72:8, 73:9, 89:10, 91:19, 102:15
**hired** [4] - 9:6, 9:9, 9:16, 9:19
**hit** [24] - 55:23, 56:7, 56:13, 60:2, 60:12, 61:12, 63:9, 63:11, 64:20, 65:20, 65:22, 66:9, 68:3, 68:15, 68:21, 69:5, 69:21, 70:17, 70:19, 70:22, 82:23, 83:1, 104:8, 104:15
**hits** [1] - 66:1
**hitting** [17] - 16:1, 25:6, 31:2, 39:16, 56:21, 60:20, 63:23, 65:3, 65:16, 68:9, 69:14, 90:23, 92:8, 102:15, 103:13, 103:19, 103:20
**hmm** [1] - 38:23
**hold** [1] - 75:21
**holding** [4] - 32:19, 44:17, 75:13, 75:18
**hospital** [21] - 13:20, 14:2, 14:3, 14:11, 14:12, 14:16, 14:17, 14:18, 14:20, 16:19, 17:1, 18:5, 19:18, 20:9, 23:7, 23:23, 73:21, 74:1, 74:19, 85:14, 97:6
**hour** [2] - 89:4, 89:8
**hourly** [1] - 31:22
**hours** [3] - 28:11, 46:7, 73:15
**hurt** [3] - 30:12, 41:17, 65:1
**hurting** [2] - 39:18, 39:19

**I**

**ID** [1] - 33:17
**idea** [1] - 10:9
**ideation** [2] - 17:22, 19:22
**ideations** [13] - 12:17, 13:3, 15:13, 16:16, 17:20, 21:16, 21:23, 22:11, 22:20, 29:18, 30:13, 73:1, 73:7
**Identification** [1] - 4:1
**identify** [2] - 13:1, 47:3
**identity** [1] - 5:9
**immediate** [2] - 68:18, 68:20
**immediately** [2] - 53:12, 84:23
**immobilized** [2] - 27:17
**immobilizes** [1] - 27:15
**improve** [1] - 86:14
**improved** [1] - 86:21
**in-service** [1] - 31:16
**Incident** [3] - 4:15, 4:22, 5:3
**incident** [21] - 16:7, 17:9, 17:11, 46:13, 51:4, 51:6, 56:3, 72:19, 78:6, 79:22, 80:10, 80:22, 81:2, 81:3, 81:8, 81:9, 88:15, 92:20, 97:19, 97:20, 99:14
**incidents** [3] - 6:5, 51:5, 96:1
**indicated** [2] - 99:13, 102:4, 104:4
**indicator** [1] - 29:19
**indicators** [1] - 29:23
**individual** [1] - 13:7
**information** [1] - 53:1
**initial** [1] - 9:2
**initials** [2] - 33:8, 33:15
**injure** [2] - 40:16
**injured** [1] - 102:2
**injuries** [5] - 58:22, 61:9, 87:9, 87:16, 102:22
**injury** [1] - 102:14
**inmate** [11] - 11:19, 15:13, 15:22, 22:9, 24:9, 24:15, 41:16, 42:11, 42:12, 86:3
**inmates** [6] - 11:10, 12:11, 18:21, 25:5, 27:2, 33:23

**inside** [1] - 69:7
**instance** [4] - 66:3, 66:4, 66:22, 67:1
**instances** [3] - 60:11, 65:23, 72:18
**instructor** [2] - 35:1, 35:10
**interaction** [8] - 45:9, 56:17, 57:4, 72:16, 89:18, 92:4, 99:23, 100:4
**interactions** [9] - 18:18, 51:1, 51:10, 73:2, 77:21, 78:4, 78:5, 85:10, 85:23
**interested** [5] - 7:11, 7:12, 11:21, 20:14, 88:16
**interfering** [1] - 77:2
**interim** [1] - 19:20
**intermediate** [1] - 37:13
**Internet** [2] - 47:18, 49:2
**interrupt** [2] - 59:1, 63:19
**intersection** [2] - 60:12, 61:14
**intersections** [1] - 61:12
**involve** [1] - 35:14
**involved** [2] - 6:4, 37:9
**issued** [2] - 48:22, 62:14
**issued-duty** [1] - 62:14
**itself** [1] - 72:20

**J**

**J4** [1] - 57:19
**jacket** [3] - 71:16, 72:5, 82:15
**jail** [89] - 11:14, 11:18, 20:4, 20:8, 20:13, 20:14, 20:16, 20:23, 21:8, 23:13, 23:16, 23:21, 24:18, 24:20, 26:1, 26:4, 26:13, 28:20, 28:21, 28:23, 32:4, 32:8, 32:15, 44:17, 44:18, 44:20, 44:22, 45:3, 45:4, 45:14, 45:16, 58:13, 58:20, 59:4, 59:12, 59:18, 59:23, 60:8, 60:10, 60:15, 61:6, 61:14, 61:15, 61:16, 61:22, 62:12, 62:22,

65:16, 66:15, 66:20, 67:10, 70:4, 70:7, 70:11, 70:18, 71:4, 71:5, 71:10, 72:14, 72:17, 72:19, 74:4, 74:10, 74:11, 74:17, 74:23, 75:5, 75:7, 75:16, 75:19, 76:10, 78:2, 86:13, 86:19, 86:20, 87:19, 88:2, 89:12, 89:16, 89:19, 89:21, 92:3, 103:12, 104:3, 104:17, 104:20
**Jail** [1] - 76:5
**Jamestown** [55] - 4:2, 4:5, 4:8, 4:11, 4:14, 4:17, 4:20, 5:1, 5:20, 6:5, 7:13, 8:2, 9:16, 9:20, 10:4, 10:16, 11:4, 13:10, 14:23, 15:5, 17:4, 17:17, 18:17, 21:1, 24:8, 24:15, 25:6, 25:14, 27:2, 31:7, 31:17, 32:3, 32:18, 33:1, 33:5, 34:22, 35:11, 43:2, 43:9, 44:15, 45:8, 45:17, 47:15, 48:14, 49:18, 52:5, 75:11, 75:19, 76:6, 78:22, 89:12, 93:18, 94:7, 98:4
**Jamestown's** [1] - 61:16
**January** [1] - 9:15
**job** [5] - 8:23, 9:3, 9:11, 9:12, 43:12
**jobs** [2] - 9:14
**Johanson** [3] - 44:10, 62:6
**Jones** [3] - 85:11, 85:16, 85:17
**judge** [1] - 76:2
**jump** [2] - 50:21, 87:7
**jumping** [1] - 27:21
**jurisdiction** [2] - 51:18, 52:17
**justification** [3] - 91:8, 91:9, 91:22

**K**

**Kaitlin** [2] - 44:10, 62:6
**keep** [2] - 16:10, 46:7
**keeping** [1] - 77:20
**kept** [2] - 60:19, 98:5
**Kevin** [4] - 44:10, 52:7, 52:18, 76:19

**kicking** [2] - 36:16, 37:11
**kicks** [1] - 85:5
**kill** [2] - 15:23, 17:8
**kind** [20] - 12:10, 12:23, 13:8, 25:4, 27:12, 28:6, 29:18, 30:23, 31:10, 36:2, 37:6, 40:2, 42:11, 42:17, 51:3, 61:23, 62:12, 63:11, 71:21, 84:9
**kits** [1] - 56:19
**knee** [6] - 39:23, 54:21, 55:8, 83:22, 100:3, 101:15
**knee-on-top** [3] - 39:23, 54:21, 83:22
**kneeing** [1] - 37:11
**kneeling** [1] - 40:3
**knowledge** [9] - 41:12, 69:9, 69:13, 69:20, 69:21, 73:17, 78:3, 81:3, 87:4

**L**

**laces** [1] - 71:20
**lack** [1] - 29:9
**last** [4] - 48:7, 50:8, 92:3, 96:19
**late** [1] - 92:18
**law** [2] - 8:17, 12:14
**lawsuits** [1] - 98:12
**layers** [4] - 53:21, 53:23, 55:15, 57:15
**laying** [2] - 36:2, 55:7
**layman's** [1] - 35:18
**lead** [5] - 15:7, 16:17, 20:19, 21:23, 79:5
**lean** [1] - 17:5
**leaning** [1] - 88:7
**learned** [1] - 37:22
**least** [4] - 32:7, 37:23, 38:3, 75:6
**leave** [2] - 10:4, 45:13
**leaving** [1] - 66:2, 72:17
**left** [12] - 45:14, 45:15, 45:17, 72:14, 72:20, 74:20, 87:3, 89:22, 93:19, 94:19, 95:18, 96:18
**leg** [1] - 40:3
**legs** [10] - 40:7, 54:11, 54:15, 54:23, 55:1, 55:10, 83:12, 83:15, 83:20, 101:8
**lengthy** [1] - 78:16
**less** [2] - 60:9, 79:10

**MCCANN & MCCANN REPORTING**

5

**lethal** [1] - 36:21
**letters** [1] - 93:15
**levels** [4] - 31:20, 32:1, 35:20, 37:1
**Lieutenant** [2] - 44:5, 62:5
**lift** [2] - 57:2, 65:13
**light** [5] - 60:12, 60:14, 61:12, 66:9, 66:11
**lights** [3] - 60:13, 61:13, 66:10
**limits** [1] - 91:5
**line** [1] - 37:16
**lined** [1] - 33:5
**located** [3] - 61:16, 66:6, 76:10
**location** [1] - 42:5
**locked** [2] - 88:6, 88:10
**locker** [1] - 62:14
**locks** [1] - 27:13
**log** [6] - 32:15, 32:20, 33:5, 33:11, 33:12, 72:11
**logs** [1] - 33:5
**look** [2] - 29:10, 32:14
**looked** [2] - 33:11, 65:7
**looking** [2] - 10:5, 50:5
**looks** [3] - 37:14, 48:3, 48:6
**loosened** [2] - 87:23, 88:4
**lower** [5] - 40:8, 54:19, 54:23, 83:9, 83:11

## M

**ma'am** [23] - 99:12, 99:17, 99:22, 100:2, 100:5, 100:9, 100:16, 100:20, 101:1, 101:4, 101:14, 101:17, 101:21, 102:3, 102:7, 102:10, 102:19, 103:21, 104:2, 104:6, 104:13, 104:18, 105:1
**Madonia** [14] - 51:21, 52:7, 52:14, 52:15, 52:20, 52:23, 54:12, 55:2, 76:20, 79:5, 79:10, 83:5, 86:16, 101:9
**main** [9] - 7:21, 21:11, 21:19, 39:7, 55:20,

64:16, 66:18, 66:19, 71:6
**maintain** [10] - 30:22, 34:20, 40:5, 42:2, 54:5, 54:21, 59:13, 63:14, 75:20, 100:16
**maintained** [13] - 54:10, 54:18, 54:23, 57:1, 65:12, 71:11, 77:17, 83:8, 83:9, 83:11, 83:20, 83:21, 84:13
**maintaining** [8] - 39:20, 39:21, 55:9, 56:12, 62:21, 70:21, 101:8, 103:3
**male** [1] - 26:1
**males** [1] - 26:3
**manipulating** [1] - 37:8
**Mark** [3] - 44:10, 44:18, 62:7
**mark** [5] - 32:14, 33:4, 33:6, 47:7, 49:20
**marked** [17] - 4:1, 46:23, 47:5, 47:14, 48:13, 49:4, 50:9, 57:19, 73:11, 93:12, 93:16, 94:16, 94:17, 95:8, 95:16
**Mary** [3] - 47:6, 93:4, 98:16
**material** [1] - 43:4
**matters** [1] - 79:13
**Mayville** [2] - 75:15, 76:4
**mean** [7] - 23:14, 59:1, 63:18, 69:3, 69:8, 69:23, 75:17
**meaning** [1] - 51:19
**means** [3] - 20:22, 21:6, 37:18
**medical** [5] - 50:1, 50:15, 60:15, 76:6, 76:9, 104:23, 105:3
**meet** [4] - 58:13, 59:3, 59:12, 59:22
**memory** [2] - 18:18, 78:15
**mental** [25] - 12:14, 12:20, 13:8, 13:11, 18:6, 24:4, 28:5, 28:16, 29:12, 29:20, 29:23, 30:6, 31:8, 31:9, 31:14, 31:18, 49:23, 50:14, 74:5, 74:16, 74:23, 85:13, 85:19, 85:20, 86:5
**mental-health** [1] - 28:16

**mention** [2] - 77:14, 85:10
**mentioned** [14] - 10:12, 33:14, 43:1, 43:11, 63:2, 63:21, 64:8, 65:14, 67:9, 67:20, 73:10, 74:7, 77:8, 81:17
**middle** [4] - 28:10, 65:20, 96:13, 96:21
**might** [6] - 6:21, 12:11, 48:6, 85:13, 85:19, 98:16
**mind** [1] - 98:23
**minimal** [1] - 40:18
**minutes** [14] - 17:21, 18:3, 31:23, 32:5, 32:7, 32:9, 32:10, 32:13, 33:9, 60:9, 60:10, 89:4, 99:2
**mischief** [1] - 81:12
**misdemeanors** [4] - 80:3, 80:20, 81:13, 81:15
**misunderstanding** [2] - 23:4, 73:20
**moment** [1] - 27:8
**monthly** [1] - 19:5
**months** [1] - 9:8
**most** [4] - 11:1, 46:9, 48:23, 87:12
**mostly** [1] - 8:3
**mother** [1] - 76:22
**motion** [1] - 96:14
**move** [6] - 27:19, 39:11, 57:19, 82:14, 82:17, 98:22
**moved** [4] - 54:20, 77:9, 83:12, 83:22
**movement** [1] - 91:15
**moving** [2] - 11:3, 36:18
**MR** [12] - 5:9, 5:14, 5:15, 6:1, 47:6, 47:10, 47:12, 93:3, 93:8, 93:9, 98:15, 105:9
**MS** [9] - 5:10, 47:8, 93:2, 93:4, 98:20, 99:1, 99:6, 105:7, 105:10
**multiple** [17] - 19:9, 25:22, 26:5, 28:22, 53:21, 54:16, 55:15, 56:4, 57:14, 63:9, 69:11, 69:14, 73:3, 73:4, 73:6, 83:4, 90:18
**multiple-officer** [2] - 54:16, 83:4

## N

**name** [2] - 33:15, 96:6
**nature** [1] - 100:10
**necessarily** [6] - 15:21, 16:12, 23:13, 24:4, 33:2, 95:6
**necessary** [2] - 38:4, 40:18
**need** [9] - 16:22, 20:16, 26:20, 30:1, 34:3, 35:17, 48:2, 55:10, 70:3
**needed** [4] - 8:20, 14:20, 53:1, 79:11, 79:13
**never** [2] - 14:14, 98:7
**New** [3] - 5:20, 9:22, 12:14
**next** [2] - 32:9, 94:5
**night** [10] - 18:19, 28:10, 29:1, 29:4, 29:13, 44:2, 44:5, 53:18, 77:22, 89:13
**none** [1] - 5:15
**normal** [1] - 11:6
**notarization** [1] - 5:13
**notes** [1] - 50:21
**notice** [1] - 56:15
**noticed** [2] - 56:16, 65:8
**notified** [1] - 52:2
**November** [2] - 9:9, 10:2
**number** [5] - 33:17, 50:12, 68:5, 94:19, 95:17
**numbers** [1] - 48:4

## O

**O-B-E-R-G-F-E-L-L** [1] - 5:11
**Obergfell** [2] - 5:10, 6:12
**object** [4] - 63:16, 84:16, 84:17, 84:21
**objections** [1] - 5:12
**observation** [10] - 19:21, 21:14, 21:21, 23:9, 24:9, 25:10, 30:9, 31:20, 31:21, 73:11
**observations** [7] - 15:1, 25:18, 33:14, 88:23, 89:10, 89:15, 92:10
**observe** [9] - 15:6, 16:9, 16:16, 17:10, 28:4, 92:4, 101:13,

101:15, 101:18
**observed** [10] - 13:17, 14:15, 28:13, 28:15, 28:19, 29:5, 32:22, 86:21, 90:12, 102:14
**observing** [3] - 29:11, 86:4, 92:7
**obstructing** [1] - 81:10
**obtained** [1] - 52:23
**obvious** [2] - 21:10, 38:7
**obviously** [9] - 26:6, 29:21, 35:2, 36:13, 36:18, 37:17, 38:5, 45:21, 75:11
**occasions** [1] - 64:9
**occurred** [1] - 51:17
**odd** [1] - 25:4
**Office** [5] - 8:8, 9:2, 9:13, 10:22, 51:15
**office** [2] - 61:17, 79:3
**Officer** [9] - 54:10, 54:14, 54:18, 54:22, 55:10, 57:5, 62:6, 62:7, 71:12, 76:19, 83:8, 83:11, 83:14, 83:19, 95:2, 96:8, 97:5, 101:7
**officer** [36] - 8:10, 8:20, 8:23, 9:15, 11:7, 15:6, 17:19, 20:23, 21:3, 21:8, 25:15, 26:1, 26:14, 28:4, 28:21, 28:23, 32:4, 36:8, 40:15, 44:6, 44:18, 44:20, 44:21, 44:23, 45:3, 54:16, 59:21, 60:23, 65:18, 83:4, 92:6, 96:5, 96:7, 101:12, 101:18, 102:9
**officer's** [1] - 36:23
**officers** [15] - 15:1, 35:21, 57:12, 63:2, 63:7, 67:15, 76:16, 76:20, 78:22, 85:5, 85:8, 87:18, 90:5, 101:6, 104:11
**official** [1] - 43:12
**often** [2] - 19:3, 19:8
**Olean** [1] - 8:3
**once** [36] - 14:10, 23:20, 24:5, 36:5, 36:15, 52:9, 52:22, 53:5, 53:10, 53:11, 54:20, 56:13, 57:7, 57:21, 61:15, 62:10, 63:5, 63:8, 63:15, 64:9, 65:2, 70:19,

71:1, 71:5, 71:10, 72:1, 72:11, 75:14, 75:23, 79:10, 79:17, 83:14, 86:19, 90:22
**One** [1] - 5:8
**one** [33] - 6:18, 7:1, 16:6, 17:7, 17:8, 17:9, 17:10, 18:23, 26:7, 26:10, 26:12, 29:12, 30:10, 44:20, 44:21, 48:7, 54:14, 56:18, 59:5, 68:6, 71:17, 71:18, 79:17, 82:20, 87:12, 90:4, 95:10, 100:18, 105:4
**one's** [1] - 32:9
**one-time** [2] - 16:6
**online** [1] - 8:4
**open** [1] - 58:3
**opportunity** [1] - 10:6
**order** [4] - 80:7, 80:13, 80:16, 93:15
**Order** [7] - 4:3, 4:6, 4:9, 4:12, 47:16, 48:14, 49:19
**originally** [2] - 59:7, 63:7
**outside** [3] - 15:4, 51:17, 52:16
**overcome** [1] - 100:15
**own** [3] - 44:22, 76:1, 88:11

**part-time** [2] - 9:3, 9:12
**partner** [5] - 52:7, 52:18, 57:5, 59:5, 103:1
**partners** [1] - 68:19
**parts** [4] - 37:8, 82:22, 82:23
**passed** [2] - 74:3, 74:22
**passenger** [1] - 58:7
**passive** [2] - 35:22, 36:4
**past** [1] - 86:3
**patience** [4] - 46:15, 88:20, 88:21, 93:1
**patient** [1] - 97:8
**patrol** [1] - 10:23, 11:4, 41:21, 42:3, 44:14, 45:5, 51:14, 57:19, 66:23, 67:12, 103:11
**patrolman** [3] - 43:14, 44:7, 44:9
**peak** [1] - 37:19
**penal** [1] - 8:17
**people** [11] - 17:14, 18:14, 18:15, 26:6, 26:23, 28:19, 28:23, 71:22, 75:21, 90:18
**pepper** [1] - 37:14
**per** [4] - 16:21, 32:10, 51:3, 74:5
**perform** [5] - 27:14, 54:9, 55:11, 55:14, 71:8
**performed** [3] - 54:16, 57:13, 57:18
**performing** [2] - 27:8, 55:22
**period** [7] - 28:6, 45:6, 56:1, 56:8, 73:16, 82:5, 87:5
**permit** [1] - 99:21
**person** [5] - 7:1, 17:10, 30:11, 33:16, 41:1
**Person** [1] - 5:7
**personal** [1] - 87:4
**personnel** [1] - 61:9
**phone** [1] - 93:5
**photos** [1] - 72:19
**phrase** [1] - 15:11
**physical** [6] - 8:15, 53:6, 53:10, 53:11, 79:21, 81:22
**physically** [1] - 18:23
**pick** [2] - 70:14, 70:16
**place** [14] - 23:16, 27:13, 53:15, 54:3,

54:4, 55:11, 56:13, 68:20, 68:23, 77:16, 83:16, 91:16, 91:20, 91:23
**placed** [10] - 54:19, 54:20, 58:4, 63:13, 65:4, 70:20, 88:4, 100:18, 103:10, 103:17
**places** [1] - 25:19
**placing** [3] - 53:7, 55:21, 56:9
**Plaintiff's** [15] - 47:8, 47:10, 47:14, 48:13, 49:5, 49:20, 50:10, 93:13, 93:16, 94:6, 94:17, 95:9, 95:16, 96:12, 96:20
**PLAINTIFF'S** [10] - 4:2, 4:5, 4:8, 4:11, 4:14, 4:17, 4:20, 5:1, 5:4, 5:6
**play** [3] - 23:1, 23:8, 27:12
**Plexiglass** [2] - 43:3, 43:6
**pocket** [2] - 71:15, 82:15
**pockets** [4] - 53:22, 55:16, 57:9, 82:8
**point** [11] - 14:4, 53:17, 54:3, 59:16, 69:3, 69:5, 69:8, 69:12, 71:2, 82:20, 85:10
**points** [1] - 7:21
**Police** [18] - 4:2, 4:5, 4:8, 4:11, 4:14, 4:17, 4:20, 5:1, 6:5, 9:7, 9:10, 35:3, 47:15, 48:14, 49:18, 61:16, 93:18, 94:7
**police** [17] - 8:20, 9:15, 10:3, 11:7, 15:5, 17:19, 35:12, 36:8, 40:15, 43:2, 59:22, 61:18, 62:1, 66:5, 66:8, 73:8, 76:11
**policies** [8] - 22:7, 22:8, 22:14, 25:9, 25:23, 26:2, 46:8, 49:17
**policy** [17] - 7:14, 17:4, 22:18, 32:11, 40:21, 41:10, 46:11, 46:12, 47:21, 48:8, 48:18, 49:8, 49:13, 50:2, 50:3, 50:8, 50:16

**port** [4] - 61:19, 61:20, 62:3, 62:4
**position** [6] - 39:23, 54:21, 55:5, 77:20, 83:22, 84:20
**positioned** [3] - 84:5, 84:8, 84:10
**possible** [11] - 37:23, 39:10, 39:22, 42:6, 60:7, 61:6, 66:20, 66:21, 70:22, 100:21
**possibly** [1] - 16:9
**post** [1] - 75:21
**Powell** [16] - 6:4, 51:11, 51:20, 52:4, 52:10, 76:21, 76:22, 99:14, 100:1, 100:4, 100:11, 100:14, 102:1, 102:5, 103:5, 105:2
**Powell's** [2] - 102:12, 102:21
**precaution** [1] - 68:11
**precautions** [5] - 19:12, 19:19, 41:13, 92:11, 92:15
**prefer** [1] - 6:9
**preliminary** [1] - 57:8
**prepare** [1] - 97:14
**prerequisite** [1] - 101:2
**present** [1] - 104:19
**pressure** [7] - 40:5, 55:9, 56:12, 57:1, 65:12, 83:15, 84:13
**pretty** [8] - 9:4, 17:15, 22:16, 22:19, 32:23, 66:17, 73:22, 78:16
**prevent** [12] - 24:9, 24:15, 24:20, 41:6, 64:15, 66:15, 68:9, 69:1, 70:22, 88:6, 88:10, 92:7
**preventing** [1] - 27:19
**prevention** [2] - 49:22, 50:13
**preview** [1] - 94:14
**previous** [1] - 77:21
**previously** [2] - 63:2, 97:23
**primarily** [1] - 77:4
**priority** [5] - 39:7, 40:14, 55:20, 60:5, 71:6
**prisoner** [2] - 11:2, 49:6
**prisoners** [11] - 11:10, 11:12, 12:16, 19:9, 26:6, 26:20, 33:7, 49:23, 50:14, 60:22,

61:22
**procedure** [5] - 22:18, 40:21, 41:4, 41:10, 42:21
**procedures** [5] - 20:17, 22:8, 22:15, 25:10, 62:11
**proceeding** [1] - 24:5
**proceedings** [5] - 14:12, 23:21, 26:11, 74:11, 74:18
**process** [7] - 13:1, 13:4, 13:5, 15:19, 29:11, 41:4, 90:6
**professional** [1] - 104:23
**program** [2] - 49:22, 50:14
**progressed** [1] - 59:10
**progresses** [1] - 29:21
**promise** [1] - 99:10
**proper** [1] - 29:8
**property** [5] - 71:14, 71:23, 72:9, 72:11, 91:13
**protect** [4] - 18:13, 18:14, 21:5, 22:1
**protected** [1] - 25:3
**protection** [3] - 80:7, 80:13, 80:16
**provide** [3] - 12:3, 39:11, 60:15
**providing** [1] - 68:10
**psychiatric** [3] - 48:15, 48:16, 85:13
**pull** [1] - 67:7
**pulled** [3] - 47:18, 49:1, 58:9
**pulling** [2] - 36:9, 67:2
**punches** [1] - 85:4
**punching** [4] - 22:12, 31:3, 37:11, 89:14
**purpose** [6] - 30:21, 53:7, 57:9, 75:18, 75:19, 84:22
**pushed** [1] - 84:9
**pushing** [2] - 36:16, 88:8
**put** [19] - 21:20, 25:20, 26:6, 27:3, 33:14, 36:10, 41:9, 53:13, 53:19, 63:15, 63:22, 77:19, 82:4, 82:18, 83:15, 84:15, 84:16, 90:7, 104:4
**putting** [7] - 21:13, 67:11, 90:6, 90:15, 90:16, 91:8, 91:9

**P**

**p.m** [2] - 43:22, 105:11
**padded** [2] - 25:3, 27:20
**Page** [1] - 5:8
**page** [4] - 48:1, 48:3, 48:17
**Pages** [9] - 4:4, 4:7, 4:10, 4:13, 4:16, 4:19, 4:23, 5:3, 5:5
**pages** [3] - 47:14, 48:17, 93:22
**pair** [4] - 71:18, 71:19
**pants** [2] - 71:16, 71:18
**paperwork** [10] - 12:19, 13:7, 14:4, 18:2, 18:4, 19:16, 24:12, 72:15, 87:2, 89:3
**park** [1] - 61:21
**parked** [2] - 62:3
**parking** [2] - 61:18, 76:12
**part** [4] - 9:3, 9:12, 35:13, 83:18

## Q

**questions** [7] - 6:19, 7:6, 88:14, 98:21, 99:9, 99:10, 105:8
**quick** [4] - 42:6, 46:18, 92:19, 98:23
**quicker** [1] - 60:15
**quickly** [6] - 39:9, 46:6, 46:8, 73:22, 92:17, 93:11
**quote** [1] - 73:5

## R

**RAIMONDO** [2] - 5:9, 5:15
**ranged** [1] - 8:16
**rapid** [2] - 65:23, 66:1
**rather** [1] - 58:14
**reach** [1] - 82:10
**reaching** [6] - 64:23, 82:6, 82:7, 82:11
**read** [1] - 5:16
**really** [5] - 10:7, 24:23, 46:8, 46:18, 73:23
**rear** [1] - 58:3
**reason** [16] - 21:19, 30:19, 33:21, 33:22, 60:18, 61:3, 61:4, 61:5, 62:16, 75:10, 90:11, 102:8, 102:17, 103:12, 103:18, 104:14
**reasonable** [1] - 12:17
**reasoning** [2] - 18:10, 21:11
**receive** [6] - 11:11, 12:20, 13:8, 31:6, 35:21, 74:15
**received** [9] - 11:13, 31:13, 31:15, 34:17, 34:19, 34:23, 35:3, 39:2, 98:7
**receiving** [2] - 35:8, 74:23
**recent** [1] - 48:23
**recess** [1] - 99:4
**recognizance** [1] - 76:1
**recognize** [4] - 46:11, 94:20, 96:14, 96:23
**red** [5] - 60:12, 60:14, 61:12, 66:9, 66:10
**refer** [4] - 7:10, 39:1, 48:4, 49:3
**reference** [1] - 24:11
**referrals** [2] - 49:23, 50:14
**referred** [1] - 26:9

**referring** [2] - 11:14, 79:14
**refused** [1] - 53:16, 77:16, 82:3, 105:2, 105:5
**refuses** [1] - 58:5
**refusing** [8] - 36:10, 53:13, 53:19, 56:5, 77:19, 82:13, 82:18, 105:6
**regarding** [20] - 7:11, 11:12, 12:10, 13:4, 25:10, 25:23, 26:2, 31:8, 31:17, 35:6, 38:13, 38:21, 42:23, 52:1, 59:6, 79:7, 81:9, 86:16, 90:10, 91:2
**regardless** [2] - 17:20, 18:2
**regards** [1] - 79:4
**regularly** [2] - 51:14, 76:12
**regularly-scheduled** [1] - 51:14
**relax** [2] - 56:12, 57:7
**relaxed** [7] - 64:21, 65:2, 71:1, 72:7, 89:19, 91:12, 91:22
**released** [2] - 76:1, 76:2
**remain** [2] - 71:22, 74:10
**remember** [3] - 73:5, 85:6, 101:9
**remote** [1] - 5:12
**removed** [3] - 56:23, 65:11, 91:22
**removing** [1] - 63:4
**rephrase** [1] - 44:13
**report** [5] - 88:18, 93:20, 95:6, 95:23, 97:19
**Report** [3] - 4:15, 4:22, 5:3
**REPORTER** [1] - 5:12
**reports** [4] - 51:6, 88:15, 92:21, 105:4
**represent** [1] - 6:4
**representation** [4] - 88:17, 94:1, 94:11, 94:23
**Request** [1] - 5:6
**requesting** [1] - 85:21
**requests** [3] - 85:14, 85:15, 87:17
**required** [5] - 12:4, 17:19, 18:1, 32:4, 71:20
**requirement** [1] -

16:21
**requires** [1] - 12:20
**reserve** [1] - 5:16
**resigned** [1] - 9:18
**resist** [2] - 56:10, 59:11
**resistance** [7] - 35:21, 35:22, 36:4, 36:5, 36:11, 36:17, 100:15
**resisted** [1] - 77:15
**resisting** [14] - 27:6, 36:7, 39:6, 54:2, 55:18, 57:23, 58:12, 58:17, 64:18, 81:11, 90:16, 91:19, 100:17
**respond** [3] - 31:9, 52:13, 102:21
**responded** [1] - 52:6
**responding** [3] - 51:21, 51:22, 52:2
**response** [2] - 31:18, 97:10
**responsibility** [3] - 12:7, 38:3, 45:16
**responsible** [1] - 45:3
**rest** [2] - 62:1, 96:17
**restrain** [3] - 42:15, 67:4, 67:8
**restraining** [1] - 90:21
**restraint** [13] - 24:12, 24:18, 25:1, 26:19, 27:3, 27:9, 27:12, 42:20, 90:7, 90:16, 91:3, 91:6, 91:16
**restraints** [10] - 24:21, 24:22, 25:1, 41:8, 53:8, 55:12, 68:10, 69:1, 71:11, 72:3
**restrict** [1] - 91:15
**restrictions** [1] - 91:2
**restricts** [1] - 91:3
**result** [1] - 87:10
**retrieve** [2] - 71:13, 91:13
**review** [2] - 97:13, 97:16
**reviewed** [4] - 95:5, 97:18, 97:20
**revise** [1] - 48:5
**revised** [3] - 48:23, 49:12, 50:6
**ride** [1] - 42:2
**road** [5] - 10:23, 11:4, 11:17, 44:14, 45:5
**Robert** [2] - 44:5, 62:5
**role** [1] - 10:20
**rotation** [1] - 28:21
**rules** [1] - 6:17
**running** [2] - 36:9, 88:12

## S

**safe** [3] - 42:6, 58:21, 103:22
**safely** [2] - 60:7, 66:21
**sally** [4] - 61:19, 61:20, 62:3, 62:4
**sally-port** [1] - 62:4
**satisfied** [2] - 52:9, 52:23
**satisfy** [2] - 52:21, 53:2
**saw** [2] - 24:11, 26:8
**scenario** [1] - 24:9
**scenarios** [3] - 8:17, 11:16, 25:22
**scene** [22] - 20:13, 52:13, 52:19, 58:15, 62:18, 63:20, 66:3, 67:15, 67:21, 71:9, 76:14, 76:16, 76:18, 76:21, 76:22, 77:12, 78:2, 86:15, 87:19, 88:1, 101:6
**scheduled** [1] - 51:14
**Schimek** [4] - 44:9, 62:8, 71:12, 71:13
**school** [2] - 7:19, 8:1
**screen** [4] - 46:17, 46:18, 48:10, 93:11
**se** [1] - 16:21
**search** [7] - 57:8, 57:13, 57:16, 57:18, 71:9, 72:1, 72:5
**seat** [5] - 59:20, 60:3, 60:4, 88:9, 103:14, 103:15, 103:18
**second** [5] - 6:23, 64:14, 65:5, 65:6, 67:1
**Second** [1] - 66:4
**seconds** [1] - 66:8
**section** [1] - 27:22
**secure** [7] - 32:16, 60:6, 60:16, 61:6, 62:14, 72:19, 103:23
**secured** [2] - 61:8, 62:23
**securing** [1] - 62:21
**security** [1] - 11:1
**see** [11] - 25:16, 27:23, 29:15, 33:10, 39:18, 46:16, 46:18, 46:21, 49:17, 82:10, 96:10
**seeing** [1] - 30:5
**seem** [2] - 21:10, 30:8
**self** [18] - 15:13, 17:9, 18:13, 18:23, 19:21, 19:22, 22:17, 24:10, 27:14, 31:2, 38:20,

41:7, 42:11, 42:13, 66:16, 72:23, 73:3, 102:18
**self-harming** [5] - 15:13, 27:14, 41:7, 42:11, 102:18
**send** [5] - 14:7, 15:2, 16:4, 16:7, 17:6
**sending** [2] - 15:15, 15:16
**sent** [2] - 73:21, 74:5
**separated** [1] - 61:23
**separates** [1] - 60:22
**September** [1] - 8:5
**sergeant** [1] - 44:8
**service** [15] - 11:5, 31:16, 50:1, 50:15, 51:17, 51:23, 52:4, 52:8, 52:9, 52:16, 52:22, 53:2, 79:3, 81:5, 86:16
**set** [3] - 76:3, 105:9
**settle** [1] - 17:12
**seven** [1] - 45:22
**several** [1] - 28:11
**share** [2] - 46:17, 93:10
**sharing** [1] - 50:19
**Sheriff** [1] - 78:17
**sheriff** [1] - 28:4
**Sheriff's** [6] - 8:6, 8:7, 9:2, 9:13, 10:21, 51:15
**sheriff's** [5] - 11:12, 31:14, 34:15, 35:5, 79:2
**shift** [7] - 34:5, 43:19, 43:20, 45:15, 45:21, 46:3, 96:4
**shifts** [1] - 28:22
**shin** [2] - 40:2, 55:8
**shirt** [1] - 71:17
**shoes** [3] - 71:19, 71:21
**short** [1] - 88:12
**shortly** [3] - 9:6, 50:20, 75:5
**shoving** [1] - 36:16
**show** [12] - 46:5, 46:7, 46:22, 48:2, 48:12, 73:15, 80:12, 92:16, 93:12, 93:21, 95:15, 96:20
**showing** [8] - 47:4, 47:13, 49:4, 50:9, 88:18, 94:5, 94:16, 95:7
**side** [6] - 17:4, 17:12, 58:6, 58:7, 58:8, 58:10

**sides** [3] - 81:18, 82:1, 82:3
**sight** [1] - 21:3
**sign** [4] - 5:16, 33:8, 93:6
**significant** [1] - 87:12
**signs** [2] - 29:9, 29:15
**silly** [1] - 69:4
**similar** [5] - 22:16, 22:19, 33:1, 35:6, 41:18
**simple** [2] - 18:12, 37:2
**simply** [1] - 100:16
**single** [1] - 71:15
**sit** [1] - 26:23
**situation** [11] - 20:11, 37:23, 38:8, 38:12, 39:4, 39:15, 40:23, 41:14, 54:8, 59:10, 79:7
**situations** [14] - 13:13, 13:15, 14:6, 16:11, 19:14, 20:6, 26:22, 27:1, 28:9, 36:19, 41:15, 42:10, 74:8
**six** [1] - 26:6
**Six** [1] - 4:10
**slammed** [2] - 84:3, 84:6
**slamming** [1] - 89:13
**slash** [1] - 48:16
**smacking** [1] - 57:3
**socks** [2] - 71:19, 71:22
**soft** [5] - 37:5, 37:8, 100:12, 100:13, 101:19
**soft-hand** [3] - 37:5, 100:12, 100:13
**soft-hand-control** [1] - 101:19
**someone** [16] - 11:18, 13:1, 14:7, 15:14, 20:11, 21:13, 21:20, 22:10, 23:5, 28:4, 28:9, 29:10, 30:5, 39:16, 40:15, 99:18
**sometimes** [4] - 6:20, 13:21, 38:8, 71:22
**somewhere** [2] - 41:20, 104:5
**soon** [3] - 59:20, 61:6, 68:18
**sooner** [2] - 61:7, 61:8
**sorry** [15] - 20:2, 23:4, 39:19, 43:19, 44:13, 48:10, 50:2, 50:8, 50:20, 58:23, 63:18, 67:16, 67:22, 95:14

**sort** [31] - 8:18, 11:8, 12:9, 13:2, 13:3, 15:17, 16:3, 16:8, 19:12, 19:19, 24:6, 24:7, 25:2, 28:1, 28:13, 29:6, 29:8, 31:6, 34:1, 34:2, 34:6, 37:21, 39:13, 40:21, 41:4, 41:10, 41:13, 42:20, 78:10, 78:20, 97:23
**sound** [4] - 7:3, 25:4, 29:7, 69:4
**sounded** [1] - 23:3
**sounds** [2] - 40:13, 66:12
**speaking** [5] - 20:3, 20:10, 52:14, 86:15, 86:17
**specifically** [1] - 12:14
**spectrum** [5] - 17:5, 17:7, 17:16, 36:23, 37:20
**spent** [1] - 89:6
**sponsored** [2] - 8:7, 9:1
**spray** [1] - 37:14
**sprays** [1] - 100:7
**staff** [5] - 13:12, 18:5, 76:6, 76:9, 97:6
**stand** [2] - 57:8, 58:19
**standing** [3] - 21:2, 52:20, 62:8
**start** [7] - 6:15, 10:1, 51:11, 57:8, 72:14, 72:16, 86:1
**started** [10] - 8:5, 8:10, 10:2, 30:9, 66:23, 68:8, 75:4, 79:23, 82:3, 92:18
**starts** [1] - 37:2
**state** [14] - 10:3, 18:7, 28:16, 29:13, 29:20, 32:14, 33:8, 35:5, 35:12, 56:5, 86:11, 86:23, 91:14, 92:1
**State** [3] - 5:10, 9:22, 35:2
**statement** [2] - 90:4, 90:9
**statements** [9] - 16:22, 19:11, 22:2, 29:16, 30:7, 30:19, 56:4, 70:8, 87:18
**stating** [1] - 62:19
**station** [3] - 59:22, 66:8, 66:11
**stay** [1] - 91:6
**stemming** [4] - 52:11, 80:9, 81:4, 81:7

**steps** [1] - 66:14
**still** [4] - 18:4, 45:14, 103:1, 103:3
**stomach** [1] - 55:7
**stood** [2] - 52:15, 90:22
**stop** [2] - 50:19, 103:22
**stopped** [1] - 64:10
**stops** [3] - 11:6, 56:2, 56:8
**straight** [1] - 20:9
**strained** [1] - 91:11
**strap** [1] - 27:18
**Street** [4] - 5:20, 51:22, 51:23, 66:4
**strike** [4] - 85:7, 101:3, 101:22
**strikes** [6] - 37:12, 100:1, 100:3, 100:6, 101:13, 101:16
**striking** [2] - 37:9, 37:11
**struggle** [1] - 56:17
**studying** [1] - 35:14
**stuff** [3] - 42:17, 46:10, 87:8
**subject** [20] - 13:17, 27:16, 37:12, 39:7, 39:10, 39:21, 40:6, 40:8, 48:15, 49:22, 50:13, 54:6, 63:15, 63:17, 84:17, 84:18, 90:16, 91:7, 100:17
**subject's** [1] - 91:4
**subjects** [3] - 34:21, 38:22, 76:13
**Sue** [3] - 76:22, 76:23, 77:3
**suicidal** [13] - 12:11, 13:2, 15:12, 19:21, 21:16, 21:23, 22:11, 22:20, 23:6, 30:23, 69:10, 73:1, 73:7
**suicide** [4] - 18:22, 22:5, 49:22, 50:13
**super** [1] - 7:9
**supervising** [3] - 11:10, 11:19, 12:11
**supervision** [9] - 12:1, 12:4, 21:4, 21:8, 29:3, 30:2, 32:1, 70:3, 76:2
**supervisor** [1] - 44:4
**surrounding** [1] - 104:11
**suspects** [1] - 76:17
**switch** [1] - 93:5
**sworn** [1] - 5:21
**symptoms** [2] - 29:9,

29:15

---

**T**

**tactics** [6] - 34:19, 35:1, 35:4, 35:7, 35:9, 39:3
**takeaway** [1] - 70:2
**takedown** [3] - 54:16, 82:22, 83:4
**TASER** [1] - 37:14
**techniques** [10] - 24:7, 34:20, 37:5, 37:10, 37:22, 39:14, 40:7, 100:12, 100:13, 101:20
**temporary** [7] - 24:22, 24:23, 53:8, 55:12, 71:11, 72:2, 75:13
**ten** [2] - 31:23, 104:10
**tendency** [2] - 12:12, 69:10
**tense** [1] - 82:3
**tensed** [1] - 53:13
**tensing** [6] - 36:9, 81:18, 82:12, 82:14, 99:14, 99:19
**term** [4] - 29:8, 29:9, 42:12, 98:10
**terms** [6] - 11:13, 18:12, 35:18, 36:22, 44:2, 76:20
**testified** [2] - 5:21, 97:22
**THE** [4] - 5:12, 98:19, 98:23, 99:3
**themselves** [20] - 12:12, 12:19, 15:8, 16:18, 18:1, 18:13, 18:23, 20:20, 21:5, 22:14, 22:22, 24:16, 24:20, 27:8, 30:12, 34:1, 39:19, 40:17, 41:3, 41:17
**thinking** [1] - 100:7
**third** [1] - 48:3
**Third** [1] - 5:20
**thorough** [1] - 57:15
**thrashing** [3] - 25:5, 39:17, 41:3
**threat** [7] - 12:18, 15:8, 16:6, 16:17, 17:23, 20:19, 23:6
**threatening** [3] - 18:14, 18:22
**threats** [9] - 15:13, 16:4, 19:21, 72:23, 73:3, 73:4, 73:7, 78:11, 90:13
**three** [3] - 9:14, 47:14

**Three** [1] - 4:4
**throughout** [1] - 56:3
**throw** [1] - 85:4
**Thursday** [1] - 93:20
**tight** [1] - 87:20
**tighten** [2] - 88:7, 100:22
**tighter** [1] - 88:11
**title** [1] - 43:12
**today** [1] - 97:14
**took** [3] - 14:17, 66:14, 79:5
**tool** [1] - 24:19
**tools** [2] - 24:7, 24:14
**top** [20] - 39:23, 47:1, 47:15, 48:15, 49:6, 49:19, 49:21, 50:10, 54:21, 55:8, 83:22, 84:3, 93:14, 93:19, 94:6, 94:18, 94:19, 95:9, 95:17, 95:18
**top-left** [2] - 93:19, 94:19
**top-right** [3] - 47:1, 49:6, 49:21
**toward** [1] - 63:8
**towards** [6] - 59:8, 62:20, 82:14, 84:9, 84:12, 99:11
**traffic** [1] - 11:5
**trained** [1] - 11:22
**training** [42] - 7:7, 7:19, 7:22, 8:9, 8:12, 8:15, 8:20, 8:22, 9:3, 11:9, 11:11, 11:13, 12:6, 12:9, 17:3, 18:9, 19:13, 21:12, 27:2, 28:2, 31:7, 31:10, 31:13, 31:17, 34:7, 34:10, 34:11, 34:13, 34:17, 34:19, 34:23, 35:3, 35:8, 35:13, 38:12, 38:21, 39:2, 39:14, 70:1, 99:20
**transfer** [1] - 35:11
**transport** [8] - 13:20, 13:21, 17:1, 20:12, 49:7, 59:16, 60:8, 66:2
**transported** [6] - 19:17, 23:23, 74:13, 74:18, 75:8, 76:4
**transporting** [2] - 41:6, 41:16, 41:19, 42:5, 67:10, 57:12, 61:21, 85:1, 103:11
**transports** [2] - 11:2, 48:16
**treatment** [2] - 49:7,

105:3
**trick** [1] - 6:22
**tried** [4] - 77:9, 77:14, 78:18, 99:15
**Trooper** [7] - 5:10, 6:3, 6:9, 6:12, 7:17, 93:11, 98:21
**trooper** [1] - 28:3
**Troopers** [1] - 9:22
**trunk** [11] - 63:10, 63:12, 67:12, 67:13, 68:4, 68:21, 69:7, 69:15, 70:17, 70:20, 70:23
**try** [3] - 37:22, 68:12, 69:10
**trying** [14] - 6:22, 36:1, 36:20, 38:6, 38:15, 38:16, 39:15, 46:6, 63:22, 67:3, 78:23, 81:20, 82:17, 99:18
**turn** [3] - 14:2, 14:11, 68:21
**turned** [3] - 63:6, 63:8, 66:4
**turtle** [1] - 55:5
**two** [8] - 8:2, 46:7, 60:9, 60:10, 60:17, 61:11, 65:22, 93:22
**Two** [4] - 4:16, 4:19, 4:23, 5:3
**type** [2] - 41:15, 99:20
**typical** [1] - 29:14

**U**

**ultimately** [3] - 13:6, 13:15, 104:3
**under** [13] - 12:1, 12:2, 21:4, 21:8, 21:13, 21:20, 26:11, 48:15, 53:6, 76:2, 78:9, 79:19, 92:12
**underneath** [8] - 53:23, 55:6, 55:13, 61:17, 65:7, 81:19, 82:15, 93:19
**underwear** [1] - 71:18
**unfortunately** [1] - 38:9
**unit** [1] - 57:19
**unlock** [1] - 58:3
**up** [24] - 27:20, 32:8, 40:7, 42:17, 53:13, 55:1, 57:8, 58:3, 63:20, 70:14, 70:16, 71:2, 80:12, 81:18, 82:3, 82:12, 82:14, 89:11, 90:19, 90:22, 99:10, 99:14, 99:19,

100:22
**UPMC** [7] - 13:10, 14:7, 15:2, 15:16, 74:5, 75:9, 97:10
**upper** [8] - 40:2, 40:4, 54:17, 54:22, 55:9, 83:10, 83:16, 83:21
**upper-body** [2] - 40:2, 54:22
**ups** [1] - 98:17
**upset** [1] - 17:15
**use-of-force** [2] - 36:23, 48:7

**V**

**vantage** [1] - 63:16
**vary** [6] - 13:5, 13:15, 16:11, 16:18, 20:6, 74:8
**vehicle** [31] - 41:5, 57:20, 57:21, 58:1, 58:3, 58:10, 62:2, 62:10, 62:13, 62:18, 63:1, 63:4, 63:5, 63:6, 63:9, 63:10, 67:18, 68:15, 68:19, 68:22, 84:6, 84:7, 84:12, 84:14, 84:20, 88:8, 90:23, 103:11, 103:23, 104:8, 104:16
**vehicles** [2] - 61:21, 62:1
**verbal** [6] - 37:2, 37:3, 38:6, 38:10, 53:15, 58:2
**versus** [2] - 11:17, 76:16
**vicinity** [1] - 89:8
**video** [5] - 24:12, 25:12, 26:8, 73:15, 90:1
**view** [2] - 26:13, 26:17
**village** [1] - 9:8
**Village** [3] - 9:10, 10:13, 10:14
**violate** [1] - 80:13
**violating** [1] - 80:6
**violation** [1] - 80:15
**vision** [1] - 92:6

**W**

**waist** [1] - 63:11
**waistline** [1] - 82:16
**wait** [1] - 26:11
**waiting** [3] - 20:17, 21:6, 52:20
**walk** [3] - 32:13, 45:2,

76:12
**walk-in** [1] - 45:2
**walked** [1] - 71:4
**walking** [2] - 63:1, 104:9
**wall** [8] - 16:1, 22:12, 31:3, 31:4, 89:12, 89:14, 92:8
**Ward** [2] - 44:5, 62:5
**warrant** [10] - 52:11, 53:3, 79:14, 79:18, 80:4, 80:9, 80:21, 81:3, 81:6, 86:18
**warrants** [2] - 52:5, 80:2
**watch** [20] - 20:21, 22:22, 23:13, 23:17, 23:19, 24:3, 25:20, 26:5, 26:11, 29:2, 29:5, 30:11, 30:15, 30:18, 32:12, 70:9, 70:12, 92:13
**watches** [2] - 26:3, 26:13, 26:16
**watching** [1] - 25:12
**ways** [1] - 40:9
**weapon** [3] - 62:14, 62:22, 62:23
**weapons** [4] - 37:14, 57:11, 64:23, 84:23
**wear** [1] - 25:5
**weekly** [1] - 19:5
**weight** [2] - 35:23, 36:3
**whatsoever** [1] - 17:20
**whereas** [2] - 24:2, 29:2
**whole** [2] - 30:21, 44:12
**window** [1] - 43:6
**winter** [2] - 53:18, 57:14
**Wise** [16] - 44:10, 52:7, 52:18, 54:10, 54:14, 54:18, 54:22, 55:10, 57:5, 76:19, 83:8, 83:11, 83:14, 83:19, 97:5, 101:7
**WITNESS** [3] - 98:19, 98:23, 99:3
**witness's** [1] - 5:9
**witnessed** [1] - 102:4
**witnesses** [1] - 76:17
**wondering** [2] - 7:17, 51:9
**worse** [11] - 28:6, 29:14, 30:4, 30:6, 30:7, 86:5, 86:6
**worsened** [1] - 86:17

**wrapping** [2] - 40:7, 55:1
**wrist** [6] - 24:22, 24:23, 42:18, 55:12, 71:11, 72:2
**wrists** [1] - 27:16
**written** [1] - 95:1
**wrote** [1] - 93:14

**Y**

**year** [1] - 71:8
**years** [1] - 8:2
**York** [3] - 5:20, 9:22, 12:14
**yourself** [2] - 67:19, 104:1

**Z**

**Zaccagnino** [1] - 6:3
**ZACCAGNINO** [10] - 5:14, 6:1, 47:6, 47:10, 47:12, 93:3, 93:8, 93:9, 98:15, 105:9
**Zoom** [1] - 7:2